UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | Case No. 24-cr-10259-DJC/MPK |
| MATTHEW FARWELL, ) | |
| ) | |
| Defendant ) | |

## UNITED STATES' MOTION FOR AND MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

Defendant Matthew Farwell, a former Stoughton police officer, has been charged with killing Sandra Birchmore to prevent her from communicating information about his commission or possible commission of federal crimes, in violation of 18 U.S.C. § 1512(a)(1)(C). The government moves to detain Farwell pending trial because he is a danger to community and poses a serious risk of flight and obstruction. The Court is authorized to conduct a detention hearing and detain Farwell on each of those independent bases because Farwell has been charged with a crime of violence that carries a mandatory life sentence. *See* 18 U.S.C. §§ 3142(f)(1)(A), (B), and 3142(f)(2)(A) and (B).

First, there is a serious risk that, if released, the defendant will obstruct or attempt to obstruct justice. That risk is not merely theoretical. On February 1, 2021, Farwell killed Birchmore, a young pregnant woman, whom he had spent years sexually exploiting. Farwell's grisly crime was designed to conceal forever the truth about his years of criminal conduct targeting Birchmore.

Moreover, even apart from his murder of Birchmore, Farwell has tried to destroy and conceal evidence of his criminal conduct. Prior to her death, Farwell instructed Birchmore to delete from her phone evidence that he had sexual intercourse with her before her sixteenth birthday. After the murder, he researched how to delete data from his own phone. And he took

1

steps to conceal the murder, including by repositioning Birchmore's lifeless body and staging her apartment to make the young woman's death appear to be a suicide, and lying to Massachusetts State Police detectives who were initially responsible for investigating Birchmore's death.

Second, Farwell's release would pose a profound danger to the community. He has been charged with the intentional, premeditated murder of a young person he knew for years. He strangled her to death when he knew she was several weeks pregnant. He did so while he was serving a police officer, and after using that position of trust and authority to groom and sexually exploit her for years, beginning when she was just 15 years old. There are no conditions of release that will protect the community from a defendant whose conduct reveals such an indifference to human life.

Third, Farwell is a serious risk of non-appearance. As described in detail below, the murder followed a report to Stoughton Police that disclosed aspects of Farwell's illicit sexual relationship with Birchmore. With Farwell on notice that he could soon face consequences for his criminal conduct, he decided to kill Birchmore. Today, the potential consequences could hardly be more severe or imminent. Farwell faces a mandatory life sentence for killing Birchmore. The weight of the evidence is overwhelming. These circumstances provide him with a significant disincentive to appear for trial. As such, there are no conditions that will reasonably assure he will appear at trial to face the evidence and consequences of his conduct.

## STATEMENT OF FACTS

The government proffers the following facts in support of its motion to detain the defendant and submits the supporting declaration of FBI Special Agent Chenee Castruita (attached hereto as Exhibit A).

I.   **The Defendant**

Farwell is 38 years old and resides in North Easton, Massachusetts with his spouse and children. Both he and his spouse possess licenses to carry firearms. There are 10 firearms registered to their home address.[1]

II.  **The Defendant's Professional Background**

Farwell served in the United States Army from 2004 to 2008. During that time, he served as an explosives expert.[2]

Farwell became a sworn police officer in 2008. He first served from 2008 to 2012 as a police officer for the Town of Wellesley, Massachusetts. On March 27, 2012, Farwell became a Stoughton police officer, a position he held until he resigned on April 1, 2022. While a member of the Stoughton Police Department, Farwell also served as a firearms and explosives instructor. Ex A, ¶ 12.

III. **The Stoughton Police Explorers Academy**

Prior to 2017, the Stoughton Police Department operated the Stoughton Police Explorers Academy (hereinafter, the "Police Explorers"), a quasi-paramilitary program designed to expose youth participants to various aspects of policing. Farwell was a volunteer for the program when he was a Wellesley police officer. After he joined the Stoughton Police Department, Farwell became a Police Explorers instructor. Ex A, ¶¶ 5, 7-8.

In March 2010, Birchmore applied to be a participant in the Police Explorers. At the time, she was 12 years old. She began participating in the program in or around the spring of 2010.

---

[1] The government proffers this information at this time. If necessary, the government will provide evidence at the detention hearing.
[2] The government proffers this information at this time. If necessary, the government will provide evidence at the detention hearing.

