**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | )   Docket No. 1:24-cr-10259-DJC |
| v. | ) |
| | )   ***LEAVE TO FILE EXCESS PAGES*** |
| MATTHEW FARWELL | )   ***GRANTED ON NOVEMBER 14, 2025*** |
| |       ***DOCKET ENTRY 70*** |

<u>**MOTION TO TRANSFER VENUE**</u>

"Much like the right to counsel, the right to remain silent, and the right not to have the evidence misstated or manipulated, the right to be presumed innocent [unless] proven guilty is a 'specific right' afforded to the accused under the United States Constitution." *Pagano v. Allard*, 218 F. Supp. 2d 26 (D. Mass. 2002) (citing *Darden v Wainwright*, 477 U.S. 168, 182 (1986)).

Matthew Farwell, through undersigned counsel, pursuant to the Fifth, Sixth, and Eighth Amendments to the United States Constitution, and Rule 21 of the Federal Rules of Criminal Procedure, moves this Honorable Court to transfer venue from the District of Massachusetts. As set forth below, due to the saturation of prejudicial local publicity, there is a reasonable likelihood that prejudicial news coverage prior to trial has and will continue to prevent a fair trial in this District.

## I.    CASE BACKGROUND

In early February of 2021, Sandra Birchmore committed suicide. Her body was discovered in her Canton, Massachusetts apartment by local law enforcement on February 4, 2021.  The Office of the Chief Medical Examiner for the Commonwealth of Massachusetts (OCME) conducted a full autopsy on Ms. Birchmore. The OCME determined that Ms. Birchmore's cause of death was asphyxia by hanging, and that her manner of death was suicide. A lengthy investigation by the Massachusetts State Police Detective Unit assigned to the Norfolk

County District Attorney's Office of Ms. Birchmore's death and the events leading up to it resulted in no criminal charges. Indeed, no person has been charged by the Commonwealth of Massachusetts with any wrongdoing in the death of Ms. Birchmore. The official cause of death on her death certificate remains, to this day, suicide.  Exhibit 1.

On August 27, 2024, three-and-a-half years after Ms. Birchmore committed suicide, the United States filed a one-count indictment purporting to allege the unlawful killing of Ms. Birchmore. Mr. Farwell entered a plea of Not Guilty to the accusations against him. On October 28, 2025, the United States filed a two-count indictment alleging both the unlawful killing of Ms. Birchmore and the death of her fetus in utero. Mr. Farwell will plead Not Guilty to the superseding indictment on November 21, 2025, and exercise his fundamental right to a jury trial. Mr. Farwell contests guilt in this case.

As demonstrated herein, the one-sided, biased media coverage has led to the widespread public misbelief that Mr. Farwell is guilty of abusing a law enforcement position of trust, of "grooming" Ms. Birchmore and having sex with her while she was a minor, and then ultimately killing her and "staging" the scene to look like a suicide.

The issue of whether the prosecution can prove beyond a reasonable doubt that Ms. Birchmore's death was a homicide, as opposed to the suicide that it was, should be tried in a court of law, not the court of public opinion. Significantly, the defense cannot defend Mr. Farwell in the press as both the local rules for the District of Massachusetts and the Massachusetts Rules of Professional Conduct forbid public comment about the evidence.[1] Consistent with these rules, undersigned counsel have repeatedly refused to participate in such a process.

---

[1] *See e.g.,* Mass. R. Prof. C. 3.6 and Local Rule 83.2.1.

### Docket Entry 9-1

On August 27, 2024, the sealed indictment was filed as Docket Entry 1 (D.E.) against Matthew Farwell. On August 27, 2024, an arrest warrant issued for Matthew Farwell.  On August 28, 2024, the government filed a motion to unseal the case. This was granted that same day, just after Mr. Farwell was arrested.  Also that same day, the government filed a motion for detention, along with an affidavit by an FBI Agent. *See* D.E. 9, 9-1. The 45-page FBI Affidavit filed by the government, before Mr. Farwell was represented by counsel, detailed a cherry-picked version of alleged "facts" and a one-sided narrative against Mr. Farwell. The contents of the affidavit, containing headings with derogatory and inflammatory characterizations of Mr. Farwell, multiple levels of hearsay and other substantial grounds for objection, have not been ruled admissible by the Court.[2]

Additionally, at 1:55 p.m., on August 28, 2024, the Boston Globe ran a story about the unsealed indictment called "What to Know About the Sandra Birchmore Case." Exhibit 2.  Thus, the press was aware of the docket filings and had the 45-page FBI Affidavit available to them before Mr. Farwell even had an attorney.   At D.E. 10, Magistrate Judge Kelley appointed the federal defender program, through Attorney Sandra Gant, to represent Matthew Farwell.  The arraignment was set for August 28, 2024, at 2:30 pm.  A copy of the motion and accompanying FBI Affidavit was not served on Ms. Gant at the time of her appointment.

