UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MATTHEW FARWELL<br><br>    Defendant | CRIMINAL No. 24-10259-DJC |

## UNITED STATES' OPPOSITION TO MOTION TO TRANSFER VENUE

The United States of America, by Leah B. Foley, United States Attorney, and Elizabeth C. Riley, Brian A. Fogerty, and Torey B. Cummings, Assistant U.S. Attorneys for the District of Massachusetts, respectfully opposes defendant Matthew Farwell's Motion to Transfer Venue (ECF No. 71). Farwell has failed to demonstrate that pretrial media coverage will prevent him from obtaining a fair trial in Boston. The Court should deny the motion.

The United States Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," Art. III, § 2, cl. 3, before a "jury of the State and district wherein the crime shall have been committed," Amend. VI. It also provides criminal defendants the right to trial by "an impartial jury," Amend. VI, and to due process of law, Amend. V. Taken together, these provisions require a change of venue only when "extraordinary local prejudice will prevent a fair trial." *United States v. Skilling*, 561 U.S. 358, 378 (2010). The Supreme Court has also cautioned that juror exposure to "news accounts of the crime" alone does not presumptively deprive a defendant of due process." *See Skilling*, 561 U.S. at 381 (cleaned up). "Prominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 561 U.S. at 381 (cleaned up) (emphasis in original). "A presumption of

prejudice," the Court has held, "attends only the extreme cases." *Skilling*, 561 U.S. at 381. The case at bar is not such a case.

The death of Sandra Birchmore and the ensuing prosecution of defendant Matthew Farwell have garnered media attention. Given the nature and circumstances of the crimes alleged in the Superseding Indictment, unsurprisingly, this case is a topic of interest for the local media and members of the community. *See Reynolds v. United States*, 98 U.S. 145, 155-156 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity"). However, the volume of media reports, and any theoretical prejudice, is far more limited when compared to other prominent cases where courts have denied defense motions for a venue change. One such notable example is the prosecution of Dzhokhar Tsarnaev for the Boston Marathon bombing, a local case that triggered international headlines and countless local acts of remembrance concerning a violent crime that shook the residents of the Commonwealth of Massachusetts and the nation. *See In re Tsarnaev*, 780 F.3d 14, 18 (1st Cir. 2015).[1] By comparison, Farwell's motion falls woefully short of demonstrating the media attention, or any alleged prejudice, that surpasses what occurred in that case. Farwell will receive a fair trial with an impartial jury where the alleged crimes occurred: the District of Massachusetts. Accordingly, his motion should be denied.

---

[1] *See also United States v. Tsarnaev*, 968 F.3d 24, 56 (1st Cir. 2020) (on direct appeal, stating "if pressed to decide the venue question now, two of us would likely find the judge abused no discretion in finding venue proper in Boston in 2015. But we need not make such a decision now."), *overruled on other grounds by United States v. Tsarnaev*, 595 U.S. 302 (2022).

**FACTUAL AND PROCEDURAL HISTORY**

As alleged in the Superseding Indictment, on February 1, 2021, Matthew Farwell killed Sandra Birchmore and her unborn son. Following Ms. Birchmore's death, state law enforcement authorities declined to open a grand jury investigation or charge Farwell with any crimes. Ms. Birchmore's death was ruled a suicide and Farwell remained out of custody for three and a half years.

On August 27, 2024, a federal grand jury indicted Farwell for killing Ms. Birchmore in violation of 18 U.S.C. § 1512(a)(1)(C). ECF No. 1. And, as has been the practice in countless other criminal cases in this District, the government filed a motion for detention with an accompanying affidavit. ECF No. 9. The motion and affidavit include information that is relevant to the government's motion for detention under the Bail Reform Act, 18 U.S.C. § 3142, *et seq*. With the responsibility of ensuring that a person who had been charged with premeditated murder did not pose a danger to the community, risk of flight, or risk of obstruction, the government submitted evidence to the Court to satisfy its burden under the Bail Reform Act. *See* ECF No. 9 at 12-13 (citing 18 U.S.C. §§ 3142(f)(1), (f)(2)(A), (f)(2)(B) and (e)).

Since U.S. Magistrate Judge Kelley entered an order of voluntary detention, the government has scrupulously refrained from disclosing in public filings additional information that could be viewed as arguably inculpatory. The government has taken pains to ensure that publicly filed status reports only contain the facts necessary to apprise the Court of the progress the parties are making on moving the case toward trial. *See, e.g.*, ECF Nos. 25, 29, 31, 51, 76. The Superseding Indictment was similarly quite brief and did not contain any new information that could be considered inflammatory or salacious.

