**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Docket No. 1:24-cr-10259-DJC |
| | ) |
| v. | ) ***LEAVE TO FILE EXCESS PAGES*** |
| | ) ***GRANTED ON 03/26/2026*** |
| | ) |
| MATTHEW FARWELL | ) |

**OPPOSITION TO GOVERNMENT'S MOTION FOR DETENTION AND**
**MEMORANDUM IN SUPPORT OF RELEASE**

*"In our society liberty is the norm, and detention prior to trial or without trial*
*is the carefully limited exception."*
*United States v. Salerno*, 481 U.S. 739, 755 (1987).

Matthew Farwell, by and through undersigned counsel, requests that this Honorable Court

conduct a detention hearing and release him pursuant to the Bail Reform Act ("BRA"). *See* 18

U.S.C. § 3142 *et seq*. He submits that the government cannot meet its burden to demonstrate by

clear and convincing evidence that his release would pose a danger to the community or, by a

preponderance of the evidence, that he presents a serious risk of flight and/or obstruction, and that

he must be released. He further submits that the factors set forth in 18 U.S.C. § 3142(g) support

his release on pretrial conditions.

As discussed below, Mr. Farwell's personal history evinces extraordinary service to both

his country and his community, he has extensive family and community ties to the Commonwealth

of Massachusetts, and he has no prior criminal record – convictions or arrests. Perhaps most

tellingly, however, in the years after Ms. Birchmore's death and notwithstanding the lengthy

Massachusetts State Police investigation and excessive press coverage, Mr. Farwell conducted

himself like the innocent man this Court presumes him to be. He lived in the same home with his

family (including his three young children); he built his own business from the ground up; he

maintained the same contact information and associations; he participated in the attendant civil suit and Massachusetts POST proceedings; and he did not intimidate or influence any witness nor destroy any piece of purported evidence. Should he be released on the conditions proposed below, or any other condition the Court deems just, he will appear for trial and comport himself in the same peaceful and respectful manner as he has over the past five years.

Although the BRA presumes pretrial release on personal recognizance in this case, there is a panoply of release conditions available to reasonably assure Mr. Farwell's appearance and the safety of the community. *Id.* at § 3142(c)(1)(B). These include: (1) release to his mother as third-party custodian; (2) live with third-party custodian, maintain residence, and do not move without prior permission of U.S. Probation; (3) confinement to residence with exceptions for legal, medical, mental health, employment, and/or family obligations as approved by U.S. Probation; (4) submit to location monitoring; (5) restrict any approved travel to the District of Massachusetts; (6) surrender any active passport to U.S. Probation and do not seek new travel documents during the pendency of the case; (7) no contact, direct or indirect, with any witnesses in the case; (8) submit to any required testing for drugs and/or alcohol; (9) refrain from possession of any firearm, destructive device, and/or other dangerous weapon; (10) submit to an unsecured bond in the amount of $50,000; and (11) report to U.S. Probation and Pretrial Services as directed. Mr. Farwell offers these proposed conditions for the Court's consideration but argues that he is entitled to the least restrictive set of conditions that the Court deems appropriate.

## I.    Background

Sandra Birchmore's death by suicide was a tragedy, and the federal government's allegations that Mr. Farwell instead killed her are undoubtedly serious. Undersigned counsel expects, however, that much of what the government declaratively states as fact in its motion and

accompanying affidavit are issues that will be heavily contested and litigated at trial. Whether Ms. Birchmore's death was a suicide as the Massachusetts Office of the Chief Medical Examiner (OCME) pronounced, or a homicide as this federal prosecution alleges, is the critical issue in this case – one upon which the government ultimately bears the burden of proof beyond a reasonable doubt. This is especially true where:

(1) Sandra Birchmore had a substantial and documented history of suicidal ideation.

(2) On February 1, 2021, the date the government alleges Ms. Birchmore was killed by the defendant, she Googled the following: "What color is the suicide ribbon?"

(3) Dr. Maria Capo-Martinez, the forensic pathologist employed by the Massachusetts Office of the Chief Medical Examiner (OCME), conducted the autopsy of Ms. Birchmore. The OCME ruled her cause of death a "suicide".

(4) The government sought a second expert opinion from an additional board-certified forensic pathologist and medical examiner, this one employed by the United States government. That forensic pathologist and medical examiner concurred with the OCME's finding that Ms. Birchmore committed suicide.

(5) The government, rejecting these expert conclusions, sought a third opinion from William Spafford Smock, M.S., M.D., a specialist in the field of emergency medicine. Dr. Smock opined that Ms. Birchmore was strangled and died by homicide. Dr. Smock is not a forensic pathologist, nor is he board certified in any specialty.[1]

(6) On October 24, 2024, Fox 25 News reported that on August 16th, 2024, nine days before Matthew Farwell was arrested in this case, Dr. Smock, along with individuals from the Massachusetts State Police, the FBI, and the U.S. Attorney's Office met with Chief Medical Examiner Dr. Mindy Hull and Dr. Maria Capo-Martinez at the office of OCME. Two sources told the news outlet that federal authorities wanted Dr. Hull to know they disagreed with the determination that Birchmore died from hanging herself.[2]

---

[1] It is undersigned counsel's understanding that the family of Sandra Birchmore hired forensic pathologist Michael Baden, M.D. to review the findings of the OCME, but he was not retained by the government in this case.

[2] *See* Ted Daniel, "Log confirms strangulation expert met with Medical Examiner about Sandra Birchmore's death." FOX25 NEWS, Oct. 24, 2024, https://www.boston25news.com/news/25-investigates/log-confirms-strangulation-expert-met-with-medical-examiner-about-sandra-birchmores-death/DM4WUFHGXFCRVEWLTSL4I7NPZM/ The defense first learned of this meeting from media reporting and, after requesting additional information from the government, understands that no notes were taken or report written about this meeting.

(7) Despite efforts by the government and its retained expert to meet with OCME regarding its opinion of Ms. Birchmore's cause of death, OCME has not changed its conclusion that Ms. Birchmore died by her own hand.[3]

Although it should be obvious given Mr. Farwell's right to be presumed innocent, the District Court's recent caution must be repeated: "the government's allegations against [Mr.] Farwell are just that, allegations, and have no evidentiary significance." D.E. 87 at 1. Consistent with Mr. Farwell's position that his innocence will be borne out at a trial and that the government should try its case before a jury and not in the court of public opinion, the forum to determine his guilt or innocence is *not* a detention hearing. *See* 18 U.S.C. § 3142(j) (determinations of pretrial detention or release do not modify or limit an accused's presumption of innocence); *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) ("the weight of the evidence is the least important of the various [§ 3142(g)] factors," lest a court make a "pretrial determination that the person is guilty.").

