UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MATTHEW FARWELL<br><br>    Defendant | CRIMINAL No. 24-10259-DJC |

**<u>GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DETENTION</u>**

Defendant Matthew Farwell is charged with the premeditated murder of Sandra Birchmore to prevent her from disclosing information about Farwell's other federal crimes. *See* ECF No. 1; 18 U.S.C. § 1512(a)(1)(C). As alleged in the Superseding Indictment and described in detail in the affidavit supporting the government's motion for detention, Farwell raped Birchmore as a child, continued to have sex with her when she became an adult, believed she was pregnant with his child, and killed her on February 1, 2021, staging the crime scene to make it look like Birchmore committed suicide. *See* ECF No. 9-1. This crime and the supporting evidence described in the government's filings require that the Court continue to detain Farwell pending trial in October.

The facts described in the government's motion for detention and the affidavit of FBI Special Agent Chenee Castruita remain true. *See* ECF Nos. 9 and 9-1. Moreover, in the nineteen months since Farwell's arrest, the evidence proving Farwell's guilt has only grown stronger. Nevertheless, Farwell moves the Court to release him into the community just months before he stands trial for the premeditated murder of a young woman and her unborn child, facing a potential life sentence. The factors the Court must consider under 18 U.S.C. § 3142 support detention now

even more strongly than they did at the time of Farwell's arrest. There is clear and convincing evidence that Farwell is a danger to the community, and a preponderance of the evidence that he is a risk of obstruction and flight. Farwell should remain in custody pending trial.

## Procedural History

Following Farwell's arrest on August 24, 2024, the government moved to detain him pending trial on the grounds that he is a danger to community and poses a serious risk of flight and obstruction. ECF No. 9. At his arraignment, Farwell agreed to voluntary detention. On October 28, 2025, the grand jury returned the Superseding Indictment, adding an additional charge for killing Birchmore's unborn son in violation of 18 U.S.C. §§ 1841(a)(1), (a)(2)(A) and (a)(2)(C). ECF No. 63. This case is set for trial to begin on October 5, 2026. ECF No. 58.

## Argument

### I.    The Evidence Supporting Detention is Even Stronger Now.

The evidence proving that Farwell committed the offenses alleged in the Superseding Indictment has gotten stronger since the defendant's arrest. Now, there is DNA evidence tying Farwell to the murder of Birchmore and her unborn child. There is additional corroboration indicating that Farwell committed statutory rape when he sexually abused 15-year-old Birchmore. There is more evidence indicating that Farwell murdered Birchmore to avoid accountability for other federal crimes. And there is additional evidence regarding Farwell's state of mind in the weeks and days before Birchmore's murder, all of which indicates that Farwell planned the killing well in advance.

### A.    Farwell's DNA was on the ligature around Birchmore's neck.

New DNA evidence conclusively ties Farwell both to the crime scene and the murder weapon. By way of background, in May 2021, the Massachusetts State Police Crime Laboratory conducted tests and found DNA on multiple items that state investigators recovered from

Birchmore's apartment. Birchmore's underwear tested positive for the presence of sperm cells. Fingernail clippings tested positive for the presence of DNA. The ligature that was around Birchmore's neck tested positive for the presence of DNA—specifically, male DNA. However, despite detecting DNA on these items, no meaningful conclusions could be drawn from this evidence in 2021. That is because state investigators did not obtain DNA from Farwell or anyone else.

That changed in August 2024. As part of the federal investigation, the FBI obtained a federal search warrant authorizing agents to obtain a DNA sample from Farwell. Farwell's DNA was compared to the DNA found on the ligature from which Birchmore hung, as well as the DNA under Birchmore's fingernails, and the sperm in her underwear. While Farwell correctly states in his memorandum that his DNA was not found under Birchmore's fingernails, he fails to mention that Farwell's DNA was found on the ligature that tied Birchmore's neck to a closet door handle. The presence of Farwell's DNA on the murder weapon—i.e., the strap used to asphyxiate Birchmore—is, of course, highly inculpatory.

