**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | Docket No.: 24-cr-10259-DJC |
| | : | |
| | : | |
| MATTHEW FARWELL | : | |

**DEFENDANT'S MOTION IN LIMINE TO EXCLUDE ARGUMENT**
**OR TESTIMONY DRAWING IMPROPER CONCLUSIONS FROM**
**COMPLEX DNA MIXTURE EVIDENCE**

The defendant, Matthew Farwell, by and through undersigned counsel, respectfully

moves the Court, pursuant to the Fifth Amendment, and Federal Rules of Evidence 401

and 403, to exclude evidence or argument extending or describing DNA results beyond

their proper bounds.

In this case, complex mixtures of DNA evidence from multiple male contributors

were found on the duffel bag strap, and in and on Ms. Birchmore's underwear.  Mr. Farwell

was excluded as a source of genetic material tested from Ms. Birchmore's left and right

hand fingernail clippings.  Because the presence of the complex mixtures of DNA in this

case tell us neither whose DNA is in fact on a specific piece of evidence, nor when or how

that complex mixture was deposited on any piece of evidence, the defense moves to

preclude such statements or arguments from any of the arguments of counsel or

presentation of evidence before the jury.

At a hearing conducted previously in this case, the government argued incorrectly,

with respect to an item of evidence (the duffel bag strap): "STR testing and Y-STR testing

– yes, Y-STR testing can only test for patrilineal lines, not the case for STR Testing." This inaccurate depiction of the evidence by the prosecutor continued with this incorrect conclusion: "And on that ligature there's one major contributor – one: the defendant. The defendant's DNA is on the murder weapon, on part of the murder weapon used to tie her to a doorknob." DN 134, Tr. at 39**.**

Additionally, the government made an argument as to <u>when</u> alleged complex mixture DNA was deposited on a piece of evidence (Ms. Birchmore's underwear) in the case:

> Paragraph 92, when the defendant claims the last time he was intimate with Ms. Birchmore was October 2020, well, we know that they had sex on November 18, 2020, after he expressed in writing his happiness that he had just had specifically vaginal intercourse with her.
>
> But they had sexual contact much more recently than that. In August of 2024, the FBI got a search warrant for the defendant's DNA; and we learned that his sperm was found in multiple locations on the underwear that she was wearing when she died. That lie to the State Police was an attempt to distance himself temporally from Ms. Birchmore, and he needed to distance himself from her because he had killed her.

DN 134, Tr. at 28.

These statements and conclusions expressed above are scientifically inaccurate. Additionally, the government's argument assumes that Ms. Birchmore was killed, as opposed to having died by her own hand, with use of the inflammatory characterization of the strap as a "murder weapon," which the defense contests. The item should be referred to as a strap, not characterized with inflammatory language which invades the province of the jurors in the case.

As set forth in the attached Exhibit 1, Letter from Dr. Maher Noureddine:

1. It is an accepted fact in my field of practice that DNA evidence **<u>does not</u> inform on when someone's DNA arrived on an item or the manner by which it**

    **arrived** (direct contact versus secondary or higher order transfer).  Therefore, it is not possible to extract this temporal information from the evidence tested in this case.

2. The assertion by the prosecutor that the defendant's DNA is on the "murder weapon" is quite misleading and cannot be confirmed by the biological evidence.  First, male-specific Y-STR DNA evidence from the ligature revealed the presence of at least four males.  Despite the exceeding complexity of that mixture, the MSP lab deduced a partial major profile through an interpretation that is not validated by that lab.  Even if a Y-STR profile is interpretable, it cannot distinguish between paternally related relatives.  A Y-STR profile is not unique to Matthew Farwell and his paternal relatives; a Y-STR profile could have originated from a random male in the population.  Second, the STR profile generated from the ligature (a mixture of four contributors) was interpreted using a probabilistic genotyping method, which is not compatible with source attribution statements (such as "*the defendant's DNA is on the murder weapon*").  **In other words, it is not possible, nor is it scientifically accepted, to rely on that interpretation method to claim that the genetic identity of the donor has been confirmed**. . . .

Exhibit 1, Paragraphs 1 and 2 (emphasis added).  Exhibit 2, Description of Dr. Noureddine's Qualifications.

