**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MATTHEW FARWELL,<br><br>　　　Defendant | CRIMINAL No. 24-10259-DJC |

## <u>UNITED STATES' TRIAL BRIEF</u>

The United States of America submits this brief summarizing the government's case-in-chief, the elements of the offenses charged in the Indictment, certain anticipated legal issues, and the testimony of certain government witnesses.

## **Introduction**

The defendant, Matthew Farwell, is charged in the Superseding Indictment with killing Sandra Birchmore, with malice aforethought, willfully, deliberately, maliciously, and with premeditation, and with the intent to prevent the communication by any person to a law enforcement officer of information relating to the commission or possible commission of a federal offense, in violation of 18 U.S.C. § 1512(a)(1)(C). He is also charged with engaging in conduct that violated 18 U.S.C. § 1512 and thereby causing the death of Birchmore's child in utero at the time the conduct took place, in violation of 18 U.S.C. §§ 1841(a)(l), (a)(2)(A) and (a)(2)(C).

The government expects to call approximately 50 witnesses in its case-in-chief, including law enforcement witnesses, civilians, and 12 expert witnesses. The government may call additional witnesses depending on cross-examination and any witnesses called by the defense. The government expects the trial to last approximately 20 trial days.

## Legal Elements of the Charged Offenses

**Count One: Killing a Witness or Victim (18 U.S.C. § 1512(a)(1)(C))**

As to Count One, the government must prove beyond a reasonable doubt that:

First, on or about February 1, 2021, the defendant killed Sandra Birchmore with malice aforethought, willfully, deliberately, maliciously, and with premeditation; and

Second, that the defendant did so with the intent to prevent a communication about the commission or possible commission of a federal offense, to wit, Deprivation of Rights Under Color of Law, Coercion and Enticement, or Wire Fraud, to a federal law enforcement officer.

The government need not prove that the defendant or Sandra Birchmore had federal law enforcement in mind, but the government must show that there was a reasonable likelihood that a relevant communication, had it actually occurred, would have been made to a federal law enforcement officer.[1]

If convicted of this offense, the defendant faces a mandatory sentence of life in prison.

**Count Two: Protection of Unborn Children (18 U.S.C. §§ 1841(a)(1), (a)(2)(A) and (a)(2)(C))**

As to Count Two, the government must prove beyond a reasonable doubt that:

First, the defendant engaged in conduct that violated Title 18, United States Code, Section 1512(a)(1)(C), as that crime is alleged in Count One; and

Second, the defendant caused the death of a child in utero at the time such conduct took place.[2]

---

[1] Adapted from *United States v. Casanova*, No. 13-CR-10077-DJC, ECF No. 768 at 135 (D. Mass. 2016), and FIRST CIRCUIT PATTERN INSTRUCTION NO. 4.18.1512(a)(1)(C).

[2] *See* 18 U.S.C. §§ 1841(a)(1) and (b)(1).

The term "unborn child" means a child in utero.  The terms "child in utero" or "child, who is in utero" mean a member of the species homo sapiens, at any stage of development, who is carried in the womb.

The government does not have to prove that the defendant had knowledge or should have had knowledge that the alleged victim of the offense, as alleged in Count One, was pregnant.  Nor does the government have to prove that the defendant intended to cause the death of the unborn child.[3]

### **Procedural History**

On February 4, 2021, members of the Canton Police Department found 23-year-old Sandra Birchmore deceased in the bedroom of her apartment.  Following a brief State Police investigation, state law enforcement and the Massachusetts Office of the Chief Medical Examiner (OCME) concluded that Birchmore died by suicide.

Beginning in or around 2023, the FBI initiated an investigation into Birchmore's death. During that investigation, agents interviewed additional witnesses, examined the forensic evidence, and reviewed voluminous electronic communications between Birchmore and Farwell, much of which had not been examined during the brief State Police investigation.

On August 27, 2024, a federal grand jury returned an indictment charging Farwell with Killing a Victim or Witness, 18 U.S.C. § 1512(a)(1)(C), for murdering Birchmore on February 1, 2021, to prevent her from communicating to law enforcement information about his historical sexual exploitation of Birchmore and other federal crimes.  ECF No. 1.

On October 28, 2025, the grand jury returned the Superseding Indictment, which includes the original charge in violation of Section 1512(a)(1)(C) as well as one count of Protection of

---

[3] *See* 18 U.S.C. §§ 1841(a)(2)(B)(i) and (a)(2)(B)(ii).

Unborn Children, in violation of 18 U.S.C. §§ 1841(a)(1), (a)(2)(A), and (a)(2)(C).  This count is based on Farwell's killing of the fetus Birchmore was carrying in utero at the time of the murder.  ECF No. 63.

## Statement of Facts

### I.    Farwell Murdered Birchmore.

#### A.    Hooded and masked Farwell was the last person to see Birchmore alive.

On February 1, 2021, at 9:08 p.m., in the middle of a blizzard and less than twelve hours before his wife's scheduled cesarian section, Farwell sent Birchmore a text asking if he could "come by for a second."  At 9:10 p.m., Birchmore responded that he was welcome to visit and that the door to her apartment would be open.  At 9:13:37 p.m., Birchmore's cell phone locked for the final time, never to be unlocked again.  As depicted in video surveillance footage, Farwell entered Birchmore's apartment building at 9:14:56 p.m.  He was wearing a dark-colored hoodie with the hood covering most of his head, and a surgical mask, an item that many witnesses have said he strongly resisted wearing during the COVID-19 pandemic.  As he walked through the building's small lobby, Farwell avoided looking in the direction of the ceiling-mounted surveillance camera.

After Farwell entered the apartment building, Birchmore's phone never sent another message.  At 9:18:03 p.m., Birchmore's phone captured a locked screen screenshot.  At 9:24 p.m., about ten minutes after Farwell arrived, Birchmore received a text message that, like all other subsequent messages, remained unread.  At 9:40:19 p.m., with Farwell still in the apartment, Birchmore's phone recorded 8 steps and never unlocked or moved again until law enforcement found her dead body days later.

At 9:43:33 p.m., more than three minutes after Birchmore's phone recorded its last movement data, video surveillance footage shows Farwell leaving Birchmore's apartment, just 29

minutes after he arrived.  The footage shows Farwell wearing the hood and surgical mask.  And

he again avoided looking in the direction of the camera as he walked briskly toward the exit.

### B.     Canton police officers found Birchmore body three days later.

On the morning of February 4, 2021, Birchmore did not show up for work as a teacher's

aide at a Sharon elementary school.  Birchmore's co-workers contacted a school resource officer,

who called the Canton Police Department to ask officers to conduct a well-being check.  Canton

police officers went to Birchmore's apartment complex where they observed that Birchmore's car

was still covered in snow from the snowstorm that hit the area on February 1.  Officers asked one

of the property manager's employees to call Birchmore, and when Birchmore failed to answer,

they obtained a key and decided to inspect Birchmore's apartment.

Once inside Birchmore's bedroom, police found Birchmore in a fully seated and partially

reclined position under a closet door handle.  A duffle bag strap (hereinafter, the "ligature") was

wrapped around her neck and affixed tightly to the closet door handle.  Birchmore's cell phone

was face-down, several inches away from her right hand.  At the time, Birchmore was

approximately eight to ten weeks pregnant.  Crime scene photos depict (but responding law

enforcement officers did not collect) a necklace that was broken on the front of Birchmore's body.

State Police troopers from the Norfolk County Crime Prevention and Control Unit (also

known as the "Norfolk CPAC") responded to the scene and took crime scene photographs.

Birchmore's body was transported to the OCME.  That same day, prior to any autopsy or

examination of Birchmore's electronic devices, the OCME received information from members of

the State Police and Canton Police concluding that Birchmore died by suicide.  Nevertheless, in

the twenty-four hours following Birchmore's death, multiple witnesses called the Norfolk CPAC,

reporting that Birchmore was in a sexual relationship with Farwell, a married Stoughton police

detective, and she could not have died by suicide.

**C.**    **Farwell identified himself in the Feb. 1 surveillance footage, but the State Police declined to obtain a warrant to seize any evidence from him.**

On February 6, 2021, an employee of the apartment complex where Birchmore was living told State Police investigators that while reviewing the video surveillance footage from February 1, he observed a person he did not recognize. The footage shows that person arrive at the building at approximately 9:14 p.m. Local and State Police investigators identified the man as Matthew Farwell. After making that identification, the then-lead State Police trooper called a State Police sergeant, who assumed the position of lead investigator going forward.

Within approximately one hour, the State Police sergeant, who had formerly served as Stoughton police officer, and the former lead State Police investigator interviewed Farwell in the parking lot of a Stoughton elementary school. While the State Police declined to record the interview with Farwell—a person who they then knew was reported to have been a sexual partner of Birchmore's and the last person to see her alive—reports indicate that Farwell eventually confirmed that he had been at the apartment on the evening of February 1. Farwell also told the State Police that he had been in a sexual relationship with Birchmore but falsely added that he had only had sex with her two or three times and that their sexual relationship began in 2020. Digital evidence shows that, in reality, Farwell had engaged in countless sexual encounters with Birchmore dating back to 2013 when she was just 15 years old.

Three days later, the State Police investigators asked Farwell if he would consent to a search of his personal phone. Farwell declined to permit the State Police to conduct a comprehensive search of his phone. Instead, he agreed to allow investigators to search for text messages between him and Birchmore. However, according to the State Police, Farwell had already told them that he had deleted those messages. Therefore, not surprisingly, the State Police's subsequent search for these messages on Farwell's phone yielded no results. Yet, at the

same time that the State Police were confirming the absence of these messages on Farwell's personal phone, Farwell was conducting a web search on his work phone concerning law enforcement's ability to resurrect messages he deleted: "can delete imessage be recovered by cellebrite." Of course, Cellebrite is the tool that the State Police, and Farwell as a local detective, used to review data obtained from cell phone.

