**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA     :
                                    :
                                    :
      v.                         :       Docket No.: 24-cr-10259-DJC
                                    :
                                    :       **HEARING REQUESTED**
MATTHEW FARWELL           :
                                    :

**DEFENDANT'S RULE 702 MOTION *IN LIMINE* TO EXCLUDE THE EXPERT TESTIMONY OF DR. MICHAEL BADEN**

Matthew Farwell, the accused, pursuant to Fed. R. Evid. 702 and 403, respectfully moves this Court to exclude in its entirety the proposed testimony of Dr. Michael Baden; or, in the alternative, to substantially narrow the scope of his proposed testimony.[1] As outlined herein, Dr. Baden's reliance on incorrect and insufficient facts, and his unreliable applications of accepted methodologies fail to meet the standards delineated in Rule 702 and the *Daubert* line of cases. *See*, *e.g.*, *Daubert, et al. v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1992); *Gen. Elec. Co. v. Joiner,* 522 U.S. 136 (1997); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Additionally, the probative value of Dr. Baden's testimony is "substantially outweighed by the risk of unfair prejudice it creates[,]" *United States v. Montas*, 41 F.3d 775, 783 (1st Cir. 1994), and thus should be excluded under Fed. R. Evid. 403.

Mr. Farwell requests a Rule 702-*Daubert* hearing to appraise the veracity of the facts on which Dr. Baden bases his opinions, as well as "examin[e] [] his conclusions to determine

---

[1] For efficiency purposes, Mr. Farwell intends for this Rule 702 motion to also serve as a motion *in limine*. Should this Court decide not to exclude Dr. Baden's testimony in its entirety, Mr. Farwell respectfully asks the Court to determine the admissibility of each statement or conclusion for trial, and in so doing, to substantially narrow both the scope and the statements of that testimony for trial.

1

whether they flow rationally from the methodology employed." *See Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 32 (2012), *citing Joiner,* 522 U.S. at 146.

## SUMMARY OF ARGUMENT

Whether Ms. Birchmore's death was a suicide as the Massachusetts Office of the Chief Medical Examiner initially pronounced, an accidental death at her own hand, or a homicide, as the federal prosecution alleges, is *the* central issue in this case.  Therefore, any expert opinions as to *whether* a killing occurred is relevant, but they require significant vetting to ensure that the proffered experts will aid the trier of fact and are basing their opinions on a reliable foundation.

The government bears the burden of establishing the reliability of Dr. Baden's testimony. Review of the government's expert disclosure and Dr. Baden's four-page letter encompassing his conclusions as to the cause and manner of Sandra Birchmore's death do not meet that burden because Dr. Baden's conclusions are ungrounded from current scientific literature, based on wrong and/or insufficient facts, and contain "too great an analytical gap between the data and the opinion proffered." *See Joiner,* 522 U.S. at 146. These deficiencies also make Dr. Baden's testimony substantially more prejudicial than probative and create an undue tendency to confuse and mislead the jury.  Fed. R. Evid. 403. Therefore, Dr. Baden's opinions should be excluded under Federal Rules of Evidence 702 and 403.

## I.     FACTUAL BACKGROUND

This Court is familiar with the facts of this case, so only those facts relevant to this Rule 702 Motion will be outlined here. Additionally, Mr. Farwell incorporates herein Section I.A. of the Factual Background[2] in his Rule 702 Motion *in Limine* to Exclude the Expert Testimony of

---

[2] These sections outline the forensic evidence timeline from February 4, 2021, when Ms. Birchmore's body was found through the autopsy and recent DNA testing, as well as the timeline of the federal investigation, beginning in approximately 2023.

Dr. William Smock (hereinafter "*Smock 702 Motion*") to be filed on August 3, 2026, to streamline this Court's review of the two 702 Motions.

### A. The Timeline of Dr. Baden's Involvement in this Case

#### 1. <u>The civil lawsuit brought by Ms. Birchmore's family.</u>

Sometime in 2021 and 2022, Darlene Smith, the surviving aunt of Sandra Birchmore, hired lawyer, Steven Marullo, to bring a civil lawsuit against Matthew Farwell, William Farwell, Robert Devine, the Town of Stoughton, and the Stoughton Police Department. The initial complaint was filed on December 29, 2022. *See Darlene Smith as the Personal Representative of The Estate of Sandra Birchmore v. Farwell, et. al*, Mass. Super. Ct., No. 2282-CV-1197 (Norfolk County Dec. 29, 2022). As relevant to this motion, the civil suit includes a wrongful death claim regarding Ms. Birchmore's death.

