**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA　　　　)
　　　　　　　　　　　　　　　　　　)　Docket No. 1:24-cr-10259-DJC
　　　　　　v.　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
MATTHEW FARWELL　　　　　　　　)

**MOTION IN LIMINE TO PROHIBIT**
**IMPROPER CHARACTERIZATION, SPECULATION, VOUCHING, APPEALS TO**
**EMOTION AND OTHER ISSUES**

Now Comes Matthew Farwell, by and through counsel, and respectfully moves the Court

*in limine* to issue an order prohibiting the government's characterization of Ms. Birchmore's death

as a "staged suicide" and to instruct the government to refrain from using words such as "child

rapist" "predator" "groomer" or "murderer" to describe Mr. Farwell, and to refer to him at trial

either by his name, "the defendant," or "the accused." Additionally, the defense moves that the

Court issue an order prohibiting the government from referring to Ms. Birchmore as the "victim,"

and instead refer to her by her name or as the deceased.

Mr. Farwell further moves for an order prohibiting the government from playing certain

videotaped evidence during the opening statement, from vouching for the federal government's

prosecution of this matter over three years after the death of Ms. Birchmore, from going beyond

the evidence that is introduced during the trial and speculating and attempting to recreate the last

moments of the decedent's life during opening or closing arguments in the case, and from

appealing to the jury as the conscience of the community regarding the inflammatory issues present

in the case.

Mr. Farwell makes this motion pursuant to the Fifth and Sixth Amendments to the United States Constitution, Rule 403 of the Federal Rules of Evidence, and any other authorities cited herein.

## PROCEDURAL HISTORY

On August 27, 2024, the government filed an indictment charging Mr. Farwell with one count of killing a witness or victim under 18 U.S.C. Section 1512(a)(1)(C)). DN 1.   The government issued a superseding indictment on October 28, 2025, alleging in Count Two a violation of the Protection of Unborn Children Act, 18 U.S.C. Sections 1841(a)(1) *et seq*. DN 63. Mr. Farwell has been continuously detained pre-trial. His jury trial is scheduled to begin on October 5, 2026.

## ARGUMENT

A motion *in limine* is an appropriate vehicle to determine the boundaries of proper opening remarks.  *See generally, e.g., United States v. Doyle*, 121 F.3d 1078, 1093-94 (7th Cir. 1997) (affirming district court order granting government's motion in limine to limit scope of defense opening statement).   As the United States Supreme Court has recognized, a district court's authority to issue in limine rulings derives from its inherent authority to manage the course of trials. *Luce v. United States*, 469 U.S. 38, 42 n.4 (1984).

In *United States v. Bulger*, 928 F. Supp. 2d 294 (D. Mass. 2013), this Court recognized that "[t]he federal courts have long sanctioned – indeed encouraged – the government and criminal defendant to seek pretrial rulings on the admissibility of evidence in the interests of an orderly presentation of evidence at a trial, even though no provision of the federal criminal rules expressly authorizes the practice." *Id*. at 300.  "Consistent with the historical origins of the practice, motions in limine are 'designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial

interruptions.'"  *Id.* (quoting *Bradley v. Pittsburgh Bd. Of Educ.,* 913 F.2d 1064, 1070 (3d Cir. 1990)).

## I.        Prohibit Improper Characterization

In past hearings conducted in this case, the government has publicly referred to the defendant in the following prejudicial ways: "This defendant raped a child [and] murdered her when she became an adult…"  (DN 134 Tr. at 20); the government has characterized Mr. Farwell's relationship with Ms. Birchmore as "exploitive, it was coercive, and it was criminal" *Id.* at 22; etc.); "he struggled with her…he strangled her… he staged her" *Id.* at 23; "Evidence of that statutory raping, of that predation, of that grooming has only gotten stronger" *Id.* at 24.

Allowing the government to continue to describe Ms. Birchmore's death as a "staged suicide" is a highly prejudicial characterization of the evidence that infringes upon Mr. Farwell's right to be presumed innocent and can mislead the jury.  It further injects the prosecution's personal opinion and characterization of the evidence into the matter:

> [B]ecause a jury will normally place great confidence in the faithful execution of the obligations of the prosecuting attorney, the prosecutor must observe a high standard of conduct to ensure that the defendant's right to a fair trial is not prejudiced. The prosecutor must avoid "undignified and intemperate" arguments and arguments that may contain "improper insinuations and assertions calculated to mislead the jury" by inciting passion and prejudice.

