UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL No. 24-cr-10259-DJC |
| v. | |
| MATTHEW FARWELL, | |
| Defendant | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S NOTICE OF EXPERT WTINESS TESTIMONY, AND REQUEST FOR *DAUBERT* HEARING**

The United States of America, by Leah B. Foley, United States Attorney, and Elizabeth C. Riley, Brian A. Fogerty and Torey B. Cummings, Assistant United States Attorneys for the District of Massachusetts, responds to defendant Matthew Farwell's notice to introduce expert witness testimony of Dr. Thomas Andrew, and requests that the Court limit his testimony or, in the alternative, conduct a pretrial *Daubert* hearing to determine the admissibility of certain areas of Dr. Andrew's proposed testimony.[1]

On June 4, 2026, the defendant provided notice of his intent to introduce expert testimony by Dr. Thomas Andrew. Dr. Andrew intends to testify to the facts and opinions set forth in a nine-page opinion letter that the defendant attached to his notice. (*See Exhibit A filed under seal*). Dr. Andrew has been a certified forensic pathologist since 1992 and the government is not challenging his qualifications to testify, generally. The government moves, in limine, to preclude Dr. Andrew from offering certain opinions for which he lacks sufficient expertise.

---

[1] *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592–95 (1993).

First, Dr. Andrew should be precluded from testifying about anything related to Sandra Birchmore's mental health treatment, including the medication that she was prescribed. In these areas, Dr. Andrew, a forensic pathologist who has not treated living patients in over thirty-five years, offers opinions that exceed his expertise. Specifically, the government moves to preclude him from testifying to, or, in the alternative, conduct a *Daubert* hearing to determine his qualifications and basis for the opinions he offers about the discretion and professional judgment of Birchmore's medical team. This includes his opinions: (1) that Birchmore's prescription for sertraline, without context, carried a "black box" warning for suicidality; (2) that therapists are "not uncommonly shocked at the suicide of their patients."

Second, Dr. Andrew should be precluded from offering his opinion about non-medical "elements of the case that favor suicide" including a July 1, 2017, journal entry that the government will seek to admit. Dr. Andrew exceeds his expertise as a forensic pathologist when he opines that this letter was a pro-suicide note. He also exceeds his expertise when he summarizes now disproven "suicidal threats" on May 14, 2020. Dr. Andrew lacks the expertise to testify regarding Birchmore's victimology and this testimony would be cumulative of another defense expert who at least has minimal experience with the psychotherapy of suicidality.

Finally, Dr. Andrew should be precluded from opining about the discretion and professional judgement of Dr. Capó Martinez, the medical examiner in this case. Specifically, Dr. Andrew should be precluded from opining that Dr. Capó Martinez was "persuaded by the USAO and FBI to… amend… the Birchmore death certificate." Dr. Andrew's conclusion is unsupported and beyond the scope of his professional expertise.

The government conferred with Farwell's counsel to seek agreement to limit Dr. Andrew's testimony to topics that his expertise supports. The parties could not come to an agreement. Dr.

Andrew should not be able to testify about the psychology of suicide generally or Ms. Birchmore's alleged suicidality. He also should not be permitted to testify about medication that he does not prescribe, its impact on living patients, or any warnings that it may or may not have carried over twenty years ago, when he was also not treating living patients. Nor should he be permitted to testify regarding his opinions about the relationship between therapists and their patients, never having worked as one and not having consulted with any in this case. Finally, Dr. Thomas should not be permitted to opine about or imply an attempt to persuade a witness during a meeting he did not attend. Accordingly, the government respectfully requests that the Court preclude Dr. Andrew's testimony on these topics or, in the alternative, to conduct a hearing under *Daubert* to resolve the foregoing issues before permitting Dr. Andrew to testify at trial.

### Background

On February 4, 2021, at approximately 11:00 a.m., Birchmore was found deceased by members of the Canton Police Department. She was found seated, reclined backward under a closet doorknob. A duffle bag strap was tied around her neck and affixed tightly to the closet doorknob above her head. Members of the Massachusetts State Police responded and photographed the crime scene.