She remained in the program through 2016. Farwell was her instructor during that time period. Ex A, ¶¶ 12-13.

### IV. The Offense

#### A. Farwell groomed and sexually exploited Birchmore when she was a child.

As a police officer, Farwell groomed and sexually exploited Birchmore when she was a child. As early as 2012, he began communicating with Birchmore online, including befriending her on Facebook. At the time, he was 26 years old. She was just 15. Ex A, ¶¶ 14, 16.

While using the internet to lay the groundwork for his child sexual exploitation, Farwell would also meet Birchmore at the Stoughton Public Library, where he would sexually groom her under the guise of providing academic tutoring. Ultimately, he engaged in sex acts with Birchmore, violating the Massachusetts statutory rape law by having sexual intercourse with her in 2013, when she was 15. This act of statutory rape had several attendant aggravating factors, such as the age disparity between Farwell and Birchmore, and Farwell's position of power and trust. Ex. A, ¶¶ 14, 28-29

#### B. Farwell continued to exploit Birchmore when she became an adult.

Farwell continued having sex with Birchmore after she became an adult and while he remained employed as a police officer. Building off the years of grooming, Farwell later cultivated a controlling and sometimes abusive relationship with Birchmore. He tracked her location with his cell phone and, as voluminous text messages demonstrate, he engaged in sexual violence. Ex A, ¶¶ 109-113.

#### C. Farwell had sex with Birchmore while on duty.

Farwell exploited Birchmore while on duty as a police officer. At times, he met Birchmore to have sex with her while he was on duty and being paid by the Town of Stoughton.

4

Of course, these are facts that Farwell concealed from the Stoughton Police Department in an effort to continue receiving his salary notwithstanding his misconduct. Ex A, ¶¶ 7, 31-34.

      D.  <u>In December 2020, Farwell learned that he had impregnated Birchmore</u>.

In October 2020, Birchmore told Farwell that she wanted a child of her own. Farwell and Birchmore reached an agreement. He would try to impregnate Birchmore in exchange for her silence about his criminal conduct (*i.e.*, child sexual abuse) and years-long extramarital affair. Ex A, ¶¶ 38-39.

In late December 2020, just a month before Birchmore died, she learned that she was pregnant. Birchmore told Farwell that he was the child's father. And Farwell responded poorly. He became physically violent with Birchmore. She told multiple friends that Farwell had pushed and shoved her, grabbed objects from her hands, and put her in a chokehold. Ex A, ¶¶ 45-53.

      E.  <u>In January 2021, Farwell learned that information about his years-long illicit sexual contact with Birchmore had been disclosed to the Stoughton Police Department and others</u>.

In January 2021, Farwell learned that, despite Birchmore getting the pregnancy she wanted, he would not be able to control her or the information that she possessed about his crimes. On January 20, 2021, a friend of Birchmore's called the Stoughton Police Department and disclosed information about Farwell's sexual contact with Birchmore. When a Stoughton Police Department employee told him about the call, Farwell again responded poorly. He angrily demanded that the employee never tell anyone about the information. Ex A, ¶¶ 58-59.

      F.  <u>In late January 2021, Farwell began planning the murder of Sandra Birchmore</u>.

By late January 2021, text messages between Farwell and Birchmore reveal that Farwell was enraged by what he perceived as Birchmore not upholding her end the pregnancy-for-silence agreement. Moreover, he had learned that Birchmore had shared with at least one other person

some of the incriminating details about his sexual relationship with Birchmore. And that information had been disclosed to his employer, a law enforcement agency. In a text on January 20, 2021 he asked Birchmore, "what else do I have to worry about now? Which other friend will do something tomorrow," an allusion to his fear that she may disclose more information about his possible commission of federal crimes: coercion and enticement, deprivation of rights under color of law, and wire fraud. Ex A, ¶¶ 58.

On January 24, 2021, Farwell started to take important steps to obstruct justice by killing Birchmore. He asked Birchmore for a key to her apartment, after previously being reluctant to having in his possession that kind of tangible proof of their relationship. And he asked Birchmore to keep it a secret that she had given him a key. Ex A, ¶ 60.