In less than 24 hours, the seeds of damage to Mr. Farwell's right to a fair trial were sown. By 6:03 a.m. on August 29, 2024, the Boston Globe published a story referring to the details of

---

[2] Should this case be transferred to another district, the defense would move to SEAL Exhibit 9-1 to prevent further prejudicial publicity in the subsequent venue.

the FBI Affidavit and discussing, among other things, digital communications alleged to be between Mr. Farwell and Ms. Birchmore. Exhibit 3.[3]

Important principles to keep in mind when analyzing the press coverage here are that publicized "facts" may be untrue, statements referenced in the reporting may ultimately be inadmissible, photographic and videotaped evidence may be unreliable, and witnesses may substantially modify their stories under oath or after confrontation and cross examination. As set forth below, Mr. Farwell has demonstrated a reasonable likelihood that prejudicial news prior to trial has prevented a fair trial in this District.

### *Local Press Coverage*

By its own account, "[t]he Boston Globe is one of the world's most prestigious daily newspapers, with a cumulative reach of over 1 million readers."[4] The Globe's social media X account boasts 774,100 followers. Exhibit 4.  In January 2025, Boston Globe Media acquired *Boston* Magazine from a Philadelphia-based publisher Metro Corp, adding to a regional newsroom portfolio that includes *The Boston Globe*, Boston.com, and STAT News.[5] For a media company with such reach and roots, it should be more than concerning that it has so steadfastly and insistently displayed its bias in its reporting on the death of Sandra Birchmore and in the allegations against Mr. Farwell.  The Globe has consistently reported on the government's one-sided narrative from the 45-page FBI Affidavit as the "facts" of this case.[6]

---

[3] Comments to this story include: "People should read the affidavit for the FBI agent in support of pretrial detention. It's hideous and horrifying. No hyperbole. It literally should be the worst thing you have ever read about a police officer."  At 9:50 a.m. that same day, a reader posted a link to the affidavit.  Within minutes, the same reader posted: "The affidavit documents Matthew Farwell's having choked Sandra Birchmore multiple times. Choking is a common predictor of homicide in abusive relationships." Exhibit 3 at 31-32.

[4] 2024 Boston Globe Media, General Media Kit, https://www.bostonglobemedia.com/wp-content/uploads/2023/12/2024-BGM-Media-Kit_General.pdf.

[5] https://www.boston.com/news/local-news/2025/01/22/boston-globe-media-acquires-boston-magazine/.

[6] The Globe has been a recipient of at least two national awards for its coverage of this case.  In one journalism competition held by the University of Colorado at Boulder, the press release claimed that the Globe's reporting demonstrates that OCME's conclusion of suicide was wrong and that its dogged pursuit of "the truth" led to the

A closer examination of the Globe's reporting further underscores the unavoidable impact on potential jurors in this District. In reviewing the press coverage, it is important to note that in assessing a motion for transfer of venue, the defendant must show a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial. *See Section II, below*. Factors that the district court may take into account include, *inter alia*:

> the extent to which the government is responsible for generating the publicity, the extent to which the publicity focuses on the crime rather than on the individual defendants charged with it, and other factors reflecting on the likely effect of the publicity on the ability of potential jurors in the district to hear the evidence impartially.

*United States v. Maldonado-Rivera*, 922 F.2d 934, 967 (2d Cir. 1990). The press coverage here has most certainly stemmed from the FBI's one-sided narrative, focuses on Mr. Farwell, impermissibly characterizes Mr. Farwell, and broadcasts facts and images that will most certainly impact the ability of potential jurors in the District to hear the evidence impartially.

Since April of 2022, the Boston Globe has run at least 77 stories involving Matthew Farwell, and 52 stories that substantially reference him or this case. Exhibits 7 and 8. One 18-page long single-spaced story, referenced above the fold on the front page of the Boston Sunday Globe, December 29, 2024 (and inserted in Globe Magazine), was titled: *Sandra Birchmore put*

---

federal prosecution of Mr. Farwell for the alleged killing of Ms. Birchmore. "[Sandra Birchmore's death] was ruled a suicide until Laura Crimaldi, a reporter with *The Boston Globe*, started digging into her past – including her history with Matthew Farwell, then a police officer. Her relentless pursuit of the truth resulted in "Secrets and Lies," which led to the case being reopened and Farwell being charged in Birchmore's killing." Exhibit 5 at 1-2. In winning her first award, the Globe journalist on the Sandra Birchmore story, Laura Crimaldi, said:

> It bothered me that there were people who had the authority and the means and methods to get to the bottom of this, and they just didn't seem too interested in doing so. […] **And by using my superpower, which is to put things in the newspaper, I could make a difference**. I wanted to do that.

*Id*. at 2 (emphasis added). Indicative of the impact of the Globe's reporting on the average reader, a judge of the media contest that awarded the Globe the Al Nakula Award for Police Reporting award said, "The story of **Sandra Birchmore's killing makes me sick to my stomach** – outraged." *Id*. at 3 (emphasis added). In winning the Edward R. Murrow 2025 Feature Reporting award for the investigative reporting in *Sandra Birchmore's death: Red flags missed, evidence overlooked, trust broken*, the Editor of the Boston Globe noted on August 15, 2025 that "We are also gratified to see the recognition for the outstanding reporting behind our Sandra Birchmore reporting, which was an investment in **uncovering the truth for her**" Exhibit 6 at 2 (emphasis added).