## **LEGAL STANDARD**

The mechanism for obtaining a change of venue based on pretrial prejudice is Federal Rule of Criminal Procedure 21(a), which provides:

> Upon the defendant's motion, the court must transfer the proceedings against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

A Rule 21(a) motion "is addressed to the sound discretion of the trial court." *United States v. Drougas*, 748 F.2d 8, 29 (1st Cir. 1984). So is any request for an evidentiary hearing on such a motion. *See United States v. Wilcox*, 631 F.3d 740, 747 (5th Cir. 2011); *United States v. Peters*, 791 F.2d 1270, 1295 (7th Cir. 1986). The defendant bears the burden of establishing pretrial prejudice warranting a change of venue. *Wansley v. Slayton*, 487 F.2d 90, 94 (4th Cir. 1973); *Stafford v. Saffle*, 34 F.3d 1557, 1566 (10th Cir. 1994).

Changing venue is only permitted "in extreme cases" where "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." *In re Tsarnaev*, 780 F.3d at 18, *quoting* Fed. R. Crim. P. 21(a). Indeed, the prejudice must be significant enough to overcome the standard venue rules set forth in the Constitution. *Wansley*, 487 F.2d at 94; *Stafford*, 34 F.3d at 1566. The First Circuit has held that the defendant must clear a high hurdle to obtain a change of venue. Such a change is only appropriate when "there is an ever prevalent risk that the level of prejudice permeating the trial setting is so dense that a defendant cannot possibly receive an impartial trial." *United States v. Quiles–Olivo*, 684 F.3d 177, 182 (1st Cir. 2012); *see also United States v. Misla–Aldarondo*, 478 F.3d 52, 58 (1st Cir. 2007). These extreme situations occur only where publicity is "both extensive and sensational in nature" such that "pervasive pretrial publicity has inflamed passions in the host community past

the breaking point." *United States v. Angiulo,* 897 F.2d 1169, 1181 (1st Cir. 1990); *see also United States v. Walker,* 665 F.3d 212, 223 (1st Cir. 2011). Importantly, "[p]retrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (1976).

The defendant's high burden for a change in venue is appropriate. Courts have long recognized the strong public interest in trying criminal cases in the district where they occurred. Not only are there myriad practical reasons for conducting a trial locally—such as the court's proximity to witnesses—but courts have recognized the long-standing community interests in the local adjudication of cases. *See, e.g., United States v. Burge*, 2009 WL 2386147 (N.D. Ill. 2009).

Moreover, rather than attempt to ascertain pretrial prejudice to the defendant far in advance of a scheduled trial, many district courts use their discretion to "proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1145, 1146-47 (11th Cir. 2006) (cleaned up); *see also United States v. Gullion*, 575 F.2d 26, 28 (1st Cir. 1978) ("We find that the trial judge did not abuse his discretion in denying the motion for a change of venue until he could consider the effect of any pretrial publicity at the time of conducting the voir dire of prospective jurors."); *United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ("[T]he key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool."); *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991) ("Only where voir dire reveals that an impartial jury cannot be impaneled would a change of venue be justified."); *United States v. Peters*, 791 F.2d 1270, 1295 (7th Cir. 1986) ("[It] was an appropriate exercise of the district court's discretion and ordinarily preferable to assess the impact of the pretrial publicity through an extensive voir dire of the prospective jurors, instead of in the vacuum of a hearing without reference to prospective jurors."). Indeed, jury voir

dire is the preferred and appropriate place to "detect and defuse juror bias" in order to ensure a fair trial. *Skilling*, 561 U.S. at 385.

Routinely, screening questionnaires and voir dire are sufficient to "detect and defuse juror bias." *See Skilling*, 561 U.S. at 381, 385. Accordingly, most courts agree that:

> [w]hen a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity. . . Indeed, we have ruled that a trial court's method of holding its decision . . . in abeyance until the conclusion of the voir dire is clearly the preferable procedure.

*See Campa*, 459 F.3d at 1146-47 (cleaned up); *United States v. Haldeman*, 559 F.2d 31, 61 (D.C. Cir. 1976) ("[If] an impartial jury actually cannot be selected, that fact should become evident at the voir dire. The defendant will then be entitled to any actions necessary to assure that he receives a fair trial.").