Even when charged with serious offenses, there is no mandate or requirement that defendants be detained and the Bail Reform Act explicitly permits release even for those accused of the most serious crimes. Indeed, "[t]he very reason that Congress directed district courts to consider factors *beyond just the severity of the offense* is the recognition that *an individual is more than the crime of which that individual has been accused*." *United States v. Mattis*, 963 F.3d 285, 291-93 (2d Cir. 2020) (emphasis added) (affirming the district court's release order after factoring in the "gravity" of the charges). As outlined below, Mr. Farwell's personal history and conduct while under microscopic scrutiny for more than 3.5 years prior to this federal indictment

---

[3] *See* Laura Crimaldi, "State medical examiner still considers Sandra Birchmore's death a suicide despite prosecution of ex-Stoughton officer," THE BOSTON GLOBE, Mar. 31, 2025, https://www.bostonglobe.com/2025/03/31/metro/sandra-birchmore-matthew-farwell-experts-suicide-strangulation/.

demonstrate his respect for the law and the proceedings. Mr. Farwell's established history substantially reduces, if not eliminates, any concerns regarding serious risk of flight, obstruction, or danger to justify release in this case.

### A.  Mr. Farwell's Ties to Massachusetts and Military Service

Matthew Farwell is a life-long resident of Massachusetts, a devoted son and father, and a decorated combat veteran and police officer who has served his country and community for nearly 20 years, since he first enlisted in the United States Army when he was 18 years old. His family has deep roots in the South Shore, where his mother, wife, and children still reside today. One of three children raised in a family that struggled to make ends meet in Stoughton, Massachusetts, Mr. Farwell has worked his entire life – starting with two jobs as a teenager, at Honey Dew Donuts and a local tow truck yard, the United States Army, and later for both the Wellesley and Stoughton Police Departments. Though he traveled internationally and across the United States when deployed with the Army, it is here, in Massachusetts, where he built his life, career, and ultimately his own business.

In 2004, Mr. Farwell volunteered for the Army at the youngest possible age and at a time when the United States was intensely involved in both the Iraq and Afghanistan conflicts, just a few years after the attacks of September 11th. The principles of service were deeply instilled in him by his father and grandfather, and Mr. Farwell thought at one time that he would make a career in the military. He completed basic training at Fort Jackson, South Carolina, volunteering and qualifying for Explosive Ordnance Disposal ("EOD") training after passing intensive suitability tests. He completed Advanced Individual Training at Redstone Arsenal in Alabama and Eglin Air Force Base in Florida in 2005 before reporting to Ft. Bliss in Texas where he was quickly promoted to Private First Class. In advance of deploying to Afghanistan in 2006, Mr. Farwell's unit at Ft.

Bliss partnered with local law enforcement agencies on EOD related issues in 32 counties in Texas. While in the U.S. Army, Mr. Farwell held Top Secret/Sensitive Compartmented Information clearance (TS/SCI), a high-level security clearance which required a rigorous background investigation.[4]

In March 2006, Mr. Farwell was deployed to Afghanistan – first to Bagram and then to Jalalabad, where he joined Task Force (TF) Paladin – a joint service task force assigned to the Afghanistan EOD mission. Charged primarily with the disposal of improvised explosive devices ("IEDs"), Mr. Farwell's team disarmed IEDs by disconnecting the detonation mechanisms or by placing additional explosives near the IED and performing a controlled detonation. His team also frequently examined the remains of vehicles destroyed by IEDs to prevent further attacks. As a result of his active engagement with, and circumstances in which he was in imminent danger from, enemies to the United States, the Army awarded Mr. Farwell the Combat Action Badge.[5] Matthew

---

[4] *See* "Access to Sensitive Compartmented Information (SCI)," United States Dep't of Commerce, Office of Security, https://www.commerce.gov/osy/programs/personnel-security/access-sensitive-compartmented-information-sci.

[5] 8–8. Combat Action Badge ("CAB")
a. On 2 May 2005, the CSA approved the creation of the CAB to provide special recognition to Soldiers who personally engaged, or are engaged by, the enemy.
b. The requirements for award of the CAB are branch and MOS immaterial. Assignment to a combat arms unit or a unit organized to conduct close or offensive combat operations, or performing offensive combat operations, is not required to qualify for the CAB. However, it is not intended to award the CAB to all Soldiers who serve in a combat zone or imminent danger area.
c. Specific eligibility requirements include:
(1) May be awarded to any Soldier.
(2) Soldier must be performing assigned duties in an area where hostile fire pay or imminent danger pay is authorized.
(3) Soldier must be personally present and actively engaging or being engaged by the enemy, and performing satisfactorily in accordance with the prescribed rules of engagement.
(4) Soldier must not be assigned or attached to a unit that would qualify the Soldier for the CIB and/or CMB. For example, an infantryman (MOS 11B) assigned to Corps staff is eligible for award of the CAB. However, an infantryman assigned to an infantry BN is not eligible for award of the CAB.
i. Soldier may be awarded the CIB, CMB, and CAB for the same qualifying period, provided the criteria for each badge are met. However, subsequent awards of the same badge within the same qualifying period are not authorized. *https://ec.militarytimes.com/static/pdfs/r600_8_22.pdf*

Farwell's concern for the safety of his fellow soldiers, and innocent Afghan civilians alike, was evident in the manner in which he conducted himself while in service to this nation.

He returned to Ft. Bliss in the Fall of 2006 and was promoted to Sergeant and selected as a team leader. The following year, Mr. Farwell began to have severe migraines and neck pain and was ultimately medically separated and honorably discharged from the Army in mid-2008. For his laudable service, however, he was awarded the Army Good Conduct Medal[6], the Army

---

[6] 4-1 Army Good Conduct Medal
The AGCM was established by EO 8809, 28 June 1941 and was amended by EO 9323, 1943 and by EO 10444, 10 April 1953. It is awarded for exemplary behavior, efficiency, and fidelity in active Federal military service. It is awarded on a selective basis to each Soldier who distinguishes himself or herself from among his or her fellow Soldiers by exemplary conduct, efficiency, and fidelity throughout a specified period of continuous enlisted active Federal military service, as outlined in this chapter. There is no right or entitlement to the medal until the immediate commander has approved the award and the award has been announced in POs (see glossary for definition of "active Federal military service"). *https://ec.militarytimes.com/static/pdfs/r600_8_22.pdf*

Commendation Medal[7], and the Joint Service Commendation Medal[8]. (Photos of Matthew Farwell's Joint Service Achievement Medal and Combat Action Badge attached as Exhibit 1). He was later assessed as having a 90% service-connected disability rating.