Furthermore, Farwell's sperm cells were found in multiple locations on the underwear that Birchmore was wearing when she was found dead on February 4, 2021. The presence of Farwell's sperm in Birchmore's underwear renders it highly likely that he lied to Massachusetts State Police detectives during his brief interaction with them in the school parking lot on February 6, 2021, when he claimed that the last time he had sex with Birchmore was in October 2020. *See* ECF No. 9, ¶ 93. This lie is relevant to Farwell's state of mind and his consciousness of guilt.

Farwell's federal-warrant-compelled DNA sample also provided insight into the paternity of her unborn son, whom Farwell is also charged with killing. DNA evidence excluded Farwell as the father of Birchmore's unborn son. However, in light of the evidence that Farwell had

3

unprotected sex with  23-year-old Birchmore, repeatedly and intentionally for months on days she was ovulating, it is not surprising that there is not a single electronic communication between Birchmore and Farwell between December 28, 2020 and February 1, 2021, in which Birchmore suggests that anyone other than Farwell is the father of her unborn child.  Also during that period, there are no text messages between the two in which Farwell denies or doubts paternity.  Rather, the evidence indicates that Farwell believed that he was the father of Birchmore's unborn son.  It is the fact that Farwell held this belief – and not the fact that he was mistaken – that will be most relevant at trial.

### B.    There is more evidence of Farwell's statutory rape of Birchmore.

Since Farwell's arrest, the government has obtained additional evidence that Farwell committed the statutory rape of Birchmore when she was 15 years old.  As described in FBI Special Agent Castruita's affidavit in support of detention, on multiple occasions Farwell acknowledged taking Birchmore's virginity.  In electronic communications obtained by investigators, Birchmore stated this happened on April 10, 2013.  On that date, she was only 15 years old.  *See* ECF No. 9-1 at ¶¶ 17, 18, 20, 21, 29.  Birchmore had also shared with others that Farwell took her virginity when she was 15.  *See, e.g.,* ECF No. 9-1 at ¶¶ 22, 50.  In addition to this evidence, the government has obtained medical records and other evidence indicating that Birchmore asked a doctor for birth control on May 1, 2013, just a few weeks after Farwell began sexually exploiting her.  And there is also evidence that, on May 30, 2013, Birchmore told a doctor that she was having sexual intercourse, providing further corroboration for electronic communications indicating that Farwell sexually exploited Birchmore when she was a child.

4

### C.    There is additional evidence of Farwell's motive.

There is more evidence that Farwell killed Birchmore because she was a victim of his federal crimes, which included deprivation of rights under color of law, coercion and enticement of a minor, and wire fraud.  *See* 18 U.S.C. §§ 242, 2422(b), and 1343.

The government has continued to amass evidence of the unique, criminal nature of Farwell's relationship with Birchmore.   As a threshold matter, Farwell's memorandum refers to Birchmore as his "adult affair partner."   ECF No. 106 at 19.   He suggests that he deleted communications with Birchmore and/or encouraged her to delete communications with him because he was merely having a consensual, extramarital affair.  However, since Farwell's arrest, FBI agents have found evidence that Farwell engaged in multiple extramarital affairs with various adult women during the eight years he was simultaneously grooming, sexually exploiting, and continuing to have sex with Birchmore.[1]  The evidence indicates that Farwell's conduct was much more brazen in these non-criminal extramarital affairs.  Multiple witnesses disclosed to the FBI that Farwell had told them about at least one of his extramarital affairs.