The National Academy of Science's influential report on forensic science has rightly voiced concern about the use of terms such as "match / no match," "consistent with," "identical," or "similar in all respects tested."  These terms can have "a profound effect on how the trier of fact in a criminal or civil matter perceives and evaluates scientific evidence."  National Research Council, National Academy of Sciences, Strengthening Forensic Science in the United States: a Path Forward, 185 (2009).

More recently, in the 2024 publication of the National Institute of Standards and Technology, U.S. Department of Commerce, DNA Mixture Interpretation:  A NIST Scientific Foundation Review, December 2024, the Foundation explains:

[P]eople constantly shed small amounts of DNA into the environment, and by touching objects, people can potentially transfer small amounts of DNA – including someone else's DNA – from one surface to another.  Analyzing small quantities of DNA can create challenges when interpreting the data.  Highly sensitive methods,

3

> now universally used across the forensic DNA community (Gill et al. 2015), often detect DNA from more than one individual in a sample. . . .

> Distinguishing one person's DNA from another's in these mixtures, estimating how many individuals contributed to the recovered DNA sample, not knowing whether the DNA is associated with a crime or is from contamination, or whether the findings support the presence of a trace amount of suspect or victim DNA make DNA mixtures inherently more challenging to interpret than single-source samples. These issues, if not properly considered and communicated, can lead to misunderstanding the strength and relevance of the DNA evidence in a case.

*Id*. at 21.  NIST Report attached as Exhibit 3.

The NIST Report explains that "DNA from multiple contributors cannot be physically separated once DNA molecules are extracted from their biological cells. . . Instead, DNA mixture interpretation is an effort to (1) infer possible genotypes as detectable sample contributors (a process sometimes referred to as *deconvoluton* of the mixture components) and (2) provide the strength of evidence for a POI [Person of Interest] to be included in or excluded from an evidentiary DNA profile."  *Id*. at 38.

Ultimately, complex DNA mixture interpretation does not allow for the conclusion that a single person's DNA is in fact in the sample lifted from an object.  Instead, the mixture is interpreted in the form of likelihood ratios, based upon hypotheses submitted. Within that process, there are uncertainties:

> From a measurement and interpretation standpoint, several challenges are fundamental to DNA mixture interpretation (see Chapter 2).  Briefly, with any PCR system, there will be stochastic variation when small amounts of DNA are analyzed.  Stochastic effects impact the recovery of alleles and genotypes from mixture samples and lead to uncertainty in assigning alleles to genotypes and genotypes to contributor profiles.  When STR markers are examined, stutter products add noise to the system.  Stutter products impact uncertainty when alleles from minor contributor(s) overlap with stutter peaks of alleles from major contributor(s). . . . Finally, sharing of common alleles can mask the presence of contributor alleles and affect the ability to estimate the number of contributors. When combined with stochastic variation and the existence of stutter products, allele sharing increases the complexity of a DNA mixture.

*Id*. at 158-59.

The process of mixture interpretation is expressed in language that incorporates and is expressed in terms of likelihood ratios. These ratios do not allow for the conclusion that any one person's DNA is in fact present in a complex mixture.

Furthermore, "DNA statistical results such as a likelihood ratio given sub-source propositions do not provide information about how or when DNA was transferred, or whether it is relevant to circumstances of a case." *Id*. at 146. This is so because DNA persists on items over time and can be transferred from one item to another.

In this case, where Mr. Farwell is presumed innocent, use of appropriate scientific conclusions could not be more important. There is no DNA result in this case allowing for the conclusion that Mr. Farwell's DNA is *in fact* present in any of the materials tested in this case; nor does any of the DNA evidence demonstrate *when* any particular *mixture* of DNA was placed on any item in the case. Arguments around any conclusions expressed in this area should be confined to proper scientific terms. Overstating the DNA conclusions to be drawn from the mixture evidence in this case would violate the due process clause and Fed. R. Evid. 401, 402 and 403, causing unfair prejudice and confusion about critical testing in the case.

Dated: August 3, 2026                     Respectfully submitted,

                                          MATTHEW FARWELL,
                                          By his attorneys,

                                          */s/ Kimberly C. Stevens*
                                          Kimberly C. Stevens, NC State Bar # 20156
                                          Joanne M. Daley, BBO # 653375

Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061
Kim_Stevens@fd.org
Joanne_Daley@fd.org

## CERTIFICATE OF SERVICE

I, Kimberly C. Stevens, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on August 3, 2026.

*/s/ Kimberly C. Stevens*
Kimberly C. Stevens