### D.    The Medical Examiner initially ruled Birchmore's death a suicide but now has revised the manner of death to undetermined.

The Medical Examiner initially ruled Birchmore's death a suicide. In April 2026, after a review of the evidence collected during the investigation into Birchmore's death, the Medical Examiner withdrew her opinion that Birchmore died by suicide and ruled the cause of death was asphyxia and the manner was undetermined.

Since the Medical Examiner's initial ruling, two independent experts have reviewed the evidence and determined that Birchmore death was a homicide. The Medical Examiner's autopsy report indicates that Birchmore's hyoid bone (a U-shaped bone at the front of the neck) was fractured on the right side and that she suffered from petechial hemorrhages of the bulbar and palpebral conjunctivae. Additionally, the Medical Examiner concluded that Birchmore had a hemorrhage of her left sternothyroid muscle. At trial, the independent experts will opine that these neck injuries are more common in homicidal strangulations than hangings, while noting they are not exclusive to homicidal hangings. Despite the existence of this physical evidence that is more common in homicidal deaths, the Medical Examiner originally categorized the manner of death as suicide largely because of the dearth of investigative updates from the assigned State Police investigators.

The Medical Examiner's original autopsy report further confirmed that Birchmore was approximately eight to ten weeks pregnant at the time of her death. The autopsy included

toxicology testing.  The results of the toxicology tests were negative for all substances except for sertraline, which was likely explained by the antidepressants Birchmore had been prescribed.

The Medical Examiner also noted and photographed a significant injury to Birchmore's right upper chest area.  This injury is a pattern imprint that was caused by one of the ligature's lobster claw clasps being pressed into Birchmore's chest.  The pattern imprint is consistent with blunt force trauma from an assault.  Importantly, when Canton police officers found Birchmore's body, the lobster claw clasp that caused this imprint was up near the door handle from which she hung, more than a foot from where it had been pressed into Birchmore's chest.

The Medical Examiner also took several photos of Birchmore's hair tangled in the ligature around her neck.  The photos show the ligature interwoven with Birchmore's hair in a complicated and extensive web of tangles.

In August 2024, pursuant to a federal search warrant, the FBI obtained Farwell's DNA. DNA testing revealed that Farwell's sperm was present in a mixture on two separate locations on the underwear that Birchmore was wearing when she died.  Moreover, Farwell's DNA was present—and in fact the major contributor—to the DNA mixture recovered from the part of the ligature that was tied around the door handle to hang Birchmore.

**II.     Farwell Intended To Prevent Birchmore From Reporting His Crimes.**

Farwell killed Birchmore on February 1 to prevent her from disclosing information about his federal crimes, including certain crimes to which she was the only or primary witness.

   **A.     Birchmore's electronic devices contain evidence that Farwell, a police officer, coerced and enticed Birchmore when she was 15 years old, and engaged in multiple sexual encounters with Birchmore while on the clock with the Town of Stoughton.**

On February 4, 2021, the State Police collected Birchmore's Apple iPhone 12, which they found on the floor of Birchmore's bedroom just beyond her reach.  Members of Birchmore's family

found her older Apple iPhone XS in Birchmore's car and gave it to State Police investigators. On February 9, 2021, five days after finding Birchmore and learning that she was in a sexual relationship with a married Stoughton Police detective, the State Police returned to Birchmore's apartment and recovered her laptop. Although the State Police investigators did not use Birchmore's devices to obtain any search warrant to collect physical or digital evidence from Farwell (or his residence), these devices contain hundreds of thousands of communications, at least 40,000 of which are between Farwell and Birchmore.

FBI agents reviewed all of Birchmore's communications. What they found is that Birchmore retained a trove of messages despite Farwell's repeated commands that she delete evidence of their communications. These messages that Birchmore retained prove several important facts.

First, the messages are contemporaneous confirmation of Farwell and Birchmore's active sexual relationship from at least February 2019, which is as far back as her messages went, until her death on February 1, 2021. Contrary to what Farwell told the State Police investigators in the hastily arranged and unrecorded meeting in the school parking lot, the text messages establish that Farwell met with Birchmore more than fifty times in the twenty-three months for which electronic data exists.

Second, most of the foregoing sexual encounters between Farwell and Birchmore occurred while Farwell was on duty as a Stoughton police officer. Many of the encounters were preceded by text messages previewing their anticipated sexual conduct or followed by messages confirming the details of the sexual encounter.

Third, the text messages between Farwell and Birchmore also confirm a criminal sexual relationship that Farwell initiated at some point between 2010—when Farwell and Birchmore

began their involvement with the Stoughton Police Explorers Program—and April 10, 2013, when Farwell took then-15-year-old Birchmore's virginity.[4]  At the time of that first episode of criminal sexual intercourse, Farwell was a 27-year-old Stoughton police officer.

Fourth, the text messages from Birchmore's devices contain more than just a fleeting reference to a single criminal sexual encounter.  Farwell sent several text messages to Birchmore in which he expressed regret that he did not take her virginity sooner, reliving non-intercourse sexual encounters prior to April 2013.

Finally, text messages also show how Farwell exploited and groomed Birchmore through her teenage years and into her early adulthood. Among other things, at times he sought to track her location through her cell phone and would become angry when she disabled that function. Farwell also asked Birchmore to enact rape fantasies, incest fantasies, and underage sex fantasies.

The text messages are not the only evidence of Farwell's historical federal crimes involving Birchmore.  Facebook records indicate that Farwell reached out to Birchmore via Facebook as early as October 2012.  And multiple witnesses will testify that Birchmore disclosed to them in real time that she was engaging in sex with Farwell.  At the time, Birchmore was a young teen enrolled in the Stoughton Police Explorers Program and living with her disabled single mother in Stoughton.

After Birchmore's death, her family collected her personal items, including Birchmore's personal journals and notebooks from 2013 until 2020.  The family released these journals to the State Police and later, the FBI.  The journal entries reveal ongoing sexual interactions with Farwell.  According to the journals, this was a relational dynamic that included the concept of sex as

---

[4] This is a fact that Farwell admitted in a text message with Birchmore on February 11, 2020 and other dates, as described below.

punishment, anal sex, and choking.  Between 2019 and 2021, there are no fewer than twenty text messages from Farwell to Birchmore, in which Farwell references and glorifies the act of choking Birchmore.

> **B.      Birchmore increased the pressure on Farwell by threatening to disclose information that would expose his criminal conduct.**

> > i.      <u>From 2019 to September 2020, Farwell and Birchmore have extensive text discussions about Farwell impregnating Birchmore</u>.

Beginning as early as 2019, Birchmore sends dozens of messages to Farwell indicating that she wants to have a child with him.  On multiple occasions, Farwell suggests that he is open to and even excited about it.  In June 2019, Farwell tells Birchmore that he does not object to Birchmore not taking birth control pills and reassures her that he will still have sex with her after he gets her pregnant.  On July 9, 2019, via text messages, Farwell reminds Birchmore that he had ejaculated inside her "for years" and begged her to stop taking birth control pills.  On July 12, 2019, when Birchmore tells Farwell that she is afraid he will not support her if she gets pregnant, Farwell tells her "if that happened you could fuck me over in like 3 seconds."  In August 2019, on the day that Birchmore learns that Farwell's wife has given birth to their second child, Birchmore sends Farwell a text indicating that she should tell his wife that he has been having sex with another girl for "almost eight years."  In his response, Farwell does not deny that fact.  Rather, he tells Birchmore that the facts about their sexual relationship are "between us and no one else."

In 2020, the two continued to discuss the plan for Farwell to impregnate Birchmore.  In March 2020, Farwell asks Birchmore if she will stop having sex with him if he does not get her pregnant.  He tells her, "I'm not willing to stop fucking you so I guess that makes the answer pretty simple."  Birchmore tells Farwell that she does not want him to agree to have a baby just to ensure he can continue having sex with her.  In June 2020, Birchmore tells Farwell that she wants a child and that if he is not willing to get her pregnant, she is going to explore IVF.  In July 2020, Farwell

suggests that he is softening to the idea of having a child with Birchmore, asking Birchmore what would happen if she were to get pregnant. He indicates that he would feel bad that she would be "stuck with it [i.e., the child]" and sends her a smiley face emoji after she tells him all of the reasons that she wants him to be the father of her child. In August 2020, Birchmore tells Farwell that she needs to walk away if he is not going to give her a child. Farwell responds by asking if "Joey," the pseudonym he uses when he pretends to rape Birchmore during sexual encounters, can come over. In September 2020, Birchmore tells Farwell that her head and heart are torn and that she needs space if he will not give her a child.

> ii.   <u>In October 2020, Birchmore threatens to disclose information about their sexual relationship if he does not impregnate her</u>.

On October 5, 2020, Birchmore learns that Farwell's wife is pregnant with their third child and that the baby is due in February 2021. At that point, via text message, Birchmore tells Farwell that if he does not get her pregnant, she is going to tell his wife. Farwell goes to Birchmore's house that evening, and after their meeting, she sends him a copy of her ovulation calendar, showing the days that month she is most likely to conceive. Based on data from Birchmore's electronic devices, she tells multiple friends about the ultimatum that she has given Farwell, and at times indicating that she is the victim given that she was fifteen years old when their relationship began. Via electronic messages, she also discloses to multiple people that Farwell routinely has sex with her when he was "on the clock."