On January 3, 2024, the Law Offices of Steven J. Marullo wrote to the Massachusetts Office of the Chief Medical Examiner ("OCME") requesting information as to the "fracture of the hyoid bone[,]" *USAO_007773*, found during the autopsy of Ms. Birchmore. Specifically, Mr. Marullo's office asked: "Is [a broken hyoid bone] consistent with cases of asphyxia where a person is simply leaning into a ligature as opposed to a violent drop or strangulation." *Id.* Additionally, the office inquired as to the "testing protocol in relation to deaths involving a fetus such as this and was any additional testing undertaken." *Id.*

The OCME replied approximately two weeks later, *USAO_007774*, explaining: "You questioned whether this [hyoid] fracture is consistent with cases of asphyxia where a person is simply leaning into the ligature as opposed to a violent drop or strangulation. After consulting with the medical examiner, she indicated that a hyoid bone can be fractured without strangulation or a violent drop." *Id.*; *USAO_034320*.

As to the testing of the fetus, the OCME stated: "the medical examiner conducted an external examination of the fetus and made the determination that no additional testing or examination was needed in relation to the cause and manner of death for Ms. Birchmore." *Id.*

**2.    The findings of Dr. Baden outlined in his June 18, 2024, Letter to the Law Offices of Steven J. Marullo.**

Dr. Baden was retained by the Law Offices of Steven J. Marullo, in or around early 2024, apparently to opine as to the cause and manner of Ms. Birchmore's death in relation to the aforementioned civil lawsuit.[3] *USAO 018108-111*.

As discussed **post**, in his June 18, 2024, Letter ("*Baden Report*"), to Ms. Smith's attorneys, Dr. Baden concluded that "the autopsy findings are typical for homicidal manual and ligature strangulation and are atypical for hanging; . . . that the neck ligature was tied to a doorknob to give the appearance of a suicidal hanging; that the cause of Ms. Birchmore's death is "Strangulation" and the manner of death is "Homicide[.]" *id*., at 3-4.

**3.    The federal government's notice of Dr. Baden in the instant case.**

In 2026, the government disclosed to Mr. Farwell, pursuant to Federal Rules of Criminal Procedure Rule 16, that it would call Dr. Baden to serve as an expert in the instant case and attached the Baden Report as it was issued to the Law Offices of Steven J. Marullo in June 2024.

The government notes in its expert disclosure that "Dr. Baden has not reviewed any additional materials since he authored his June 18, 2024, report." Gov't Disclosure, at 3. Absent from discovery is any evidence that the government has directly consulted Dr. Baden regarding the instant case. It bears noting, too, that the government's disclosure differs from the Baden Report as it changes Dr. Baden's cause of death determination from "strangulation," *Baden*

---

[3] Defense counsel has received no documentation as to what information attorneys with the Law Offices of Steven J. Marullo, Ms. Smith, or any other family members of Ms. Birchmore have shared with Dr. Baden, if any.

*Report*, at 4, to "asphyxia/strangulation" without explanation for the change.

## II.    LEGAL STANDARD

### A. Federal Rules of Evidence 702

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and codified the trial court's gatekeeping role regarding expert testimony. *See* Fed. R. Evid. 702.

The *Daubert* Court explained the court's "gatekeeping" role is to "ensur[e] that an expert's proffered testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Samaan*, 670 F.3d at 31, *quoting Daubert,* 509 U.S. 597. This gatekeeper role is essential to "'insur[e] that the fact-finding process does not become distorted by expertise that is fausse and science that is junky." *Fogarty v. Whole Foods Mkt. Grp., Inc.*, No. 18-CV-11090, 2020 WL 1446728, at *2 (D. Mass. Mar. 25, 2020) (cleaned up).

Additionally, "trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir.1998). "'[C]onclusions and methodology are not entirely distinct from one another' and 'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'" *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 15 (1st Cir. 2011), *quoting Joiner,* 522 U.S. at 146. Therefore, expert testimony may be excluded if there is "too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.

Ultimately, the court must determine by a preponderance of the evidence that (1) the expert's "scientific, technical, or other specialized knowledge will help the trier of fact," (2) the proposed testimony is "based on sufficient facts or data," (3) the testimony "is the product of

reliable principles and methods," and (4) the expert testimony "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

The burden is on the proponent of the expert testimony to "by a preponderance of proof that the expert has used a sound and methodologically reliable reasoning process to reach his or her conclusion, and that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Calisi v. Abbott Lab'ys*, No. CIV.A. 11-10671-DJC, 2013 WL 5441355, at *6 (D. Mass. Sept. 27, 2013) (cleaned up).