*United States v. Lawrence*, 735 F.3d 385, 432 (6th Cir. 2013) (quoting *United States v. Solivan*, 937 F.2d 1146, 1150 (6th Cir. 1991)). Referring to Mr. Farwell as a "child rapist" "predator" "groomer" or "murderer" or any other form of name-calling presents similar Rule 403 concerns. Additionally, Federal Rule of Evidence 103(c) directs the trial court, in jury cases, to the extent practicable, to conduct proceedings "so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury."

### A. Dehumanizing Mr. Farwell

The government may not be allowed to use epithets or otherwise attempt to dehumanize or engage in zoomorphism of the defendant through rank name-calling. *See United States v. Cannon*, 88 F.3d 1495, 1502 (8th Cir. 1996) (name calling "simply does not further the aims of justice or aid in the search for truth, and is likely to inflame bias in the jury and to result in a verdict based on something other than the evidence"), *abrogated in part on other grounds, Watson v. United States*, 552 U.S. 74 (2007).

The First Circuit has found that reference to the defendants "as animals is especially inflammatory and improper." *United States v. Martinez-Medina*, 279 F.3d 105, 119 (1st Cir. 2002). In that case, the First Circuit found it "disturbing" when the prosecutor characterized the defendants as "hunting each other like animals" and "killing one another 'with no mercy.'" *Id*. at 119 (citing *United States v. Hands*, 184 F.3d 1322, 1332 (11th Cir. 1999) ("improper to refer to defendant as 'wickedly vicious man, monster, drug dealer'")). Courts have condemned prosecutors giving defendants the characteristics of animals. *See, e.g., Volkmor v. United States*, 13 F.2d 594, 595 (6th Cir. 1926) ("scaly, slimy" is intentional abuse).

Courts have found it improper for the government to refer to the defendant or the crimes as "cold-blooded," *see e.g., United States v. Shaw*, 701 F.2d 367, 390 (5th Cir. 1983), *abrogated on other grounds* as recognized by *United States v. Burden*, 964 F.3d 339, 350 n.11 (5th Cir. 2020) ("colder, more cold blooded, remorseless defendant" was "improper[]"). Because humans are warm-blooded, referring to blood being "cold" is inconsistent with humanity and implies that the defendant is an "other" or "reptilian." *See Silva v. Roden*, 52 F. Supp. 3d 209, 224-25 (D. Mass. 2014) (improper to refer to description of event in opening as "cold-blooded" or "slaughter").

4

Likewise, referring to the defendant as a "predator" is also a "gratuitous insult[]." *Byrd v. Collins*, 209 F.3d 486, 536 (6th Cir. 2000).  Thus, the government should not be permitted to describe Mr. Farwell as having "preyed" upon Ms. Birchmore.  Predator/prey is an animalistic dichotomy and one that dehumanizes Mr. Farwell.  *See also Bland v. Sirmons*, 459 F.3d 999, 1025 (10th Cir. 2006) ("heartless and vicious killer" is "unnecessary and inappropriate").

## B. Referring to Ms. Birchmore as "The Victim"

To properly enforce the presumption of innocence, courts must remain vigilant for conditions that compromise the integrity of the fact-finding process.  *Estelle v. Williams*, 425 U.S. 501, 503 (1976).  Additionally, "courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt."  *Id.*

Ms. Birchmore should be referred to by either her name or as the decedent in the case.  Given the starkly competing theories that Ms. Birchmore was either killed by another or died by her own hand, to allow repeated labeling of Ms. Birchmore as "the victim" invades the province of the trier of fact to determine whether in fact Ms. Birchmore was killed.  Fed. R. Evid. 701.  Expressing such a conclusion in the use of this language is not helpful to the trier of fact, where the ultimate issue to be tried is whether Ms. Birchmore was killed by another.

In several jurisdictions, referring to a complaining witness or a deceased individual as the "victim" is improper when the defense argues that no crime was committed.  *State v. Juarez*, 2021 UT App. 53 (2021); *State v. Carrera*, 2022 UT App 100 (2022).  The term "victim" is defined as "one that is acted on and usually adversely affected by a force or agent [or] one that is injured." *State v. Nomura*, 79 Hawai'i 413, 416 (Haw. Ct. App. 1995).  Consequently, the term is conclusive in nature and connotes a predetermination that the person referred to has, in fact, been wronged.  *Id.* at 416; *State v. Mundon*, 292 P.3d 205 (Haw. 2012).