On February 5, 2021, Dr. Capó Martinez conducted an autopsy on Birchmore. At the time of autopsy, she was relying on a death notification report which contained information from state and local law enforcement noting that the death was a "suicide by hanging." No members of law enforcement attended the autopsy.

On February 9, 2021, Dr. Capó Martinez was again notified by the State Police that they were treating the case as a suicide. On May 1, 2021, Dr. Capó Martinez reached out to State Police

investigators to determine if there were any investigative updates in the case and she was told that there were none.

On May 6, 2021, Dr. Capó Martinez issued a death certificate, ruling that Birchmore's cause of death was asphyxia by hanging and that the manner of death was a suicide. Dr. Capó Martinez noted a furrow mark around Birchmore's neck, petechial hemorrhages of the bulbar and palpebral conjunctivae, skin of the face and larynx; hemorrhage of the left sternothyroid muscle, and a fracture of the right hyoid bone. She also noted and photographed a 2.3 x 2.0 centimeter dry red brown abrasion to Birchmore's right upper chest. Dr. Capó Martinez will testify that the physical findings with which Birchmore presented were either more prevalent in homicidal strangulations than in suicidal hangings or at least equally present in the two. Despite this, Dr. Capó Martínez originally ruled the manner of death as suicide based on investigative updates, or lack thereof, from investigators.

On June 18, 2024, Dr. Michael Baden, a forensic pathologist retained by the Estate of Sandra Birchmore issued a report in which he opined that the physical injuries found on Birchmore were commonly found in homicidal manual and ligature strangulation, but not in suicidal hangings. Dr. Baden served as the Director of Medicolegal Investigations at the New York State Police for over twenty-five years and, prior to that, as the Chief Medical Examiner for the City of New York. Dr. Baden opined that, in his fifty years of experience, a fractured hyoid bone occurs rarely, if at all, in suicidal hangings. He also noted that the extensive degree to which Birchmore's hair was tangled in the ligature was inconsistent with his experience seeing suicidal hangings. Dr. Baden concluded that Birchmore died from homicidal strangulation. On the day that Dr. Baden's report became public, the defendant authored a goodbye letter to a close family friend asking him to care for his children.

In August 2024, Dr. William Smock, a leading expert in the field of asphyxia-related deaths with over forty years of experience in the forensic evaluation of injuries, issued a report in which he opined that a seated hanging in which so little of Birchmore's body weight was suspended would not have resulted in a fractured hyoid bone.  He opined that Birchmore's sex and age made it even more unlikely that such a passive method of death would have resulted in this injury.  He indicated that, in his forty years of experience, he has never seen a fractured hyoid bone in a seated young person.  Dr. Smock also noted that the injury photographed by the medical examiner on Birchmore's right upper chest is a patterned imprint, the consequence of blunt force trauma caused by a lobster clasp on the duffle bag strap.  The clasp that caused this injury was found nowhere near the injury site when Birchmore was recovered, meaning that she could not have died in the position in which she was ultimately found.  Dr. Smock also noted that Birchmore had abrasions on the inferior and lateral aspects of her nose and opined that these types of injuries are commonly seen in cases where a victim moves their nose back and forth against something in an attempt to breathe.  He opined that, based on the totality of the circumstances, Birchmore's cause of death was asphyxia and her manner of death was homicide.

In August 2024, members of the prosecution team and FBI met with Dr. Capó Martinez to ensure that there was no information that the team had not considered before charging the defendant with murder.  There was not.  Dr. Capó Martinez requested to review voluminous discovery that had not been generated or made available to her prior to her May 2021 ruling.  In April 2026, when the government met with Dr. Capó Martinez for the second time to prepare her expert notice due May 1, 2026, Dr. Capó Martinez informed the government that, based on her review of the materials, she was no longer of the opinion memorialized in her May 2021 report.

In April 2026, Dr. Capó Martinez amended the death certificate, ruling Birchmore's cause of death to be asphyxia and manner of death to be undetermined.