On January 26, 2021, Farwell also started casing Birchmore's apartment, the future crime scene, searching for places to carry out the murder. He inspected her bathroom and closet, places where items could be hung. His behavior was strange enough that Birchmore told multiple friends that she was concerned. Ex A, ¶¶ 60, 64.

> G. On February 1, 2021, Farwell went to Birchmore's apartment wearing a mask and strangled her to death using a duffle bag strap.

On February 1, 2021, Farwell decided to act. For him, that day provided at least two advantages: a blizzard was approaching greater Boston, ensuring that no one would notice Birchmore's absence from work for several days; and Farwell's wife was hours away from delivering their third child. Therefore, Farwell texted Birchmore to tell her that he was coming to her apartment. He entered her apartment wearing a face mask, despite being well known as a resistant to COVID-19 mask mandates. And he murdered Birchmore, the 23-year-old pregnant women he had exploited and used for years, by strangling her to death. Within minutes of

6

silencing Birchmore, video surveillance footage shows him leaving her apartment. Ex A, ¶¶ 66-71.

V.    **Additional Evidence Regarding Farwell's Efforts to Obstruct**

In addition to the obstruction crime alleged in the indictment, there is evidence that Farwell took steps to conceal his criminal conduct before Birchmore's death and later to obstruct the murder investigation.

A.    Farwell directed Birchmore to delete electronic evidence of his crimes.

Before Farwell killed Birchmore, Farwell directed her to delete evidence of their sexual relationship. This was evidence that he raped Birchmore when she was 15 and that he had engaged in sexual violence. For example, in February of 2019, Farwell exchanged text messages with Birchmore in which they discussed her virginity and he acknowledged that it was "a big thing to get to be the first." In March 2019, the defendant asked Birchmore, "what would you have done if we never used a condom and I never pulled out . . ." Birchmore reassured Farwell that she "wouldve still finished school :)" A few months after that, on June 5, 2019, Farwell directed Birchmore to make sure all of their text and Facebook messages had been deleted. Ex A, ¶¶ 17, 19, 118.

In another text message conversation, Farwell discussed "the first time" he and Birchmore had sex. Farwell sent a text indicating he would have liked to have sex with Birchmore when she was even younger, saying, "You should've told me we could've fucked so much sooner." After sending that text, Farwell quickly instructed Birchmore, "Clear that out part out baby," and when she confirmed that she did so, he texted "Good girl." Ex A, ¶¶ 119.

Farwell also wanted to ensure that Birchmore would delete text messages in which they discussed his violence. For example, on March 19, 2019, the defendant sent Birchmore texts

7

about his desire to use sexual violence and to pretend to rape her. At the end of this conversation, Farwell sent her a text instructing her to "Clear out this text." Ex A, ¶ 118.

> B. Farwell tried to prevent a Stoughton Police Department employee from further disclosing information about his crimes and immediately confronted Birchmore for sharing incriminating information.

In the weeks before Birchmore's murder, Farwell previewed some of the steps he would take to prevent witnesses from disclosing information about his crimes. On January 20, 2021, Farwell reacted angrily when Person 5, then an employee of the Stoughton Police Department, confronted him about a call he/she received regarding his illicit sexual relationship with Birchmore. Farwell directed Person 5 never to mention the topic to him again and not to tell anyone else. Ex A, ¶¶ 58-59. Farwell then began franticly texting with Birchmore. He wrote:

- "you also told me no one knew about us yet [he/she] claimed we are fucking"

- "you have no idea how bad what [he/she] did is"

- "I literally can't believe this is even real life like what else do I have to worry about now? Which other friend will do something tomorrow?" Ex A, ¶ 58.

Within days of the foregoing text messages, Farwell was asking Birchmore to give him a key to her apartment but to keep it secret. Within days, he was scoping out her closets and bathrooms. And within 12 days, Birchmore was dead.

> C. After killing Birchmore, Farwell repositioned her body and staged her apartment to make it appear that Birchmore had committed suicide.