*her trust in the police. They broke it.* Exhibit 9.  Exhibit 9 should be read in its entirety to understand the prejudice that attaches.  Just some examples of the prejudicial content, revealing a one-sided narrative that draw the reader to conclude that Mr. Farwell is guilty, include:

> The investigations, charges, and recollections tell a story that is, in some ways, sickeningly familiar: An alleged predator chose his victim well, before she had the capacity to know what was happening to her, and leveraged her vulnerabilities against her – for a decade. The damage done to Birchmore left her open to exploitation by others, too. But there is more here. The immense power imbalance that Birchmore endured in her life persisted long after she was gone. Time and again, investigators gave the benefit of the doubt to the police officer now accused of killing a young woman who was rarely, if ever, granted the same consideration. *Id.* at 18.

> Experts on child sexual abuse see this often, where victims abused by one person will then go on to be used by others, and may even seem to enter into other exploitative relationships willingly – because grooming normalizes those behaviors. *Id.* at 23.

> At 9:08 p.m., Farwell asked if he could "come by for a second" after all.  He was already close by: He walked into the lobby a few minutes later. Less than a week later, Farwell would tell a state trooper he'd gone there to tell her the baby wasn't his and to end the relationship – to say "it was all over." After 29 minutes, the lobby camera picked up Farwell again, coming off the elevator, passing through the front doors, and walking out into the darkness. *Id.* at 25.

> Later that day, Farwell apparently had second thoughts about cooperating.  Using his department-issued phone, he made two Google searches, according to federal prosecutors.  First, he wrote, and then deleted, "can delete imessage be recovered by cellebrite."  Cellebrite makes tools that help investigators study data from mobile devices.  Then, rethinking the form he'd just signed, Farwell made a second search: "can you revoke consent in Massachusetts."  He deleted that question, too.  *Id.* at 28.

> Records show that troopers did in fact seek Farwell's DNA shortly after Birchmore's death.  If they had obtained it, they could have compared it with samples from Birchmore's clothing, her fetus, and the ligature around her neck, for example.  But by March 8, Farwell was done cooperating with police.  He refused to provide a DNA sample, or submit to an interview with a polygraph test. *Id.* at 29.

> This past June, Dr. Michael Baden, the forensic pathologist hired by members of Birchmore's family to review the state medical examiner's determinations, made an explosive finding: This was a case of homicide, he said. Soon, another expert

hired by the federal investigators, Dr. William Smock, came to the same conclusion. *Id*. at 31.

Perhaps the most ominous evidence came when the FBI looked at the health app on Birchmore's iPhone, which tracks a user's steps – an analysis that does not appear to have been done by State Police. The last movement it recorded was eight steps, around 9:40 p.m., a few minutes before Farwell was seen leaving the building. *Id*. at 31.

The article features a photograph and unequivocally states that it shows "Matthew Farwell entering Ms. Birchmore's apartment building on February 1, 2021," the last day the Globe maintains that she was alive. *Id*. at 27.[7]



A SECURITY CAMERA IMAGE OF MATTHEW FARWELL ENTERING BIRCHMORE'S BUILDING ON FEBRUARY 1, 2021.

---

[7] One example of the bias in the reporting is illustrated in a Globe article published on June 12, 2025, written by Columnist Yvonne Abraham, along with Globe Staff Laura Crimaldi and Gordon Russsell. This article discusses DNA testing results, where two unidentified sources note that Mr. Farwell is not the father of the fetus that was carried by Ms. Birchmore. **The article then offers rampant speculation on the impact of the purported facts on the ultimate trial jury, reporting that "the damage to the government's case could be minimal."** Exhibit 10 at 3 (emphasis added). The story re-prints the large photograph attributed to Mr. Farwell from what it claims is video camera footage from the lobby of Ms. Birchmore's apartment building on "**the last day she was seen alive**. **Minutes before he left the building, Birchmore's cellphone, usually in constant use, stopped moving and stayed motionless until its battery drained and her body was discovered three days later.**" *Id*. at 4 (emphasis added). The story, like the overall reporting in this case, skews in favor of a government-friendly narrative. *See also Matt Farwell refused to provide DNA to detectives investigating Sandra Birchmore's death. Does he regret it now?* June 25, 2025. Exhibit 11. The Globe reports that "**Farwell was the last person to see Birchmore alive** on the evening of Feb. 1, 2021," and re-prints the photograph that they attribute to Mr. Farwell. The article then claims that **Birchmore's cell phone stopped moving "[m]inutes before Farwell departed**." *Id*. at 6 (emphasis added). The story adds a quote that "Investigators see a '**massive red flag**' whenever people of interest in death investigations decline to cooperate with DNA testing. . . **Innocent people do not decline DNA testing** . . ." *Id*. at 7 (emphasis added).

Displaying photographic and videotaped evidence to the public and conclusively drawing evidentiary meaning from those images, before challenges to the admissibility and reliability of such materials can be tested in the courtroom, places this case squarely within the realm of the seminal change of venue case, *Rideau v. Louisiana*, 373 U.S. 723 (1963), discussed below; *see also Sheppard v. Maxwell*, 384 U.S. 333, 338-340, 357 (1966) (prejudice was presumed from pretrial publicity, a sample of which included reports that Sheppard refused a lie detector test; he was uncooperative with police; his family had set up a "protective ring" around him; there had not yet been an inquest; the investigation had been inept because of "friendships, relationships, hired lawyers"; "a front-page charge that somebody is 'getting away with murder'"; and an accusation that he had fathered an illegitimate child with an inmate).