## ARGUMENT

### I. The Court Should Deny Farwell's Motion Because He Fails to Allege Media Reporting That Satisfies His High Burden.

It is true that, "[in] rare cases, the community is so predisposed that prejudice can be presumed, and venue must be transferred as a matter of law." *United States v. Abello-Silva*, 948 F.2d 1168, 1176-77 (10th Cir. 1991). Farwell argues that this is one of those rare cases, but Supreme Court precedent dictates otherwise.

### A. The pretrial publicity in this case pales in comparison to the cases in which the Court has found a presumption of prejudice.

The Supreme Court has presumed prejudice arising from negative community sentiment and pretrial publicity in only three cases, all of which were decided more than 50 years ago: *Rideau*

*v. Louisiana*, 373 U.S. 723 (1963), *Estes v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). The facts of those cases are instructive.

>  i. *Rideau* involved a small community to which local media broadcast a recording of the defendant's custodial confession.

In a Louisiana parish of 150,000 people, Rideau was tried and convicted of robbery, kidnapping, and murder. *Rideau*, 373 U.S. at 724. Following his arrest, police interrogated him in jail and filmed his confession. *Id.* On three separate occasions shortly before trial, which took place less than two months after his arrest, a local television station broadcasted the confession to local audiences ranging from 24,000 to 53,000 people. *Id.* In reversing Rideau's conviction, the Supreme Court held:

> What the people saw on their television sets was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder. . . this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was Rideau's trial -- at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.

*Id.* at 726.

>  ii. *Estes* involved a "circus atmosphere."

In *Estes v. Texas*, 381 U.S. 532 (1965), the defendant was convicted in state court for swindling after defrauding farmers into purchasing fertilizer and equipment that did not exist. The proceedings in *Estes* were "conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). During the proceedings in *Estes*, there were twelve cameramen in the courtroom, parts of the proceedings were broadcast live, and there were wires and equipment that were distracting to both the jurors and the witnesses. The Court

opined that this atmosphere could not preserve a fair trial. The Supreme Court based that opinion primarily on the perils and harm of televising trials. *Estes*, 381 U.S. 535-38, 549-52.

           iii.      *Sheppard* involved "bedlam" reigning at the courthouse.

In *Sheppard,* the defendant was charged with bludgeoning his wife to death in their suburban Cleveland home. *Sheppard*, 384 U.S. 333. After being interrogated by police for hours, Sheppard was made to re-enact the murder inside the home, with media present. The media published detailed stories, including photographs, of Sheppard's reenactment. *Id*. at 338-339. The coroner then called an inquest and subpoenaed Sheppard to testify, questioning him for hours in front of the media and not permitting his counsel to participate. *Id*. at 339-340. Soon after, Sheppard was arrested and charged with the murder. The intensity of the publicity only increased at Sheppard's trial. The names and addresses of the members of the jury venire were published in three Cleveland newspapers and the prospective jurors received calls and letters regarding Sheppard's prosecution, from both anonymous sources and friends. *Id*. at 342. During trial, the at-capacity courtroom was filled with so many journalists only one row of 14 seats was left for the defendant and victim's families. *Id*. at 344. While the trial itself was not photographed or video-recorded, the witnesses, jurors, defendant, and judge were photographed and recorded every time they entered or left the courtroom for the nine weeks of trial. Daily transcripts of the trial were made available to the media, which would then publish the testimony of each witness as well as some photographs of trial exhibits. *Id*. at 344-345. The jurors, who were not sequestered during trial, were "thrust into the role of celebrities," exposing them "to expressions of opinion from both cranks and friends," all of whom had access to all the details of the trial proceedings through the extensive media coverage. *Id.* at 353.

After being found guilty at trial, the Supreme Court reversed the conviction, holding that "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom." *Id*. at 353, 355. However, Court observed that it was not the "months of virulent publicity about Sheppard and the murder" in the pretrial media coverage on its own that denied Sheppard due process; it was also the "carnival atmosphere" that pervaded the trial. *Skilling*, 561 U.S. at 380 (citing *Sheppard,* 384 U.S. at 358).

        B.    <u>*Skilling* provides a four-factor test for evaluating a motion for a change of venue for pretrial publicity</u>.

In 2010, the Supreme Court in *Skilling*, distinguishing *Rideau*, *Estes*, and *Sheppard*, held that a defendant must show something "more than heated reporting pretrial" to obtain a change of venue. *Skilling*, 561 U.S. at 380. The Court emphasized that prejudice cannot be presumed from negative community sentiment or pretrial publicity, except under circumstances such as in *Rideau*, *Estes*, and *Sheppard*, where "prejudicial publicity may be so inflammatory and so pervasive that the *voir dire* simply cannot be trusted to fully reveal the likely prejudice among prospective jurors" *Skilling*, 561 U.S. at 440 (cleaned up); *see also United States v. McVeigh*, 153 F.3d 1166, 1181 (10th Cir. 1998) (in order to grant a change of venue, a court must find "inflammatory pretrial publicity so permeated the community . . . that the publicity in essence displaced the judicial process.").