Upon his return to Massachusetts, Mr. Farwell moved back to Stoughton and eventually to Easton with his wife. He attended and graduated from the police training academy and first joined the Wellesley Police Department. While with Wellesley Police, Mr. Farwell earned several commendations for his vital work in responding to emergency scenes and saving lives. In 2012,

---

[7] 3–18. Army Commendation Medal
a. The ARCOM was established by War Department Circular 377, 18 December 1945 (amended in DAGO 1960–10, 31 March 1960).
b. The ARCOM is awarded to any Servicemember of the Armed Forces of the United States who, while serving in any capacity with the Army after 6 December 1941, distinguishes himself or herself by heroism, meritorious achievement, or meritorious service. Award may be made to a member of the armed forces of a friendly foreign nation who, after 1 June 1962, distinguishes himself or herself by an act of heroism, extraordinary achievement, or meritorious service, which has been of mutual benefit to a friendly nation and the United States.
c. The ARCOM may be awarded for combat related service or achievement after 29 February 1964.
d. Awards of the ARCOM may be made for acts of valor performed under circumstances described above which are of lesser degree than required for award of the BSM. These acts may involve aerial flight.
e. The ARCOM may be awarded for acts of noncombatant-related heroism which do not meet the requirements for an award of the SM or for acts of aerial flight which do not meet the requirements for award of the AM.
f. The ARCOM will not be awarded to general officers.
g. Award of the ARCOM may be made to any individual commended after 6 December 1941 and before 1 January 1946 in a letter, certificate, or order of commendation, as distinguished from letter of appreciation, signed by an officer in the rank or position of a MG/O–8 or higher. Veterans and retirees may submit letter applications to National Personnel Records Center (NPRC), 1 Archives Drive, St. Louis, MO 63138–1002. Soldiers who retired or were discharged after 1 October 2002 will send their letter application to Commander, U.S. Army Human Resources Command, Awards and Decorations Branch (AHRC–PDP–A), 1600 Spearhead Division Avenue, Fort Knox, KY 40122–5408. Awards of the Army Commendation Ribbon and of the Commendation Ribbon with Metal Pendant were redesignated by DAGO 1960–10, as awards of the ARCOM, without amendment of orders previously issued. *https://ec.militarytimes.com/static/pdfs/r600_8_22.pdf*

[8] 2–6. Joint Service Commendation Medal
The Joint Service Commendation Medal was authorized by the Secretary of Defense on 25 June 1963. It is awarded in the name of the Secretary of Defense to Servicemembers of the Armed Forces of the United States who, after 1 January 1963, distinguished themselves by outstanding performance of duty and meritorious achievement. The prescribing directive for the Joint Service Achievement Medal is DODM 1348.33, Volume 1. *https://ec.militarytimes.com/static/pdfs/r600_8_22.pdf*

Mr. Farwell joined the Stoughton Police Department and within just one year he received a Life Saving Medal, a Meritorious Award, and a Commendation Award. He was promoted to detective in 2017 and continued to accrue commendations and public service awards. (Photo of Matthew Farwell's Stoughton Police Department Life Saving Medal attached as Exhibit 2).

**B. State Investigations and Proceedings and Mr. Farwell's Conduct Prior to His Federal Arrest**

Mr. Farwell's leave from Stoughton Police was swiftly initiated following the death of Ms. Birchmore. Importantly, Mr. Farwell respected the processes and the lengthy investigations that followed. Throughout the attendant Stoughton Police internal affairs investigation, the Massachusetts State Police and Norfolk County District Attorney's Office investigation, and the POST proceedings, Mr. Farwell repeatedly showed he is far from a flight risk. He remained put, engaged counsel, and saw these matters through to their eventual dispositions. Ultimately resigning from the Stoughton Police Department in 2022, Mr. Farwell subsequently entered into a voluntary decertification agreement with POST.

Mere days after Ms. Birchmore's death, Mr. Farwell voluntarily spoke with Massachusetts State Police investigators and consented to a search of his personal cell phone. Despite the government's claims that he later "Googled" the topic of revoking consent in Massachusetts, he never did so.

Mr. Farwell also answered a civil lawsuit filed by the Estate of Sandra Birchmore. The civil matter has been stayed pending the disposition of this federal case.

Notwithstanding the intense scrutiny of the state investigations – which resulted in no criminal charges filed by the Commonwealth of Massachusetts against Mr. Farwell in relation to Ms. Birchmore's death – Mr. Farwell sought to maintain some semblance of normalcy for his

family. Though the government concedes he "went on with his life,"[9] in truth he worked incredibly hard to rebuild a life in the state where he was born and raised.

Far from the conduct of someone intending to flee the district, Mr. Farwell took out a 10-year business loan to start his own business, which he named after his two sons and daughter. He obtained his commercial driver's license, purchased a semi-truck and trailer to transport cargo and freight for his business, and registered his business with the Secretary of the Commonwealth of Massachusetts.

As a combat veteran, Matthew Farwell sought out medical and mental health services from the VA. He maintained and nurtured relationships with a close circle of friends and family, including his mother who lives roughly 15 minutes away. His only travel since 2021 has been to visit family or work briefly out of state, and when his U.S. passport expired in 2023, he did not renew it.

Moreover, until his arrest in this case, Mr. Farwell remained a lawfully registered firearm owner and safely secured his guns in a safe in his marital home. Neither before nor after Ms. Birchmore's death did Mr. Farwell ever use any firearm to threaten or harm himself or others. After his license was suspended as a result of his arrest, all of his firearms were relinquished.

Most importantly, however, Mr. Farwell, along with his wife, continued to raise their three young children in their family home. Often treated like a pariah himself by former colleagues and community members, with his name and reputation smeared across social media and the press. In fact, two months prior to his arrest, local and national news outlets heralded a report by Dr. Michael Baden, a forensic pathologist hired by the family of Sandra Birchmore. Headlines in People

---

[9] *See* D.E. 88, Transcript of Motion Hearing, Jan. 20, 2026 (quoting the government, "he went on with his life for over three years before he was indicted.").

magazine[10] and on CourtTV.com[11] proclaimed that Matthew Farwell was an alleged murderer. Matthew Farwell did not flee the jurisdiction in response to these so called "bombshells"; he stayed put. He did not interfere with this investigation in any way, even as members of the public, here in the Commonwealth and across the country, called for his arrest and prosecution.

Mr. Farwell remained singularly focused on providing for his family and protecting them from the circus-like atmosphere generated in the wake of Ms. Birchmore's suicide and revelations surrounding his prior interactions with her. While other men who had ongoing affairs with Ms. Birchmore moved out of state after her death,[12] Mr. Farwell remained in the same home, in the same town.

Put simply: for more than 3.5 years after Ms. Birchmore's death and until his arrest in this case, Mr. Farwell did not behave in any way that would indicate he was either a risk of flight or risk of obstruction. He conducted himself peaceably and sought to quietly rebuild his life. Despite this, and despite surveilling him for months, heavily armed law enforcement agents arrested Mr. Farwell while he was alone with his 7-year-old son on August 28, 2024.[13] Mr. Farwell was respectful, he was not armed, and he submitted to arrest without incident.