By contrast, Farwell endeavored to maintain the secrecy of his long-term sexual relationship with Birchmore.  He repeatedly instructed Birchmore to delete text messages from him.  In addition, when Farwell found out that Birchmore had disclosed their sexual relationship to a friend, he texted Birchmore with apparent anger, "you also told me that no one knew about us . . ." and "Like you have no idea how bad what she did is." *See* ECF No. 9-1 at ¶ 58.  The employee of the Stoughton Police Department who took the call reporting Farwell's sexual relationship with Birchmore stated that Farwell was enraged and ordered the employee "not to speak about this to anyone and to never talk about it again."   ECF No. 9-1 at ¶ 59.  Farwell's relationship with

---

[1] *See* Exhibits 11–13 to be filed under seal.

Birchmore was not like the sexual relationships he had with other adult women. Its genesis was a crime. And he acted accordingly.

There is also additional evidence that puts Farwell's motive in context. Since Farwell's arrest, FBI agents have honed in on evidence indicating that Birchmore knew she was a child sexual exploitation victim, and she was willing to leverage it to get what she wanted from Farwell. In text messages with friends, Birchmore referred to herself as a victim of Farwell's crimes. After learning she was pregnant, Birchmore became even more assertive and resistant to Farwell's manipulation. Birchmore contacted attorneys to begin planning for potential issues related to paternity, child custody and support. FBI agents have interviewed multiple witnesses and reviewed Birchmore's communications that indicate that Birchmore had a plan to obtain Farwell's financial support for the child they both believed he fathered. And these communications indicate that Birchmore was willing to use her role as a victim of Farwell's crimes to ensure that she and her unborn child would be financially secure.[2]

### D.    There is additional evidence of Farwell's state of mind.

The government's prior filings describe some of the compelling evidence showing Farwell's state of mind and consciousness of guilt. *See* ECF Nos. 9 and 9-1. Among other things, Farwell told Birchmore to delete their text messages (ECF No. 9-1 at ¶¶ 117–118); to stop putting things in writing (ECF No. 9-1 at ¶ 56); he agreed to accept a key to her apartment (ECF No. 9-1 at ¶ 60); he inspected her closets (ECF No. 9-1 at ¶ 61); he appeared at her apartment on short notice wearing a mask (ECF No. 9-1 at ¶ 71); and he lied to Massachusetts State Police detectives (ECF No. 9-1 at ¶¶ 90–100). The evidence has continued to build on this front.

---

[2] *See* Exhibit 15 to be filed under seal.

Several of Farwell's former colleagues at the Stoughton Police Department have provided evidence that corroborates Farwell's mounting stress in January 2021 and tends to prove the Government's theory of premeditation. One witness indicated that, when he was at work in the fall of 2020, Farwell started texting feverishly and taking private phone calls. When the witness asked Farwell what was wrong, Farwell indicated that he had to "put crazy back in the bag" and then everything would be ok.[3] This witness indicated that Farwell became increasingly stressed in January 2021. On February 2, 2021, while Birchmore lay dead and undiscovered in her apartment, Farwell uncharacteristically texted this witness to ask the witness if the witness was working and whether anything was going on at work because he was "bored as hell sitting in the hospital."[4] The witness recalls this being the first and only time Farwell expressed any interest in what was happening at the Stoughton Police Department when he was not on duty.[5] Of course, however, the timing of this check-in makes sense. Birchmore was dead, and there had been no public reports of her death.

Another one of Farwell's former co-workers told FBI agents about another ominous statement by Farwell in the lead up to Birchmore's death. Approximately two weeks before Birchmore's death, the co-worker and Farwell were eating at a restaurant. The witness told Farwell that he looked "stressed," and Farwell indicated that he was having relationship problems with a woman other than his wife. When this witness asked if they could help, Farwell said "the problem was going to take care of itself."[6]

---

[3] *See* Exhibit 2 to be filed under seal.
[4] Farwell's wife had just given birth to one of his children.
[5] *See* Exhibit 3 to be filed under seal.
[6] *See* Exhibit 4 to be filed under seal.