In October 2020, Birchmore does not get pregnant. In text messages recovered from Birchmore's devices, Farwell tells Birchmore that their agreement was only to "try once." However, Birchmore takes the position that their deal does not involve merely having unprotected sex one time. In November 2020, Birchmore asks Farwell to consider not simply getting her pregnant but also being present for the birth of the baby and signing the birth certificate so that

they can "both get what [they] want." Through November, Birchmore continues to ask or demand that Farwell give her what she wants. Based on the text messages, they continue to have unprotected sex.

In late November 2020, the text messages reveal that Birchmore gets frustrated with Farwell and tells him that she is about to walk away and "do whatever [she] decide[s] to do." Separately, she tells people that Farwell is not afraid of losing her. Rather, she believes he is afraid of what she will do if he does lose her.

On December 11, 2020, Farwell has unprotected sex with Birchmore on a day they both believe she is ovulating. Farwell tells Birchmore that he does not believe she will ever be satisfied with what he agrees to do as part of their compromise.

> iii.     <u>In December 2020, Birchmore gets pregnant, discloses the pregnancy to Farwell, and his behavior becomes violent and erratic</u>.

On December 28, 2020, Birchmore learns that she is pregnant and tells Farwell. He responds poorly. Based on a review of the text messages between the two, at no point does he deny paternity. Birchmore tells Farwell that she is going to protect her child and that he is going to have to sign the child's birth certificate. In the alternative, she says, he would not be signing his wife's child's birth certificate. Farwell tells Birchmore that she has given him no choice and that she is the "worst person on the face of the earth."

On December 29, 2020, Farwell meets Birchmore at her apartment. During that meeting, Birchmore shows Farwell a pregnancy poster that she has made for him. In the text messages that followed that meeting, Birchmore tells Farwell that something he did during the meeting made her fear him. Via text messages, she also tells at least three friends about this frightening encounter with Farwell, describing concerns for her own safety and the safety of the baby. She tells at least

one friend that Farwell grabbed her phone out of her hand, removed her computer from her hand, and shoved her.

iv.    <u>Birchmore's electronic communications demonstrate her ability and willingness to navigate the legal and healthcare system in preparation for becoming a single mother.</u>

The data on Birchmore's various electronic devices show that from October 2020 until her death, Birchmore told multiple people about how she had embraced the idea of becoming a single mother.  She began to research and contact lawyers to ensure that she could obtain custody of her child and support from Farwell.

In January 2021, Birchmore's pregnancy progressed.  She attends doctor's appointments, receives an ultrasound, researches and narrows a list of potential baby names.  She plans a birth announcement with accompanying hair appointments and photographer, contemplates gender reveals, and researches baby shower venues and newborn photographers,  Birchmore purchases a car seat, baby clothes and other items, and orders a handmade birth announcement canvas and personalized onesies.  The data from her electronic devices and witness disclosures have revealed that she told at least eighty-five people that she was pregnant.

At the same time, Farwell began to distance himself from Birchmore, refusing copies of ultrasound photos and declining to participate in any planning for the child.  Sensing this, Birchmore starts to research and engage with probate and family attorneys.  She reminds Farwell that she expects him to be present for the birth of her child.  She also tells him that she expected the baby to have his last name, and that he will have to see the child and spend a portion of his holidays with the child.  Via text message, Farwell tells her that it is "so much more than [she has] ever asked for."  Farwell begins to refuse to text about any of these baby-related topics, telling her that they will discuss them in person.  Ultimately, Birchmore tells Farwell that she will give him until January 31, 2021 to meet to reach an agreement.

v.      Birchmore's friend calls Farwell's law enforcement employer and reports information about Farwell's sexual relationship with Birchmore.

On January 20, 2021, Birchmore's friend calls the Stoughton Police Department and tells a Stoughton Police employee that her friend, Sandra Birchmore, has been having sex with Officer Matthew Farwell. The Stoughton Police employee tells Farwell, who responds by angrily commanding the employee never to mention it to him again and never to tell anyone else. Farwell then texts Birchmore, telling her that he thought he had until January 31 to meet with her and that he thought no one knew that they had been having sex. He asked her what friend (of hers) he would have to worry about in the future. After that date, Birchmore tells friends that Farwell had done a "complete 180" and that he has started to come around, bringing her ginger ale when she was nauseous and accepting a copy of a key to her apartment. Birchmore texts two friends, less than a week before her death, that she observed Farwell looking in her bathroom and closets, which she found odd.

Birchmore and Farwell continue to meet in person, specifically on January 23, 2021, and January 29, 2021, apparently engaging in anal sex on January 29, 2021, given that Birchmore is then on doctor-ordered pelvic rest. During that penultimate meeting on January 29, 2021, Farwell asks Birchmore whether the apartment door code that she has given him is unique to her or whether is the same for all residents of the complex.

During her final week alive, Birchmore registers and pays for a standardized test that she plans to take at Massasoit Community College on February 6, 2021, corresponds with her obstetrician and gynecologist and books future appointments, meets with her therapist and books future appointments, googles and considers baby names, engages with a child custody lawyer, and

books a hair appointment for her planned Valentine's Day pregnancy announcement and gender reveal.

vi.    Birchmore's last twenty-four hours.

On January 31, 2021, Birchmore tells Farwell that the public school where she works will be having an early dismissal so she will be released early the following day due to the impending blizzard. She asks if he will be able to shovel out her car and he indicates that he will not be around. He does not tell her that his wife has a c-section scheduled for the early morning of February 2, 2021. Accordingly, Birchmore arranges for a friend to shovel out her car to ensure that she can get to work on Thursday, February 4. 2021.[5]

On February 1, 2021, Birchmore comes home from work at 12:35 p.m. She speaks with her aunt and sends a photo of where her car is parked to a friend to ensure that the friend can shovel out her car. Birchmore enters her apartment building at 12:51 p.m., and is texting with multiple people, including Farwell. She asks him if they are going to meet later in the week or if he can come over that night. Farwell tells her that he is not in town but that he can "probably" meet her later in the week. Birchmore seemingly takes a nap, then spends the afternoon browsing baby items on the Kohl's website, ordering clothes, Facetiming with a friend, talking to her aunt on the phone, and ordering food from DoorDash.

At 5:01 p.m., she goes to the lobby of her building to pick up food that has been delivered and returns upstairs at 5:02 p.m. Birchmore then resumes texting and submits an admission form for Massasoit, resets her password for her gas company account, and goes back downstairs and outside between 5:31 p.m. and 5:33 p.m. to dust snow off of her car. Video surveillance footage

---

[5] School was cancelled for February 2, 2021, and February 3, 2021 was already scheduled to be remote.

shows her hair in a bun, and she is wearing the clothes she is ultimately found wearing when law enforcement finds her body on February 4, 2021.

Birchmore uses both her phone and her laptop that evening, looking up an EMT fire training course, baby names, pregnancy symptoms, and information about new cars. She texts multiple people, telling Farwell at 6:20 p.m. that she has received an early baby shower gift and that she does not want to have her shower during the COVID pandemic. Farwell tells her that he is "stressed," and Birchmore responds that they will be ok. She asks if when she learns the baby's gender, Farwell can purchase the clothes the baby will wear when she brings the baby home from the hospital. Farwell does not respond.

In the hour before Farwell arrives at Birchmore's apartment, she continues to text with multiple people and reaches out to the person who is creating homemade baby onesies for her. She asks that person to send her photographs of onesies when she is done. She googles private event spaces for a baby shower, researches bookshelves for a baby or child, and has a twenty-five-minute phone call with her best friend.

At 9:07:56 p.m., Farwell texts Birchmore to ask if she is still awake. At 9:08:54, he asks if he can visit. Birchmore responded at 9:10:46 p.m. that the door will be open when he arrives and sends him a smiley face emoji. At 9:13:37pm, Birchmore's phone locked for the final time and was never unlocked again. A man who multiple witnesses have identified as Matthew Farwell is seen on surveillance video entering Birchmore's apartment at 9:14:56pm. At 9:18:03pm, Birchmore's phone captured a locked screenshot. It still does not unlock. At 9:24 p.m., Birchmore's friend sends her a picture of the onesies she has designed and created for Birchmore's unborn baby. Birchmore never opens her phone nor reads that text. At 9:40:19pm, her phone

remained locked and recorded 8 steps, never to move again. Farwell was captured leaving her apartment at 9:43:33pm.

<strong><u>Anticipated Legal Issues</u></strong>

The following is a non-exhaustive list of legal issues that may arise during the trial.

**I.      <u>Motions in Limine</u>**

The government intends to separately brief certain issues in separate motions *in limine*. For ease of reference, the government will file the following motions *in limine*:

- Motion *in Limine* to Admit Victim Statements Pursuant to Fed. R. Evid. 804(b)(6)

- Motion *in Limine* to Exclude Evidence of Penalties

- Motion *in Limine* to Admit Evidence Pursuant to Fed. R. Evid. 902(11) and 803(6)

- Motion *in Limine* to Exclude Evidence Pursuant to Fed. R. Evid. 412 and 403 (Filed Under Seal)

- Motion *in Limine* to Admit Evidence Pursuant to Fed. R. Evid. 404(b) (Filed Under Seal)

- Motion *in Limine* to Exclude Certain Evidence (Filed Under Seal)

**II.     <u>Stipulations</u>**

The parties intend to stipulate that forensic scientists Alicia Zimmerman, Stephanie Waite, and Elisabeth Duval (MSP Crime Laboratory) and Danielle Reed (Bode) will be permitted to testify to underlying benchwork that they did not perform but which they reviewed and based their conclusions on.