### B. Federal Rules of Evidence 403

In addition to qualifying under Rule 702, an expert's testimony must pass Rule 403's balancing test. *See United States v. Tetioukhine*, 725 F.3d 1, 6 (1st Cir. 2013). In *United States v. Montas*, the Court determined that "expert testimony may be excluded under Rule 403 if its probative value is substantially outweighed by the risk of unfair prejudice it creates." 41 F.3d 775, 783 (1st Cir. 1994). "Evidence is generally deemed unfairly prejudicial if it has an undue tendency to prompt a decision by the factfinder on an improper basis[,]" *Doe by & through Pike v. Pike*, 405 F. Supp. 3d 243, 247 (D. Mass. 2019), which is "commonly, though not necessarily, an emotional one[,]" Fed. R. Evid. 403 advisory committee notes.

The expert testimony may likewise be excluded if it is likely to "mislead[] the jury[.]" Fed. R. Evid. 403. As cautioned by the *Daubert* Court:

> Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.

*Daubert*, 509 U.S. at 595 (*quoting* Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)).

Furthermore, when an expert's testimony "appear[s] to put the expert's stamp of approval on the government's theory, such testimony might unduly influence the jury's own assessment of the inference that is being urged." *Montas*, 41 F.3d at 784. Therefore, when an expert's testimony has "deficiencies," "there is a risk that the jury will attach undue significance to this opinion offered by an expert." *See Clark v. Cap. Vision Servs., LLC,* No. 22-CV-10236-DJC, 2024 WL 3458525, at *20 (D. Mass. July 18, 2024).

Ultimately, Rule 403 "permits exclusion" when the evidence is "substantially" outweighed "by the dangers of its admission." *United States v. Pires*, 138 F.4th 649, 670 (1st Cir.), *cert. denied*, 146 S. Ct. 253 (2025) (cleaned up).

## III.    ARGUMENT

### A.    The Court Should Exclude Dr. Baden's Opinions Because They Are Unreliable.

Dr. Baden's opinion as to the cause and manner of Ms. Birchmore's death, and the determinations underpinning that opinion, should be excluded because they do not accurately reflect what is presented in the sources he cites, are not grounded in the current scientific literature in forensic pathology and anthropology or sufficient and/or correct facts, and they contain significant analytical gaps.

### 1. <u>Dr. Baden's physical findings are not the produce of reliable principles and do reflect a reliable application of forensic pathology principles to the facts of this case.</u>

In his review of the physical findings at autopsy, Dr. Baden observed "prominent petechial hemorrhages in the eyes and skin above the ligature, an abrasion on the chin, hemorrhage in neck muscle and a fracture of the right hyoid bone." *Baden Report*, at 2. Then, citing to two textbooks[4] and his experience, Dr. Baden opined: "All of these pathologic findings

---

[4] Dr. Baden cites to Vincent DiMaio and Dominick DiMaio, *Forensic Pathology* 247-269 (Vernon J. Geberth, ed., 2nd Ed. 2006) (hereinafter "*DiMaio*"), and *Spitz and Fisher's Medicolegal Investigation of Death: Guidelines for*

are commonly found in homicidal strangulation --- manual and ligature --- but not in suicidal hanging." *Id.*, at 2.

> a.  The physical findings.

In his description of the physical findings at autopsy, Dr. Baden failed to explain that "petechial hemorrhages in the eyes and skin above the ligature, an abrasion on the chin, hemorrhage in neck muscle and a fracture of the right hyoid bone," *Baden Report*, at 2, are also common in incomplete suicidal hangings. Nor is there evidence that he even considered this alternative despite the very textbooks he cites clearly do so.

As a threshold issue, Dr. Baden did not mention in his Report two critical facts: "[h]anging is the most common method of suicide worldwide and virtually all hangings are suicidal." *DiMaio*, at 249. Certainly, other forms of neck compression, such as manual and ligature strangulation occur, but in the Commonwealth of Massachusetts, the ratio of occurrence between homicidal strangulation and suicidal hanging between 2016 and 2022 was 21:2 (467/22).[5]

> i.  Petechial hemorrhages.

Dr. Baden indicated that "petechial hemorrhages in the eyes and skin above the ligature," *Baden Report*, at 2, "are commonly found in homicidal strangulation --- manual and ligature --- but not in suicidal hanging[,]"[6] *id.*, *citing DiMaio* and *Spitz and Fisher*. But upon close review of

---

*the Application of Pathology to Crime Investigation* 405-443 (Werner U. Spitz and Francisco J. Diaz, eds., 5th Ed. 2020) (hereinafter "*Spitz & Fisher*").

[5] This data was coalesced from two Commonwealth of Massachusetts state sites: (1) "Statewide homicide data," Injury Surveillance Program, Department of Health, available at https://www.mass.gov/info-details/statewide-homicide-data; and, (2) "Suicide data & reports," Division of Violence and Injury Prevention, Department of Health, available at https://www.mass.gov/info-details/suicide-data-reports.

[6] Petechial hemorrhages are "pinpoint hemorrhages produced by rupture of small vessels, predominantly small venules." *DiMaio*, at 233.

both of those texts, they do not support this supposition.