The government has, in pleadings and in Court hearings, referred to Ms. Birchmore as a "victim." For a few examples, in their Motion for Pretrial Detention, the government wrote that Mr. Farwell used "violence both to harm his victim while she was alive and to obstruct justice by killing her." DN 9 at 14. Additionally, in the government's second supplemental memo in support of detention, they refer to "a letter from victim Sandra Birchmore's family." DN 127. In the Surreply to the Motion to Suppress, the government refers to Mr. Farwell's "23-year-old victim." DN 153 at 4. Whether Ms. Birchmore's death was caused by a criminal act or self-harm sets this case apart from those where the issue is whether the deceased was killed by the accused or another. As such, it would be improper to use language in the upcoming trial which assumes that the decedent was in fact killed at the hands of another.

## II.    Speculation and Recreating the Decedent's Last Moments

Arguments in which a prosecutor purports to recreate the deceased victim's thoughts and feelings as the alleged crime unfolded are nothing more than "gross speculation." *Combs v. Coyle*, 205 F.3d 269, 292-293 (6th Cir. 2000); *see also Land v. Allen*, 573 F.3d 1211, 1219-20 (11th Cir. 2009) (where no direct evidence of events at decedent's home, improper for prosecution to invite the jurors to speculate on interactions between defendant and deceased; "The prosecutor exceeded the bounds of appropriate conduct by claiming to describe exactly what happened, and particularly what was said, with such specificity."); *United States v. Rodriguez*, 581 F.3d 775, 803 (8th Cir. 2009) (direct review of federal death sentence; government asking jurors to imagine the decedent's "raw fear of what would be her fate as the Defendant drove her into the night" was improper because government introduced no evidence of the victim's fear); *Urbin v. State*, 714 So. 2d 411, 421 (Fla. 1998) (prosecutor "went far beyond the evidence in emotionally creating an imaginary script demonstrating that the victim was shot while 'pleading for his life'"); *Bertolotti v. State*, 476

So. 2d 130, 133 (Fla. 1985) (finding prosecutor improperly urged the jury to place themselves in the position of the victim and imagine the victim's "final pain, terror and defenselessness"). Speculating about matters that will not be in evidence is a quintessential form of misconduct.

In *United States v. Canty*, 37 F.4th 775 (2022), the First Circuit addressed improper argument in mischaracterizing a piece of evidence by drawing conclusions about what a video allegedly meant.

> The prosecutor's final improper argument was improper as to Canty. When commenting on the video showing Jordan helping Osborne apply a tourniquet to his arm, the prosecutor mischaracterized this piece of evidence. At the end of rebuttal, referring to both defendants, she stated 'they'd help you put a tourniquet on your arm if it meant that you were going to get what you needed so that you could go back out and make another deal.' It is improper for the prosecution to make a statement 'unsupported by any evidence.'

*Id*. at 789 (citation omitted).

There is a complete absence of evidence here about the final moments of Ms. Birchmore's life. Any attempt to fill that gap on the part of the prosecution by attempting to recreate the final moments of her life, or guessing as to the state of mind of another, would be grossly speculative, highly inflammatory, and prohibited by Rule 403. Fed. R. Evid. 403.

### III.    Prohibit Use of Video in Opening Statement

"[T]he proper functioning of the opening statement of the prosecutor is limited to a discussion of the evidence which he intends to introduce and believes in good faith is admissible and available . . . . 'It is not to poison the jury's mind against the defendant.'" *United States v. DeVincent*, 632 F.2d 147, 153 (1st Cir. 1980) (internal quotations omitted). "Nor should an opening statement contain unnecessary, overly dramatic characterizations." *United States v. DeRosa*, 548 F.2d 464, 470 (3d Cir. 1977). "These principles necessarily lead to the conclusion that the opening statement is to be limited to a general statement of facts which are intended or expected to be proved. An opening statement is not designed to be an evidentiary recitation which

minutely describes in detail, rather than generally outlines or foreshadows, the testimony to be produced." *Id*. at 470-71.