On June 4, 2026, Farwell noticed Dr. Andrew Thomas, a board-certified forensic pathologist with twenty years of experience at the New Hampshire Medical Examiner's Office. Dr. Andrew Thomas concludes that the "final resting place could exert an inward directed force sufficient to produce the fracture observed at autopsy." He does not cite any studies, medical literature or any examples of cases that he has worked on in the past twenty years that form the basis of this opinion. Specifically, he does not provide any support for his conclusion that a twenty-three-year-old female sitting, almost reclined, under a closet door handle and tilting her head to the left could have caused a fracture to the right superior horn of her hyoid bone. Next, he concludes that Birchmore had "vaguely patterned apparently perimortem abrasions… on the right side of the back which may represent abrasions caused by terminal hypoxic seizure activity against the closet door." He, again, provides no support for the basis of this conclusion.

With respect to the fracture to Birchmore's right greater horn of her hyoid bone and hemorrhage of the left sternothyroid muscle, Dr. Andrew states "of particular note is the absence of any description of hemorrhage associated with the fracture at autopsy." While he is correct that the hemorrhage is not noted in the autopsy report, he ignores photographs of the hyoid bone itself, taken by the FBI at the request of the government's expert, which clearly depict a hemorrhage at the fracture site. Dr. Andrew also suggests that the post-mortem drying artifact of the nose has been over-interpreted as smothering. He neither confirms nor denies that there are visible abrasions on her nose and has noticed no opinion of the source of the marks on Birchmore's nose.

Dr. Andrew agrees with Dr. Smock's conclusion that the injury to Birchmore's right side of her chest is a visible, patterned, perimortem abrasion. He further agrees that the petechial

hemorrhages observed on Birchmore are consistent with asphyxia and not necessarily helpful to definitively differentiate a suicidal hanging versus homicidal strangulation. Dr. Andrew's ultimate conclusion is that, based only on the crime scene and autopsy, he cannot conclude that the manner of death was homicidal asphyxia to the exclusion of suicidal hanging. Or, in other words, based on the medical evidence alone, suicidal hanging is not impossible. He opines that Birchmore's cause of death is hanging, not asphyxia, and her manner of death as undetermined.

It is at this point in his opinion notice that Dr. Andrew begins to opine about issues beyond the scope of his expertise. Dr. Andrew writes:

> Of additional note is the fact that Ms. Birchmore had been prescribed sertraline, a selective serotonin uptake inhibitor (SSRI) 12 days prior to her death. As far back as 2004, it was noted there appeared to be a subset of those prescribed SSRIs who were at increased risk of suicide early in treatment or with changes in dosage. In January of 2005, the FDA required a so-called black-box warning on all SSRIs and antidepressants, highlighting the increased risk of suicidal thoughts and behaviors in children, adolescents and young adults up to 24, during the initial stages of treatment.

Dr. Andrew provides no support for where "it" was "noted," over twenty years ago, that this medication caused an increased risk of suicide, and cites no study to support this proposition. Not only has he not disclosed the basis for this statement, but the defense has not noticed any training or experience that would render him qualified to offer an opinion to the jury as what sertraline is, what potential dosages are, what it is used to treat, or what the risk factors are. Dr. Andrew does not, and has not for thirty-five years, treated living patients. He has never worked as a psychiatrist or mental health provider. As such, his attempt to second-guess Birchmore's

prescribing doctor's decision cannot be reliable testimony that the jury should be permitted to hear under Fed. R. Evid. 702.

Dr. Andrew should also be precluded from sharing his opinion, which he admits is a personal and not a professional opinion, about therapists and their relationships with their patients. Specifically, Dr. Andrew writes:

> Finally, in my personal experience of twenty years as Chief Medical Examiner in New Hampshire, therapists are not uncommonly shocked at the suicide of their patients, but suicide is simply not reliably predictable in patients with depression, particularly when there is a confluence of acute stressors.