After killing Birchmore, Farwell moved her lifeless body and staged her apartment to conceal his crime by making it appear that she died by suicide. As described in more detail in Exhibit A (*see id*. at ¶¶ 83-89), notwithstanding the fact that first responders found Birchmore in a seated position with a strap around her neck and door knob, Dr. William Smock determined that Birchmore's death was a homicide. Dr. Smock cited Birchmore's hyoid bone fracture, the pattern imprint injury on her chest, abrasions on her nose, and the broken necklace, among other

evidence, that led him to conclude with a reasonable degree of medical and scientific certainty that Birchmore's death was a homicide. These specific injuries and evidence are consistent with Farwell suffocating Birchmore by strangulation, and then hanging her lifeless body from her closet doorknob—which he had inspected days earlier—to make it appear as if she took her own life.

D. <u>After the murder, Farwell searched for ways to conceal his years-long relationship with Birchmore and his communication with her on the day of the murder</u>.

After Birchmore's death, Farwell gave limited consent to search his personal cell phone to law enforcement officers who were investigating the death. However, on February 9, 2021, Farwell used his work cell phone to make and delete two Google searches. First, he searched for and deleted, "can delete [sic] imessage be recovered hy [sic] cellebrite." Cellebrite is a tool that forensic examiners use to extract data from cell phones. Then, he searched for and deleted, "can you revoke consent in massachusetts." Ex A, ¶ 117.

E. <u>After the murder, Farwell lied to Massachusetts State Police detectives</u>.

When Farwell met with Massachusetts State Police detectives who were investigating Birchmore's death, he lied to them. Ex A, ¶¶ 90-100. His multiple false statements reveal a deliberate effort to minimize his relationship with Birchmore and avoid consequences for his misconduct:

- Farwell falsely told detectives that his sexual relationship with Birchmore began in 2020. According to his own text messages with Birchmore, it actually began in 2013, when Birchmore was 15.

- Farwell falsely told detectives that he only had sex with Birchmore two or three times in the previous year. According to text messages, he had sex with her at least ten times in the 13 months prior to her death.

- Farwell falsely told detectives that the last time he had sex with Birchmore was in October 2020, attempting to avoid suspicion about whether he was the father of

9

- Birchmore's unborn child. However, text messages indicate that Farwell met Birchmore to have sex after that date.

- Farwell falsely told detectives that he had not seen Birchmore in the week before her death. However, he visited her apartment on January 29, 2021.

- Farwell falsely told detectives that he had been trying to distance himself from Birchmore. However, approximately ten days before her death, he asked her for a key to her apartment and told her he would come over to give her "hugs." About three days before her death, Farwell told her that he would engage in sexual activity with her.

## VI. Additional Evidence Regarding the Danger Farwell Poses to the Community

### A. Farwell has a long track record of using physical and sexual violence.

Text messages show that the defendant physically abused Birchmore. On at least 20 occasions in just the year before her death, Farwell sent Birchmore text messages stating that he would grab her throat, pin her down by her throat, squeeze her throat, or choke her during sexual activity. For example, less than four months before her death, Farwell told Birchmore that during their next sexual encounter, he was going to "grab [her] throat and say stfu [shut the fuck up] now or I won't pull out." In November 2020, Farwell told Birchmore, "Maybe I'll hold you down by your throat while I pound you." He then reflected on "how tight" he should squeeze, texting that he wanted her to feel like "omg this is really happening and I can't stop it." Farwell's penchant for violence is confirmed by Birchmore's disclosures to friends that the defendant assaulted her in the weeks before her death. Ex A, ¶¶ 49, 103-108.

Additionally, text messages between Farwell and Birchmore and Birchmore's own journal entries reveal Farwell's efforts to "punish" her with violent sex acts. This violent sexual punishment started as early as 2013 and continued until 2020. The evidence indicates that the defendant used violent sex acts to punish Birchmore for getting bad grades, lying to him, or being sexually active with other people. The evidence indicates that Farwell's efforts to control

Birchmore also included directing her to use her phone to share her location with him and admonishing her when she failed to do so. Ex A, ¶¶ 109-113.

Farwell also has a demonstrated preoccupation with sexual assault in a number of ways. First, Farwell's texts with Birchmore include numerous discussions about him forcing her to engage in certain sex acts. Farwell asked Birchmore, on multiple occasions, to act as if he were raping her when they had sex. For example, in one text conversation on November 8, 2020, Farwell told Birchmore that he enjoyed having sex with her. When Birchmore asked what would be perfect for him, he replied, "you say no and make me take it. Full r word." Ex A, ¶ 110. Additionally, Birchmore's journals detail sexual violence that she suffered at the hands of Farwell as a means of punishment. Ex A, ¶ 109.