"A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field . . . But [freedom of discussion] must not be allowed to divert the trial from the 'very purpose of a court system' * * * to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures.'" *Sheppard v. Maxwell*, 384 U.S. at 350-51 (citations omitted).

### Reader Comments

The Globe stories to date have more than 3500 reader comments posted, reflecting widespread public opinion that Mr. Farwell is guilty and must be punished severely.[8] The stories began more than two years before this federal indictment and persist with every event in the case. Both the pace and intensity of its coverage suggest that the Globe's reporting, and the prejudicial impact of its coverage will continue exponentially as the case progresses towards trial.

---

[8] Exhibit 8.  See this Exhibit for samples of representative comments by the public, along with the number of comments which followed each story.

The public comments to the Globe articles show a strong bias against Mr. Farwell.  For example, public comments include definitive pronouncements of Mr. Farwell's guilt: "He murdered her! The internal affairs report said Matthew Farwell was the last known person to see Birchmore alive. . ." Exhibit 8 at 2. Others draw unfounded and unestablished connections to other investigations spearheaded by the Massachusetts State Police or local prosecutors: "She was murdered by the father of her unborn child, Stoughton police officer Matthew Farwell. This is another suspiciously criminal investigation by the State Police assigned to Norfolk DA Michael Morrissey's office. . . ." *Id*. at 5. Worse, some public comments demand the ultimate penalty of death in this case: "The killer deserves the death penalty.  A police officer who is a child rapist and then kills his pregnant victim and his future child? Death penalty material if there ever was any."  *Id*. at 6. One reader writes simply: "Death Penalty." Followed by another comment:

> Hey, I'm reading the affidavit.  Perhaps Sandra Birchmore might have made a fine police officer.  On pp. 7-8 of the affidavit we may see, the deceased has already established as a fact that Matthew Farwell took her virginity on April 10, 2013.  She wrote that date in a text message to Matthew Farwell, and, he did not dispute her assertion.  I am beginning to think that, from the grave, her evidence may compel a conviction in this case.  The death penalty could be too good for this guy.  Let Sandra Birchmore haunt his dreams.  Let him live a waking nightmare.  Couldn't happen to a better guy.

*Id*. at 7.  Another reader disparaged Mr. Farwell and said he should die: "PIG Farwell should exit Prison in a green bag. Highly likely, playing the Cop Card he victimized / abused other Girls and Women." *Id*. at 10.  The examples continue: "Firing Squad . . . what a demonic thing this Mathew Farwell is . . . so gross in Norfolk county Ma [*sic*]." *Id.* at 13.

Most recently, when defense counsel filed a motion requesting leave to file a motion to transfer venue exceeding the page limits (D.E. 69), the Globe published a story within a half an hour.  Exhibit 15.  A selection of separate public comments to that story include:

I would move to Worcester area to give him one less chance of appeal when he is found guilty[.] *Id*. at 6.

His trial will never be moved out of state. His contention is that all Mass. residents can't be impartial until all evidence is revealed at trial….BS…the fact that his case is well known does not mean 12 jurors can't be fair and perforn [sic] their duty. In colonial days this vile murderer and child abuser would have been hung outside the courthouse post conviction. A nice oak tree would be fine. *Id*.

Gross incompetence at the original death investigation location allowed this to happen. Can't wait to witness these cops testifying regarding their careful examinations and thorough follow up of information. If not for info from other teenagers and friends of Sandra there would be no case. Tragic. *Id*. at 7.

### State Senator Proposes Massachusetts Legislation Against "Staged Suicide"

The storm of local press coverage has delivered such great impact within the District of Massachusetts that it recently prompted Massachusetts State Senator Rebecca Rausch (D-Needham) to propose a new bill aimed at identifying and investigating so-called "staged suicides," citing Sandra Birchmore's death as an impetus for the legislation. The timing of the announcement of this bill – immediately following the superseding indictment filed against Mr. Farwell – is further evidence of its connection to and impact on this case. An October 29, 2025 Globe article by Laura Crimaldi regarding the bill – published less than 24 hours after news of the superseding indictment hit the press, and the same day as the press conference for the bill – not only asserts Ms. Birchmore's suicide was staged, but again lays the groundwork for public prejudice against Mr. Farwell. *See Citing Sandra Birchmore case, new proposal seeks to address staged suicides.* Exhibit 12.

This piece also draws comparisons between the case against Mr. Farwell to a case in California of a defendant who was convicted of murder after trial. Notably, that trial featured the testimony of the government's anticipated "expert" witness in this case: Dr. William Smock. The article references a non-profit organization, Alliance for HOPE International, which is a sponsor of identical legislation in California, but fails to mention that Smock is the medical director for a

program directly sponsored by and affiliated with Alliance for HOPE International.  Alliance for HOPE International is discussed in this and other stories with no mention of its direct relationship with William Smock.[9]  Sen. Rausch's proposed legislation exemplifies and epitomizes the extreme effects of the local news coverage of this case. News media consumers in this District, affected by the prejudicial coverage of this case, have been convinced that Ms. Birchmore's suicide was "staged." The bill is a direct result of this outcry.