Skilling was the former CEO of Enron, a large Houston-based corporation that collapsed into a fraud-induced bankruptcy. *Skilling*, 561 U.S. at 368. A "large number of victims [lived] in Houston — from the [t]housands of Enron employees . . . [who] lost their jobs, and . . . saw their 401(k) accounts wiped out, to Houstonians who suffered spillover economic effects." *Id.* at 385-86 (cleaned up). Skilling moved for a change of venue, arguing that "hostility toward him in Houston, coupled with extensive pretrial publicity, had poisoned potential jurors." *Id.* at 369. To

9

support this claim, "Skilling, aided by media experts, submitted hundreds of news reports detailing Enron's downfall; he also presented affidavits from the experts he engaged portraying community attitudes in Houston in comparison to other potential venues." *Id.* at 369-70. Notwithstanding his cascade of submissions, the district court held that Skilling had not "establish[ed] that pretrial publicity and/or community prejudice raise[d] a presumption of inherent jury prejudice" such that "questionnaires and voir dire . . . [could not] ensure an impartial jury." *Id.* at 372-73.

The Supreme Court agreed, holding that Skilling failed to establish a presumption of prejudice. After citing *Rideau*, *Estes*, and *Sheppard*, the Court held that "[i]mportant differences separate Skilling's prosecution from those in which we have presumed juror prejudice." *Skilling*, 561 U.S. at 381-82. Specifically, the Court observed:

> First, we have emphasized in prior decisions the size and characteristics of the community in which the crime occurred. In *Rideau*, for example, we noted that the murder was committed in a parish of only 150,000 residents. Houston, in contrast, is the fourth most populous city in the Nation: At the time of Skilling's trial, more than 4.5 million individuals eligible for jury duty resided in the Houston area. . . Second, although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight. Rideau's dramatically staged admission of guilt, for instance, was likely imprinted indelibly in the mind of anyone who watched it. . . Third, unlike cases in which trial swiftly followed a widely reported crime, over four years elapsed between Enron's bankruptcy and Skilling's trial. Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse.

*Id.* at 382-83 (cleaned up). In affirming the district court's denial of Skilling's change of venue motion, the Supreme Court identified four factors, three of which are applicable here, to determine whether a defendant has met his high burden of establishing presumption of prejudice: (1) the size

10

and characteristics of the community in which the crime occurred; (2) the nature of the publicity; and (3) the passage of time between the crime and the trial.[2]

    C.    Farwell cannot satisfy the *Skilling* factors.

        i.    The size and characteristics of the community weigh in favor of conducting the trial in Boston.

The facts of this case are far closer to *Skilling* than *Rideau*, *Estes*, or *Sheppard*. Boston is one of the 25 largest cities in the United States, and the Eastern Division of the District of Massachusetts, from which jurors will be summoned, covers approximately 4,800 square miles and includes approximately 5 million people, making it the 10th largest metropolitan area in the United States. The district of comprised of a mix of urban, suburban, rural, and coastal communities, and its population is multi-ethnic, multi-racial, and economically diverse. All sectors of the economy are well-represented, including, manufacturing, agriculture, trade, and the arts.

Here, as in *Skilling*, because of the size and diversity of the local population, the Court will find 12 fair and impartial jurors. *See, e.g., United States v. Salameh*, 1993 WL 364486, *1 (S.D.N.Y. Sep. 15, 1993) (in case of first World Trade Center bomber, denying motion for change of venue, based, in part, on finding that "jurors from this district, one of the largest and most diverse districts in the country," are as likely to be fair and impartial "as jurors from other parts of the country"); *People v. Manson*, 61 Cal. App. 3d 102, 176-177 (Cal. Ct. App. 1976) (declining to transfer Charles Manson trial out of Los Angeles in part because "adversities of publicity are considerably offset if trial is conducted in a populous metropolitan area.") (collecting cases); *New York v. David Berkowitz*, 93 Misc.2d 873, 879 (1978) (declining to transfer "Son of Sam" murder trial out of Brooklyn).