**(8) Procedural History**

---

[10] *See* Liam Quinn, "Death of Woman Who Accused Cop of Sex Abuse Was Ruled Suicide. But Prominent Pathologist Doesn't Think So", People Magazine, June 25, 2024. https://people.com/sandra-birchmore-death-not-suicide-says-expert-michael-baden-report-8668969

[11] *See* Lauren Silver, "Michael Baden: Sandra Birchmore's death was homicide, not suicide", CourtTV.com, June 26, 2024. https://www.courttv.com/news/michael-baden-sandra-birchmores-death-was-homicide-not-suicide/

[12] These include, according to the government's own evidence, Mr. Farwell's brother who is a named defendant in the civil lawsuit as well as the confirmed biological father of Ms. Birchmore's fetus who has thus far not been publicly named.

[13] The defense is unable to provide the Court with a video record of Mr. Farwell's arrest, because the officers involved deliberately turned off their body-worn cameras before effectuating it and deploying non-lethal explosive devices in the presence of a child.

In late August 2024, Mr. Farwell was charged by indictment with killing a witness/victim, in violation of 18 U.S.C. § 1512(a)(1)(C). D.E. 1. More than a year later, in mid-October 2025, the government superseded with an indictment charging killing a witness/victim, in violation of 18 U.S.C. § 1512(a)(1)(C) and thereby causing the death of a child in utero, in violation of 18 U.S.C. § 1841. D.E. 63. He has pleaded Not Guilty. D.E. 13, 74. Prior to Mr. Farwell's initial appearance and arraignment in this case on August 28, 2024, the government filed a motion for detention. In support thereof, the government appended an affidavit by Special Agent Chenee Castruita ("SA Castruita") with the Federal Bureau of Investigation ("FBI"). D.E. 9-1. On September 7, 2024, on the advice of counsel, Mr. Farwell consented to a voluntary order of detention without prejudice. D.E. 18. On September 9, 2024, this Honorable Court entered an Order of Voluntary Detention, "without prejudice to the defendant filing a motion at any time seeking a full detention hearing and the setting of conditions of release, regardless of whether there have been changed circumstances." D.E. 21.

On December 9, 2025, the government notified this Court that it did not intend to seek the death penalty in this case. D.E. 75.

**(9) Argument**

There is a presumption of release in this case. The BRA directs judges to order pretrial release on personal recognizance or an unsecured appearance bond unless they find "that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). Even where a judge makes such a finding, 18 U.S.C. § 3142(c) still mandates pretrial release subject to certain enumerated and least restrictive conditions. Section 3142(f) – which the government invokes in moving for Mr. Farwell to be detained pretrial – "specifies certain conditions under which a detention hearing

12

shall be held." *United States v. Ploof*, 851 F.2d 7, 9 (1st Cir. 1988). As relevant here, a detention

hearing is required where Mr. Farwell has been charged with a crime of violence that carries a

sentence of life imprisonment and the government alleges his release would pose a danger, and

where the government alleges that Mr. Farwell poses a serious risk of flight and obstruction *See*

18 U.S.C. §§ 3142(b)(f)(1)(A) and (B); §§ 3142(b)(f)(2)(A) and (B).

A defendant may only be detained, however, if the judge determines that "no condition or

combination of conditions will reasonably assure the appearance of the person as required and the

safety of any other person and the community." 18 U.S.C. § 3142(e). The factors the Court must

consider in making this determination are set forth in 18 U.S.C. § 3142(g):

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

The First Circuit directs that "due attention" must be given to all four factors. *United States*

*v. O'Brien*, 895 F.2d 810, 816 (1st Cir. 1990). But § 3142(g) is notably silent about the relative

weight a court should give these factors when deciding whether to release or detain a defendant.

In assessing Matthew Farwell's mental condition, the Court should not punish him for

seeking treatment from the VA. As a combat veteran, these are services to which he is entitled. His

willingness to engage in treatment and his compliance therewith is commendable. He should be

13

applauded for this, not penalized, in assessing his worthiness for bail in this matter.[14] Indeed, the Court ought to credit any criminal defendant, especially our veterans, who identify their needs, seek out appropriate assistance, and comply with their treatment obligations.

Similarly, Mr. Farwell's unblemished history of lawful gun ownership cannot form the basis for detention in this case.[15] The Commonwealth of Massachusetts has some of the strictest gun laws in the country. These rules are designed to balance public safety with the rights of individual gun owners. Whether in his professional capacity as a soldier or police officer or in his civilian life, Matthew Farwell abided by these rules without incident. His arrest in this case necessitated the seizure of his lawfully owned firearms. There are no firearms in his marital home or his mother's residence, nor anywhere in his custody and/or control.

Finally, the Court cannot cite Mr. Farwell's present lack of employment as grounds for detention in this matter. He has been held custody and unable to work. However, he was gainfully self-employed at the time of his arrest and U.S. Probation Pretrial Services verified that he registered his company on January 21, 2022, and he is endorsed to operate motorcycles, combined Tank/HAZ-MAT, and the operation of any vehicle that would be referred to as a double or triple. Furthermore, even if Mr. Farwell is not able to obtain employment before his October 5, 2026 trial date, he will continue to receive a monthly stipend from the VA.

Mr. Farwell submits that the BRA requires that he be released because, as he stands before the court today, he is neither a "serious risk" of flight nor obstruction, nor would his release pose a danger. If this Court disagrees, the detention factors at 18 U.S.C. § 3142(g) support a finding that there are conditions available that in whole or in part are more than sufficient to mitigate any such risk. The BRA thus mandates that he be released subject to the least restrictive set of conditions,

---

[14] *See* Pretrial Services Report, pg. 4, #2; #2.
[15] *See* Pretrial Services Report, pg. 4, #4.

including those proposed herein and any others which the Court believes necessary to reasonably assure his appearance and compliance. Finally, any "doubts regarding the propriety of release should be resolved in the defendant's favor." *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991).

### A. Mr. Farwell Does Not Pose a Serious Risk of Flight

It is the government's burden to prove by a preponderance of the evidence that there is a "serious risk" that Mr. Farwell will flee if released and that no condition or combination of conditions would reasonably assure his appearance at court proceedings. *See* 18 U.S.C. § 3142(b)(f)(2)(A). *See also United States v. Patriarca,* 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Digiacomo*, 746 F. Supp. 1176, 1181 (D. Mass. 1990). Evidence of *some* risk or *a* risk of flight is not enough, neither is the mere fact of a serious charge. Here, it is *because of* the seriousness of the allegations and the severity of the possible punishment that Mr. Farwell has every reason to return to court. He seeks first and foremost to clear his name. Equally important to him, however, is his family and the devastating effect that any violation of pretrial release conditions would have on his three young children. Put plainly, he has absolutely everything to lose should he fail to appear or violate any term of pretrial release, and everything to gain by seeing this case through to trial.