The foregoing new evidence is important because it is inculpatory. But it also reveals that, as the pressure mounted in January and February 2021, Farwell devised a plan to kill Birchmore. This track record should give the Court pause, especially anticipating that a similar pressure will grow as trial in this case approaches. The evidence of Farwell's reaction to life-altering pressure demonstrates that the Court cannot be assured that he will comply with conditions as that date approaches.

III.    **The Court Should Reject Farwell's Arguments About Risk of Flight and Obstruction.**

    A.    **Farwell's decision to remain in Massachusetts when he believed he had avoided prosecution does not mitigate the current risk of flight.**

In his motion, Farwell argues that he is not a risk of flight because he did not flee in the years between Birchmore's death and his federal arrest. ECF No. 106 at 17. The Court should reject this argument because it ignores the critical change in circumstances since his arrest. In the time between Birchmore's death and August 2024, Farwell believed that he was not the subject of any criminal investigation. He had a good basis for that belief. For much of that time, there was no criminal investigation into Birchmore's death. To the extent that there was any short-lived criminal investigation, at no point was Farwell seriously considered as a suspect in a homicide  He did not know or suspect that he could face life in prison until the FBI arrested him in August 2024. From that point forward, Farwell's incentive to flee changed drastically.

On February 6, 2021, employees of Birchmore's apartment complex informed the State Police that they had security video footage from February 1, 2021, which showed a then-unidentified masked man entering Birchmore's apartment building after she was last seen alive earlier that day. Subsequently, members of the Canton Police Department and State Police identified Farwell as the masked man entering the apartment building. Within hours of that identification, a state investigator contacted Farwell and invited him to meet with state

investigators at the parking lot of a local elementary school.  There, they discussed Birchmore's death for approximately thirty to forty-five minutes.  During that conversation, Farwell was not asked to provide a DNA sample or any evidence whatsoever from his personal phone.

After the February 6, 2021 conversation with state investigators, Farwell retained possession of his personal cell phone for three days.  After that three-day period, state investigators asked Farwell for consent to search his phone.  Farwell declined to permit state investigators to search his personal phone.  On February 9, 2021, he consented to a limited search of messages between him and Birchmore.   However, he indicated he had already deleted these messages, claiming he did so after he broke up with Birchmore on February 1, 2021.  As a longtime law enforcement officer who had previously partnered with the State Police in Norfolk County, Farwell knew that if any meaningful state investigation were ongoing, his DNA would have been compelled and his devices would have been seized.  Here, Farwell knew that no search warrant had been conducted at his home to search for the clothing he was wearing the night of the murder.  No location data related to his phone was sought to determine where he went before or after the death of Birchmore.  Indeed, after giving state investigators his phone on February 9, Farwell told at least one witness, "they won't find anything" because he had "wiped" his phone.[7]

If Farwell had any concerns about being the subject of a criminal investigation, those concerns were allayed on February 11, 2021, when Farwell's twin brother was interviewed by state investigators.  In that interview, state investigators assured Farwell's brother that any investigation was "not criminal in nature" and that "no one was in trouble."  When Farwell's brother told Farwell that he had been interviewed, Farwell assured his brother that it would "be over soon."  In the fall of 2021, Farwell's brother learned that the Norfolk County District Attorney's Office had

---

[7] *See* Exhibit 8 to be filed under seal.

concluded its investigation.  Indeed, Norfolk County District Attorney's Office records indicate that the office's investigation was officially closed at least by August of 2021, if not earlier.[8]

At no point prior to August 2024 was Farwell treated as the subject of a murder investigation.  He could be certain that, to the extent any such investigation ever did exist, it was closed at least by August 2021.  The current posture and corresponding incentives to flee could not be more different.  A federal grand jury has charged him with multiple crimes carrying a possible life sentence.  The FBI has conducted a thorough investigation.  His DNA is on the ligature found around Birchmore's neck.  Witnesses have shared their recollections of his incriminating statements.  And the Court has set a trial date at which a jury will decide his fate.  Under these circumstances, his decision to stay put prior to August 2024 is of little significance.