The parties intend to stipulate that on February 2, 2021, at 9:25am at Newton Wellesley hospital, the defendant's third child was born via scheduled C-section.

The parties intend to stipulate that a 2019 legal settlement that Birchmore had with JLN Donuts is authentic and will not require a keeper of the records to authenticate.

### III.    Authentication of Records

The government intends to introduce Matthew Farwell's marriage certificate and Birchmore's birth certificate pursuant to Fed. R. Evid. 902(2) and 803(9).

The government intends to introduce Birchmore's medical records from Signature Health as well as Boston Medical Center Health Systems (as successor to the hospital formerly known as Good Samaritan Medical Hospital in Brockton) under Fed. R. Evid. 902(11) and 803(6). The government will seek to admit certain statements contained therein as statements made for the purpose of medical diagnosis or treatment. Fed. R. Evid. 803(4).

The government intends to introduce records kept in the regular course of business by the Stoughton Police Department, including: (1) attendance, faculty and curriculum records from the Stoughton Police Explorer's Program; (2) time sheets and time off requests for the defendant; (3) contents of the defendant's personnel file including his resume and high school transcripts. These will be offered through one or more witnesses.

The government intends to introduce billing records for the defendant's cell phone to demonstrate that he was in regular contact with Birchmore by phone at least since 2015. These records are accompanied by a certificate that complies with Fed. R. Evid. 902 (11) and 803(6).

Finally, the government intends to introduce records of Wal-Mart Inc. that are also accompanied by a certificate that complies with Fed. R. Evid. 902(11) and 803(6). These records include a receipt for a copy of a key that Birchmore had made for the defendant in the days before her murder.

### IV.    **Expert Witnesses**

The government has disclosed the following experts:

1. Alicia Zimmerman, Forensic Scientist (Toxicology)

The government intends to introduce expert testimony from Alicia Zimmerman, a forensic scientist at the Massachusetts State Police Crime Laboratory.  Ms. Zimmerman has worked in the Toxicology Section of the Laboratory since 2014.  There, she detects, identifies, and quantifies drugs and their metabolites in urine, blood, vitreous humor, and postmortem tissue samples. During her almost twelve years at the lab, she has worked predominantly on the testing of postmortem samples.  Ms. Zimmerman will testify regarding the testing of Birchmore's heart blood collected during autopsy on February 5, 2021.  She will explain the various tests conducted by other forensic scientists in her unit, and she will explain her interpretation of that testing and her conclusions regarding the absence of any alcohol or controlled substances present in Birchmore's heart blood.  She will testify to the presence of sertraline in the heart blood.

2. Stephanie Waite, Forensic Scientist (Criminalistics)

Stephanie Waite is a Forensic Scientist IV at the Massachusetts State Police Crime Laboratory, a role which she has held since October 2024.  Prior to that, she worked at the Massachusetts State Police Crime Laboratory as a Forensic Scientist III since January 2015.  In that role, Ms. Waite performed, among other responsibilities, chemical, physical, biological, microscopic, and body fluid examinations of evidence found at crime scenes or submitted by law enforcement personnel.  Prior to her role as a Forensic Scientist III, she served as a Forensic Scientist II (2013-2015), a Chemist II (2009-2012) and a Chemist I (2008), all for the Massachusetts State Police Crime Laboratory.

Ms. Waite will explain that she tests various items for the presence of biological fluids including but not limited to blood, seminal fluid, sperm cells, and amylase, which is present in saliva, breast milk, urine, and fecal matter. She will also explain how the lab can collect skin cells by swabbing various items. Ms. Waite will testify regarding her testing of swabs collected from Birchmore's body during the completion of an evidence collection kit on February 26, 2021 and the conclusions that she was and was not able to draw from that testing. Ms. Waite will also testify regarding testing various stains on the underwear that Birchmore was wearing when she died. She will testify to the positive presence of sperm cells on two locations on Birchmore's underwear.

Ms. Waite will also testify that she swabbed the ligature from which Birchmore hung and that she submitted skin cells collected from a portion of the ligature to the DNA section of the laboratory. She will also testify about the collection of fingernail scrapings and a known blood standard from Birchmore.

### 3.  Elizabeth Duval, Forensic Scientist (DNA)

Ms. Duval is a Forensic Scientist III at the Massachusetts State Police Crime Laboratory, a position that she has held since 2019. Prior to that, she was employed as a Forensic Scientist II at the Massachusetts State Police Crime Laboratory from 2009 until 2019. Ms. Duval will define DNA for the jury. She will describe where DNA can be found, how one can develop a DNA profile, and how DNA profiles are used in the forensic setting. Ms. Duval will explain the type of DNA testing that was conducted in this case and the steps involved in such testing.

Ms. Duval will testify about the difference between a single source DNA profile and a mixture DNA profile. She will also testify about the difference between STR and Y-STR testing, how and why each is conducted, and what conclusions can be drawn from each. STR testing can

identify an individual DNA profile.  Additionally, she will explain what a known standard is and contrast it to the definition of an unknown sample.

Ms. Duval will testify about her interpretations of and conclusions drawn from the DNA testing in this case.[6]  In sum, she will testify that a swab collected from the back interior crotch of Birchmore was separated into a sperm fraction and a non-sperm fraction.  Ms. Duval will explain what these terms mean.  The non-sperm fraction was a mixture.  STR testing was performed and the mixture is 220 quintillion times more likely to originate from a mixture in which the defendant is a contributor than not.  Ms. Duval will testify that YSTR testing was also performed on the non-sperm fraction and a major contributor was developed.  That testing revealed that major contributor's profile is 1,246 more likely to have originated from the defendant or a patrilineal relative than not.  The sperm fraction of this stain also underwent STR testing.  This testing generated a DNA profile that was a mixture and at least 16 quadrillion times more likely to originate from a mixture in which the defendant is a contributor than not.

Ms. Duval will testify that a stain on the back exterior right side of Birchmore's underwear also tested positive for the presence of sperm cells.  A sperm and non-sperm fraction were created.  STR testing on the sperm fraction generated a profile that was a mixture.  That mixture is at least 5.5 quintillion times more likely to have originated from a mixture in which the defendant is a contributor than not.

Ms. Duval will also testify about her testing of the sample of the portion of the ligature found tied around Birchmore's neck.  STR testing was performed and generated a DNA profile

---

[6]  On May 1, 2026, the government notified the defense of the other forensic scientists who had completed benchwork on the known samples and unknown samples in this case and asked them to notify the defense if there is any objection to Ms. Duval testifying as to the benchwork and her conclusions drawn therefrom.

that was a mixture.  That mixture is at least 6.2 trillion times more likely to originate from a mixture in which the defendant is a contributor than not.  YSTR testing was also performed on the ligature. YSTR testing generated a profile that was a mixture with a major contributor.  The major contributor's profile is at least 158 times more likely to have originated from Matthew Farwell or a patrilineal relative than not.  She will explain that the defendant was excluded as being the source of DNA under Birchmore's right fingernails.  Birchmore had only her own DNA under her left fingernails.

Ms. Duval will testify about the testing of another unknown sample collected by consent from a male witness in this case (Witness 1).  It is 790 quadrillion times more likely that the mixture generated from the sperm fraction found on the interior back crotch of Birchmore's underwear included Witness 1's DNA than not.  It is 5.4 nonillion times more likely that the mixture generated form the sperm fraction found on the exterior right side of Birchmore's underwear included Witness 1's DNA than not.  Witness 1 is excluded from being included in the mixture found on the ligature from which Birchmore hung.  DNA profiles generated from the known sample collected from the defendant via search warrant and Witness 1 via consent were sent to Bode Laboratories to be compared against the DNA profile of Birchmore's unborn son.

4.   Danielle Reed (Bode Laboratory)

Ms. Reed is an expert in the field of forensic DNA analysis.  She worked for Bode Technology in their DNA lab in Lorton, Virginia from March of 2005 to January of 2026.  Because the Massachusetts State Police Crime Laboratory does not conduct paternity testing, Bode Laboratory compared the fetal tissue collected from the body of Birchmore during autopsy to several known standards.  Ms. Reed will testify that she used DNA profiles generated by the Massachusetts State Police Crime Laboratory collected from known samples from Sandra

Birchmore, Matthew Farwell, and Witness 1.  She generated a DNA profile from the fetal tissue. Based on her testing, she excluded the defendant from being the paternal contributor to the fetal tissue.  Witness 1 was included as being the potential paternal contributor to the fetal tissue.  Ms. Reed will explain that Witness 1 is five trillion times more likely to be the paternal contributor to the fetal tissue than untested individuals.  The government has sought a stipulation to Ms. Reed's testimony or, in the alternative, to admit her report through Elizabeth Duval.

5.  <u>Dr. Maria Capó Martinez (Massachusetts Office of the Chief Medical Examiner)</u>

Since 2016, Dr. Capó Martínez has served in the Massachusetts Office of the Chief Medical Examiner ("OCME").  She has served as a Physician Specialist at the OCME since 2017.  At the OCME, the term physician specialist is synonymous with forensic pathologist and medical examiner.  Starting in 2019, she has served as a Forensic Pathology Fellowship Training Attending Physician.  Throughout her tenure at the OCME, Dr. Capó Martínez has performed autopsies to determine the manner and cause of death.

During her career as a pathologist, Dr. Capó Martínez has conducted chart reviews, external exams/views, as well as full autopsies.  As of April 2026, Dr. Capó Martínez has conducted approximately 1,158 autopsies.