DiMaio, in the introduction to the "Strangulation" section, wrote that "there are three main forms of strangulation: (1) hanging, (2) ligature strangulation, (3) manual strangulation." *Id.*, at 248. Regarding *all three types* of strangulation, DiMaio observed "petechiae are classically seen in the conjunctivae and sclerae." *Id.*, at 233.

Furthermore, Ms. Birchmore's body was found in a position consistent with a seated incomplete, atypical hanging, meaning that part of her body was touching the ground and the ligature knot was at the side of her neck. *See USAO_013366*; *USAO_008820. DiMaio* explained that "in partial suspension hangings where the carotid arteries and venous drainage are completely occluded," *id.*, at 253, as was likely with Ms. Birchmore, "the vertebral arteries continue to supply blood to the head, producing congestion of the face and petechiae. Thus, facial congestion and petechiae *are commonly seen* in these cases." *Id.* (emphasis added). Spitz and Fisher, at 406, stated that "[i]n cases of *semi-suspension,* arterial blood flow to the head persists while the venous return is interrupted[,]" and noted that "[o]ver 50 percent of suicidal hangings show petechial hemorrhages[,]" *id.*, at 409.

ii.   The abrasion on Ms. Birchmore's chin.

During her examination of Ms. Birchmore, the medical examiner noted a "dry yellow abrasion" on Ms. Birchmore's face. *Autopsy Report*, at 2. Dr. Baden, without explanation, states that this abrasion occurred or was the result manual and/or ligature strangulation. *Baden Report*, at 2. Despite his 50 years of experience, it appears Dr. Baden did not consider the obvious alternative – that the abrasion was perimortem and consistent with how Ms. Birchmore's head was terminally positioned when she was found. *See*, *e.g.*, *USAO_017442*.

iii.   The hyoid fracture and the current scientific literature.

9

Dr. Baden's Report stated that hyoid fractures are "commonly found in homicidal strangulation --- manual and ligature --- *but not* in suicidal hanging[,]" *id.*, at 2 (emphasis added), and that "[a]ccording to Dr. DiMaio's textbook, fracture of the hyoid bone occurs rarely, if at all, in suicidal hanging and does occur in half of homicidal strangulations of women[,]" *id.*

These conclusory statements ignore a significant and growing body of literature, largely following the latest edition of DiMaio's textbook, proving wrong this long-held assumption. Additionally, these statements, based on only two textbooks, fail to acknowledge that "[e]ven reference textbooks and manuals of forensic pathology do not concur on the occurrence and diagnostic significance of laryngohyoid fractures in hanging[.]"[7]

To prevent this Court from reading the same recitation of the scientific literature twice, Mr. Farwell incorporates herein Section III.AB.2. from *Smock 702 Motion*. The analysis therein directly addresses Dr. Baden's outdated assumptions as to the frequency of hyoid fractures in suicidal hanging deaths of all kinds.

Moreover, Dr. Baden does not address the absence of hemorrhage at the hyoid fracture site – a critical omission. A fracture without hemorrhage means it is likely that the fracture occurred *post*mortem. *See*, *Smock 702 Motion* III.B.2.a. (discussing hemorrhage at fracture sites); *DiMaio*, at 248 ("[f]ractures of the . . . hyoid bone can *only* be considered antemortem if there is blood at the fracture site") (emphasis added); *Spitz & Fisher*, at 431 ("Focal hemorrhage *always* surrounds a fracture sustained during life and distinguishes it from postmortem artefact.") (emphasis added).

When reviewing that literature, it is also critical to highlight that Dr. Baden's sparse

---

[7] Lenka Zátopková et al., *Laryngohyoid fractures in suicidal hanging: A prospective autopsy study with an updated review and critical appraisal*, 290 FORENSIC SCI. INT'L 70, 73 (2018) (providing an extensive literature review on relevant scientific studies).

report is devoid of any discussion of the biomechanical factors that impact the likelihood of a hyoid fracture in an incomplete hanging. Researchers have found that when there is no hemorrhage at the fracture site, as is the case here, *see Autopsy Report*, at 4, those biomechanical factors become a critical component of any analysis as to the cause of the fracture, *Smock 702 Motion*, Section III.B.2.d.

      b.  <u>Dr. Baden failed to address the absence of certain physical findings typically found in manual and ligature strangulation.</u>

The Baden Report, at 3, concluded that "the autopsy findings are typical for homicidal manual and ligature strangulation and are atypical for hanging," yet Dr. Baden did not mention what was absent from the autopsy findings – indicators of either suicide or an accidental death.