In accordance with these principles, this Court should prohibit either party from playing video or audio evidence in their opening statements, because such a practice would create unfair prejudice, confuse the issues, and mislead the jury.

As set forth in the exhibits to the motion to transfer venue, the Boston Globe has aired repeatedly a video tape or still photos of imagery that they contend shows Matthew Farwell entering the apartment complex where Sandra Birchmore resided.  They attribute a specific time frame to that video, and contend that it demonstrates that Matthew Farwell was actually in the apartment itself when Sandra Birchmore died.  The discovery served on the defense shows that the time stamp on the video is off by an undetermined amount.  A Canton Police Department report describes: "The camera's video time and actual time was believed to be 13 minutes off." (USAO_008890).  From another law enforcement report:  "It should be noted that the time stamp on the DVR system was approximately 13 minutes faster than the actual time."  (USAO_008835-36).  These are imprecise measurements of time, and the method of calculating the estimates will be the subject of cross-examination.

The defense objects to any argument or use of the videotape in the opening statement, objects to the foundation for the admissibility of the video and will raise such objections if and when the piece of evidence is offered, and objects to any conclusions that might be drawn from the errant time stamp on the video.  Even if the defense did not have such objections, arguing that the video demonstrates where Mr. Farwell was when Ms. Birchmore died lacks evidentiary foundation and is an improper argument about the contents of the video.  As such, the defense

specifically moves to exclude reference to this video or playing the video during the government's opening statement.

One example of the government claiming that the video establishes the exact time that the defendant was allegedly in the apartment occurred during the detention hearing, where the government argued that at "9:40 p.m. the phone records eight steps, and it ends up at its final resting place under a closet doorknob, face down. The defendant is still in the apartment at that point for another three minutes. That phone never moves again, never lifted up, never backlit again. . ." (DN 134, Tr. at 36). This argument about the timing was drawn from the alleged timing on the lobby videotape. Similarly, in the government's briefing, they wrote "Had the medical examiner known that someone was with Birchmore when her phone activity stopped and the last time her movements were recorded, she could have considered these facts when making her determination." (DN 111 at 13-14). Again, this argument was based on approximate timing of the lobby videotape.

These or similar claims should not be permitted in the opening statement, nor should the video from the lobby be shown in the opening until the admissibility of the tape can be determined. First, the time-stamp on the video is unreliable. Second, even if the time stamp on the video was reliable (which it is not), the most the video shows is that Mr. Farwell allegedly exited an elevator. The lobby video does not show precisely when Mr. Farwell left any apartment, and Ms. Birchmore's apartment is situated on another floor of the building. It certainly does not establish that he was in the apartment when Ms. Birchmore's phone stopped moving. Most importantly, it does not demonstrate that Mr. Farwell was with Ms. Birchmore when she died. Such argument is inflammatory, its prejudicial value substantially outweighs any probative value, and the argument should not be permitted in the opening statement. Fed. R. Evid. 401, 403.

IV.    **Prohibit Vouching for the Federal Government's Investigation**

In pre-trial hearings, the government has contended that Matthew Farwell had "gotten away with" criminal activity for over three and a half years since Ms. Birchmore's death and while the investigation was pending in the Commonwealth of Massachusetts, and that it took this federal prosecution to bring Mr. Farwell into custody.  At DN 127, p. 4, the government argued that "Farwell took no steps to flee, nor are there other notes like this written, during the three and a half years that he believed he had gotten away with the charged offenses."  At DN 134, p. 33, the government argued that "He successfully obstructed justice for years."  At p. 41, they argued "[w]hen he was asked by investigators around the same time to meet with them also in a parking lot, they told him this wasn't criminal, there's no suspects, and this investigation is the last thing they needed.  And one can assume that this defendant was told the same thing: not a suspect, nothing criminal, no investigation.  And so lack of flight means nothing."  And at p. 42, the government contended that:  "the first time the walls start to close in on the defendant, what does he do?  He writes a goodbye letter.  The walls are much closer now.  It is not just Dr. Baden.  It's a federal grand jury.  It's a federal indictment.  It's an imminent looming trial date, and it is a mandatory life sentence."  Granted, those arguments were proffered by the government in a different context.  But should a similar argument take place at trial -- for example, that the Commonwealth of Massachusetts did not bring charges and the defendant nearly "got away with" an offense until the federal government stepped in – that would be taking the argument to impermissible bounds.