Dr. Andrew has never worked as a therapist or psychiatrist and has not treated living patients for decades. He did not engage with any of Birchmore's mental health providers, and his personal opinion, generally, as to the relationships between therapists and their patients is an impermissible overreach.

Relatedly, Dr. Andrew should not be permitted to offer his opinion as to non-medical evidence that he alleges "favor suicide." Specifically, he writes that Birchmore had a:

> …documented history of suicidal behaviors. Among her writings are a note dated 7/1/2017 that can be considered a proto-suicide note and a "pros and cons" analysis regarding suicide dated 6/30/2017. Suicidal threats prompted involvement of the Stoughton Police Department on 5/14/2020 with involuntary evaluation at Good Samaritan hospital."

There is nothing in Dr. Andrew's 11 page CV, his nine page opinion letter, nor Farwell's notice of Andrew's testimony that suggests that Dr. Andrew is any more qualified than an average person to testify about whether certain journal entries or police reports demonstrate suicidality.

While he may discuss what he reviewed, he cannot describe them in the manner in which he attempts to his notice and characterize such testimony as an "expert opinion." Dr. Andrew does not and has not treated living patients in decades. Offering an opinion from Dr. Andrew on Ms. Birchmore's alleged suicidality is also cumulative of another expert that they have noticed.

Finally, Dr. Andrew should also be precluded from offering his personal conclusions about a meeting between law enforcement and the medical examiner that he did not attend. Specifically, he opines that the medical examiner's amendment of Ms. Birchmore's death certificate as the result of persuasion by the FBI or the USAO[2]. This patently false and dismissive opinion should give the Court pause about the reliability and unbiased nature of the remainder of Dr. Andrew's opinions. While the defendant is free to cross-examine Dr. Capó Martinez herself about the amendment to Ms. Birchmore's birth certificate, Dr. Andrew lacks firsthand knowledge to render an opinion that should be offered to the jury.

While Dr. Andrew's experience in some areas is certainly sufficient to permit him to render opinions that could assist the jury, he is not a psychologist, psychiatrist, or even a doctor who has treated live patients for decades. His expert opinion letter overreaches and the defense has declined, at this point, to limit his testimony to comport with Fed. R. Evid. 702.


**Argument**

I.    **The Court should conduct a *Daubert* hearing to determine whether to exercise its gatekeeping function and exclude Dr. Andrew as unqualified and/or limit his testimony**.

---

[2] Curiously, Dr. Andrew does not comment on a pre-trial meeting that the defense held with Dr. Capo Martinez in the spring of 2026.

Rule 702 "governs the admissibility of expert testimony and 'provides that a proposed expert witness must be sufficiently qualified to assist the trier of fact, and that his or her expert testimony must be relevant to the task at hand and rest on a reliable basis.'" *United States v. Stokes*, 388 F.3d 21, 26 (1st Cir. 2004) (quoting *United States v. Diaz*, 300 F.3d 66, 74 (1st Cir. 2002)). The rule states, in part, that "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto . . . if . . . (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the witness has reliably applied the principles and methods to the facts of the case." *See* Fed. R. Evid. 702.

The Court has an important gatekeeping role "by screening proffered expert testimony for both reliability and relevance." *Stokes*, 388 F.3d at 26 (citing *Daubert*, 509 U.S. at 592–95). "Expert testimony 'must be relevant not only in the sense that all evidence must be relevant . . . but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue.'" *Stokes*, 388 F.3d at 26 (quoting *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998) (citations omitted)).

It is Farwell's burden, as the proponent of the expert testimony, to demonstrate its admissibility. *See United States v. Tetiokhine*, 725 F.3d 1, 12 (1st Cir. 2013) (citing *Harrison v. Sears, Roebuck & Co.*, 981 F.2d 25, 30 (1st Cir. 1992)).

      A.    <u>Dr. Andrew  has failed to disclose information establishing that he is qualified to opine about Birchmore's "victimology."</u>

The Court should conduct a hearing to determine whether Dr. Andrew  is "qualified as an expert by knowledge, skill, experience, training, or education" to opine about Birchmore's "victimology," which entails an evaluation of her mental health and her alleged "history of suicidal behaviors."