Finally, Farwell's iCloud account contained images that confirm his interest in domestic and sexual violence, including strangulation. Ex A, ¶¶ 115-116. For example, his iCloud contained the following:

- A meme containing a photo of a woman with tape over her mouth that states, "Duct tape turning 'no, no, no' into 'mmm, mmm, mmm' since 1942";

- An image that states, "When she says 'choke me daddy' and you get carried away and now she's dead";

- A screenshot of an image of a woman saying that she could not sleep, followed by a man choking her saying, "goodnight bitch"; and

- A meme glorifying a person who kills and sexually abuses someone who "no one will miss."

B. <u>Farwell has a demonstrated sexual interest in children</u>.

Farwell is a danger to children. He committed statutory rape under Massachusetts law by having sex with Birchmore when she was 15. In text messages with Birchmore, he romanticizes the statutory rape, by discussing the first time they knew they were going to have sex and his regret that they did not have sex earlier in 2012, And Farwell repeatedly disclosed to Birchmore

his interest in having sex with children. Via text message, Farwell asked Birchmore to pretend that she was 13 or 14 years old when they were having sex. He also had Birchmore join his sexual role play in which he posed as her older brother and simulated nonconsensual incest. Ex A, ¶¶ 14, 24-25, 29.

      C.  <u>Farwell is a firearms and explosives expert with access to many guns</u>.

Farwell has extensive training regarding firearms and explosives, having served in the Army and as an instructor for the Stoughton Police Department. He has a license to carry a gun with ten guns registered to his residence.

## ARGUMENT

**I.**    <u>**The Bail Reform Act, 18 U.S.C. § 3142, Authorizes the Court to Detain Farwell on Three Independent Bases: Danger to the Community, and Risk of Flight and Obstruction**</u>.

Congress empowered judicial officers to release or detain defendants pending trial. *See* 18 U.S.C. § 3141(a). Section 3142 governs pretrial detention determinations. 18 U.S.C. § 3142. Under Section 3142(f)(1), the Court shall hold a detention hearing, upon the government's motion, in a case that involves a crime of violence (§ 3142(f)(1)(A)) and one that involves an offense for which the maximum sentence in life imprisonment or death (§ 3142(f)(1)(B)). Here, the charged offense, Killing a Victim or Witness, pursuant to 18 U.S.C. § 1512(a)(1)(C), satisfies both criteria. *See* 18 U.S.C. § 3156(a)(4)(A) (defining "crime of violence" as "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another"); 18 U.S.C. § 1512(a)(3)(A) ("The punishment for an offense under this subsection is (A) in the case of a killing, the punishment provided in sections 1111 and 1112."); and *see* 18 U.S.C. § 1111(b) (stating that the penalty for first degree murder is death or mandatory life imprisonment).

Under Section 3142(f)(1), the Court must determine whether the defendant is a danger to the community or risk of flight. *See* 18 U.S.C. § 3142(f)(1) ("reasonably assure the appearance of such person as required and the safety of any other person and the community"). And pursuant to § 3142(f)(2), the Court must hold a detention hearing upon the government's motion (or *sua sponte*) when the case involves "a serious risk that [the defendant] will flee" or "a serious risk that [the defendant] will obstruct or attempt to obstruct justice." 18 U.S.C. § 3142(f)(2); *United States v. Montalvo–Murillo*, 495 U.S. 711, 716–17 (1990).

The government must prove the defendant is a danger to the community by clear and convincing evidence. *See* 18 U.S.C. § 3142(f). The Court applies a preponderance of the evidence standard in determining whether the defendant is a risk of flight or obstruction. *See* 18 U.S.C. § 3142(f) and (e).