### *The Boston Herald*

The Boston Herald has printed 27 articles referencing Matthew Farwell, and 10 stories covering this federal case. Exhibit 13 at 2-3.

On August 28, 2024, the Herald printed:

> As scandalous as the Karen Read frame-up is, the Sandra Birchmore case may be even more horrific, and not just because both murders occurred in the same corrupt town, featuring largely the same cast of bumbling, corrupt cops […] The state medical examiner ruled Birchmore's death a 'suicide.' Wink wink nudge nudge […] How long would it have taken them to string Karen Read up, just like they did to Sandra Birchmore?

*Id*. at 10-12. On September 1, 2024, the Herald, in its News, Crime and Public Safety section, published: "The 'grisly' details on how a former Stoughton cop allegedly groomed, raped, impregnated and then killed a young woman he first met when she was 12 years old are darker than prosecutors could possibly describe in a press conference announcing his arrest."  *Id*. at 15. On August 28, 2024, the Herald referred to Mr. Farwell as a "depraved former Stoughton cop." *Id*. at 5. And from an editorial on September 15, 2024 by the Boston Herald Editorial Staff, the paper noted that "[i]t is hard to imagine a more clear-cut case for enforcing federal law for

---

[9] *Compare* Exhibit 11 at 7-8 ("'Innocent people do not decline DNA testing,' said Gwinn, who is president of Alliance for HOPE International, a California nonprofit that trains law enforcement to recognize domestic violence cases that are staged to look like suicides or accidents.  'If you weren't completely innocent, why wouldn't you want to rule yourself out?'") *with* Exhibit 14 at 7 (describing former prosecutor [Gwinn of Alliance for HOPE International] as someone "**not connected to this case** [who] told the Globe that the suicide declaration by Massachusetts authorities had all the telltale signs of 'confirmation bias[.]'") (emphasis added).

protecting unborn children than this one […] when the very existence of the unborn child was the very evidence against this monster." *Id*. at 33.  On September 15, 2024, the Herald featured a full-page cover for its Sunday edition entitled "LIFE FOR A LIFE" imprinted over a photograph of Sandra Birchmore, and a caption at the bottom:  "Unborn victims of Violence Act not used in Birchmore murder case.  Why not?"  *Id*. at 50.  Recently, the Herald even reported when Mr. Farwell was not going to attend the arraignment in person, and in the same article stated that he killed "their" baby.  *Id*. at 48.  Additional Boston Herald articles are included within Exhibit 13.

### *Local Television Coverage*

Local television coverage on the federal charges began as early as August 28 and August 29, 2024.

NBC's footage depicts the arrest of Matthew Farwell by FBI SWAT officers as well as video clips from the United States Attorney's press conference, detailing the 45-page FBI Affidavit against Mr. Farwell. Based on the "court paperwork," the report repeats the government's version, with detail, against Mr. Farwell using terms such as "groomed," "sexual abuse," "exploit and rape a child" and the claim that Ms. Birchmore's actions before her death prove that she would not have committed suicide.[10]

WHDH's footage opens with "Accused Killer murdered a woman he got pregnant in 2021." The report outlines the prosecutor's version of events- that Mr. Farwell started an "illegal sexual relationship" with Ms. Birchmore when she was just 15. Throughout, the report references "court documents," showing a photo of the "congrats we are going to be parents" poster, as well as details of excerpts of conversations they attribute to Ms. Birchmore and her friends and to Ms.

---

[10] https://www.nbcnews.com/news/us-news/matthew-farwell-sandra-birchmore-death-stoughton-massachusetts-rcna168650

Birchmore and Mr. Farwell. The video also shows clips of Stoughton Police Chief Donna McNamara, discussing Ms. Birchmore and her trust of law enforcement.[11]

CBS's video begins with "former Stoughton police officer charged in the killing of pregnant woman." The video shows various pictures of Ms. Birchmore including one with her cat, multiple times. The reporter states that Mr. Farwell is accused of grooming Ms. Birchmore and that they have been following this story for years. There are clips from the United States Attorney's press conference, calling Mr. Farwell, "depraved" and discussing the physical size difference between Ms. Birchmore and Mr. Farwell. There are also stills from the Motion and Memorandum in Support of Pretrial detention including texts between Ms. Birchmore and her friend. The video also shows protestors and Justice for Sandra Birchmore supporters.[12]  A screenshot was shown during the news story showing a text bubble attributed to Ms. Birchmore saying Mr. Farwell had looked in her closet.  The coverage then provided that Sandra Birchmore was found "dead in front of that closet" a week later as part of a "staged" suicide. *Id*.

The local television station WCVB began reporting on Mr. Farwell's indictment by 5:28 a.m. on August 29, 2024, and a news report begins with Ms. Birchmore's former martial arts instructor stating the fact that "her perpetrator is facing justice is reassuring."  The video shows clips from the United States Attorney's press conference, describing how Ms. Birchmore "survived years of grooming, statutory rape and sexual violence all at the hands of Matthew Farwell." There is a photo of a "congrats we are going to be parents poster" along with mention

---

[11] https://whdh.com/news/former-stoughton-police-officer-indicted-in-connection-with-pregnant-womans-2021-murder/

[12] https://www.cbsnews.com/boston/news/sandra-birchmore-matthew-farwell-stoughton-police-charges/

of the Stoughton P.D. internal investigation. The report ends with the penalty Mr. Farwell is

facing - life in prison or the death penalty.[13]

In sum, the repeated reporting in this case has led the community (as demonstrated

through such notables as the Editor of the Boston Globe and a Massachusetts State Senator, and

the thousands of negative public comments) to conclude that Mr. Farwell killed Ms. Birchmore

and staged her death to appear as a suicide. This series of events has created a reasonable

likelihood that prejudicial and overwhelming news coverage prior to trial has prevented a fair

trial in this District.