---

[2] The fourth *Skilling* factor concerns the jury's decision as to guilt after trial, which is not applicable to this case because it has not yet gone to trial.

11

In fact, this District has a long history of conducting trials involving extensive publicity. *See, e.g., United States v. Bulger*, No. 99-cr-10371-DJC (D. Mass.); *United States v. Colburn et al.,* 19-cr-10080-NMG (D. Mass.); *United States v. Chin et. al,* 14-cr-10363-RGS (D. Mass). Indeed, even the significant media coverage in this District regarding Tsarnaev, the man who murdered three people and injured hundreds at the Boston Marathon, did not require a change in venue. *See In re Tsarnaev*, 780 F.3d at 18.

The characteristics of the community and the crimes further support denying Farwell's motion. The crimes alleged in the Superseding Indictment did not affect the community where potential jurors reside in the same way that Tsarnaev and Skilling's crimes did. Tsarnaev and his brother set two bombs at the finish line of the Boston Marathon, killing and maiming victims from throughout the region. Many considered it to be a terrorist attack on the marathon, the City of Boston, and the United States. Skilling, the former Enron CEO, was the leader of a major Houston-based corporation that collapsed into bankruptcy as a result of fraud. *Skilling*, 561 U.S. at 368. A "large number of victims [lived] in Houston -- from the [t]housands of Enron employees . . . [who] lost their jobs, and . . . saw their 401(k) accounts wiped out, to Houstonians who suffered spillover economic effects." *Id.* at 385-86. Notwithstanding the wide community impact of their respective crimes, courts denied Tsarnaev and Skilling's requests to move their cases to different districts. Here, Farwell's motion does not measure up to either of the foregoing unsuccessful attempts to change venue.

        ii.     <u>Nature of the publicity weighs in favor of conducting the trial in Boston</u>.

Courts have denied defendants' requests to change venue in many highly publicized criminal trials, demonstrating how rarely this relief is granted and how extreme the prejudice must be to meet the high bar. *See, e.g., Yousef*, 1997 WL 411596, at *3 (1993 World Trade Center

bombing in New York City); *Salameh*, 1993 WL 364486, at *1 (1993 World Trade Center bombing in New York City); *United States v. Moussaoui*, 43 Fed. Appx. 612, 613 (4th Cir. 2002) (September 11, 2001 terrorist attack on the Pentagon in northern Virginia); *United States v. Haldeman*, 559 F.2d 31, 61-62 (D.C. Cir. 1976) (Watergate defendants). These trials of demonstrable national interest—terrorist attacks and a national scandal that triggered a presidential resignation—involved much more media coverage than that of Farwell and were conducted in the districts in which the crimes occurred.

Even if the Court were to find that this case has received "extensive" media coverage, "[e]xtensive knowledge in the community of either the crimes or the defendants is not sufficient, by itself, to render a trial constitutionally unfair." *Drougas*, 748 F.2d at 29. That is especially true where, as here, the coverage has been largely "factual, as opposed to inflammatory." *United States v. Misla-Aldarondo*, 478 F.3d 52, 58 (1st Cir. 2007). While news stories about this case have reported information about a serious crime, they have "contained no confession or other blatantly prejudicial information" as was the case in *Rideau*. *See Skilling*, 561 U.S. at 381. That alone is enough to defeat a claim of presumed prejudice. *See, e.g., Haldeman*, 559 F.2d at 61-62 (holding that Watergate defendants were not entitled to change of venue because "the pretrial publicity in this case, although massive, was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession. It is true that some of the pieces . . . are hostile in tone and accusatory in content . . . [but the bulk] consists of straightforward, unemotional factual accounts.").

Moreover, the Supreme Court has repeatedly held that "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Assn.*, 427 U.S. at 554; *see also Gannett Co., Inc. v. DePasquale*, 443 U.S. 368 404 n.1 (1970) (Rehnquist, J.,

13

concurring) ("In fact, as both the Court and the dissent recognize, the instances in which pretrial publicity alone, even pervasive and adverse publicity, actually deprives a defendant of the ability to obtain a fair trial will be quite rare."). Even in the notorious *Sheppard* case, where the defendant was subjected to unimaginably prejudicial publicity, the Court held that, absent the "carnival atmosphere" that pervaded the trial, the "months [of] virulent publicity about Sheppard and the murder" would <u>not</u> have been sufficient to create a presumption of prejudice. *Sheppard*, 384 U.S. at 335–49, 353–61. Pretrial publicity in *Tsarnaev* far exceeded the media publicity in this case. As the First Circuit wrote, "[i]t is no exaggeration to say that the reporting of the events [in the *Tsarnaev* case]—in the traditional press and on different social-media platforms—stands unrivaled in American legal history (at least as of today)." *Tsarnaev*, 968 F.3d at 42. Media reports in *Tsarnaev* included the "views of prominent community members," including the former mayor and former police commissioner of Boston, that the defendant should receive the death penalty. *Id.* at 43. Here, while the defendant cherry-picks a handful of reader comments that appear to vilify Farwell, he does not identify a single instance of improper press coverage that even borders on the public spectacle in Sheppard or the two other cases in which the Supreme Court has held that it was error not to transfer venue.