Although the government alleges that the certainty of a lengthy or severe potential sentence upon conviction provides incentive to flee, it does not by itself create a *serious* risk of flight.[16] Many cases which note that the possible imposition of the death penalty, for example, provides an

---

[16] The government's reliance on *United States v. Pierce*, 107 F. Supp. 2d 126 (D. Mass. 2000) on this point is inapposite. There, as in the cases cited in *Eischeid*, *supra*, the court specifically noted that the defendant was on probation at the time of his offense, thus "demonstrat[ing] an unwillingness or an inability to abide by conditions of supervision," and that he "lack[ed] substantial ties with this district but maintain[ed] significant ties outside of it." *Id.* at 128-29.

incentive to flee also present with "other indicators of a propensity to flee such as a transient life style, a lack of employment, or the fact that the defendant's family had moved [out of the jurisdiction]." *United States v. Eischeid*, 315 F. Supp. 2d 1033, 1037 (D. Ariz. 2003) (collecting cases). Mr. Farwell presents with no such indicators.

Even for defendants facing capital punishment, pretrial release is warranted where they have substantial family and employment ties to the community. *See e.g., id.* (government did not meet its burden of proving by preponderance of evidence that defendant was a flight risk, notwithstanding capital murder indictment, where defendant had "close ties to community, a job and responsible work history, two homes, a retirement fund, virtually no criminal record, a college education, and no apparent history of drug or alcohol abuse."). Additionally, the elimination of the death penalty as a potential penalty – as is the case here – mitigates a defendant's risk of flight and is a factor in the release calculus. *See e.g., United States v. Torres-Rosario*, 600 F.Supp.2d 327, 334 (D.P.R. 2009) ("Facing the death penalty could surely create a motive to flee. Eliminating or reducing the possibility would therefore mitigate the risk.").

The First Circuit generally upholds detention orders based on serious risk of flight where defendants have insubstantial local community ties and/or extensive ties to other jurisdictions. *See e.g., United States v. Vargas*, 804 F.2d 157 (1st Cir. 1986) (affirming detention order based on serious risk of flight for defendant, a citizen of Chile, had no "necessarily reliable or firmly established ties" to the area and was expecting a child with his wife who lived in Chile). *Cf. United States v. Say*, 233 F.Supp.2d 221, 226 (D. Mass. 2002) (holding that a defendant's "substantial ties to Worcester" prevented the court from "find[ing] by a preponderance of the evidence that he pose[d] a risk of flight"). Detention orders have also been upheld where defendants have substantial means and/or resources to flee. *See e.g., United States v. Rudolph*, 582 F. Supp. 3d 804

16

(D. Colo. 2022) (affirming detention order on serious risk of flight grounds for defendant charged with foreign murder where he had had accumulated vast wealth, owned property in Mexico, traveled frequently and had extensive overseas contacts, and was intimately familiar with living long periods outside the country).

As outlined herein, Mr. Farwell has demonstrably long-standing and deep ties to his local community in Massachusetts. This is where he has built and rebuilt his life and where his family remains. Raised without substantial means, Mr. Farwell has worked his entire life, but he is by no means wealthy (evidenced, of course, by the fact of undersigned counsel's appointment and the court's finding of indigency). He has no ties whatsoever to any other jurisdiction, aside from his brother who relocated out of state and with whom he has no contact. Moreover, as part of their investigation, the government obtained Mr. Farwell's international travel records, which reflect planned family vacations. Aside from that, his only out-of-jurisdiction travel has been on behalf of the United States when he was deployed at various military bases and/or fighting on behalf of our Country in Afghanistan.

One need look no further, however, than Mr. Farwell's own conduct between Ms. Birchmore's death in February 2021 and his arrest in late August 2024 to see that he poses no risk of flight, let alone a serious risk. For more than 3.5 years, he endured intense scrutiny from his former employer and colleagues, which resulted in the loss of his career in law enforcement. His personal life was dissected and misrepresented by the press and in social media. Had he any propensity or desire to flee, he would have done so when he became aware of the allegations, when the media first publicly reported on them, or when he was publicly named as a suspect in relation to any offense involving Ms. Birchmore. Yet in the face of daily, unrelenting judgment, Mr. Farwell remained in his community and with his family. He started his own business, registered it with the

17

Massachusetts Secretary of the Commonwealth, and took out a significant multi-year business loan – all of which demonstrates not just his ties to Massachusetts, but his intent to remain here. Unlike the government's speculative claims of risk of flight, his own conduct is direct evidence that he poses no risk of non-appearance or non-compliance with pretrial release conditions.

To the extent the government argues that the weight of the evidence – more fully discussed below – contributes to a risk of flight here, to presume risk of flight from strong "evidence" of guilt would be "tantamount to a presumption of guilt." *United States v. Gray*, 651 F. Supp. 432, 436 (W.D. Ark. 1987). This would impermissibly infringe upon on Mr. Farwell's constitutional presumption of innocence and the protection set forth at 18 U.S.C. § 3142(j).

Finally, where "the answer to whether a defendant poses a 'serious risk of flight' is derived from a fact-specific examination to determine if there exist conditions or a combination of conditions that would reasonably assure a defendant's appearance at future court proceedings if released," Mr. Farwell's complex of circumstances warrant release. *United States v. Giordano*, 370 F. Supp. 2d 1256, 1263 (S.D. Fla. 2005). As outlined herein, conditions exist to both manage and substantially reduce any concerns regarding risk of flight.

### B. Mr. Farwell Does Not Pose a Serious Risk of Obstruction

As with flight, the BRA places the burden on the government to prove by a preponderance of the evidence that a defendant poses a serious risk of obstruction and that no condition or combination of conditions would reasonably assure the protection of the community from such obstruction. *See* 18 U.S.C. § 3142(b)(f)(2)(B). Evidence or allegations of *some* risk or *a* risk of obstruction is, again, not enough. *See Ploof*, 851 F.2d at 12 (not enough for court to find a "strong suggestion that defendant 'might' engage in" witness intimidation or obstruction). Here, the government fails to establish a serious risk that Mr. Farwell, if released, would obstruct justice.

Furthermore, a "Safety Concern for Potential Witnesses" is clearly insufficient.[17] A court must identify an articulable threat posed by the defendant to an individual or the community. *United States v. Munchel*, 991 F.3d 1273, 1280, 1283 (D.C. Cir. 2021).

First, the government suggests that the charge itself is, by definition, rooted in obstruction and detention is justified on that basis alone. If this were true, then there would be a presumption of a risk of obstruction for all defendants charged with or convicted of obstruction or obstruction-type offenses. There is not. *See e.g., United States v. Demmler*, 523 F. Supp. 2d 677, 681 (S.D. Oh. 2007) (declining to adopt a rule that obstruction and witness-tampering offenses demand that defendants be held in custody pending trial). *See also* 18 U.S.C. § 3142(e)(3) (enumerating offenses for which a rebuttable presumption of detention applies; obstruction offenses are not included). Instead, the only presumption that applies in this case is the presumption of innocence.