**B.    New evidence supports a finding that Farwell presents a serious risk of flight and obstruction.**

Farwell's post-offense conduct includes his efforts to falsely portray Birchmore as suicidal, and other criminal conduct involving extremely risky behavior.  For background, out of the dozens of witnesses FBI agents have interviewed, not a single witness has indicated that Farwell expressed any remorse regarding Birchmore's death.  Quite the opposite.  At least one witness told agents that Farwell joked about Birchmore's death.[9]  Witnesses also indicated that, after Birchmore's death, Farwell spread rumors about Birchmore's mental health struggles, likely in an attempt to influence those who might be wondering whether he was responsible for her death.

Farwell made other attempts to lead people to believe that Birchmore died by suicide.  Two witnesses separately disclosed that, in the months after Birchmore's death, while Farwell was on leave from the police department, Farwell purported to reenact Birchmore's death.  According to

---

[8] *See* Exhibit 5 to be filed under seal.
[9] *See* Exhibit 14 to be filed under seal.

witness disclosures, at a small private gathering, an intoxicated Farwell was discussing Birchmore's death. During that discussion, Farwell sat down under a doorknob and demonstrated the position in which Birchmore was found, assuring the skeptical witnesses that it was possible for someone to commit suicide in that manner.[10] At the time, it had not been publicly revealed that Birchmore was found hanging from a doorknob.

In addition, even though the defendant did not flee before the FBI arrested him, there is evidence that Farwell engaged in other criminal conduct during the period between Birchmore's death and his arrest. Specifically, there is evidence of a sexual incident involving a young adult woman that took place after Birchmore's death. This young woman reported to local police that in the summer of 2021, she met Farwell at a bar. The woman reported that Farwell bought her an alcoholic drink. The next thing the woman remembers that night is waking up naked in her bed as Farwell was walking around her bedroom looking for his keys. The woman does not remember how she got home and indicated that her lack of memory was wholly inconsistent with the two or three alcoholic beverages she had consumed. She disclosed that her neighbor had also texted her twice that night because he was concerned that a truck was idling in her driveway and a phone inside the truck was audibly ringing over and over again. After the incident, the woman was concerned about what, if anything, had happened so she texted Farwell. Farwell responded by confirming that they had sex and told her they "should do it again."[11]

FBI agents interviewed another person who was with Farwell on the night of the foregoing incident. This former friend of Farwell confirmed that he saw Farwell approach the woman in the bar, the woman appeared to be "drunk and crying," and Farwell began to flirt with her. The former

---

[10] *See* Exhibits 8 and 9 to be filed under seal.
[11] *See* Exhibit 6 to be filed under seal.

11

friend confirmed that Farwell and the woman left the bar at the same time.[12]  Other witnesses have confirmed that Farwell's wife had been calling his phone multiple times that night in an attempt to contact him, corroborating the neighbor's statement that he heard a phone ringing in the truck relentlessly.[13]  Another friend of Farwell's, whom he was out with on the evening in question, indicated that Farwell's wife contacted him in an attempt to locate Farwell.  When this friend confronted Farwell about it, Farwell admitted that he had had sex with the woman from the bar.[14]

Farwell's attempts to persuade witnesses of a false narrative regarding Birchmore and the circumstances of her death, as well as the evidence of his alleged sexual conduct with an incapacitated woman following Birchmore's death are circumstances alone that should give the Court pause when deciding whether to release the defendant.  But, here, when coupled with the other overwhelming evidence described in the government's motion and Special Agent Castruita's affidavit, these facts make it clear that the Court cannot be assured that the defendant will comply with any conditions of release.