Dr. Capó Martínez will testify regarding the autopsy process performed by OCME medical examiners.  She will testify about the term "cause of death," which refers to the disease or injury causing the death.  She will contrast that with manner of death, which are the circumstances under which the death occurred.  The OCME can classify a manner of death under one of six main categories: natural, accident, suicide, homicide, therapeutic complications (complications associated with medical interventions), and undetermined.  Dr. Capó Martínez will describe what each of those mean.  She will also explain how medical examiners consider factors beyond just

medical findings in conducting their autopsies.  During the course of performing autopsies, medical examiners consider at least four components to forensic death investigations: (1) scene investigation; (2) forensic autopsy and laboratory testing; (3) police reports and witness statements; and (4) medical history and hospital records.

Dr. Capó Martínez will testify about her experience conducting autopsies in which a person died by asphyxia.  She will describe her experience, both currently and as of February 2021, conducting autopsies on individuals who had died by asphyxia.  During the last four years, Dr. Capó Martínez has either externally examined or autopsied approximately 117 suicidal hangings.

At the time she conducted Birchmore's autopsy, Dr.  Capó Martínez had conducted approximately 63 examinations, including views, external examinations, and autopsies, on asphyxia-related deaths, approximately five related to homicidal asphyxia.  At least four of these cases included injuries to other localities and were not isolated asphyxia cases.

The most common signs of homicidal strangulation (manual or ligature) are: petechial hemorrhages on different parts of body including the eyes; fracture of either the hyoid bone, thyroid cartilage, or cricoid cartilage; and hemorrhages of neck muscles.  While these are all more common in homicidal strangulations, they are not exclusive to homicidal strangulations, as it is not impossible for them to be present in suicidal hangings.  With either manual or ligature strangulation the decedent may also have external bruising or abrasions on the neck.  In smothering related deaths, one may see injuries on the tongue, lip, mouth, or face.

Dr. Capó Martínez will also testify regarding the cause and manner of death of Sandra Birchmore.  During the autopsy Dr. Capó Martínez performed on February 5, 2021, she noted a furrow/mark around Birchmore's neck, petechial hemorrhages of the bulbar and palpebral

conjunctivae, skin of the face, and larynx.  Dr. Capó Martínez will explain what these injuries are and what can cause them.

Dr. Capó Martínez also noted a hemorrhage of the left sternothyroid muscle.  This is more common in homicidal strangulations, according to some of the literature, but also can be present in suicidal hangings.  She also noted a fracture of Birchmore's right side hyoid bone.  This type of trauma is more commonly present in strangulation related deaths than in hanging suicides, although, she will opine that a fractured hyoid bone is not exclusive to homicides, as it can be seen in hangings as well.  Dr. Capó Martínez does not recall ever seeing a fractured hyoid bone from a partial hanging like the one in this case, but opines that it is not impossible for that to occur.

Dr. Capó Martínez will also testify about a 2.3x2.0 centimeter, dry-red brown abrasion located on Birchmore's right upper chest.  Dr. Capó Martínez made note of this abrasion in her autopsy, measured it, and also photographed it extensively.  Dr. Capó Martínez did not, at the time of the autopsy, identify this as a patterned imprint consistent with the buckle located on the ligature.  After reviewing the photographs of the injury and comparisons with the buckle, Dr. Capó Martínez confirms that there is a perimortem abrasion on Birchmore's chest and agrees that this injury may be a patterned abrasion caused the buckle.

Dr. Capó Martínez also noted that Birchmore was pregnant, with a fetus consistent with 8-10 weeks gestation and unremarkable placenta and amniotic sac.  Dr. Capó Martínez photographed the fetus at autopsy and returned it to the body of Birchmore.  In the days following the autopsy, Dr. Capó Martínez was asked to preserve the fetus and she will explain the steps she took to do so and the ultimate transport of the fetal tissue to Bode Crime Laboratories.

At the time of her autopsy, Birchmore's nose, lips, and fingertips were dried and mummified, her lower extremities had early marbling, and the right side of her posterior torso had

multiple decomposition bullae.  While Dr. Capó Martínez cannot say with any degree of medical certainty how long Birchmore had been deceased, her body did not appear inconsistent with a day of death being February 1, 2021.

On February 26, 2021, Dr. Capó Martínez conducted a biological evidence collection kit on Birchmore. Dr. Capó Martínez will explain the steps that she took to conduct the biological evidence collection kit and the submission of that kit to the Massachusetts State Police Crime Laboratory.

While all of the physical findings with which Birchmore presented were either more prevalent in homicidal strangulations than in suicidal hangings or equally present in the two, in May 2021, Dr. Capó Martínez originally ruled the manner of death as suicide.  This was based on information that she received from the original investigation and responses to her request for investigative updates.  She will testify that at no point prior to that date was she or the OCME notified that this death was a potential homicide or a suspicious case.

On April 30, 2026, Dr. Capó Martínez issued an amended death certificate in which she opined that Birchmore died by asphyxia and that the manner of her death was undetermined.  This was based on her review of additional information that she was provided in and after August 2024. Based on information unknown to her in May 2021, including but not limited to data from Birchmore's cell phone, the surveillance video, the DNA evidence, and the Birchmore and Farwell's history of consensual or sexual choking, Dr. Capó Martínez evaluated the medical evidence with new context.  Her opinion is no longer that Birchmore died by asphyxia by hanging, but rather by asphyxia.  Her manner of death is medically undetermined.

6.  <u>Dr. William Smock, Physician (Forensic Evaluation)</u>

Dr. Smock is an emergency medicine residency and forensic fellowship trained physician with more than 40 years of experience in the forensic evaluation of injuries, the analysis of injury causation and reconstruction, including asphyxia-related deaths, and crime scene evaluation. Dr. Smock's training, experience and position as a coroner's investigator, a Police Surgeon, an Instructor for the Louisville Metro Police Department Academy and the United States Department of Justice, a Professor of Emergency Medicine, the Medical Director of a Sexual Assault Nurse Examiner (SANE) at a major urban Level 1 Trauma Center, the Medical Director of an EMS service, a Physician and Medical Advisor to the FBI and U.S. Marshals Service, and an Assistant Medical Examiner for the Kentucky Medical Examiner's Office includes the emergency treatment, investigation and reconstruction of injuries sustained in traumatic incidents, including the investigation of crime scenes, blunt and penetrating trauma, torture, investigation of war crimes, sexual assault, strangulation, suffocation, positional asphyxia and pattern injury recognition.

Dr. Smock has treated and evaluated thousands of patients, both fatally and non-fatally injured, who have experienced the physiological consequences of asphyxia, overdose, penetrating and blunt and force trauma, including gunshot wounds. Dr. Smock been accepted in both federal and state courts as an expert in forensic medicine, emergency medicine, torture, injury interpretation, injury reconstruction, asphyxia-related injuries and deaths, and staged and altered crime scenes. Dr. Smock is also the Medical Director of the San Diego-based Training Institute for Strangulation Prevention and has written and lectured extensively on the medical risks and consequences of strangulation, suffocation, positional asphyxia, blunt force trauma, traumatic deaths, crime scene evaluation, hidden homicides, staged and altered crime scenes, and the recognition and interpretation of pattern injuries.

Dr. Smock will testify about his process of attending and participating in thousands of autopsies and performing autopsies as an autopsy assistant.  He will explain steps taken in cases of suspected asphyxia-deaths and relevant factors to consider in determining the cause and manner of death.  Specifically, Dr. Smock will testify about the importance of considering various factors and evidence from the crime scene as well as victimology.  Dr. Smock, in the last 40 years, has responded to, investigated and assisted law enforcement at more than a thousand death and crime scenes, practiced forensic and emergency medicine on thousands of living and deceased patients, and forensically reconstructed hundreds of critical incidents.

Dr. Smock will testify about his experience and expertise in the recognition of staged and altered crime scenes.  Dr. Smock is a national trainer and annually trains hundreds of local, state and federal law enforcement officers, prosecutors, judges, defense attorneys, physicians, and nurses in the evaluation of asphyxia-related deaths, including staged and altered injuries crime scenes.  Dr. Smock and the Training Institute on Strangulation Prevention have created a 4-day, hand-on course, using Dr. Smock's cases, to train professionals in how to recognize and investigate possible homicidal deaths, staged to look like accidents, overdoses or suicides, at staged or manipulated crime scenes.  Dr. Smock provides a minimum of 2 trainings a year for federal law enforcement officers and the U.S. Department of Justice at the National Advocacy Center (NAC) in Columbia, South Carolina on these specific forensic topics.  A list of Dr. Smock's forensic trainings on staged and altered crime scenes, asphyxia related deaths, and injury reconstruction can be found in the attached Curriculum Vitae.

Dr. Smock will explain the pathophysiology of fatal asphyxia, specifically fatal strangulation and suffocation.  Strangulation is the application of external pressure to the neck blocking airflow, blood flow or both.  The application of pressure on the arteries blocks the flow

of blood and oxygen to the brain, thereby depriving the brain of both blood and oxygen. The application of pressure on the airway blocks the flow of oxygen to the lungs. Blockage of either airflow or blood flow constitutes a serious physical injury with the grave risk of death. Suffocation is the obstruction of the nose and mouth and commonly occurs in concert with a strangulation assault.

The cells, neurons and synapses of the brain are the most sensitive cells in the entire body to the lack of oxygen. These neurologic structures will begin to die within seconds after being deprived of oxygenated blood. When the brain is unable to receive blood and oxygen, brain damage and death will result. With occlusion of the carotid arteries, it takes only seconds (average of 6.8 seconds) to lose consciousness and only minutes for death to occur. Prolonged anoxic insults to the brain can result anoxic seizures, in the loss of sphincter control followed by involuntary urination, defecation, and death.