*DiMaio* states that "[i]n *most* cases of manual strangulation, . . . marks of violence are frequently present on the skin of the neck. Typically, abrasions, contusions and fingernail marks on the skin." *Id.*, at 261. *See also Spitz & Fisher*, at 436 ("Defense wounds on the body of a strangulation victim are frequent . . ."). Despite reviewing autopsy materials indicating and showing *no* defensive marks,[8] *see USAO_007729*, and despite basing his conclusions on aforementioned texts, Dr. Baden does not indicate that he weighed or even considered the *lack* of defensive marks on Ms. Birchmore's body.

Additionally, other than the left sternothyroid hemorrhage, an injury that often occurs during a suicidal hanging,[9] and the fractured hyoid with no hemorrhage present, the medical examiner did not find *any* of the other injuries that typically accompany manual or ligature

---

[8] *See also Smock 702 Motion*, Section I.A.1. (outlining first responders finding no defensive marks on Ms. Birchmore's body).

[9] *See*, *e.g.*, Roman Kuruc et al., *Autopsy Findings in Hanging: A 10-Year Prospective Study of 660 Cases*, 6 Forensic Sci. (2026), available at https://www.mdpi.com/2673-6756/6/1/16 ("One of the most frequently observed internal injuries in hanging is hemorrhage within the neck muscles, caused by both direct pressure from the ligature and indirect stretching of these structures").

strangulation, *see Autopsy Report*, at 3-4. As DiMaio, at 262, stated, "[r]arely, no marks are present" in manual strangulation. *Id.*, at 262. Spitz and Fisher, at 428, explained that "[t]he hallmarks of manual strangulation are fingertip bruises and fingernail marks on the neck," as well as those same kind of bruising in the deeper neck tissues, *id.*, at 429.

As to the suggestion of ligature strangulation in the *Baden Report*, at 2-3, Dr. Baden provides no explanation, other than the generic one outlined **ante**. Nor does he address that there was only one furrow mark on Ms. Birchmore's neck, *see Autopsy Report*, at 3, and no defensive marks, both contraindications of ligature strangulation.

Dr. Baden erroneously observes that the "very tightly applied ligature cross[ed] the mid-neck *horizontally*." *Baden Report*, at 2 (emphasis added). He does not grapple with the fact that the medical examiner documented, *Autopsy Report*, at 3 ("The furrow rises gradually on either side of the neck"), and in photographs, *USAO_034380-83*; *034981*; *034414*; *034420-21*) an upward cant to the ligature is visible, consistent with suicide and inconsistent with ligature strangulation. *See DiMaio*, at 258 ("In ligature strangulation, in contrast to hangings, the ligature mark usually encircles the neck in a horizontal plane often overlying the larynx or upper trachea."); *Spitz & Fisher*, at 436 (in strangulation, the "[m]ark on neck is horizontal").

When reviewing Dr. Baden's physical findings in their totality, it is clear that Dr. Baden did not grapple with or consider research in modern forensic pathology, and that he did not examine any possible alternative explanations for the injuries Ms. Birchmore did show, along with those she did not. While Dr. Baden is not required as an expert to consider every "alternative explanation[]," he is required to have "adequately accounted for obvious alternative explanations[,]" Fed. R. Evid. 702 advisory committee's notes to 2000 amendment, and this is especially so when those alternatives are present in the very textbooks he apparently consulted

and cited to justify his opinions.

Because Dr. Baden does not demonstrate "the reliability of [his] methodology and the validity of his reasoning," he should not be allowed "to testify as to the inferences and conclusions he draws from it[.]" *See Ruiz–Troche*, 161 F.3d at 85, *citing Daubert*, 509 U.S. at 590, 596). Thus, his testimony as to the physical findings must be excluded under Rule 702.

Furthermore, Dr. Baden has 50 years of experience as a forensic pathologist and is a famous television figure, meaning that his testimony "may be assigned talismanic significance in the eyes of lay jurors[,]" *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir.2004), and increasing the likelihood that the jury will not discern or consider the errors in Dr. Baden's testimony. Therefore, the unreliability of Dr. Baden's testimony creates a high likelihood of unfair prejudice and a propensity to mislead and confuse the jury, s*ee* Fed. R. Evid. 403, substantially outweighing the probative value of his testimony. Dr. Baden's testimony must also be excluded under Rule 403.

### 2. <u>Dr. Baden's conclusions are based on erroneous and insufficient facts</u>.

Federal Rules of Evidence Rule 702 requires that an expert's "testimony is based on sufficient facts or data." Fed. R. Evid. R. 702(b). Given that the question of whether a killing occurred in this case – i.e., whether Ms. Birchmore took her own life, or was killed – is an open one, an expert opining on that question should review all of, or at least most of the available facts around that issue, *including* facts related to Ms. Birchmore's mental health and relevant DNA findings. *See Calisi v. Abbott Lab'ys,* 2013 WL 5441355, at *8 (finding that an expert's "assertion" on a particular matter must "have a sufficient basis").

        a. <u>Dr. Baden has not reviewed sufficient facts regarding Ms. Birchmore's mental health</u>.