In *United States v. Canty*, 37 F.4th 775 (1st Cir. 2022), the First Circuit addressed the concept of improper vouching by the prosecution.  "A prosecutor improperly vouches for a witness when she places the prestige of her office behind the government's case by, say, imparting her

10

personal belief in a witness's veracity *or implying that the jury should credit the prosecution's evidence simply because the government can be trusted.*" *Id*. at 789 (citing *United States v. Aviles-Colon*, 536 F.3d 1, 25 (1ˢᵗ Cir. 2008) (quoting *United States v. Perez-Ruiz*, 353 F.3d 1, 9 (1ˢᵗ Cir. 2003)) (emphasis added).

The *Canty* Court considered the impact of four improper statements made by the prosecution, from improper vouching and three other statements, each addressed below.  The First Circuit found that the arguments spanned from opening, through closing, and in rebuttal; ultimately, the Court reversed the convictions at issue and granted a new trial.

In *Canty*, the government argued, among other things, that:

[a]nd with all due respect to [defense counsel], these agents did three years of work, and it is evident in the exhibits that you saw.  Those grand jury transcripts they waved around were hundreds of pages long.  We didn't just throw people up there that we met. . . .

So we spent three years carefully talking to those people.  So to say there's been no law enforcement work is unfair, because this case has revealed that these agents spent time with people.  They showed compassion for people who had problems, they spent time with them, and they made sure that there was corroborative evidence for their stories.

37 F.4th at 788-789.

The First Circuit found that the prosecution crossed the line, in the above argument, when she used "we" in describing the work that had been done to make the case.  *Id*. at 789.  "In total, these arguments conveyed to the jurors that the government witnesses in the case could be trusted because of the hard work of the police and the prosecution had put into selecting and vetting them during the investigation."  *Id*.  These statements were improper, the Court held, because they tied the witnesses' credibility to the hard work and compassionate character of the police and prosecution.

11

Any argument to the effect that the Commonwealth of Massachusetts, the Norfolk County District Attorney's Office, the Massachusetts State Police, the Office of the Chief Medical Examiner or the Stoughton Police cannot be trusted and that the Federal Government "rightfully" brought Mr. Farwell to trial, or that Mr. Farwell almost "got away with it" for over three years, would be improper here.

**V.       Prohibit Appeals to the Jury's Emotions as Conscience of the Community**

At the hearing on the motion to transfer venue, DN 88, Tr. at 28, the government argued:

> Simply because the evidence necessary to support a motion for pretrial detention based on dangerousness, obstruction, and risk of flight might be unfavorable to the defendant, does not render the government's filings inappropriate or inflammatory. As inconvenient as those facts may be, including Farwell's truths to the -- untruths to law enforcement, those are facts. That's not a basis to move this trial because the government was fulfilling its obligation to ensure that the community was protected and the proceedings were upheld with integrity.

Though the argument at the hearing on the defendant's motion to transfer venue was made for a different purpose, any argument or statement at trial that the jury should serve in a role as protector of the community, or conscience of the community regarding the topics presented in this case, would be improper. "[I]t is improper to appeal to the 'jury's emotions and role as the conscience of the community.'" *United States v. Canty*, 37 F.4th 775, 787 (1st Cir. 2022) (citing *United States v. Aviles-Colon*, 536 F.3d 1, 24 (1st Cir. 2008), quoting (*United States v. Martinez-Medina*, 279 F.3d 105, 119 (1st Cir. 2002)).

<u>CONCLUSION</u>

For these reasons, the defense asks this Court to prohibit improper characterization of the alleged homicide or Mr. Farwell, the improper use of evidence in the opening statement and closing argument, and otherwise provide the relief sought herein.

12

Dated: August 3, 2026

Respectfully submitted,

MATTHEW FARWELL,
By his attorneys,

*/s/ Kimberly C. Stevens*
Kimberly C. Stevens, NC State Bar # 20156
Joanne M. Daley, BBO # 653375

Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061
Kim_Stevens@fd.org
Joanne_Daley@fd.org

## CERTIFICATE OF SERVICE

I, Kimberly C. Stevens, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on August 3, 2026.

*/s/ Kimberly C. Stevens*
Kimberly C. Stevens