The First Circuit has held that an expert must do more than disclose his or her mastery of a broad umbrella of topics without demonstrating a focused expertise in the particular subject of his or her proposed testimony. *See Tetiokhine*, 725 F.3d at 17. In *Tetiokhine*, the court held that the district court properly excluded expert testimony by Sergei Khrushchev, the son of former Soviet Premier Nikita Khrushchev, concluding that while Mr. Khrushchev may have possessed some expertise regarding world affairs and national security issues, that expertise did not qualify him to testify regarding "family law and adoption customs in the former Soviet Union," which was the issue relevant to the proffered defense. *Id.* at 18–19. The First Circuit specifically rejected the notion that Mr. Khrushchev's "purely anecdotal" knowledge would satisfy the requirements of Rule 702. *Id.*

Dr. Andrew's expert report does not identify any education, training, or practical experience that indicates that he has the requisite knowledge to assist the triers of fact in their understanding of Birchmore's mental health or her inclination to being at risk of committing suicide. While Dr. Andrew's resume and expert report describe experience and expertise regarding anatomical pathology and forensic pathology, they say nothing about his familiarity or expertise in psychology or psychiatric medicine. (Andrew CV) Therefore, until Dr. Andrew discloses a basis for his opinions regarding that material that he does not have any educational or professional expertise in, the Court should exclude his testimony regarding Birchmore's mental health.

    a.  <u>Dr. Andrew cannot opine about the professional judgement of Dr. Capó Martinez or Birchmore's medical team because he is not qualified to do so.</u>

Based on Dr. Andrew's report, the Court should also preclude him from testifying regarding the professional judgement of Dr. Capó Martinez and the bases for her amended ruling. In forming an opinion, an expert must base his or her testimony on sufficient data and tether that data to the use of reliable principles and methods. *See* Rule 702(b)–(d). Furthermore, an analysis

of Rule 702(b) requires an evaluation of the expert's conduct. Here, Dr. Andrew has not disclosed any basis to support his accusation that Dr. Capó Martinez was "persuaded by the USAO and FBI to… amend… the Birchmore death certificate."

Additionally, Dr. Andrew has failed to cite any data to support his opinion about the pregnancy-related anxiety medication that Birchmore's OBGYN prescribed. It must be reiterated that Dr. Andrew is not a psychiatrist and does not treat living patients. He is not qualified to testify about psychiatric medications. Furthermore, he is not an obstetrician and is not qualified to testify about the interplay of psychiatric medications and pregnancy. Finally, he never treated Sandra Birchmore. A forensic pathologist, who has never worked as a psychiatrist and has not treated living patients for thirty-five years simply lacks the expertise necessary to render an opinion about anxiety medication provided to a pregnant person who he never treated.

Dr. Andrew also made a brief, but sweeping generalization of his personal, not professional or trained, experience with therapists, and stated that the shock that Birchmore's therapist experienced when they learned of her sudden death was not uncommon among the other therapists that he has personally encountered throughout his career. Again, Dr. Andrew has not reviewed the communication that Birchmore had with her therapist, nor spoke with the therapist or even reviewed prior interviews with her, to come to his overly broad conclusion, and relies on no professional or educational experience to opine such an imprudent generalization. Accordingly, Dr. Andrew has failed to disclose a basis to opine about the discretion and efficacy of Birchmore's medical team.

**Conclusion**

For the foregoing reasons, the government respectfully requests that the Court conduct a

Daubert hearing to resolve the government's objections to the proposed expert testimony of Dr.

Thomas A. Andrew.

Respectfully submitted,

LEAH B. FOLEY
United States attorney

By:    */s/ Elizabeth C. Riley*
ELIZABETH C. RILEY
BRIAN A. FOGERTY
TOREY B. CUMMINGS
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non-registered participants .

*/s/ Torey B. Cummings*
TOREY B. CUMMINGS
Assistant United States Attorney

Date: August 3, 2026