Moreover, like danger to the community and risk of flight, obstruction of justice is a stand-alone basis for detention pending trial. *See United States v. Acevedo-Ramos*, 755 F.2d 203, 207-09 (1st Cir. 1985) ("[W]here the court finds that a defendant's release creates an unusual risk of obstruction of justice, the Constitution and relevant statutes permit detention."); *see also United States v. Gotti*, 794 F.2d 773, 779 (2d Cir. 1986) (upholding detention after the district court found that the defendant tampered with a witness in a state proceeding and stating, "[a]ll bail decisions rest on predictions of a defendant's future behavior. It would be anomalous to hold that such predictions cannot rest on a defendant's recent conduct in another proceeding, which may shed considerable light on his motive, capacity and propensity to commit certain acts if free on bail."). Importantly, "[t]he extension of inherent powers to deny bail during trial to the pre-trial period recognizes that unless the witnesses are protected before trial they and their testimony will not be available at trial." *United States v. Graewe*, 689 F.2d 54, 57 (6th Cir. 1982).

In evaluating whether conditions can reasonably be fashioned to eliminate the risks of danger, flight, or obstruction associated with releasing the defendant, the Court must consider: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the defendant's history and personal characteristics; and (4) dangerousness. *See* 18 U.S.C. § 3142(g).

II. **The Court Should Detain Farwell Pending Trial.**

Farwell killed a young person to cover up his own crimes that he committed while he was employed as a police officer. That chilling act of obstruction of justice followed his previous attempts to destroy evidence. In addition, Farwell is violent. He used that violence both to harm his victim while she was alive and to obstruct justice by killing her. In the end, his conduct was all designed to avoid accountability for his underlying crimes, which should also give the Court grave concerns about whether he will appear for future proceedings. On this record, there are no conditions that can reasonably assure the Court that Farwell will not harm others, obstruct justice, or flee to avoid the consequences in this case. Accordingly, the Court should detain him pending trial.

A. Farwell is a danger to the community.

As a threshold matter, a murder charge "weigh[s] substantially in favor of a finding of future dangerousness." *United States v. Zhang*, 55 F.4th 141, 150 (2d Cir. 2022) (affirming decision not to re-open a detention hearing for a defendant who was charged with murder-for-hire). Murder "by its nature involves violence and bespeaks danger to others." *Id.* Here, the defendant took another person's life. That singular act demonstrates the risk that his release poses to the entire community. *See* 18 U.S.C. § 3142(g)(1).

But there is more to it. The evidence set forth in detail in Exhibit A describes the manner in which Farwell committed the murder. He got a key to Birchmore's apartment. He inspected the apartment to find an ideal place to commit the crime. He showed up during a snowstorm

when he knew he would have hours or days before Birchmore would be missed at work. He arrived wearing a mask to disguise his appearance. He quickly strangled Birchmore, choking off her air supply until she perished. He moved her body and tied a duffle bag strap to the closet doorknob to make it look like Birchmore had done this to herself. And he quickly left her apartment. The crime required planning and a unique willingness to take risks to cause irreversible harm. 18 U.S.C. 3142(g)(1). Release conditions cannot safeguard the community against a defendant who has displayed this type of commitment to harming others. 18 U.S.C. §§ 3142(g)(1) and (g)(3).

Second, Farwell killed Birchmore after engaging in domestic violence. The Second Circuit has acknowledged, "[a] willingness to strike loved ones offers probative evidence of a tendency to violence and dangerousness toward others." *United States v. Mercedes*, 254 F.3d 433, 437 (2d Cir. 2001) (reversing the district court's pretrial release order as to three defendants and citing to one of the defendant's history of domestic violence, even without any criminal record, as contributing to a finding that the defendant was dangerous). In fact, a study found that a single episode of strangulation was associated with a 750% increase in the risk of becoming a victim of a completed domestic homicide in all ethnic groups. *Non-fatal strangulation is an important risk factor for homicide of women* (J. Emerg Med. 2008 Oct). Here, not only did Farwell choke Birchmore during sex on several occasions, but in the weeks prior to her death, she reported to friends that he assaulted her when they were discussing her pregnancy. Farwell's interest in and glorification of violence towards women was clearly displayed in the images agents recovered from his iCloud account. 18 U.S.C. § 3142(g)(3).

Third, the Court should have heightened concerns about the danger Farwell presents because of his extensive experience with weapons and the 10 firearms that are registered at his home. Farwell had firearm training in the military and during his law enforcement career. Plus,

15

he had sufficient expertise to serve as a firearms instructor for other law enforcement officers. 18 U.S.C. § 3142(g)(3).