## II.    ARGUMENT

The Constitution requires transfer of venue here, given the rights at stake and the scope of

prejudicial publicity. Prejudice should be presumed and transfer should be granted to safeguard

Mr. Farwell's constitutional rights to due process and to ensure a fair trial.  Additionally, under

Federal Rule of Criminal Procedure 21(a), there is a reasonable likelihood that the pretrial

publicity will prevent a fair trial here.

### A.  Mr. Farwell's Constitutional Rights

Mr. Farwell contests his guilt. The Sixth Amendment guarantees criminal defendants the

right to trial by an impartial jury. *United States v. Quiles-Olivo*, 684 F.3d 177, 181 (1st Cir. 2012)

(*citing* U.S. Const. amend. VI, and *Skilling v. United States*, 561 U.S. 358, 396 (2010)). The Fifth

Amendment guarantees that no individual shall be deprived of life, liberty or property, without

due process of law. In this death-eligible case (where all parties still await the Attorney General's

decision on whether death will be authorized as an available punishment), the Eighth

Amendment prohibits cruel and unusual punishment from being inflicted upon a defendant. If

---

[13] https://www.wcvb.com/article/former-stoughton-massachusetts-police-officer-indicted-in-pregnant-woman-s-death/61996455

extraordinary local prejudice would prevent a fair trial, the trial must be transferred to another district. *United States v. Casellas-Toro*, 807 F.3d 380, 385 (1st Cir. 2015) (citing *Skilling*, 561 U.S. at 378)). "The theory of our [trial] system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado ex rel. Attorney General of Colo.,* 205 U.S. 454, 462 (1907).

The United States Supreme Court has given practical meaning and definition to these constitutional provisions, particularly the Fifth and Sixth Amendments, in the context of venue in its seminal decisions of *Irvin v. Dowd*, 366 U.S. 717 (1961), *Rideau v. Louisiana*, 373 U.S. 723 (1963), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). Put simply, a criminal defendant must receive a fair trial consistent with constitutional due process. *Sheppard v. Maxwell,* 384 U.S. at 335. *Sheppard* specifies that a "fair trial" requires "a trial by an impartial jury free from outside influences." *Id*. at 362.  The burden of establishing presumed prejudice can be met despite juror assurances of impartiality and where potential jurors have only read or scanned newspaper articles. *Marshall v. United States*, 360 U.S. 310 (1959).

In *Skilling v. United States*, 561 U.S. 358 (2010), a case involving the Enron CEO charged with a massive fraud scheme, the Supreme Court distilled several principles from its cases involving pretrial publicity and presumptive prejudice.  With regard to two of those factors, the Court noted:

> [A]lthough news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight. Rideau's dramatically staged admission of guilt, for instance, was likely imprinted indelibly in the mind of anyone who watched it. *Cf. Parker v. Randolph,* 442 U.S. 62, 72, 99 S. Ct. 2132, 60 L.Ed.2d 713 (1979) (plurality opinion) ("[T]he defendant's own confession [is] probably the most probative and damaging evidence that can be admitted against him." (internal quotation marks omitted)). Pretrial publicity

about Skilling was less memorable and prejudicial. No evidence of the smoking-gun variety invited prejudgment of his culpability. See *United States v. Chagra,* 669 F.2d 241, 251–252, n. 11 (C.A.5 1982) ("A jury may have difficulty in disbelieving or forgetting a defendant's opinion of his own guilt but have no difficulty in rejecting the opinions of others because they may not be well-founded.").

*Id.* at 382-83.

In the case at hand, the press continually and insistently repeats the government's claims of Mr. Farwell's guilt, rooted principally in the FBI Affidavit filed before Mr. Farwell's arraignment on August 28, 2024.  To be sure, Mr. Farwell has been steadfast in his plea of not guilty, and he has not had a chance to challenge the materials set forth in the 45-page FBI Affidavit, DE 9-1.  But that has not stopped the media from broadcasting photographs of Mr. Farwell "entering and leaving" her apartment complex, according to the captions; or from pronouncing that Mr. Farwell got into an argument with Ms. Birchmore, that he was supposedly with her when her cell phone recorded its last steps, that he "staged her suicide," leaving "minutes after," and that he was the "last person to see her alive."  Like *Rideau,* these "facts" are likely imprinted indelibly in the mind of anyone who has seen or read them, as they have been repeatedly set out in the media coverage here.

In *Skilling*, the Supreme Court further observed that "unlike cases in which trial swiftly followed a widely reported crime[,] over four years elapsed between Enron's bankruptcy and Skilling's trial. Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Skilling*, 561. U.S. at 383 (internal quotations omitted). In the present case, the Globe's coverage began two years before Mr. Farwell's federal indictment, continues to this day, and will increase substantially as trial approaches.  The Herald will likewise continue to write stories, as will the local television news stations.