In addition, in the media, citizens and commenters referred to Tsarnaev as a "monster," a "terrorist," a "scumbag," and "what evil looks like." *United States v. Tsarnaev*, 968 F.3d 24, 43 (2020). Yet the court denied Tsarnaev's multiple motions for a change of venue, each time holding that the defendant had not demonstrated the extreme prejudice necessary to warrant overcoming the Constitution's presumption that crimes should be tried in the districts where they took place. *See Tsarnaev*, 968 F.3d at 43-64.

While Farwell highlights various reader comments to support his claim that a fair and impartial jury cannot be selected in the District of Massachusetts, reader comments to news stories are not necessarily reflective of broader community knowledge or attitudes. "A jury may have difficulty in disbelieving or forgetting a defendant's opinion of his own guilt but have no difficulty in rejecting the opinions of others because they may not be well-founded." *United States v. Chagra*, 669 F.2d 241, 251–252, n. 11 (5th Cir. 1982).

While individuals who commented on media stories and those who hold biases against the defendant or the government should not—and would not, through an effective voir dire process—serve as jurors, a juror does not need to be totally unfamiliar with the existence of a case. Courts have repeatedly held that "the due process guarantee of trial by a fair and impartial jury can be met even where . . . virtually all of the veniremen admit to some knowledge of the defendant due to pretrial publicity." *United States v. Bliss*, 735 F.2d 294, 297–98 (8th Cir. 1984). As the Supreme Court explained in *Irvin v. Dowd*, 366 U.S. 717 (1961):

> It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id*. at 722–23. *See also Reynolds v. United States*, 98 U.S. 145, 155–156 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who

15

has not read or heard of it, and who has not some impression or some opinion in respect to its merits."); *Drougas*, 748 F.2d at 29 ("[T]his court has previously recognized that the sixth amendment does not require that each juror's conscious mind be tabula rasa, let alone his or her subconsciousness."); *Knapp v. Leonardo*, 46 F.3d 170, 176 (2d Cir. 1995) (finding no manifest error in state court's determination that jury was impartial despite defense argument that 83 percent of the venire was excused because they had prejudged the case.).

          iii.        <u>The passage of time weighs in favor of conducting the trial in Boston.</u>

The passage of time weighs in favor of denying Farwell's motion. The Supreme Court has held that the temporal proximity matters. The more time between the crime and the trial, the less compelling the argument for presumed prejudice. In *Skilling*, for example, Enron went bankrupt more than four years before Skilling's trial. *See Skilling*, 561 U.S. at 383 (distinguishing the four-year gap in the *Skilling* case from "cases in which trial swiftly followed a widely reported crime" such as *Rideau*, 373 U.S., at 724, where trial took place only two months after the crime).

By the time Farwell's case goes to trial, five and a half years will have passed since the death of Ms. Birchmore and her unborn child. Twenty-six months will have passed since he was arrested on federal charges and the government moved to detain him. With the timeframe of this case sitting on the opposite end of the spectrum from *Rideau*, the temporal proximity factor weighs heavily in favor of conducting this trial in Boston.

## **CONCLUSION**

The government agrees that the defendant has a right to be tried where the Court can seat an impartial jury. That venue is in the District of Massachusetts, the jurisdiction in which the crimes were committed, where most of the witnesses work or reside, and where Ms. Birchmore was born, raised, and was supposed to be protected. High-profile cases have been tried in this

district. Voir dire is the way to ensure that jurors are fair and impartial. Accordingly, the Court should deny Farwell's motion and rely on screening questionnaires and voir dire to select a fair and impartial jury from the Eastern Division of the District of Massachusetts.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:  */s/ Torey B. Cummings*
     ELIZABETH C. RILEY
     BRIAN A. FOGERTY
     TOREY B. CUMMINGS
     Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2025, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

*/s/ Torey B. Cummings*
Torey B. Cummings
Assistant United States Attorney