In asserting that Mr. Farwell allegedly asked his adult affair partner to delete mutual messages that might prove an affair and conducted two Google searches on the scope of consent and Cellebrite technology, the government ignores the equally consistent innocent reasons that would explain this conduct. It also ignores the fact that Mr. Farwell *did not* revoke consent or delete content on his phone after being contacted by investigators. Although the government emphasizes Mr. Farwell's law enforcement history and military experience with explosives, there was no indication whatsoever that any physical evidence was tampered with or destroyed prior to or after Ms. Birchmore's death.[18] Moreover, in arguing that Mr. Farwell "lied" to Massachusetts State Police troopers by minimizing the extent and nature of his relationship with Ms. Birchmore,

---

[17] *See* Pretrial Services Report, pg. 4, #5.
[18] This includes Ms. Birchmore's cell phone, computer, journals, and other writings which were undisturbed in her apartment.

the government also ignores the fact that he never *denied* the affair and *admitted* seeing her breaking up with her at her apartment on February 1, 2021.

Even assuming arguendo that the government's allegations regarding obstruction are true, however, the inquiry for serious risk of obstruction is not whether a defendant has previously engaged in obstruction or an attempt to obstruct. This "only propels the Government halfway to its objective." *United States v. Madoff*, 586 F. Supp. 2d 240, 250 (S.D.N.Y. 2009). "The question is not simply whether [the defendant's past] actions can be considered obstruction, but whether there is a *serious* risk of obstruction in the future." *United States v. Mercado*, 737 F. Supp. 3d 153, 160 (W.D.N.Y. 2024) (quoting *Madoff*, 586 F. Supp. 2d at 250, and ordering release even where there was "some" evidence of obstruction) (emphasis in original). *See also United States v. Lamar*, 600 F. Supp. 3d 714 (E.D. Ky. 2022) (defendant's refusal to answer door for officers executing search warrant, smashing of cell phones, and attempts to hide cash and break police car window evinced "reflexive desire to avoid immediate detection [rather than] propensity for future deliberate interference with an actual judicial proceeding."). This does not mean that a defendant's past behavior should not be part of the serious risk of obstruction calculus "but the Government needs to show that there is a serious risk that these potential harms exist going forward." *Madoff*, 586 F. Supp. 2d at 250. It cannot do so here.

To the extent that as-yet-unproven allegations regarding past obstruction can establish a serious risk of obstruction, then the Court must also consider *both* Mr. Farwell's countless opportunities to influence witness testimony and/or obstruct justice during the years after Ms. Birchmore's death when he was the subject of lengthy investigations) *and* the complete absence of evidence that he did anything of the sort. Specifically, not a single witness has indicated to the government that Mr. Farwell demanded, instructed, asked, or made any effort to influence their

20

statements or prevent their cooperation with law enforcement in either the state investigations or this federal prosecution. *Cf. United States v. Teixeira*, No. 1:23-cr-10159-IT, 2023 WL 5672758 (D. Mass. Sept. 1, 2023) (ordering detention where, after investigation was initiated, defendant destroyed electronic hard drives, replaced his phone shortly before his arrest, and directed witnesses not to cooperate with law enforcement if approached, and to delete any messages and posts evincing contact). Significantly, the protective order governing law enforcement reports in this case does not require that witness names and statements be shielded from Mr. Farwell and there has similarly been no allegation whatsoever that he has sought to influence or intimidate any witnesses after his arrest.

Finally, Mr. Farwell submits that any concerns regarding obstruction can be sufficiently mitigated by conditions of release and monitored by Pretrial Services. These include no-contact orders with witnesses as well as restrictions on Mr. Farwell's movements, as outlined above.

### C. Mr. Farwell Does Not Pose a Danger

In alleging danger as grounds for detention, the government has a heightened burden of proof and must show by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142(f). This requires proof that a particular defendant poses an actual danger, not a theoretical one. *See Patriarca*, 948 F.2d 789. Allegations of violence alone do not satisfy the clear and convincing evidence standard. *United States v. Ridinger*, 623 F. Supp. 1386, 1402 (W.D. Mo. 1985). Moreover, neither the fact that a defendant has been charged with a crime of violence nor that he may face a life sentence upon conviction establish a presumption of danger. *See* 18 U.S.C. § 3142(e)(3) (markedly missing from list of offenses for which a rebuttable presumption of danger applies are crimes of violence or offenses which carry maximum sentence of life). *See also id.* at

21

§ 3142(f)(1)(A)-(B) (crimes of violence and/or offenses which carry maximum life sentence require a detention hearing upon government motion).[19] An individualized assessment in this case demonstrates that the government has not, and cannot, meet its burden to show that Mr. Farwell poses a danger to any other person or the community.

Threaded throughout the government's motion is the claim that, because the federal government indicted Mr. Farwell where state prosecuting authorities did not, that somehow in itself creates a risk of flight, obstruction, or danger. That argument fails when one considers first the arbitrariness of the timing of Mr. Farwell's indictment and arrest. A review of the evidence suggests that the government formally began its investigation sometime in the fall of 2023, yet it did not charge Mr. Farwell by complaint or immediately arrest him – instead permitting him to remain the community, in his home, and with his children and family.

For more than 3.5 years following Ms. Birchmore's death, Mr. Farwell's only interactions with police were in the context of traffic citations and motor vehicle accident response. He did not intimidate, influence, or harm any person let alone any witness, and did nothing that would give rise to the government's speculative claims of danger here. This course of events warrants a finding that he does not present a danger as he appears before the court today. *See e.g., United States v. Diggs*, No. 1:23-cr-10322-IT, 2024 WL 1620997 (D. Mass. Apr. 15, 2024) (ordering release for defendant whose offense conduct involved selling a machine gun with armor-piercing bullets to an undercover informant where "the government's willingness to allow Diggs to remain in the community, coupled with the absence of any evidence that Diggs's engaged in similar criminal behavior from December 2022 to January 2024, mitigate [danger]."). Put simply, Mr. Farwell's

---

[19] *See also* Section D(1), *infra*.

conduct in the aftermath of Ms. Birchmore's death and his arrest in this case establishes that he is not a danger and can fully obey the law.

Possession of guns alone does not constitute clear and convincing evidence of danger. *United States v. Jeffries*, 679 F. Supp. 1114, 1118 (M.D. Ga. 1988). The government's argument regarding Mr. Farwell's access to and/or knowledge of guns here is a red herring. His years of responsible firearm ownership, consistent with the strict laws of the Commonwealth of Massachusetts, prove his respect for the law and the safety of the community. Additionally, there is no evidence whatsoever that – even when Mr. Farwell possessed firearms lawfully – he ever used or threatened to use them to harm anyone or commit any crime. What's more, after his arrest Mr. Farwell's firearms have been relinquished since his arrest.