**C.    Farwell arguments are without evidentiary support.**

Farwell's motion focuses on the Office of the Chief Medical Examiner's ("OCME") report indicating, based on the information available to the assigned medical examiner at the time, the medical examiner believed that Birchmore died by suicide.  Importantly, the medical examiner did not visit the scene of Birchmore's death and relied heavily on the first responders to thoroughly investigate the scene.[15]  As it turns out, this reliance was misplaced.  At the time of Birchmore's

---

[12] *See* Exhibit 7 to be filed under seal.

[13] *See* Exhibit 9 to be filed under seal.

[14] *See* Exhibit 10 to be filed under seal.

[15] Farwell also relies on a report of an interview with a forensic pathologist with the Armed Forces Medical Examiner System, who reviewed the OCME materials and merely opined that, based on the information that the medical examiner had at the time she conducted the autopsy,

autopsy, the medical examiner received a report from the Canton Police Department containing just a single paragraph, stating in a conclusory fashion that Birchmore's death was a "suicide by hanging." In that one-paragraph report, Canton Police also misidentified the item from which she hung. The officer calls it a "scarf"; it was a duffle bag strap.[16] Moreover, within an hour of responding to the scene of Birchmore's death, local law enforcement officers were notifying the medical examiner that there was "no foul play at the time of the report."

Similarly, state investigators submitted a report on February 4, 2021, at 7:03 p.m., just a few hours after Birchmore was found. In that report, the state investigators called the case "Birchmore/Suicide/Canton." They noted that "antidepressant medications were documented at the scene," but did not notify the medical examiner of several other critical facts. For example, when the medical examiner conducted an autopsy and made her initial findings, she did not know that Birchmore was found with a necklace broken from its chain down the front of her body. This evidence, which is consistent with a struggle, was not given to the medical examiner. State investigators did not preserve the necklace for the medical examiner to inspect. Further, at the time of autopsy, no investigator had reviewed Birchmore's cell phone. Therefore, the state investigators could not tell the medical examiner that the phone contained evidence that Farwell was in Birchmore's apartment on February 1, 2021. Without that evidence, state investigators could not tell the medical examiner that Farwell had just told Birchmore he was arriving at her apartment at the moment her phone locked for the final time. Similarly, they could not tell the medical examiner that Farwell was in Birchmore's apartment when her phone recorded its final step data. Finally, they could not tell her that her phone was never accessed again whatsoever after

---

there were no additional steps that she should have taken to conduct a thorough autopsy. This doctor did not review the additional evidence gathered as the federal investigation continued.

[16] This duffle bag strap is referred to herein as a ligature.

Matthew Farwell was seen on surveillance video leaving her apartment. Had the medical examiner known that someone was with Birchmore when her phone activity stopped and the last time her movements were recorded, she could have considered these facts when making her determination in this case.

Nor did the medical examiner have the benefit of the DNA test results that now show that Farwell, the person who was in Birchmore's apartment when her phone stopped moving, also left his DNA on the ligature from which she hung. Because state investigators had not reviewed Birchmore's electronic devices, the medical examiner did not know that Farwell had a history of choking Birchmore during sexual encounters. She did not know that Farwell had engaged in a new pattern of domestic violence in early January 2021. She did not know that Farwell had recently searched the closet near where she was hung.

Moreover, it was not revealed to the medical examiner that eleven days before Birchmore was found deceased under a doorknob, a witness had called the Stoughton Police Department and exposed Farwell's sexual relationship with Birchmore. No one told the medical examiner that Farwell reacted by warning the Stoughton Police Department employee never to tell anyone about the call and sending Birchmore angry text messages about the serious nature of that disclosure.

Finally, the medical examiner noted, but did not understand the significance of, the perimortem injury to Birchmore's clavicle. At the time she made her findings, the medical examiner did not notice that the injury to Birchmore's clavicle, which was caused while Birchmore was alive, matched the buckle of the knot found behind Birchmore's head, suggesting that she could not have died in the position in which she found.