There are many types of fatal asphyxia, including manual strangulation, ligature strangulation, suffocation and positional asphyxia. All types of asphyxia deprive the human brain of oxygen which leads to brain damage and death.

There are various manners in which a person can appear to have committed suicide by hanging, including a complete hanging, in which the entirety of their body weight is suspended and an incomplete or partial hanging in which only part of the body weight is applied to the neck ligature. For incomplete hangings, a person could attempt or appear to commit suicide in a standing, kneeling, seated, or reclined position. Birchmore was found in a reclined and seated position. Dr. Smock will discuss his experience with investigating deaths where the victim was strangled or suffocated to death and the body then positioned as a victim of "suicide".

Dr. Smock will testify regarding his review of the evidence, medical records, video recordings, crime scene photographs, autopsy report, autopsy photographs, X-rays, photographs of and an actual examination of the preserved hyoid bone of Birchmore, and investigative reports.

Sandra Birchmore presented with fractures of the right superior horn of her hyoid bone. Hyoid bone fractures are commonly seen in strangulation assaults and in hangings with full body weight applied to the ligature rather than in partial hangings. Dr. Smock will testify to his forensic experience and review of the scientific and medical literature, which make clear how rare it is for a hyoid bone fracture to occur in a seated or reclined incomplete hanging, especially when a decedent is under thirty years old. For persons under thirty years old, the hyoid bone is actually 3 separate bones and is not yet fully fused and, thus is much more flexible and takes significantly more pressure to fracture. The type of pressure required to fracture a hyoid bone in a person under thirty years old is inconsistent with the amount of pressure applied to the hyoid bones in partial seated hangings.

The CT scan of Birchmore's hyoid bone revealed evidence of a medially (inwardly) displaced fracture of the right greater horn and Dr. Smock will describe how Birchmore's hyoid bone fracture is acute. Dr. Smock will also testify about his treatment and evaluation of patients who have survived hyoid bone fractures. Common symptoms that patients would experience with a fractured hyoid bone are exquisite throat pain, extreme difficulty swallowing and a raspy voice. Dr. Smock will opine that the severity of the hyoid bone fracture with which Birchmore presented at autopsy would have caused her severe pain, trouble swallowing, and trouble speaking had she survived.

Additionally, Sandra Birchmore presented at autopsy with a pattern imprint on her right upper chest. This injury was a perimortem created injury. Doctor Smock will explain how one

can tell the difference between a postmortem and perimortem injury given the presence of a vital reaction on the skin.  The perimortem injury to Birchmore's right upper chest was caused by blunt force trauma and contains a pattern imprint that matches in length, width, and shape of the spring-loaded lobster claw clasp that were found on the ligature behind Birchmore's neck and above the doorknob from which she hung.  The position and location of the spring-loaded clasps that were found on the ligature indicate that she did not die in the position in which she was found.  Doctor Smock will present an exhibit to the jury which shows the imprint that the same clasp makes when it is pressed into clay.  The imprint matches the pattern injury found on Birchmore's right upper chest and is inconsistent with an incomplete hanging.

Birchmore presented with areas of skin missing from both the interior and lateral aspects of her nose.  These abrasions are commonly seen in cases of suffocation when the victim moves their nose back and forth in an effort to breathe.

7.  <u>Nicholas Guarino (MSP Forensic Examiner)</u>

Forensic Examiner Guarino is a civilian employee of the Norfolk District Attorney's Office, having served in that capacity since April 2026.  In this role, Forensic Examiner Guarino provides digital forensics assistance in criminal investigations conducted by state and local law enforcement agencies.  Forensic Examiner Guarino acquires and preserves digital evidence from various digital media, including computers and cellular telephones.

Prior to joining the Norfolk District Attorney's Office as a civilian Forensic Examiner, Guarino served as a Massachusetts State Police Trooper from October 2015 through March 2026.

Forensic Examiner Guarino is expected to testify regarding his forensic extraction of data from three Apple iPhone smartphones (the "iPhones"): (1) Apple iPhone XS, serial no. C39XK1GWKPFP; (2) Apple iPhone 12, serial no. DNPDM8L30DXW; and (3) Apple iPhone

XR, serial no. DX3D1C3XKXKN.  He will also testify regarding the forensic extraction of data from one laptop computer (the "laptop"): an Apple MacBook Air laptop, serial no. C02CH0DMMNHQ.  Forensic Examiner Guarino may testify that the iPhones and laptop were preserved in a forensic state after they were seized and that he subsequently performed data extractions on the iPhones and laptop using reliable tools and methods.  Forensic Examiner Guarino may further testify that, using reliable forensic tools, the extracted data included various digital artifacts, including, but not limited to, text and SMS messages, internet browsing history, web search history, call logs, emails, health data, photographs, contacts, downloaded applications data, and operating system data.  Forensic Examiner Guarino may be asked to authenticate these artifacts and testify that they are exact copies of files and/or data found on the iPhones and/or laptop at the time the devices were seized.

### 8.  Chris Beckstrom (FBI Forensic Examiner)

Christopher Beckstrom is an FBI Certified Senior Digital Forensic Examiner at the New England Regional Computer Forensics Laboratory (NERCFL).  In his more than 10 years with the FBI, Mr. Beckstrom has worked continuously as a Digital Forensic Examiner.

In his current role with the FBI, Mr. Beckstrom performs digital forensic investigations, regularly extracting and reviewing mobile phones, computers, and data produced by internet service providers in response to legal process.  He performs these investigations using widely accepted forensic tools such as Cellebrite Physical Analyzer, Axiom, and Graykey.  During his tenure with the FBI, Mr. Beckstrom has performed, or assisted with the performance of, the extraction or review of data from more than 1000 digital devices.

Mr. Beckstrom is expected to testify that he did not perform the extraction of data from the iPhone XS, iPhone 12, or the Apple laptop.  However, he obtained the original extraction files and

processed the data to a readable format using reliable tools (e.g., Cellebrite Physical Analyzer and Magnet Forensics Axiom).

Mr. Beckstrom is expected to testify that he personally performed the original forensic extractions of data from the iPhone 12 Pro and also performed a full file system extraction of the iPhone XR.  He may testify about the methods utilized to preserve the data before he subsequently commenced data acquisition from the devices.

For each of the foregoing digital devices, Mr. Beckstrom may further testify that, using another reliable forensic tool (i.e., Cellebrite or Axiom), he reviewed various digital artifacts, including, but not limited to, text and SMS messages, internet browsing history, call logs, photographs, emails, contacts, downloaded applications data, and operating system data.

In the context of digital artifacts, Mr. Beckstrom may testify concerning metadata.  As a general matter, Mr. Beckstrom will testify that metadata is data about other data that is often used to summarize basic information about the data including, but not limited to, the source of the data and the date and time the data was created, accessed, sent, received, and/or deleted.  Mr. Beckstrom may testify about the metadata associated with various artifacts obtained from the iPhones and/or laptop (as well as the online accounts identified below).  With respect to text or SMS messages obtained from the iPhones, for example, Mr. Beckstrom may testify about the date and time the messages were sent or received, and the phone numbers associated with the sender and recipient(s) of the messages.  Regarding internet browsing history and/or web search history, Mr. Beckstrom may testify concerning the date and times recorded that various websites were accessed or searches were run, the web address or URL associated with any websites, and the program(s) associated with access.

Mr. Beckstrom is expected to testify regarding the processing and review of artifacts among the data produced by certain internet service providers and a local agency regarding online accounts such as Birchmore's iCloud, Facebook, and Google accounts and the defendant's iCloud accounts and Stoughton.ma.gov email account.

Mr. Beckstrom will provide an overview of the forensic examination of iCloud, Google, Facebook, and email accounts. He will describe programs used to process the data from the respective accounts, specifically, Axiom, and the types of data obtained, including, *inter alia*, account information, evidence of user attribution, emails connected to the accounts, text messages, photographs, videos, messaging platforms, messages contained within messaging platforms, location data, and corresponding dates and times.

Mr. Beckstrom may testify that, based upon his review of the data from the foregoing accounts, certain videos, images, and electronic communications are accurate reproductions of data produced by the respective internet service providers. He may also testify concerning the absence of certain data in the selected produced data.

9. Dr. Michael Baden (Forensic Pathologist)

Dr. Michael Baden is the former Chief Medical Examiner of New York City and past Co-Director of the New York State Police Medico-Legal Investigations Unit. He has worked as a medical examiner for 50 years and has performed more than 20,000 autopsies. He has held professorial teaching appointments at Albert Einstein Medical School, Albany Medical College, New York University School of Medicine, New York Law School and John Jay College of Criminal Justice.

Dr. Baden will testify that the injury that Birchmore sustained would have caused a loss of consciousness in less than ten seconds and death within a few minutes. He will testify that

Birchmore presented at autopsy with petechial hemorrhages in her eyes as well as a hemorrhage of the left sternothyroid muscle and fracture of her right hyoid bone. All of these pathologic findings are commonly found in homicide strangulation, both manual and ligature. In Dr. Baden's fifty years of experience and according to his review of the medical literature, these injuries are not commonly present in suicidal hanging deaths. Dr. Baden will describe that in his experience and through his research, fracture of the hyoid bone is very uncommon in suicidal hangings, especially in partially suspended hangings like the one in which Birchmore's body was found.

The manner in which Birchmore's hair was tangled in the ligature is also inconsistent with his experience with suicidal hangings. Dr. Baden will also note that the ligature tightly applied and crossing the mid-neck horizontally would have compressed the carotid arteries bilaterally. The appearance and location of the ligature was also, in his opinion, consistent with homicidal strangulation rather than a suicidal hanging.