Here, despite the primary question being whether Ms. Birchmore took her own life or

was killed, Dr. Baden apparently only had access to the Internal Affairs report,[10] from which he summarized that "Ms. Birchmore had told her friends that she was happy that she was pregnant, and that Det. Mathew Farwell was the father." *Baden Report*, at 2. However, as described in depth in the *Smock 702 Motion*, Section III.B.1.a., Ms. Birchmore had an extensive history with mental illness and suicidality. That Dr. Baden was not provided those materials, or *any* of Ms. Birchmore's mental health records means his testimony as to her mental state and the cause and manner of her death should be excluded.

b.  <u>Dr. Baden has not reviewed the DNA results in this case</u>.

On page 3 of his Report, Dr. Baden states: "It appears that the Sexual Assault Kit was not tested at all!" *Id.* This is incorrect. An April 2, 2021, report by the Massachusetts State Police Crime Lab ("MSPCL") noted that a general examination of items from vaginal, genital, anal, perianal, and oral swabs was performed. *USAO_008897*. In addition, a general examination was conducted of samples from Ms. Birchmore's underpants, screening for seminal fluid, sperm, saliva, etc. *USAO_008897*. Subsequently, on May 19, 2021, MSPCL reports note additional testing of vaginal swabs and stains from Ms. Birchmore's underpants, as well as testing samples from the ligature found around Ms. Birchmore's neck and fingernail clipping from both of Ms. Birchmore's hands. *USAO_013096*.

Critically, the fact that Dr. Baden was unaware that DNA was tested in 2021means that he formed his opinion with insufficient facts, including that the DNA collected from underneath Ms. Birchmore's fingernails *totally excluded Matthew Farwell* as the source of the male DNA that was recovered from underneath Ms. Birchmore's fingernails. The absence of Mr. Farwell's DNA

---

[10] Beginning February 5, 2021, Stoughton Police Department began an internal affairs investigation "into the matter of the unattended death of Sandra Birchmore, and into the possible violations of the policies, procedure, rules and regulations of the Stoughton Police Department." *USAO_016249-308*. The Internal Affairs Report was issued on August 29, 2022. *Id.*

from Ms. Birchmore's fingernail clippings bears directly on physical contact with her on the night of her suspected death and whether her death was caused by a struggle.[11]

Additionally, the majority of DNA testing on the ligature and Ms. Birchmore's underwear involved complex mixtures involving three or more contributors, and thus cannot be said to "match" any single individual. Throughout the DNA testing process, the MSPCL neglected to include samples from William Farwell, Mr. Farwell's fraternal twin, which casts doubt on any testing that provides statistical support for the inclusion of Matthew Farwell's DNA. *See also* Defendant's Motion *in Limine* to Exclude from Argument or Testimony Describing Improper Conclusions from Complex DNA Mixture Evidence.

With regard to the fetal tissue recovered from Ms. Birchmore, Bode Technology ("Bode") detailed testing performed in their January 20, 2025, report, *USAO_053157*, and then issued a supplemental report regarding testing of the samples on April 30, 2025, *USAO_036434*. In April 2025, the government provided additional DNA testing results from Bode Technology which excludes Matthew Farwell as the biological father. *USAO_034787*.

Having demonstrated that Dr. Baden formed his opinion with erroneous facts—that the sex assault kit was not tested – and insufficient facts – that it was tested and what the results were, his opinion is unreliable.  Further, according to the expert witness disclosure served on the defense by the prosecution, Dr. Baden still has not reviewed those results.

Because "a certain patina attaches to an expert's testimony unlike any other witness: this is 'science,' a professional's judgment, the jury may think, and give more credence to the

---

[11] *See e.g.,* Bublil Nurit, et al., *Evaluating the prevalence of DNA mixtures found in fingernail samples from victims and suspects in homicide cases*, 5 FSI Genetics 532-537 (2011) (noting that "[v]iolent crimes are frequently characterized by a struggle between the victim and the perpetrator where biological material can be expected to be exchanged between them," and that the amount of biological material transferred under the fingernails is greater during homicide victims' deaths than in casual activities or encounters).

testimony than it may deserve." *U.S. v. Monteiro*, 407 F.Supp.2d 351, 358 (1st Cir. 2006), *quoting*

*United States v. Hines,* 55 F.Supp.2d 62, 64 (D. Mass. 1999). Dr. Baden's opinions, bear that

"patina" of expertise, even though they are not based on sufficient *or accurate* information, and

even though they omit, and indeed seem not to consider *at all*, the complicated reality of Ms.