Fourth, Farwell is a danger to children. Unlike many exploitation cases in which there is no evidence of hands-on sexual contact with children, here, Farwell enticed and sexually abused Birchmore when she was 15 years old. *See, e.g., United States v. McCarty*, 2009 WL 5061577, at *10 (D. Haw. Dec. 24, 2009) (in a child pornography case with some evidence of production, denying motion for release, holding the defendant would pose a danger to the community, in part, because he had "an obvious prurient sexual interest in children and acted upon those interest on multiple occasions."). Indeed, he wrote in a text stating that he wished he had sex with her even earlier. Moreover, text messages show that Farwell maintained his sexual interest in children for years. He wanted Birchmore to pretend to be 13 or 14 years old when they had sex. And he initiated child sex incest role-playing that further confirms that he remains a danger to children, just as he was when he began grooming Birchmore more than a decade ago. 18 U.S.C. §§ 3142(g)(1) and (g)(3).

### B. Farwell remains a risk of obstruction.

For the last three years, Farwell may have believed that he had gotten away with killing Sandra Birchmore. Now that he has been charged and some of the evidence has been revealed, circumstances have changed. He now knows that, if convicted, he faces a mandatory life sentence. These new circumstances provide a great incentive for him to further obstruct justice.

The Court is in the unique position of having a wealth of information about what this defendant has done in the past when he believed there was a risk of criminal consequences. When Farwell feared that Birchmore might reveal information about his commission or possible commission of federal crimes, he killed her. When a Stoughton Police employee told him that he/she had received a call reporting aspects of Farwell's illicit sexual relationship with

16

Birchmore, Farwell sprung into action, directing that employee not to talk about the information, and frantically admonishing Birchmore for revealing information. Throughout the final year or two of Birchmore's life, Farwell directed her to delete communications that could incriminate him. When State Police detectives interviewed Farwell, he lied to them.

Farwell's track record—which includes violence, intimidation, and dishonesty—strongly indicates that, if released, he will continue to try to save himself by obstructing justice before trial. That could put many civilian witnesses at risk. Ultimately, release would pose a tremendous risk to the fundamental integrity of these proceedings.

        C.        <u>Farwell is a risk of flight</u>.

The defendant is also a risk of flight. The grave consequence, a mandatory life sentence, that will result from a conviction provides a strong incentive to flee. *See United States v. Zhang*, 55 F.4th 141, 151 (2d Cir. 2022) (stating, in a murder-for-hire case, the mandatory sentence of life in prison "creates an extraordinary risk of flight," citing specifically to that defendant's age of 34 years old); *see also United States v. Pierce*, 107 F. Supp. 2d 126, 128 (D. Mass. 2000) (affirming magistrate judge's detention order because defendant charged with narcotics trafficking and witness tampering "has an extremely strong incentive to flee based upon the length of the prison term he faces under the charges pending against him and the likelihood of conviction").

Farwell also presents a risk of self-harm, given the nature of the charge, the corresponding mandatory life sentence, and his access to and experience with firearms. Courts have held that a defendant's risk of self-harm is an appropriate part of the court's assessment of whether the defendant is a risk of nonappearance. *See, e.g., United States v. Workman*, 680 F. App'x 699, 702 (10th Cir. 2017) (holding the court was "within its discretion to consider suicidal ideation and previous suicide attempts in determining whether it [could] reasonably assure [the

defendant's] appearance[,]" but emphasizing that it might have "view[ed] the question differently if the district court considered only . . . suicidal ideation").

## CONCLUSION

Based upon the foregoing, the government has met its burden to show that no conditions of release will reasonably assure the defendant's appearance, the safety of any person or the community, or the integrity of this proceeding. Accordingly, the government requests that the Court order the defendant detained pending trial. The government further requests that, if the Court is inclined to release the defendant on conditions, it stay its order for such time to permit the government to file a motion for revocation of the order of release under 18 U.S.C. § 3145(a).

Respectfully submitted this 28th of August 2024,

JOSHUA S. LEVY
Acting United States Attorney

*/s/ Torey B. Cummings*
TOREY B. CUMMINGS
BRIAN A. FOGERTY
ELIZABETH C. RILEY
Assistant United States Attorneys
One Courthouse Way
Boston, MA 02210

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

*/s/ Torey B. Cummings*
Torey B. Cummings
Assistant United States Attorney

Dated: August 28, 2024