The above Supreme Court decisions recognize that when there has been pervasive media coverage of a case and the quality of the coverage creates a reasonable likelihood or perception that a fair and impartial trial cannot be had in the current district, prejudice is presumed, and venue must be changed. In the above trio of cases, transfer is encouraged where the threat of prejudice lurks and venue may be changed proactively. *See Sheppard*, 384 U.S. at 362-63 ("[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity"). There is no sign that the coverage will abate here.

In *Murphy v. Florida*, 421 U.S. 794, 800 n4, (1975), the Supreme Court distinguished "mere familiarity with petitioner or his past" from an "actual predisposition against him," juxtaposing "largely factual publicity" and "that which is invidious or inflammatory." *Id*. In *Murphy*, the Supreme Court found that the general community atmosphere was not inflamed, and that the publicity itself was largely factual in nature.

By contrast here, the publicity is not limited to a factual presentation and the comments noted go far beyond a "familiarity" with Mr. Farwell -- instead revealing an "actual predisposition against him." The FBI Affidavit which forms the predicate for much of the reporting is filled with irrelevant and inflammatory characterizations of Mr. Farwell himself. The coverage has led the readers to conclude that Mr. Farwell is guilty, to call him vile names, and to cry out for severe punishment, including death.

In *Rideau v. Louisiana*, 373 U.S. 723 (1963), the Supreme Court wasted no time in presuming prejudice where the record established that a confession by the accused had been televised pre-trial. The Court arrived at its conclusion of presumed prejudice without examining

the transcript of voir dire for actual prejudice. The Court was not concerned with whether any particular juror had seen the televised interview. Instead, the Court emphatically observed:

> [W]e do not hesitate to hold, without pausing to examine a particularized transcript of the voir dire examination of the members of the jury, that due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised 'interview.'

*Rideau*, 373 U.S. at 727. *See also Murphy,* 421 U.S. at 799 (noting that in *Rideau*, "the Court did not examine the voir dire for evidence of actual prejudice because it considered the trial under review 'but a hollow formality'").

In *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996), the district court took heed of the necessity to resolve venue issues prior to jury selection, because "a failed attempt to select a jury would, itself, cause widespread public comment creating additional difficulty in beginning again at another place for trial." The *McVeigh* Court also noted: "Because the penalty of death is by its very nature different from all other punishments in that it is final and irrevocable, the issue of prejudice raised by the present motions must include a consideration of whether there is a showing of predilection toward that penalty." *Id*. at 1474. The *McVeigh* decision defined prejudice as "(a) an adverse judgment or opinion formed beforehand or without knowledge or examination of the facts", and "(b) a preconceived preference or idea." *Id*. at 1472. As noted in the comments to and the content of the news articles that have been circulated in this District, presumed prejudice exists.

### *The Tsarnaev Decisions*

Although the law on venue in the First Circuit has most recently been shaped by its decisions related to the Boston Marathon bomber, Dzokhar Tsarnaev, both the posture and nature of prejudice evident in the case against Tsarnaev are readily distinguishable from Mr. Farwell's case and do not foreclose the relief requested herein. For example, in *In re Tsarnaev*, 780 F.3d 14

(1st Cir. 2015), the First Circuit addressed a request for a writ of mandamus and discussed whether the district court clearly and indisputably erred in concluding that venue need not have been transferred, and the proper remedy was time and a fulsome jury selection. The Court held that the extraordinary remedy was not required in that case.

On appeal, the First Circuit in *United States v. Tsarnaev*, 968 F.3d 24 (1st Cir. 2020), *rev'd on other grounds*, 595 U.S. 302 (2022), noted as an important consideration on the venue transfer motion that Tsarnaev did not contest his guilt – thus, the bulk of the publicity involving his case and prosecution was *true*:

> [M]ost of the publicity was true – something we now know from Dzhokhar's guilt admission in his lawyer's guilt-phase opening and closing statements (notably, Dzhokhar does not say he would have raised an innocence defense in another venue). So after the first day of trial, a juror from Boston and one from California would know essentially the same things about the case – even though the California juror would have seen less of the publicity.

968 F.3d at 55 (internal quotations omitted). In contrast, Mr. Farwell has maintained his innocence.

Additionally, the First Circuit wrestled with the fact that because the publicity was so overwhelming, it would be difficult to find a suitable location not so infected with pre-trial publicity: "We note too that this is not a case where almost everybody locally knows something and very few elsewhere know of it." *Tsarnaev*, 968 F.3d at 55. As noted by the First Circuit, the Boston Marathon bombing would likely be viewed "as an attack on all of America (as [Tsarnaev] himself did) – thus negating any advantage in changing venues." *Id.* at 56.[14] Unlike the widespread nationwide coverage present in the *Tsarnaev* case, the issues present here are of

---

[14] Ultimately, the First Circuit in the 2020 *Tsarnaev* decision did not explicitly rule on the venue issue: though they suggested two judges would "likely find the judge abused no discretion in finding venue proper in Boston in 2015," the Court "need not make such a decision now," as it instead remanded the penalty-phase portion for a retrial. 968 F.3d at 56.

overwhelming local interest. The pretrial publicity focusing on the presumed guilt of Mr. Farwell and visual displays of his purported presence at the scene of the death have resulted in a presumption of prejudice in this case, requiring a transfer under the Constitution.