The government's arguments regarding Mr. Farwell's danger to children are similarly unavailing. In both the underlying Massachusetts State Police investigation and the FBI's investigation in this case, the government performed digital extractions on Mr. Farwell's phones and obtained records detailing his internet search histories and material in iCloud accounts. In *none* of that evidence did the government find one iota of child pornography or anything that would suggest any prurient interest in children. The government's reliance on *United States v. McCarty*, No. 08-CR-00513-JMS, 2009 WL 5061577 (D. Haw. Dec. 24, 2009) and *United States v. Mercedes*, 254 F.3d 433, 437 (2d Cir. 2001) is inapposite. Both involved presumptions of pretrial detention, which do not apply here.

To the extent that the Court has remaining concerns about danger should Mr. Farwell be released, conditions exist to mitigate those concerns, and any such doubts should be resolved in favor of release. *See United States v. Clark*, 791 F. Supp. 259, 261 (E.D. Wash. 1992) (doubts concerning whether defendant poses a danger must be resolved in defendant's favor).

### D.  The Bail Factors Support Mr. Farwell's Release[20]

If the Court finds that Mr. Farwell is a serious risk of flight or obstruction or a danger to any person or the community, he is still entitled to release because there are release conditions available that will reasonably assure his appearance and compliance with judicial procedures. *See* 18 U.S.C. §§ 3142(c), (g).[21]

### 1.  Nature and Circumstances of the Offenses Charged

Mr. Farwell is charged with serious offenses in this case. Neither the fact that he has been indicted nor the fact that his charged offenses are serious, however, *mandate* detention under the BRA nor is it dispositive or determinative of whether there are sufficient release conditions that will reasonably ensure Mr. Farwell's appearance at trial and compliance with judicial procedures. The First Circuit has counseled that the seriousness of criminal allegations does not itself inform whether the circumstances of the offense justify pretrial detention. *See e.g. United States v. Edson*, 487 F.2d 370, 372 (1st Cir. 1973).

The government's arguments appear to suggest that any defendant charged with murder, manslaughter, or causing the death of another person should be denied on the basis of the indictment and the government's allegations alone. The BRA, however, explicitly permits release *even for* defendants charged with murder for whom, unlike Mr. Farwell, the government is seeking the death penalty. Numerous courts have released defendants facing significant, similar, and/or even more serious exposure than Mr. Farwell faces here. *See e.g., United States v. Kelley*, 4:25-cr-00093-RSB-CLR, D.E. 73 (S.D. Ga. 2025) (affirming release order and unsecured bond for two

---

[20] For further discussion on the fourth factor (alleged danger) under 18 U.S.C. § 3142(g), *see* Section III(C), *infra*.

[21] *United States v. Xulum*, 84 F.3d 441, 443 (D.C. Cir. 1996) (per curiam) ("Section 3142 speaks only of conditions that will 'reasonably' assure appearance, not guarantee it").

defendants charged with capital felony murder and second degree murder for whom the government had, at the time of release order, not yet indicated whether it would seek the death penalty); *United States v. Owens*, No. 6:22-mj-00118-JAR, D.E. 17 (E.D. Okla. May 11, 2022) (ordering release on a series of conditions and unsecured bond for defendant charged with murder in violation of 18 U.S.C. §§ 1111(a), 1151, and 1153 and § 924(c) offenses); and *United States v. Grey*, 1:25-cr-04141-KG, D.E. 17 (D.N.M. Oct. 24, 2025) (ordering release on conditions for defendant charged with second degree murder in violation of 18 U.S.C. §§ 1153 and 1111 and § 924(c) offense).

Even in Massachusetts state courts, where defendants are more commonly charged with murder and where those charged with first degree murder have no right to bail,[22] judges have issued pretrial release orders for murder defendants. *See e.g., Commonwealth v. Almeida*, Suffolk Superior Court No. 1684CR0848 (Mass. Apr. 24, 2018) (setting cash bail for defendant charged with first degree murder); *Commonwealth v. Fonseca-Colon*, Hampden Superior Court No. 1679CR0800 (Mass. Sept. 5, 2018) (same); *Commonwealth v. Bullock*, Suffolk Superior Court No. 1284CR10996 (Mass. Nov. 14, 2012) (same); *Commonwealth v. Coleman*, Suffolk Superior Court No. 1484CR10606 (Mass. Dec. 7, 2020) (same, and reducing amount of cash bail set).

Should the Court find that Mr. Farwell's charges weigh in favor of detention, however, that does not end the inquiry, nor does it require detention. As mentioned, courts must give due attention to all four factors, and the nature and circumstances of the offense "is simply the first of the § 3142(g) factors" and is only "one factor in the analysis." *United States v. Enix*, 209 F. Supp. 3d 557, 564-65 (W.D.N.Y. 2016) (ordering release on conditions where the defendant was "charged

---

[22] "[A] defendant charged with murder in the first degree has no right to bail, but may be admitted to bail in the discretion of the judge. The judge's exercise of discretion should not rest solely on a presumption against bail, but should be based on a careful review of the specific details of the case and the defendant's history." *Vasquez v. Commonwealth*, 481 Mass. 747, 748 (2019).

with some very serious crimes, including a RICO conspiracy that involved a pattern of racketeering activity involving murder, robbery, kidnapping, drug trafficking, and obstruction of justice as part of its predicate acts").

### 2. The Weight of the Evidence

The government's emphasis on the weight of the evidence permeates nearly every aspect of its motion for detention. Although it is an enumerated factor under 18 U.S.C. § 3142(g), courts have held that it is "the least important" detention factor. *See Motamedi*, 767 F.2d at 1408 (internal citations omitted); *United States v. Parker*, 65 F. Supp. 3d 358, 365 (W.D.N.Y. 2014).[23] That is both "because it is inherently difficult to assess the Government's case before trial" and because "a defendant must be presumed innocent." *Id.* (citing *United States v. Fama*, No. 13 CR 234 JFK, 2013 WL 2467985, at *3 (S.D.N.Y. June 7, 2013)). *But see United States v. Zhang*, 55 F.4th 141, 154 (2d Cir. 2022). In cases where "much of the case will likely hinge on the credibility of the government's witnesses – an assessment the Court is unable to make at this juncture" (i.e., at a detention hearing), then "this factor is, at best for the government, neutral." *United States v. Fox*, 602 F. Supp. 3d 434, 441 (W.D.N.Y. 2022). Mr. Farwell submits that his case falls squarely in this category, but even if the court finds this factor weighs in favor of detention, conditions of release nonetheless exist to satisfy any remaining concerns regarding serious risk of flight, obstruction, and danger.