### D.    The Cases Farwell Cites are Distinguishable.

In his motion, Farwell cites state court murder cases in which defendants obtained cash bail. None of the cases he cites are analogous to this case, in part, because only one of them

14

involve a defendant who has been charged with first degree murder and that case was quite distinct from Farwell's.[17]  The federal cases that the defendant cites are even less persuasive as they are highly distinguishable from and therefore inapplicable to the present case.[18]

### IV.    Farwell's Claims About His History and Characteristics are Unpersuasive.

Lastly, the government observes that much of the defendant's memorandum is devoted to portraying Farwell as a family man and war hero.  However, the defendant fails to address the additional evidence about Farwell's pertinent characteristics that show that Farwell is a danger to the community and risk to others.  For example, the government's memorandum in support of detention summarized Farwell's long track record of using physical and sexual violence, including deeply troubling evidence recovered from his phone.  *See* ECF No. 9 at ¶¶ 114–116.  While

---

[17] In *Commonwealth v. Almeida*, the court held the defendant without bail at his arraignment date.  The sole reason that he was held without bail was because he was charged with first degree murder.  The defendant was not given a cash bail until nearly two years later, after extensive litigation regarding the defendant's DNA and delay in reaching a trial date.

In *Commonwealth v. Coleman*, the defendant was never charged with pre-meditated first degree murder.  Rather, the defendant was indicted on second degree murder, which was eventually reduced to manslaughter and, even in that case, the defendant was held on $250,000 bail.

Similarly, in *United States v. Bullock*, the defendant was also charged with second degree murder.  And, in *Commonwealth v. Miguel Fonseca-Colon*, the defendant was held without bail with the sole reason for bail being that he was charged with first degree murder.  The defendant was not given a cash bail until more than a year later, after the court indicated that it found the defendant's presentation in a motion to dismiss "comprehensive and convincing" evidence of "reasonable doubt if not innocence."

[18] *See United States v. Kelley*, No. 4:25-cr-00093-RSB-CLR (S.D. Ga. 2025) (the allegations involved child neglect resulting in death and the defendants were charged with felony murder and murder in the second degree); see *United States v. Owens*, No. 6:22-mj-00118-JAR (E.D. Okla. May 11, 20022) (the Court cited potential for viable self-defense claim, defendant himself called 911, and conflicting evidence was presented at detention hearing); and *United States v. Grey*, 1:25-cr-04141-KG (D.N.M. Oct. 24, 2025) (defendant presented plausible self-defense claim,  started performing CPR on the victim immediately after she shot him).

honorable military service is always a laudable characteristic, Farwell's ties to the community and years of service failed to stop him from sexually exploiting Birchmore and murdering her and her unborn child.

### Conclusion

While the defendant stands charged with two crimes committed on or around February 1, 2021, the Superseding Indictment and evidence cited in the government's filings indicate that Farwell has been committing crimes for years. His crimes began while he was a police officer, sexually exploiting 15-year-old Birchmore. He committed wire fraud many times over when he visited Birchmore to engage in sex acts while on the clock working as a police officer. Then, as alleged in the Superseding Indictment, he brutally murdered Birchmore, strangling her with a ligature in order to prevent information about his crimes from getting to law enforcement. This makes Farwell dangerous. And a preponderance of the evidence shows he is both a risk of further obstruction and a risk of flight.

For the reasons stated herein as well as those in the government's initial memorandum in support of detention, the government asks that the Court order the defendant detained pending trial. The government further requests that, if the Court is inclined to release the defendant on conditions, it stay its order for such time to permit the government to file a motion for revocation of the order of release under 18 U.S.C. § 3145(a).

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:    /s/ *Elizabeth C. Riley*
ELIZABETH C. RILEY
BRIAN A. FOGERTY
TOREY B. CUMMINGS

16

Assistant United States Attorneys

17

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

_\_\_Elizabeth C. Riley\_\_\__
ELIZABETH C. RILEY
Assistant United States Attorney

Date: April 6, 2026