10. <u>Jessica Hyde (Digital Forensic Expert)</u>

Jessica L. Hyde is an experienced digital forensic expert and founder of Hexordia, a firm that provides specialized digital forensic training and consulting. Ms. Hyde has worked in the field of digital forensics for more than 15 years. During this time, she has performed hundreds of forensic extractions of data from digital devices using a variety of commercial forensic extraction tools (e.g., Cellebrite, Graykey, Verakey), analyzed data derived from Apple products, and taught college and graduate level courses in digital forensics. Her testimony will draw on her extensive experience in the field, which is summarized below.

Ms. Hyde is expected to testify regarding her review of the surveillance video footage depicting a lobby at the Canton Woods Apartment complex on February 1, 2021, and her comparison of that video to the data from Sandra Birchmore's iPhone XS and Apple iPhone 12.

Based on this comparison, Ms. Hyde will testify that the timestamp on the surveillance video footage is approximately 13 minutes to 13 minutes and 30 seconds ahead of the actual time. Ms. Hyde calculated the foregoing offset by comparing the events depicted in the video to the extracted data. This included comparison with the following data: Apple Health step data; changes in the phone's physical orientation; SMS messages with DoorDash; device lock and unlock; backlight status; application in focus; and application in use.

Ms. Hyde's testimony regarding the approximate time offset for the surveillance video is based on her extensive experience obtaining and analyzing the foregoing data extracted from digital devices. It is also based on Ms. Hyde's training and experience regarding the reliability of time-related metadata for the foregoing artifacts.

Ms. Hyde is expected to testify regarding her review of the iPhones and laptop for evidence of the deletion of data. This will include testimony regarding her search for deleted text and SMS messages. At trial, Ms. Hyde may testify regarding the recovered artifacts and possible deletion on the devices she reviewed.

Ms. Hyde is expected to testify regarding Apple Health data, including step data. Her testimony on this topic is based on her training, review of applicable manufacturer and independent literature regarding Apple Health data, and extensive experience extracting and analyzing Apple Health data.

Ms. Hyde will testify that Apple iPhones and Watches contain a set of sensors that record the user's movements. These sensors record, among other things, the number of steps a user takes and the corresponding times when those steps occur. On an Apple device, this data is stored in the database titled "Healthdb_secure.sqlite."

Ms. Hyde is expected to testify regarding data (or the absence of data) derived from an Apple Watch 5 that was paired with the iPhone 12 identified above.  By way of background, Ms. Hyde is expected to testify regarding the process by which an iPhone and Apple Watch 5 pair, sync, and exchange data, specifically Apple Health data.  This background testimony will be based on Ms. Hyde's review of manufacturer and independent literature regarding Apple Watch functions, as well as her professional experience obtaining and analyzing data derived from Apple Watches.

Ms. Hyde is expected to testify that the aforementioned Apple Watch 5 last synced with the above-identified iPhone 12 on January 31, 2021.  Her testimony will be based on her review of the data from the healthdb.sqlite and healthdb_secure.sqlite files obtained from the iPhone 12. She will also testify that she specifically reviewed the Apple Health data databases and corresponding WAL file from the iPhone 12 data to confirm that the Apple Watch 5 did not attempt to transfer any health data (e.g., heart rate or step data) to the iPhone 12 after January 31, 2021.

Ms. Hyde is expected to testify that there may be multiple reasons why data did not transfer from the Apple Watch 5 to the iPhone 12 after January 31, 2021.  The Bluetooth function on the Apple Watch may have been deactivated.  A user may deactivate an Apple Watch's Bluetooth function when using Apple AirPods to listen to audio or video files on another Apple devices (e.g., MacBook laptop).  By deactivating the Watch's Bluetooth function, the user can prevent the Watch from trying to connect to the AirPods and thereby disconnecting the user's AirPods from the laptop.  Alternatively, the Apple Watch's battery may have died.  Ms. Hyde's testimony regarding the possible reasons why no data transferred between the Apple Watch 5 and iPhone 12 will be based on her review of applicable manufacturer and independent literature, and her extensive experience analyzing Apple Watch derived data in a forensic setting.

Ms. Hyde will also testify regarding the absence of forensically sound methods of obtaining Apple Health data from the Apple Watch 5.

11. <u>Dr. Lisa Rocchio (Clinical and Forensic Psychologist)</u>

Lisa M. Rocchio, Ph.D., is a clinical and forensic psychologist who specializes in the assessment and treatment of interpersonal violence and traumatic stress. Dr. Rocchio earned her Ph.D. in 1995, and after completing a postdoc, became licensed in 1997. She owns and operates an interdisciplinary group psychotherapy practice and an independent forensic practice in Rhode Island. She is a Clinical Assistant Professor within the Department of Psychiatry and Human Behavior at the Brown University Alpert School of Medicine where she conducts supervision and training for psychiatry fellows. Over the course of her career, Dr. Rocchio has obtained specialized training regarding, and has specialized her clinical and forensic practice in, the assessment and treatment of patients who have experienced traumatic stress and interpersonal violence (which includes but is not limited to rape, sexual assault, childhood sexual abuse, intimate partner violence, and sexual harassment). In the last twenty-five years, Dr. Rocchio has evaluated and treated hundreds of individuals who have experienced interpersonal violence, including childhood sexual abuse, rape and sexual assault, intimate partner violence, and sexual harassment. Dr. Rocchio has published and presented at national and international conferences in her areas of expertise, and regularly provides supervision, consultation, and training to other professionals. She is a fellow of the American Psychological Association (APA), where she is a Past-President and founding member of APA's Division of Trauma Psychology and a former member of the APA Ethics Committee. Dr. Rocchio has served as president of the Rhode Island Psychological Association (RIPA), and as RIPA's representative to APA's Council of Representatives. Dr.

Rocchio never met or treated Sandra Birchmore and has not reviewed any of the discovery in this case nor interviewed any of the potential witnesses.

Dr. Rocchio will testify regarding the following:

Grooming refers a series of deceptive tactics, strategies, or *modus operandi* that are used by perpetrators for the purpose of sexually abusing a child. Most instances of childhood sexual abuse are not perpetrated through the direct use of force. Rather, the majority of childhood sexual abuse is perpetrated by someone known to the victim in the context of a pre-existing or manufactured relationship between the perpetrator and victim, and individuals with particular vulnerabilities are often targeted by perpetrators.

Most instances of childhood sexual abuse are committed through the use of non-violent tactics involving the use of deliberate psychological manipulation, grooming, and coercion in the context of the perpetrator's relationship with the victim. Sexual abuse of children is a process, not a single event. The concept of grooming has been a part of research literature for at least 40-50 years. Grooming is generally believed to fall into five stages.

Children with particular vulnerabilities are often targeted by perpetrators of sexual abuse. These vulnerabilities may include but are not limited to minors who: have already experienced victimization of any kind; have psychological or chronic health difficulties; come from disadvantaged circumstances; have cognitive or intellectual disabilities; and/or have a single parent family. Grooming is a strategic pattern of behaviors that can take a variety of forms and function to render the victims vulnerable to abuse, to obscure the nature of the abuse, and to build trust and attachment between the victim and their abuser. Sexual abuse of minors frequently occurs through the use of manipulation or coercion in the context of an established relational dynamic that is developed over time, rather than through the use of forcible sexual assault.

Individuals who sexually abuse minors are typically in positions of trust. Trust can develop between a child and an adult in a position of authority, like a police officer, due to a variety of factors, including but not limited to the power differential inherent within the relational dynamic; the officer's increased authority, professional experience, expertise, and training; the connection to the department where the officer works; the role of police officers in protecting public safety; and the child's background and experiences. Differences in size or physical strength can also contribute to a perpetrator's power and control over a victim. Other adults conveying to children their trust in adults in positions of authority can make it easier for perpetrators in these types of positions to abuse children. These factors enable the perpetrator to spend time with the child and not have that raise any sort of suspicion. Perpetrators obtain access to a victim and then are able to isolate them for purposes of sexual abuse.

To build trust and attachment, perpetrators of child sexual abuse manipulate, lie, and deceive. They exploit vulnerabilities they have identified and put themselves in a position to meet their victim's unmet needs. For example, perpetrators may spend time with the victim, give them special attention to let them know they are special in some way, or create false sense of family, love, security, or protection. This increases the likelihood the minor will become attached and connected to perpetrator and increases his power and control over his victim.

Teenagers in general are more easily manipulated than adults. They are more easily led to believe things that are not true. Teenagers are more likely to blame themselves and to fear getting in trouble. Teenagers are more likely to take risks, to behave impulsively, and to ignore or miss certain red flags. They have less life experience to fall back on to help to inform their decisions, and they can be more emotionally driven.

When grooming a child for sexual abuse, perpetrators may start slowly and gradually so that the perpetrator is able to define for the child what is and what is not normal. For example, perpetrators may start by normalizing touch (arm/shoulder/hugs), sitting very close, touching a leg, or giving a massage, introducing and normalizing the idea that physical contact is happening. Then they may begin slowly introducing the topic of sex by talking about it, telling sexual jokes, or showing movies with sex scenes.  Those grooming behaviors escalate over time, typically involving increasingly exploitative types of sexually abusive actions.  The relational dynamic of trust and attachment and this normalization of sexual touch can prevent victims from being aware that what they are experiencing is abuse.  Children who are victims of abuse are often manipulated into believing that they are making an "adult choice," thereby reducing the likelihood of disclosure.