Birchmore's mental health, or the DNA findings *excluding* Mr. Farwell. Thus, the opinions are

highly likely to mislead the jury on *the* central issue in this case – whether a killing occurred.

Consequently, his testimony is excludable under Rule 702. Additionally, because the risk of

substantial prejudice that will arise from Dr. Baden's unreliable opinions outweighs any

probative value of those opinions, his opinions must also be excluded under Rule 403.

### 3. <u>Dr. Baden's opinions contain analytical gaps</u>.

      a.  <u>Dr. Baden's unsupported speculation as to Ms. Birchmore's hair "entangled" in the ligature</u>.

Citing only his experience, Dr. Baden makes the following assumptions in his Report: (1)

that women are "careful to place the ligature against the skin underneath the hair," *Baden Report*,

at 2, (2) that women do not let the ligature get "entangled within the hair," *id.*, (3) that tangled

hair *only* "occurs when there is resistance during homicidal strangulation," *id.*, at 3, and, (4) that

the aforementioned "is apparent in Ms. Birchmore's autopsy photographs," *id.* Dr. Baden

provides no explanation, no data or statistics, or any other bases for any of these assumptions.

As this Court has previously explained, "an expert may ... testify solely on the basis of

experience, [but] he must explain how that experience leads to the conclusion reached, why that

experience is a sufficient basis for the opinion, and that that experience is reliably applied to the

facts." *Calisi*, 2013 WL 5441355, at *10, *quoting McGovern v. Brigham & Woman's Hosp.*, 584

F.Supp.2d 418, 426 (D. Mass. 2008). When the expert fails to do this, the expert and his

proponents ask the Court to simply take the expert's word for it. But "nothing in either *Daubert*

16

or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Rodriguez v. Hosp. San Cristobal, Inc.*, 91 F.4th 59, 69–71 (1st Cir. 2024), *quoting Joiner*, 522 U.S. at 146.

Here, this Court should exclude Dr. Baden's assumptions about women and suicide because they do not pass Rule 702 muster. These misleading and inflammatory statements must also be excluded under Rule 403, as they are highly likely to "prompt a decision by the factfinder on an improper basis." *Doe by & through Pike v. Pike*, 405 F. Supp. 3d at 247.

  b. <u>Dr. Baden's "subjective belief or unsupported speculation"[12] that Ms. Birchmore's death was a staged homicide</u>.

Dr. Baden, without providing any rationale or evidence, pronounced that "the neck ligature [found on Ms. Birchmore] was tied to a doorknob to give the appearance of a suicidal hanging." *Baden Report*, at 4. This absolutist and unsupported speculation must be excluded because Dr. Baden has not shown a "reliable basis to reach his opinion," *see Calisi* 2013 WL 5441355, at *13, and it contains a yawning "analytical gap between the [available] facts and the opinion proffered," *id.*

First, Dr. Baden has not only failed to show a "reliable basis to reach his opinion," *see id.*, he has provided no bases at all for this opinion. It is simply a statement in his Report with nothing more.

Second, Dr. Baden reviewed "autopsy and toxicology reports, [and] scene and autopsy photographs[.]" *Baden Report*, at 1. Though Mr. Marullo and Ms. Smith likely had the first responder reports, detailing the scene, it does not appear that Dr. Baden received and/or reviewed them. To make such a conclusive determination that the scene was staged, it would seem critical

---

[12] *Joiner*, 522 U.S. at 146, *quoting Daubert*, 509 U.S. at 590.

that the expert have either visited the scene while the body was still present or reviewed the observations noted by those who were. Had he reviewed those reports, Dr. Baden would have seen that first responders found no signs of struggle in Ms. Birchmore's apartment, no drag marks, and did not note any indications of an attempt to cover marks or tracks.[13]

Given Dr. Baden's failure to provide *any* evidence or bases for making this conclusion in this case, as well as *any* explanation of the principles and methods he applied to make such a conclusion, there is no way for anyone to critically review or test the principles and methods Dr. Baden is applying to declare a staged homicide. *See United States v. Raymond*, 700 F. Supp. 2d 142, 147 (D. Me. 2010).

Notably, one study included in the literature review referenced *Smock 702 Motion*, at Section III.B.2., cautions against the very type of definitive conclusion that Dr. Baden draws:

> [Textbook] [c]hapters on asphyxia in different editions of the textbook (e.g., Spitz, Spitz and Diaz) consistently state that in hanging cases, fractures of the hyoid bone or thyroid cartilage are the exception rather than the rule, while in manual strangulation cases, fractures of the hyoid bone, thyroid cartilage, and cricoid cartilage are frequently observed. Similarly, it is stated that fractures are common in ligature strangulation but, again, are uncommon in hanging. *Statements like these have the potential to raise suspicion of a staged suicide when laryngohyoid fractures are observed in a hanging case*.