### B. Venue Must Be Transferred Under Fed. R. Crim. P. 21(a)

Rule 21 of the Federal Rules of Criminal Procedure *requires* a transfer of venue if "the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). To prevail on a motion under Rule 21(a), the defense need only show "a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial." *United States v. Maldonado-Rivera*, 922 F.2d 934, 966-67 (2d Cir. 1990) (quoting *Sheppard*, 384 U.S. at 363)). *See also United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (no error in denying motion for change of venue pursuant to Rule 21(a) where defendant failed to show a "reasonable likelihood" that pretrial publicity would prevent a fair trial).

It is important to consider that much of the source of this pretrial publicity stems from the publicly filed FBI Affidavit and other law enforcement and governmental sources. None of the pretrial publicity has been initiated by Mr. Farwell or his defense team. *Cf. Maldonado–Rivera,* 922 F.2d at 967, *supra,* noting that in assessing a defendant's Rule 21(a) motion for change of venue, the district court may take into account, *inter alia*, the extent to which the government is responsible for generating the publicity and the extent to which the publicity focuses on the crime rather than on the individual defendants charged with it.

*Maldonado-Rivera* upheld the district court's denial of Rule 21(a) motion where the court found, among other things, that the government's press release had contained only authorized

factual materials which were not prejudicial and some of the pretrial publicity had been generated by the defendants themselves.

In *United States v. Moody*, 762 F. Supp. 1485 (N.D. Ga. 1991), a case was transferred from the Atlanta metropolitan area to the District of Minnesota.  The defendant made a showing in *Moody* that local media spread prejudicial information about the defendant's past criminal record and statements by federal investigating officers about the defendant's guilt.

The Court's opinion focused on publicity in the Atlanta Journal and Constitution, including this statement: "[m]uch of the evidence against Moody is circumstantial.  But investigators say such cases are frequently successful because they are built from interlocking pieces and do not depend on a single 'smoking gun.'" *Moody*, at 1488 (emphasis omitted). The Court pointed to another article which read "[t]his is a coffin that has a thousand nails in it, a federal law enforcement official said of the case against Moody." *Id*. (emphasis omitted).

The *Moody* Court printed, in a footnote, the entirety of a 14-paragraph article from the Atlanta Journal Constitution, entitled "Here's evidence against Moody," noting that the information came from federal investigators.  The newspaper article outlined factually the "evidence against Moody." *Id*. at 1489.  The Court found it important that prejudicial information reached the public through news accounts which included references to the defendant's past criminal record and convictions, the government's evidence against the defendant, and statements of federal investigating officers concerning defendant's guilt.  The Globe's 18-page single-spaced article here (Exhibit 9 hereto) bears substantial similarity to the problems addressed with a transfer by the *Moody* Court.  The *Moody* Court found under Rule 21(a) that transfer was warranted from the large metropolitan area of Atlanta to Minnesota. *Id*. at 1490-91.

A review of the attached exhibits shows repeated and similar prejudicial and inflammatory publicity about Mr. Farwell himself and the nature of the "crime" that the press, the public, and even a Massachusetts State Legislator has assumed Mr. Farwell committed. The press has become an arm of the government in spreading a one-sided prosecutorial version of the case. To preserve Mr. Farwell's right to a fair trial, and the presumption of innocence, we request a transfer of this case from the District of Massachusetts.

### *Requested Transfer to the District of Rhode Island*

The defense suggests transferring this case to the District of Rhode Island, in Providence. Under Rule 21(b), though the forum would not be as convenient to the prosecutors or perhaps many witnesses (though many witnesses may in fact be as conveniently situated), Mr. Farwell is housed seven miles from the courthouse in Central Falls, Rhode Island, and transfer there would be more convenient for Mr. Farwell and likely the U.S. Marshals Service. Furthermore, Rhode Island is a suitable location for transfer of this case as it is still close to the alleged locations at issue in this case. Providence has its own airport, and an Amtrak station convenient to the courthouse. Most importantly, Providence has its own news coverage and lacks the local and personal interest and volume of personal, prejudicial and inflammatory coverage paid to this case and Mr. Farwell by the local press in Massachusetts.

### III.    CONCLUSION AND REQUEST FOR ORAL ARGUMENT

For the foregoing reasons, and pursuant to the Fifth, Sixth, and Eighth Amendments to the United States Constitution and Federal Rule of Criminal Procedure 21, the defendant requests that this Court transfer venue in this action to the District of Rhode Island. Consistent with Local Rule 7.1(d), undersigned counsel request that this Honorable Court hold a hearing

and permit oral argument on this motion. Pursuant to Local Rule 7.1(a)(2) counsel conferred with the government and understands that the government opposes this motion.

This the 17th day of November, 2025.

Respectfully submitted,

MATTHEW FARWELL
By his attorneys,

*/s Kimberly C. Stevens*
Kimberly C. Stevens
N.C. State Bar # 20156
Joanne M. Daley
BBO # 653375
Sandra Gant
BBO # 680122

Assistant Federal Public Defenders
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on November 17, 2025.

*/s Kimberly C. Stevens*
Kimberly C. Stevens