Although this is not the forum to determine Mr. Farwell's guilt or innocence, the government's claims about the weight of the evidence must be understood and analyzed through

---

[23] The First Circuit has not yet weighed in on the relative weight to be given to each of the four § 3142(g) factors.

the lens of exculpatory and mitigating evidence that it both had in its possession at the time of

filing its bail motion and did *not* cite or acknowledge therein. This includes, for example:

- Ms. Birchmore's lengthy mental health history including suicidal ideation and attempts dating back years before her death[24];

- Ms. Birchmore's Google search history on the morning of February 1, 2021, that reveals a focus on suicide, to wit a "What color is the suicide ribbon?" query;

- The sexual proclivities the government attributed solely to Mr. Farwell that were in fact consensual features of Ms. Birchmore's relationships with multiple other intimate partners (including the actual father of her child); and,

- Critically, the expert opinion of a board-certified pathologist with the federal government that corroborated OCME's finding that Ms. Birchmore committed suicide[25] (an opinion which the government obtained mere days prior to rejecting it and then retaining William Smock, M.D., a Doctor of Emergency Medicine, who would ultimately support the government's theory of cause of death in this case).

The government's claims about the weight of the evidence must also be analyzed against

the exculpatory evidence obtained *after* Mr. Farwell's indictment and arrest in this case. This

includes, *inter alia*, forensic DNA testing which revealed complex DNA mixtures from multiple

contributors on nearly all tested evidence items, with all but one interpreted as having between

two, four, or at least four, contributors.[26] Most notable, however, is the fact that *Mr. Farwell was*

---

[24] For the Court's review, undersigned counsel offers to submit some of this evidence under seal. Counsel suggests – out of respect for Ms. Birchmore and her family, and to avoid additional pretrial publicity – that specific material regarding her mental health: diagnoses, medications at the time of her death, and history of suicidal ideation and attempts be filed under seal, notwithstanding that some of this material is not subject to the protective order in this case. *See* D.E. 22, 54.

[25] This board-certified pathologist with the Armed Forces Medical Examiner System within the Department of Defense agreed with the OCME opinion of both cause and manner of death that Ms. Birchmore committed suicide by hanging and concluded there was nothing that supported a finding of a manual strangulation. The defense is not aware whether this second opinion confirming OCME's finding has been shared with OCME.

[26] To interpret the DNA mixture results, the Massachusetts State Police Crime Lab used a probabilistic genotyping software, STRmix, to assign likelihood ratios comparing conditional probabilities that Ms. Birchmore's, Mr. Farwell's, and certain other persons' DNA is or is not observed in the complex DNA mixtures. Unlike "match statistics" calculated for single-source DNA evidence, however, likelihood ratios cannot, and do not, indicate a "DNA match." *See e.g.,* National Institute of Standards and Technology,

*totally excluded* from the DNA recovered from underneath Ms. Birchmore's fingernails, which corroborates observations of first responders who noted no signs of a struggle in Ms. Birchmore's apartment. Moreover, Mr. Farwell's repeated denials of paternity – both to Ms. Birchmore and to law enforcement – were proven true as DNA analysis confirmed that he was not the father of Ms. Birchmore's fetus.

Though SA Castruita's affidavit briefly mentions OCME's official determination of cause of death – specifically that Ms. Birchmore committed suicide by hanging – it is a fact which must be emphasized in the weight of the evidence analysis. Where two board-certified government forensic pathologists opine that Ms. Birchmore died by her own hand, and where the only question put before a jury is whether Mr. Farwell committed a killing, it cannot be said that the weight of the evidence solely favors the government.

Even where the weight of the evidence or the likelihood of conviction is strong, however, the Court must find a relationship between this factor and a defendant's "likelihood of making himself unavailable for trial." *See Edson*, 487 F.2d at 372 (holding that "[u]ntil a defendant has been convicted, the nature of the offense, as well as the evidence of guilt, is to be considered only in terms of the likelihood of making himself unavailable for trial"); *see also United States v. Lizardi-Maldonado*, 275 F.Supp.3d 1284, 1292 (D. Utah 2017) ("[T]o avoid falling down the rabbit-hole into the world into the world of '[s]entence first – verdict afterwards,' the Court considers the strength of the evidence in terms of that evidence's bearing on the risk of harm to the community. The likelihood of conviction by itself has no bearing on the pretrial release decision").

---

"DNA Mixture Interpretation: A NIST Scientific Foundation Review," Dec. 2024, at 14, https://doi.org/10.6028/NIST.IR.8351 (DNA mixtures are "inherently more difficult to interpret than high-quality single-source DNA samples.").

Where there is no such connection here, the factor should weigh in favor of release – or at the very least be deemed neutral.

### 3. Mr. Farwell's Personal History and Characteristics

The criteria set forth in 18 U.S.C. § 3142(g)(3) all support Mr. Farwell's release on pretrial conditions. These include his family and lifetime community ties, lengthy history of employment including extraordinary military service, limited but stable financial resources, and his lack of a criminal record. His lack of substance and/or alcohol issues, paired with the fact that he has never been on probation, parole, release, or pending sentencing for any offense (let alone at the time the government alleges he committed the instant offenses), also weigh in his favor. Undersigned counsel need not further belabor the years of Mr. Farwell's respect for court proceedings and the related investigations that preceded his arrest in this case – it is clear that he would conduct himself in the same manner if released pending trial. Even after his arrest, while detained in a federal pretrial facility, Mr. Farwell has conducted himself peaceably and respectfully. He has incurred no disciplinary reports and has maintained strong family ties.

Importantly, his family knows of and firmly appreciates the seriousness of the government's allegations in this case. Mr. Farwell's request that he be released to a third-party custodian and that he live with his mother (not with his wife and children) further demonstrates the seriousness with which he takes this case. He has no desire to expose his children to further scrutiny or harassment while he seeks to clear his name. For all these reasons, this factor clearly militates in favor of Mr. Farwell's release.

### (10) Conclusion

The BRA mandates that Mr. Farwell be released pretrial. The government cannot demonstrate that he is currently a risk of flight or obstruction, let alone a risk that could be

considered "serious," or that he poses a danger. Should the Court find, however, that such risks exist, Mr. Farwell is still entitled to release because there are conditions available that will reasonably ensure his presence at trial and his compliance with court rules.

March 26, 2026                                     Respectfully submitted,

MATTHEW FARWELL,
By his attorneys,

*/s/ Joanne M. Daley*
Joanne M. Daley, BBO # 653375
Kimberly C. Stevens, NC State Bar # 20156
Sandra Gant, BBO # 680122
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061
Joanne_daley@fd.org

### CERTIFICATE OF SERVICE

I, Joanne M. Daley, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on March 26, 2026.

*/s/ Joanne M. Daley*
Joanne M. Daley