Perpetrators then seek to maintain control of their victims in order to coerce them into continued sexual abuse and reduce the likelihood of disclosure.  Perpetrators often use coercive control strategies to commit child sexual abuse and to attain and maintain power and control over victims.  Coercive control refers to a strategic pattern of behavior that is designed to attain and maintain control in a relationship.  It is defined as an ongoing pattern of domination by which perpetrators interweave physical and sexual violence with intimidation, sexual degradation, isolation, deprivation, and/or control.  Intimidation is often used to maintain secrecy and to instill fear, dependence, compliance, loyalty, and shame.  If intimidation is sufficient to establish compliance, physical violence may not be necessary.  Control is used to compel obedience more indirectly. Specific controlling tactics used to regulate behavior typically involve isolation, thereby increasing dependency, dictating victims' everyday choices, micro-managing behavior, and establishing "rules" for everyday life.  Violation of these rules is severely punished, and compliance is strictly enforced.  Examples of coercive control may include engaging in rough

violent sex acts as a "punishment" for noncompliance or the use of surveillance behaviors such as tracking a victim's location to extend the boundaries of the perpetrator's control.  The effects of coercive control are exacerbated in interactions between adults and children, because children generally have less power, access to resources, autonomy, cognitive abilities, and experience than adults.

Negative aspects of the relationship (*i.e.,* abuse) are frequently interspersed with positive or neutral events that facilitate the abuse and maintain the victim's attachment to the perpetrator, allowing the abuse to continue and instilling a false sense of hope.  This results in the victim feeling confused and having difficulty identifying the abuse as wrong.  In a grooming dynamic, the perpetrator cultivates in the victim an attachment and trust.  Maintaining that attachment can be a powerful motivator.  Appeasing and agreeing to a perpetrator's sexual desires can become strategies employed by the victim to increase their own safety.

Sometimes perpetrators are well-respected in other areas of their lives, held up as pillars of the community, and/or have power based on their occupation, relationships, or connections.  When victims see their perpetrators as appropriate and highly respected in public, this adds to the power differential and reduces the likelihood of disclosure.

Victims of childhood sexual abuse are often very confused about the nature of the abuse and about the perpetrator.  They have developed trust with and attachment to a relationship that involves them being harmed.  Perpetrators can give victims a distorted sense of "normal" sexual behavior, and the abuse can interfere with normal psychosocial development.  Difficulties with emotional and physical intimacy as well as impairments in sexual functioning are well established consequences of childhood sexual abuse.

In consensual sexual relationships, parameters and specific sex acts are discussed and mutually agreed to.  Just because a person consents to a certain sex act on one occasion or some occasions does not mean they have consented to all future instances of that sex act, even with the same partner.  In a consensual sexual relationship, each person defines for themselves their own parameters and boundaries around what they will or will not agree to do.  In situations involving grooming and sexual abuse, the perpetrator is the one who defines the boundaries and what is "normal."  Perpetrators instill their own sexual template on the victim and define what is appropriate.  Sometimes perpetrators use degradation or humiliation or require victims to engage in "taboo" behaviors, which reinforces the power dynamic.  The use of these behaviors can increase the victim's sense of shame, and false belief that they were complicit.

The tactics and manipulation utilized during by the perpetrator during the grooming process both informs and influences the relational dynamic as the victim ages.  Even after the victim is legally old enough to consent to sex, if the relational dynamic continues, the perpetrator maintains his position of power over her due to the history of grooming and ongoing coercive control.  From the start of the grooming process, often the perpetrator is the only one of the two of them that continues to have a stable job, power and authority in the community, permanent housing, and financial stability, which further extends the unequal power dynamic.

The disclosure of rape and sexual assault is a process that occurs over time, and commonly well after the incident.  This is particularly true for individuals who are raped or sexually assaulted as children and by someone they know.  The majority of children who are sexually abused do not disclose that abuse until adulthood.  Disclosure that occurs after some period of time following the abuse is referred to as delayed disclosure and is common for a variety of reasons, including but not limited to, confusion, fear of backlash, self-blame, shame, difficulty labeling the experience as

abuse, and fear of not being believed.  Adolescents in particular may avoid disclosure due to factors such as fear of getting in trouble, a fear of having freedom constricted if they disclose, fear of judgment or blame, fear that perpetrator will get in trouble, and a sense of loyalty to perpetrator. If and when victims of child sexual abuse are ready to disclose, they will most often tell a trusted friend or close family member, and are less likely to report to perceived authority figures.

The dynamics of coercive control within the context of childhood sexual abuse frequently result in experiences of emotional and mental distress and confusion that can further interfere with the ability to disclose abuse or to seek help.  The violence, abuse, and abuse of power in combination with the perpetrator's use of tactics of degradation, dehumanization, and humiliation results in the victim's deterioration in psychological wellbeing and functioning, and can make it exceedingly difficult and, at times, impossible for the victim to extricate themselves from the abuse.  Victims commonly begin to doubt their own judgments and may feel incapable of making independent decisions.

In addition to factors impacting the timing of disclosures, there are a number of factors that may influence the ways individuals talk about their experiences of childhood sexual abuse.  The majority of individuals who have experienced childhood sexual abuse do not label it as such. Rather than using words like "sexual assault" and "rape," victims will often use words that are less frightening and function to help them to minimize the impact of what has happened to them and distance themselves from it.  Coping strategies and psychological defenses commonly used by victims in response to child sexual abuse and child sexual assault include, but are not limited to, avoidance, compartmentalization, minimization, directed forgetting, making excuses for others, self-blame, and denial.  These strategies function to allow the individual to maintain an attachment

to and/or relationship with the perpetrator, and to put aside and protect themselves from, painful and frequently overwhelming feelings.

### V.     Procedural Issues

#### A.     Witness Sequestration and Exemptions

Pursuant to Federal Rule of Evidence 615, the government respectfully requests that the Court order all witnesses excluded from the courtroom so that they cannot hear other witnesses' testimony, with three exceptions.

First, the government requests that its case agent be exempt from the witness sequestration order.  *See United States v. Machor*, 879 F.2d 945, 953 (1st Cir. 1989) (explaining that Rule 615(a)(2) provides an exception to sequestration for the case agent, as they are a designated representative of the government).

Second, the government seeks to exempt from sequestration two family members of Birchmore's who are anticipated witnesses for the government.  One witness is Birchmore's aunt, and her legal next-of-kin.  A second witness is Birchmore's cousin.  Since Birchmore is the victim of the crime alleged in Count 1 of the Superseding Indictment and Birchmore is deceased, these two witnesses, as her family members, have the right not to be excluded from the trial pursuant to 18 U.S.C. § 3771(b)(2)(D).  This right not to be excluded exists "unless the court, after receiving clear and convincing evidence, determines that testimony by the [family member] would be materially altered if the [family member] heard other testimony at that proceeding."  18 U.S.C. § 3771(a)(3).

The government anticipates calling these family members toward the beginning of the trial (among approximately the first 10 witnesses) and expects their testimony to focus primarily on some of their interactions with Birchmore prior to her death and their own actions when they

learned of Birchmore's death.  These areas of testimony are not subject to alteration based on hearing other testimony at trial.  Further, the government has interviewed both of these family members and has produced reports of those interviews to the defendant.

### B.    Jury Selection

Due to the anticipated length of the trial, the government proposes that the Court select four alternate jurors rather than two.  The government intends to file a proposed jury questionnaire in lieu of voir dire questions.  The parties are working together on this issue.

### C.    Demonstratives

Pursuant to Federal Rule of Evidence 107, at trial the government intends to introduce text messages between Farwell and Birchmore.  Due to the volume of these messages, in addition to publishing texts, the government intends to play audio recordings of individuals[7] reading these text messages exchanged between the defendant and Birchmore.  The government does not intend to seek to admit these recordings as evidence but intends to use them only as demonstrative exhibits.  Like using a demonstrative transcript of an audio or visual recording that is played during trial, use of the audio recordings of the text messages will enable jurors to receive the evidence visually and aurally.  Use of the audio recordings will also prevent any accidental misreading of the text messages (which contain abbreviations, typos, and incorrect grammar) by the prosecutor or the testifying witness.  The government will share the audio recordings of the text messages with defense counsel (and the Court, should the Court wish to receive advance copies) prior to trial for their review.

Rule 107 of the Federal Rules of Evidence states that the "court may allow a party to present an illustrative aid to help the trier of fact understand the evidence or argument if the aid's

---

[7] FBI agents who are not part of the case team will record the text conversations.

utility in assisting comprehension is not substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or wasting time." An illustrative aid can be "any presentation offered not as evidence" but to help the trier of fact to understand. Fed. R. Evid. 107, Advisory Committee Note to 2024 Amendments. The First Circuit has held that courts have "broad discretion in admitting demonstrative evidence." *United States v. López-López*, 282 F.3d 1, 15-16 (1st Cir. 2002).

The government would not oppose a limiting instruction regarding the audio recordings in which the Court would inform the jury that the audio is only being played to assist them; that the written text messages in the exhibits, and not the audio, are the evidence in the case; and any difference that they may hear between the audio and the exhibits is to be resolved in favor of what they read in the exhibits. *See, e.g., United States v. Anderson,* 452 F.3d 66, 77-78 (1st Cir. 2006) (describing a similar instruction).

### D.    Trial Schedule

Given the large number of witnesses, the anticipated length of trial, and the sensitive nature of the anticipated evidence, the government respectfully requests that the Court set a trial schedule that provides for three full days and two half-days per week. The interspersed half-days will enable jurors to take a break from the intensity of the trial. Defense counsel joins in this request.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:    */s/ Elizabeth C. Riley*
TOREY B. CUMMINGS
BRIAN A. FOGERTY
ELIZABETH C. RILEY
Assistant United States Attorneys

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

/s/ Elizabeth C. Riley
Elizabeth C. Riley
Assistant United States Attorney

Date: August 3, 2026