Bradley Adams et al., *Anthropological examination of the hyoid bone, thyroid cartilage, and cricoid cartilage in suicidal hangings*, 70 J. OF FORENSIC SCIENCES 1908, 1909 (2025) (emphasis added). Such assumptions are simply not supported by the current state of science. *See Smock 702 Report*, at Section III.B.2. (collecting studies); Adams et al., at 1916 ("In cases of neck compression where the manner of death is unclear (e.g., suicide versus homicide), the presence and location of laryngohyoid fractures alone are insufficient to indicate a manner of death.").

When viewing Dr. Baden's conclusion that Ms. Birchmore's death was a staged suicide,

---

[13] For a full description, *see Smock 702 Motion*, at Section I.A.1.

*see Baden Report*, at 4, in totality, it is no "more than unsupported speculation or abstract beliefs." *Equal Emp. Opportunity Comm'n v. Texas Roadhouse, Inc.*, 215 F. Supp. 3d 140, 158 (D. Mass. 2016) (cleaned up). Dr. Baden "does not document any methodology he used to reach his conclusion, [he] seems to be suggesting that the Court can rely solely upon his training and experience." *Fogarty*, 2020 WL 1446728, at *4. Because this conclusion is simply *ipse dixit*, and is completely unfounded, the "proposed opinion does not satisfy Fed.R.Evid. 702(b)-(d).14," *Calisi*, 2013 WL 5441355, at *13, and it must be excluded.

These same deficiencies should exclude this testimony under Rule 403, as well. Dr. Baden's "expert" status puts the "patina" of "science," *Monteiro*, 407 F.Supp.2d at 358, on a speculative conclusion contravened by the evidence, misleading a layperson jury into make inferences that are unfairly prejudicial to Mr. Farwell regarding a critical issue in this case. This very real risk of unfair prejudice tips the scales, substantially outweighing any probative value this testimony might hold – and given its lack of foundation, that value is minimal, at best. *See Pires*, 138 F.4th at 670.

    c. <u>Dr. Baden's unsupported determination as to the cause and manner of Ms. Birchmore's death</u>.

While Dr. Baden may be a forensic pathologist and has had the authority and training to determine cause and manner of death, in this case, as outlined **ante**, the significant deficiencies in the facts and research he was provided or considered, the analyses he undertook, and the analytical gaps present in his analyses do not provide a sufficient bases for his determination that "the cause of Ms. Birchmore's death is 'Strangulation' and the manner of death is 'Homicide'[,]" *Baden Report*, at 4. Incorporating all of the arguments herein, Dr. Baden's ultimate opinion does *not* "rest[] upon 'good grounds,' 'based on what is known.'" *Milward*, 639 F.3d 11 at 15, *quoting Daubert*, 509 U.S. at 590.

The Court's role in a *Daubert* challenge is "to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Milward*, 639 F.3d at 15, *quoting Kumho Tire*, 526 U.S. at 152. With this report, Dr. Baden does not employ the required "level of intellectual rigor," *id.,* as his Report demonstrates that "too great an analytical gap exists between the existing data and [Dr. Baden]'s conclusion[,]" *id.*, at 22-23 (cleaned up).

Additionally, because "the evidence brings ... unfair prejudice [and] a cognizable risk of confusing the jury, and [the risk] substantially overbalances any probative value, then the evidence must be excluded." *United States v. Rodriguez-Estrada*, 877 F.2d 153, 155 (1st Cir. 1989). Consequently, for all the reasons discussed **ante**, this Court should exclude Dr. Baden's testimony as to cause and manner of death under both Rules 702 and 403.

## REQUEST FOR HEARING

Consistent with Local Rule 7.1(d), Mr. Farwell requests that this Honorable Court hold a hearing on this Rule 702 motion, permitting oral argument, and examination of the expert witness, Dr. Baden. Pursuant to Local Rule 7.1(a)(2), undersigned counsel has conferred with the government and understands that it objects to the relief requested herein.

## CONCLUSION

For the foregoing reasons, and pursuant to the Federal Rules of Evidence 702 and 403, and *Daubert*, the defendant requests that this Court exclude Dr. Baden's testimony in its entirety.

**Dated:** August 3, 2026

Respectfully submitted,

MATTHEW FARWELL,
By his attorneys

_____
Joanne M. Daley, BBO # 653375
Kimberly C. Stevens, NC State Bar # 20156
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061
Joanne_daley@fd.org
Kim_Stevens@fd.org

## CERTIFICATE OF SERVICE

I, Joanne M. Daley, hereby certify that this document filed through the ECF system

will be sent electronically to the registered participant(s) as identified on the Notice of Electronic

Filing (NEF) on August 3, 2026.

_____
Joanne M. Daley