UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MATTHEW FARWELL<br><br>Defendant | CRIMINAL No. 24-10259-DJC |

### GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT VICTIM STATEMENTS PURSUANT TO FED. R. EVID. 804(b)(6)

The United States of America, by Leah B. Foley, United States Attorney, and Brian A. Fogerty, Elizabeth C. Riley, and Torey B. Cummings, Assistant U.S. Attorneys for the District of Massachusetts, moves to admit certain out-of-court statements by victim Sandra Birchmore, pursuant to Federal Rule of Evidence 804(b)(6). The government respectfully requests an *in limine* ruling that it may introduce three categories of statements at trial: (1) Birchmore's electronic communications that have been extracted from her cell phone, laptop, and exist in her social media accounts; (2) Birchmore's oral statements to testifying witnesses; and (3) excerpts of Birchmore's handwritten journal entries. None of these statements are testimonial. Therefore, admission presents no Sixth Amendment Confrontation Clause issues.

The government now proffers facts establishing—and will prove by at least a preponderance of evidence at trial—that (a) Farwell caused Birchmore's unavailability (b) by a wrongful act (c) undertaken with the intention of preventing Birchmore from testifying at a future trial. *See United States v. Houlihan*, 92 F.3d 1271, 1280 (1st Cir. 1996). Based on the proffer set forth herein, the government requests that the Court make that preliminary finding before trial. *See United States v. Jiménez-Benceví*, No. 12-221 (JAF), 2013 U.S. Dist. LEXIS 52315, *6–9

(D.P.R. Apr. 5, 2013) (ruling *in limine* without an evidentiary hearing that Fed. R. Evid. 804(b)(6) statements are admissible); *cf. United States v. Weadick*, 15 F.4th 1, 8-9 (1st Cir. 2021) (in the context of admission of co-conspirator statements, describing the common practice of provisionally admitting statements subject to final *Petrozziello* ruling at the close of evidence).

## Background

I.      **Procedural History.**

On February 4, 2021, members of the Canton Police Department found 23-year-old Sandra Birchmore deceased in the bedroom of her apartment.  Following a brief State Police investigation, state law enforcement and the Massachusetts Office of the Chief Medical Examiner (OCME) concluded that Birchmore died by suicide.

Beginning in or around 2023, the FBI initiated an investigation into Birchmore's death. During that investigation, agents interviewed additional witnesses, examined the forensic evidence, and reviewed voluminous electronic communications between Birchmore and Farwell, much of which had not been examined during the brief State Police investigation.

On August 27, 2024, a federal grand jury returned an indictment charging Farwell with Killing a Victim or Witness, 18 U.S.C. § 1512(a)(1)(C), for murdering Birchmore on February 1, 2021, to prevent her from communicating to law enforcement information about his historical sexual exploitation of Birchmore and other federal crimes.  ECF No. 1.

On October 28, 2025, the grand jury returned the Superseding Indictment, which includes the original charge in violation of Section 1512(a)(1)(C) as well as one count of Protection of Unborn Children, in violation of 18 U.S.C. §§ 1841(a)(1), (a)(2)(A), and (a)(2)(C).  This count is based on Farwell's killing of the fetus Birchmore was carrying in utero at the time of the murder. ECF No. 63.

II.     **Farwell Murdered Birchmore.**

A.     **Hooded and masked Farwell was the last person to see Birchmore alive.**

On February 1, 2021, at 9:08 p.m., in the middle of a blizzard and less than twelve hours before his wife's scheduled cesarian section, Farwell sent Birchmore a text asking if he could "come by for a second." At 9:10 p.m., Birchmore responded that he was welcome to visit and that the door to her apartment would be open. At 9:13:37 p.m., Birchmore's cell phone locked for the final time, never to be unlocked again. As depicted in video surveillance footage, Farwell entered Birchmore's apartment building at 9:14:56 p.m. He was wearing a dark-colored hoodie with the hood covering most of his head, and a surgical mask, an item that many witnesses have said he strongly resisted wearing during the COVID-19 pandemic. As he walked through the building's small lobby, Farwell avoided looking in the direction of the ceiling-mounted surveillance camera.

After Farwell entered the apartment building, Birchmore's phone never sent another message. At 9:18:03 p.m., Birchmore's phone captured a locked screen screenshot. At 9:24 p.m., about ten minutes after Farwell arrived, Birchmore received a text message that, like all other subsequent messages, remained unread. At 9:40:19 p.m., with Farwell still in the apartment, Birchmore's phone recorded 8 steps and never unlocked or moved again until law enforcement found her dead body days later.

At 9:43:33 p.m., more than three minutes after Birchmore's phone recorded its last movement data, video surveillance footage shows Farwell leaving Birchmore's apartment, just 29 minutes after he arrived. The footage shows Farwell wearing the hood and surgical mask. And he again avoided looking in the direction of the camera as he walked briskly toward the exit.

3

### B.    Canton police officers found Birchmore body three days later.

On the morning of February 4, 2021, Birchmore did not show up for work as a teacher's aide at a Sharon elementary school. Birchmore's co-workers contacted a school resource officer, who called the Canton Police Department to ask officers to conduct a well-being check. Canton police officers went to Birchmore's apartment complex where they observed that Birchmore's car was still covered in snow from the snowstorm that hit the area on February 1. Officers asked one of the property manager's employees to call Birchmore, and when Birchmore failed to answer, they obtained a key and decided to inspect Birchmore's apartment.

Once inside Birchmore's bedroom, police found Birchmore in a fully seated and partially reclined position under a closet door handle. A duffle bag strap (hereinafter, the "ligature") was wrapped around her neck and affixed tightly to the closet door handle. Birchmore's cell phone was face-down, several inches away from her right hand. At the time, Birchmore was approximately eight to ten weeks pregnant. Crime scene photos depict (but responding law enforcement officers did not collect) a necklace that was broken on the front of Birchmore's body.

State Police troopers from the Norfolk County Crime Prevention and Control Unit (also known as the "Norfolk CPAC") responded to the scene and took crime scene photographs. Birchmore's body was transported to the OCME. That same day, prior to any autopsy or examination of Birchmore's electronic devices, the OCME received information from members of the State Police and Canton Police concluding that Birchmore died by suicide. Nevertheless, in the twenty-four hours following Birchmore's death, multiple witnesses called the Norfolk CPAC, reporting that Birchmore was in a sexual relationship with Farwell, a married Stoughton police detective, and she could not have died by suicide.

4

C.    **Farwell identified himself in the Feb. 1 surveillance footage, but the State Police declined to obtain a warrant to seize any evidence from him.**

On February 6, 2021, an employee of the apartment complex where Birchmore was living told State Police investigators that while reviewing the video surveillance footage from February 1, he observed a person he did not recognize. The footage shows that person arrived at the building at approximately 9:14 p.m. Local and State Police investigators identified the man as Matthew Farwell. After making that identification, the then-lead State Police trooper called a State Police sergeant, who assumed the position of lead investigator going forward.

Within approximately one hour, the State Police sergeant, who had formerly served as a Stoughton police officer, and the former lead State Police investigator interviewed Farwell in the parking lot of a Stoughton elementary school. While the State Police declined to record the interview with Farwell—a person who they then knew was reported to have been a sexual partner of Birchmore's and the last person to see her alive—reports indicate that Farwell eventually confirmed that he had been at the apartment on the evening of February 1. Farwell also told the State Police that he had been in a sexual relationship with Birchmore but falsely added that he had only had sex with her two or three times and that their sexual relationship began in 2020. Digital evidence shows that, in reality, Farwell had engaged in countless sexual encounters with Birchmore dating back to 2013 when she was just 15 years old.

Three days later, the State Police investigators asked Farwell if he would consent to a search of his personal phone. Farwell declined to permit the State Police to conduct a comprehensive search of his phone. Instead, he agreed to allow investigators to search for text messages between him and Birchmore. However, according to the State Police, Farwell had already told them that he had deleted those messages. Therefore, not surprisingly, the State Police's subsequent search for these messages on Farwell's phone yielded no results. Yet, at the

same time that the State Police were confirming the absence of these messages on Farwell's personal phone, Farwell was conducting a web search on his work phone concerning law enforcement's ability to resurrect messages he deleted: "can delete imessage be recovered by cellebrite." Of course, Cellebrite is the tool that the State Police, and Farwell as a local detective, used to review data obtained from cell phone.

**D.     The Medical Examiner initially ruled Birchmore's death a suicide but now has revised the manner of death to undetermined.**

The Medical Examiner initially ruled Birchmore's death a suicide. In April 2026, after a review of the evidence collected during the investigation into Birchmore's death, the Medical Examiner withdrew her opinion that Birchmore died by suicide and ruled the cause of death was asphyxia and the manner was undetermined.

Since the Medical Examiner's initial ruling, two independent experts have reviewed the evidence and determined that Birchmore death was a homicide. The Medical Examiner's autopsy report indicates that Birchmore's hyoid bone (a U-shaped bone at the front of the neck) was fractured on the right side and that she suffered from petechial hemorrhages of the bulbar and palpebral conjunctivae. Additionally, the Medical Examiner concluded that Birchmore had a hemorrhage of her left sternothyroid muscle. At trial, the independent experts will opine that these neck injuries are more common in homicidal strangulations than hangings, while noting they are not exclusive to homicidal hangings. Despite the existence of this physical evidence that is more common in homicidal deaths, the Medical Examiner originally categorized the manner of death as suicide largely because of the dearth of investigative updates from the assigned State Police investigators.

The Medical Examiner's original autopsy report further confirmed that Birchmore was approximately eight to ten weeks pregnant at the time of her death. The autopsy included

toxicology testing. The results of the toxicology tests were negative for all substances except for sertraline, which was likely explained by the antidepressants Birchmore had been prescribed.

The Medical Examiner also noted and photographed a significant injury to Birchmore's right upper chest area. This injury is a pattern imprint that was caused by one of the ligature's lobster claw clasps being pressed into Birchmore's chest. The pattern imprint is consistent with blunt force trauma from an assault. Importantly, when Canton police officers found Birchmore's body, the lobster claw clasp that caused this imprint was up near the door handle from which she hung, over a foot from where it had been pressed into Birchmore's chest.

The Medical Examiner also took several photos of Birchmore's hair tangled in the ligature around her neck. The photos show the ligature interwoven with Birchmore's hair in a complicated and extensive web of tangles.

In August 2024, pursuant to a federal search warrant, the FBI obtained Farwell's DNA. DNA testing revealed that Farwell's sperm was present in a mixture on two separate locations on the underwear that Birchmore was wearing when she died. Moreover, Farwell's DNA was present—and in fact the major contributor—to the DNA mixture recovered from the part of the ligature that was tied around the door handle to hang Birchmore.

### III.    Farwell Intended To Prevent Birchmore From Reporting His Crimes.

Farwell killed Birchmore on February 1 to prevent her from disclosing information about his federal crimes, including certain crimes to which she was the only or primary witness.

> **A.    Birchmore's electronic devices contain evidence that Farwell, a police officer, coerced and enticed Birchmore when she was 15 years old, and engaged in multiple sexual encounters with Birchmore while on the clock with the Town of Stoughton.**

On February 4, 2021, the State Police collected Birchmore's Apple iPhone 12, which they found on the floor of Birchmore's bedroom just beyond her reach. Members of Birchmore's family

found her older Apple iPhone XS in Birchmore's car and gave it to State Police investigators. On February 9, 2021, five days after finding Birchmore and learning that she was in a sexual relationship with a married Stoughton Police detective, the State Police returned to Birchmore's apartment and recovered her laptop. Although the State Police investigators did not use Birchmore's devices to obtain any search warrant to collect physical or digital evidence from Farwell (or his residence), these devices contain hundreds of thousands of communications, at least 40,000 of which are between Farwell and Birchmore.

FBI agents reviewed all of Birchmore's communications. What they found is that Birchmore retained a trove of messages despite Farwell's repeated commands that she delete evidence of their communications. These messages that Birchmore retained prove several important facts.

First, the messages are contemporaneous confirmation of Farwell and Birchmore's active sexual relationship from at least February 2019, which is as far back as her messages went, until her death on February 1, 2021. Contrary to what Farwell told the State Police investigators in the hastily arranged and unrecorded meeting in the school parking lot, the text messages establish that Farwell met with Birchmore more than fifty times in the twenty-three months for which electronic data exists.

Second, most of the foregoing sexual encounters between Farwell and Birchmore occurred while Farwell was on duty as a Stoughton police officer. Many of the encounters were preceded by text messages previewing their anticipated sexual conduct or followed by messages confirming the details of the sexual encounter.

Third, the text messages between Farwell and Birchmore also confirm a criminal sexual relationship that Farwell initiated at some point between 2010—when Farwell and Birchmore

began their involvement with the Stoughton Police Explorers Program—and April 10, 2013, when Farwell took then-15-year-old Birchmore's virginity.[1] At the time of that first episode of criminal sexual intercourse, Farwell was a 27-year-old Stoughton police officer.

Fourth, the text messages from Birchmore's devices contain more than just a fleeting reference to a single criminal sexual encounter. Farwell sent several text messages to Birchmore in which he expressed regret that he did not take her virginity sooner, reliving non-intercourse sexual encounters prior to April 2013.

Finally, text messages also show how Farwell exploited and groomed Birchmore through her teenage years and into her early adulthood. Among other things, at times he sought to track her location through her cell phone and would become angry when she disabled that function. Farwell also asked Birchmore to enact rape fantasies, incest fantasies, and underage sex fantasies.

The text messages are not the only evidence of Farwell's historical federal crimes involving Birchmore. Facebook records indicate that Birchmore reached out to him via Facebook as early as October 2012. And multiple witnesses will testify that Birchmore disclosed to them in real time that she was engaging in sex with Farwell. At the time, Birchmore was a young teen enrolled in the Stoughton Police Explorers Program and living with her disabled single mother in Stoughton.

After Birchmore's death, her family collected her personal items, including Birchmore's personal journals from 2013 and 2019. The family released these journals to the State Police and later, the FBI. The journal entries reveal ongoing sexual interactions with Farwell. According to the journals, this was a relational dynamic that included the concept of sex as punishment, anal

---

[1] This is a fact that Farwell admitted in a text message with Birchmore on February 11, 2020 and other dates, as described below.

sex, and choking.  Between 2019 and 2021, there are no fewer than twenty text messages from Farwell to Birchmore, in which Farwell references and glorifies the act of choking Birchmore.

**B.      Birchmore increased the pressure on Farwell by threatening to disclose information that would expose his criminal conduct.**

i.      From 2019 to September 2020, Farwell and Birchmore have extensive text discussions about Farwell impregnating Birchmore.

Beginning as early as 2019, Birchmore sends dozens of messages to Farwell indicating that she wants to have a child with him.  On multiple occasions, Farwell suggests that he is open to and even excited about it.  In June 2019, Farwell tells Birchmore that he does not object to Birchmore not taking birth control pills and reassures her that he will still have sex with her after he gets her pregnant.  On July 9, 2019, via text messages, Farwell reminds Birchmore that he had ejaculated inside her "for years" and begged her to stop taking birth control pills.  On July 12, 2019, when Birchmore tells Farwell that she is afraid he will not support her if she gets pregnant, Farwell tells her "if that happened you could fuck me over in like 3 seconds."  In August 2019, on the day that Birchmore learns that Farwell's wife has given birth to their second child, Birchmore sends Farwell a text indicating that she should tell his wife that he has been having sex with another girl for "almost eight years."  In his response, Farwell does not deny that fact.  Rather, he tells Birchmore that the facts about their sexual relationship are "between us and no one else."

In 2020, the two continued to discuss the plan for Farwell to impregnate Birchmore.  In March 2020, Farwell asks Birchmore if she will stop having sex with him if he does not get her pregnant.  He tells her, "I'm not willing to stop fucking you so I guess that makes the answer pretty simple."  Birchmore tells Farwell that she does not want him to agree to have a baby just to ensure he can continue having sex with her.  In June 2020, Birchmore tells Farwell that she wants a child and that if he is not willing to get her pregnant, she is going to explore IVF.  In July 2020, Farwell suggests that he is softening to the idea of having a child with Birchmore, asking Birchmore what

10

would happen if she were to get pregnant. He indicates that he would feel bad that she would be "stuck with it [i.e., the child]" and sends her a smiley face emoji after she tells him all of the reasons that she wants him to be the father of her child. In August 2020, Birchmore tells Farwell that she needs to walk away if he is not going to give her a child. Farwell responds by asking if "Joey," the pseudonym he uses when he pretends to rape Birchmore during sexual encounters, can come over. In September 2020, Birchmore tells Farwell that her head and heart are torn and that she needs space if he will not give her a child.

ii.     <u>In October 2020, Birchmore threatens to disclose information about their sexual relationship if he does not impregnate her</u>.

On October 5, 2020, Birchmore learns that Farwell's wife is pregnant with their third child and that the baby is due in February 2021. At that point, via text message, Birchmore tells Farwell that if he does not get her pregnant, she is going to tell his wife. Farwell goes to Birchmore's house that evening, and after their meeting, she sends him a copy of her ovulation calendar, showing the days that month she is most likely to conceive. Based on data from Birchmore's electronic devices, she tells multiple friends about the ultimatum that she has given Farwell, and at times indicating that she is the victim given that she was fifteen years old when their relationship began. Via electronic messages, she also discloses to multiple people that Farwell routinely has sex with her when he was "on the clock."

In October 2020, Birchmore does not get pregnant. In text messages recovered from Birchmore's devices, Farwell tells Birchmore that their agreement was only to "try once." However, Birchmore takes the position that their deal does not involve merely having unprotected sex one time. In November 2020, Birchmore asks Farwell to consider not simply getting her pregnant but also being present for the birth of the baby and signing the birth certificate so that they can "both get what [they] want." Through November, Birchmore continues to ask or demand

11

that Farwell give her what she wants. Based on the text messages, they continue to have unprotected sex.

In late November 2020, the text messages reveal that Birchmore gets frustrated with Farwell and tells him that she is about to walk away and "do whatever [she] decide[s] to do." Separately, she tells people that Farwell is not afraid of losing her. Rather, she believes he is afraid of what she will do if he does lose her.

On December 11, 2020, Farwell has unprotected sex with Birchmore on a day they both believe she is ovulating. Farwell tells Birchmore that he does not believe she will ever be satisfied with what he agrees to do as part of their compromise.

iii.    <u>In December 2020, Birchmore gets pregnant, discloses the pregnancy to Farwell, and his behavior becomes violent and erratic.</u>

On December 28, 2020, Birchmore learns that she is pregnant and tells Farwell. He responds poorly. Based on a review of the text messages between the two, at no point does he deny paternity. Birchmore tells Farwell that she is going to protect her child and that he is going to have to sign the child's birth certificate. In the alternative, she says, he would not be signing his wife's child's birth certificate. Farwell tells Birchmore that she has given him no choice and that she is the "worst person on the face of the earth."

On December 29, 2020, Farwell meets Birchmore at her apartment. During that meeting, Birchmore shows Farwell a pregnancy poster that she has made for him. In the text messages that followed that meeting, Birchmore tells Farwell that something he did during the meeting made her fear him. Via text messages, she also tells at least three friends about this frightening encounter with Farwell, describing concerns for her own safety and the safety of the baby. She tells at least one friend that Farwell grabbed her phone out of her hand, removed her computer from her hand, and shoved her.

12

      iv.      <u>Birchmore's electronic communications demonstrate her ability and willingness to navigate the legal and healthcare system in preparation for becoming a single mother.</u>

The data on Birchmore's various electronic devices show that from October 2020 until her death, Birchmore told multiple people about how she had embraced the idea of becoming a single mother. She began to research and contact lawyers to ensure that she could obtain custody of her child and support from Farwell.

In January 2021, Birchmore's pregnancy progressed. She attends doctor's appointments, receives an ultrasound, researches and narrows a list of potential baby names. She plans a birth announcement with accompanying hair appointments and photographer, contemplates gender reveals, and researches baby shower venues and newborn photographers. Birchmore purchases a car seat, baby clothes and other items, and orders a handmade birth announcement canvas and personalized onesies. The data from her electronic devices and witness disclosures have revealed that she told at least eighty-five people that she was pregnant.

At the same time, Farwell began to distance himself from Birchmore, refusing copies of ultrasound photos and declining to participate in any planning for the child. Sensing this, Birchmore starts to research and engage with probate and family attorneys. She reminds Farwell that she expects him to be present for the birth of her child. She also tells him that she expected the baby to have his last name, and that he will have to see the child and spend a portion of his holidays with the child. Via text message, Farwell tells her that it is "so much more than [she has] ever asked for." Farwell begins to refuse to text about any of these baby-related topics, telling her that they will discuss them in person. Ultimately, Birchmore tells Farwell that she will give him until January 31, 2021 to meet to reach an agreement.

v.    Birchmore's friend calls Farwell's law enforcement employer and reports information about Farwell's sexual relationship with Birchmore.

On January 20, 2021, Birchmore's friend calls the Stoughton Police Department and tells a Stoughton Police employee that her friend, Sandra Birchmore, has been having sex with Officer Matthew Farwell. The Stoughton Police employee tells Farwell, who responds by angrily commanding the employee never to mention it to him again and never to tell anyone else. Farwell then texts Birchmore, telling her that he thought he had until January 31 to meet with her and that he thought no one knew that they had been having sex. He asked her what friend (of hers) he would have to worry about in the future. After that date, Birchmore tells friends that Farwell had done a "complete 180" and that he has started to come around, bringing her ginger ale when she was nauseous and accepting a copy of a key to her apartment. Birchmore texts two friends, less than a week before her death, that she observed Farwell looking in her bathroom and closets, which she found odd.

Birchmore and Farwell continue to meet in person, specifically on January 23, 2021, and January 29, 2021, apparently engaging in anal sex on January 29, 2021, given that Birchmore is then on doctor-ordered pelvic rest. During that penultimate meeting on January 29, 2021, Farwell asks Birchmore whether the apartment door code that she has given him is unique to her or whether it is the same for all residents of the complex.

During her final week alive, Birchmore registers and pays for a standardized test that she plans to take at Massasoit Community College on February 6, 2021, corresponds with her obstetrician and gynecologist and books future appointments, meets with her therapist and books future appointments, googles and considers baby names, engages with a child custody lawyer, and books a hair appointment for her planned Valentine's Day pregnancy announcement and gender reveal.

14

vi.    Birchmore's final twenty-four hours.

On January 31, 2021, Birchmore tells Farwell that the public school where she works will be having an early dismissal so she will be released early the following day due to the impending blizzard. She asks if he will be able to shovel out her car. He indicates that he will not be around. He does not tell her that his wife has a c-section scheduled for the early morning of February 2, 2021. Accordingly, Birchmore arranges for a friend to shovel out her car to ensure that she can get to work on Thursday, February 4. 2021.[2]

On February 1, 2021, Birchmore comes home from work at 12:35 p.m. She speaks with her aunt and sends a photo of where her car is parked to a friend to ensure that the friend can shovel her out her car. Birchmore enters her apartment building at 12:51 p.m., and is texting with multiple people, including Farwell. She asks him if they are going to meet later in the week or if he can come over that night. Farwell tells her that he is not in town but that he can "probably" meet her later in the week. Birchmore takes a nap, then spends the afternoon browsing baby items on the Kohl's website, ordering clothes, Facetiming with a friend, talking to her aunt on the phone, and ordering food from DoorDash.

At 5:01 p.m., she goes to the lobby of her building to pick up food that has been delivered and to her apartment and returns upstairs at 5:02 p.m. Birchmore then resumes texting and submits an admission form for Massasoit, resets her password for her gas company account, and goes back downstairs and outside between 5:31 p.m. and 5:33 p.m. to dust snow off of her car. Video surveillance footage shows her hair in a bun and she is wearing the clothes she is ultimately found in when law enforcement finds her body on February 4, 2021.

---

[2] School was cancelled for February 2, 2021, and February 3, 2021 was already scheduled to be remote.

Birchmore uses both her phone and her laptop that evening, looking up an EMT fire training course, baby names, pregnancy symptoms, and information about new cars. She texts multiple people, telling Farwell at 6:20 p.m. that she has received an early baby shower gift and that she does not want to have her shower during the COVID pandemic. Farwell tells her that he is "stressed" and Birchmore responds that they will be ok. She asks if when she learns the baby's gender, Farwell can purchase the clothes the baby will wear when she brings the baby home from the hospital. Farwell does not respond.

In the hour before Farwell arrives at Birchmore's apartment, she continues to text with multiple people and reaches out to the person who is creating homemade baby onesies for her. She asks that person to send her photographs of onesies when she is done. She googles private event spaces for a baby shower, researches bookshelves for a baby or child, and has a twenty-five-minute phone call with her best friend.

At 9:07:56 p.m., Farwell texts Birchmore to ask if she is still awake. At 9:08:54, he asks if he can visit. Birchmore responded at 9:10:46 p.m. that the door will be open when he arrives and sends him a smiley face emoji. At 9:14 p.m., Farwell arrives. At 9:24 p.m., Birchmore's friend sends her a picture of the onesies she has designed for Birchmore. Birchmore never opens her phone nor reads that text message.

### IV.    **Birchmore's Out-Of-Court Statements.**

At trial, the government will seek to introduce three categories of Birchmore's statements pursuant to Rule 804(b)(6), which is also known as the forfeiture by wrongdoing doctrine:

### A.    Birchmore's Electronic Communications.

The government will seek to introduce Birchmore's electronic communications with Farwell and others.[3]   This category will include Birchmore's extensive texts with Farwell regarding, among other things, their sexual relationship that began in April 2013, the continuing sexual relationship from 2013 through Birchmore's death, and discussions about Farwell and Birchmore's attempts to conceive a child.

This category of Birchmore statements will also include her electronic communications with other witnesses regarding her relationship with Farwell.   For example, Birchmore made statements to others about the criminal genesis of their sexual relationship, and Farwell's violent and bizarre behavior in the weeks before her death.   The government will seek to introduce Birchmore's statements to friends that in January 2021, Farwell inspected Birchmore's apartment. This will also include Birchmore's electronic communications with others discussing her plans for the future, including her decision, if necessary, to embrace the role as a single mother and engage a lawyer to ensure that Farwell pay child support.

---

[3] The government will seek to admit Farwell's electronic communication with Birchmore, pursuant to Fed. R. Evid. 801(d)(2)(A).  Of course, absent admission pursuant to Fed. R. Evid. 804(b)(6), Birchmore's statements would not be admitted for the truth of the matter asserted. Instead, they would be admissible to provide context for Farwell's admissions and to prove his knowledge. *See, e.g.*, *United States v. Cruz-Diaz*, 550 F.3d 169, 176 (1st Cir. 2008) (statement offered for the limited purpose of showing what effect the statement had on the listener is not hearsay); *United States v. Bailey*, 270 F.3d 83, 87 (1st Cir. 2001) (statement "offered to show the effect of the words spoken on the listener (e.g., to supply a motive for the listener's action) is not hearsay"); *United States v. Catano*, 65 F.3d 219, 225 (1st Cir. 1995) (other parts of a conversation that are "reciprocal and integrated utterance(s) . . . reasonably required to place [the defendant's] admissions into context" are not hearsay).

### B.    Birchmore's Oral Communications.

The government will also seek to introduce through testifying witnesses certain statements Birchmore made to those witnesses.  Again, the thrust of these statements will be Birchmore's long sexual relationship with Farwell, his behavior, and her own plans for motherhood.

### C.    Birchmore's Journal Entries.

At trial, the government will also seek to introduce narrow excerpts of Birchmore's journals.  After her death, one of Birchmore's family members retrieved these journals from her apartment and former residence.  The excerpts will include Birchmore's reflections on Farwell's initial sexual encounters with Birchmore when she was a child, their ongoing sexual relationship while he continued to serve a Stoughton police officer, and Farwell's relevant sexual proclivities that gave him access to Birchmore and an opportunity to strangle her without resistance (i.e., Farwell's interest in sex as punishment, choking, and rape fantasies).

### Legal Standard

Rule 804(b)(6) provides that when a declarant is unavailable, the rule against hearsay does not exclude "[a] statement offered against a party that wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness and did so intending that result." Fed. R. Evid. 804(b)(6).  Though the court's holding in *Houlihan* addressed the admissibility of testimonial hearsay statements, courts in this circuit cite the principles recited in *Houlihan* and the court's analysis in determining the admissibility of non-testimonial statements under Rule 804(b)(6).  *See, e.g., Jiménez-Benceví*, 2013 U.S. Dist. LEXIS 52315, at *2–6 (ruling *in limine* that out-of-court statements made to associates of the defendant and law enforcement were admissible under Rule 804(b)(6)); *United States v. Kilmartin*, 1:14-cr-00129-JAW, 2016 U.S. Dist. LEXIS 135299, at *5 (D. Me. Sept. 30, 2016).  Therefore, regardless of whether the statements

are testimonial, the fundamental principles hold true that "courts will not suffer a party to profit by his own wrongdoing. Thus, a defendant who wrongfully procures a witness's absence for the purpose of denying the government that witness's testimony waives his right under the Confrontation Clause to object to the admission of the absent witness's hearsay statements." *Houlihan,* 92 F.3d at 1279-80. And "when a person who eventually emerges as a defendant (1) causes a potential witness's unavailability (2) by a wrongful act (3) undertaken with the intention of preventing the potential witness form testifying at a future trial, then the defendant waives his right to object on confrontation grounds to the admission of the unavailable declarant's out-of-court statements at trial." *Id.* at 1280. "Moreover, it is sufficient in this regard to show that the evildoer was motivated *in part* by a desire to silence the witness; the intent to deprive the prosecution of testimony need not be the actor's *sole* motivation." *Id.* at 1279 (emphasis in original) (citing *United States v. Thomas*, 916 F.2d 647, 651 (11th Cir. 1990)). Ultimately, "the government need only prove such predicate facts by a preponderance of the evidence." *Id.* at 1280.

## Argument

I. **The Court Should Admit Sandra Birchmore's Out-Of-Court Statements Under Rule 804(b)(6).**

The Court should rule *in limine* that based on the government's pretrial proffer Sandra Birchmore's out-of-court statements are admissible for the truth of the matters asserted therein, pursuant to Fed. R. Evid. 804(b)(6). After years of hiding their illicit relationship, reminding Birchmore to delete text message evidence of the genesis of their sexual relationship, Farwell realized that Birchmore possessed information that could send him to prison. And, on January 20, 2021, he learned that that information was dangerously close to law enforcement. So, he went to her apartment on February 1, 2021, and he killed her to mitigate that risk. As a result, Farwell did exactly what Rule 804(b)(6) is designed to address: He sought to deprive law enforcement and the

19

court of Birchmore's testimony. The just remedy is to admit what Farwell killed Birchmore to prevent, Birchmore's statements about Farwell's criminal sexual conduct, his efforts to defraud the Town of Stoughton, and communications that are probative of Farwell's plan to murder Birchmore.

**A.      Farwell wrongfully caused Birchmore to be unavailable.**

The Court can make the preliminary ruling that Farwell made Birchmore unavailable by killing her on February 1, 2021. While the jury will have the final say on this issue, the Court, like others that have addressed pretrial motions to admit Rule 804(b)(6) statements, may consider the nature of the charges, the return of an indictment, and the type and quantum of evidence the government will present at trial to prove the defendant made the declarant unavailable. *See, e.g.*, *Kilmartin*, 2016 U.S. Dist. LEXIS 135299, at *6-9 (citing the fact that the defendant was charged with witness tampering and retaliation); *Jiménez-Benceví*, 2013 U.S. Dist. LEXIS 52315, at *4–9 (ruling in limine based on the government's proffer identifying witnesses who would testify that the defendant killed the declarant).

In this case, the Court has sufficient information to make its preliminary ruling by a preponderance of the evidence. As a threshold matter, the grand jury returned the Superseding Indictment charging Farwell with Killing a Witness or Victim, in violation of 18 U.S.C. § 1512(a)(1)(C); *see Kilmartin*, 2016 U.S. Dist. LEXIS 135299, at *6-9. Moreover, the government herein makes a substantial and detailed proffer of the evidence proving that Farwell killed Birchmore:

First, it is undisputed that Farwell was the last person to see Birchmore alive. Video surveillance footage confirms that on February 1, Farwell arrived at Birchmore's apartment on short notice, wearing a hood covering his head and, uncharacteristically, a surgical mask covering his face. The footage shows Farwell entering Birchmore's building and quickly exiting

approximately 29 minutes later.  Importantly, Farwell timed his visit to coincide with an arriving snowstorm that would close the school where Birchmore worked on February 2 and 3, giving him at least a two-day buffer before Birchmore's body would be found and law enforcement would begin asking questions about the circumstances of her death.  The timing was also personally convenient for Farwell; his third child was scheduled to be born by c-section just a few hours after he exited Birchmore's apartment, so he would be unavailable and not physically present at the Stoughton Police Department when officers received word that former Stoughton Police Explorer Sandra Birchmore had been found dead.

Second, while Farwell was inside Birchmore's apartment, Birchmore stopped interacting with her cell phone.  Against the backdrop of the voluminous digital evidence and witness testimony that Birchmore was nothing short of a prolific cell phone user, the fact that Birchmore's cell phone never moved after Farwell arrived and she never read or responded to texts is remarkable.  So is the fact that Birchmore's cell phone—untouched since Farwell entered the apartment—was found next to Birchmore's lifeless body.

Third, forensic evidence links Farwell to the murder weapon.  Farwell's DNA is on the ligature that was found around Birchmore's neck.  The reasonable inference from this evidence is that Farwell touched the ligature that was placed around Birchmore's neck at the time of her death.

Fourth, the forensic evidence regarding Birchmore's injuries indicate that she died by strangulation, not asphyxia by hanging.  Two independent experts have opined that, among other things, Birchmore's fractured hyoid bone, other hemorrhaging in the neck area, and the existence of perimortem abrasions on her nose are evidence that further supports the conclusion that she was murdered and did not take her own life and that of her unborn child.  And, ultimately, the Medical

21

Examiner has revised the ruling regarding the manner of Birchmore's death from suicide to undetermined.

The foregoing proffer does not include all of the evidence and testimony the government will introduce at trial to prove Farwell killed Birchmore.  However, it provides ample support for the Court to make the threshold finding that Farwell rendered Birchmore unavailable by a wrongful act, i.e., murder.

**B.      Farwell murdered Birchmore, at least in part, to prevent her from being available as a witness.**

The Court can also make a preliminary finding about Farwell's intent to render Birchmore unavailable.  Farwell killed Birchmore because she posed a grave risk.  Birchmore was the primary witness to Farwell's myriad crimes.  At trial, the evidence of Farwell's intent to eliminate the risk Birchmore posed will include, among other things, Farwell's own admissions as well as the testimony of other witnesses.

The government will introduce approximately ten text messages between Farwell and Birchmore during which the two discuss Farwell's criminal sexual encounters with Birchmore when she was only 15 years old.  For example, on February 11, 2020, Farwell told Birchmore that he had butterflies the day he took Birchmore's virginity, acknowledging that "it was such a big day."  Birchmore told Farwell that she will never forget the date on which she lost her virginity to him, telling him that it was April 10, 2013.[4]  Farwell acknowledged that statement with a smiley face emoji, told her it was the best day of his life and that he was in love with her.  He then told

---

[4] The government will admit medical records to corroborate this, including records from March 13, 2013, that indicate she told her pediatrician she being tutored at the library by a police officer; May 1, 2013, where she sought out birth control from her pediatrician; May 30, 2013, where she reported that she was sexually active just two weeks after turning sixteen, the legal age of consent.

her that he regretted not taking her virginity earlier, referencing "that day in the library."[5]  There are also multiple text messages between Farwell and Birchmore where they discuss sexual contact and penetration that occurred before Farwell took then-fifteen-year-old Birchmore's virginity.  For example, in one text conversation from February 21, 2019, Farwell asked Birchmore what she would have done if he had tried to take her virginity the day he first "fingered" her.[6]  These texts reveal Farwell's knowledge that (1) he has committed a crime by sexually exploiting Birchmore; and (2) Birchmore remembers his criminal conduct.

Furthermore, the government will introduce several text messages between Farwell and Birchmore during which the two discuss Farwell meeting her while "on the clock."[7]  For example, on November 18, 2020, Farwell indicates that he is actively conducting interviews on a "murder" when he asks her if she would require him to wear a condom if they were to engage in anal sex later that evening, and telling her that he wanted her to "say no" during their sexual encounter. When he does appear at her hotel later that evening, he tells her that he needed to go in another entrance because people were "dealing" drugs near another entrance.  Despite being on duty as a Stoughton police officer at the time and seeing people dealing drugs within his jurisdiction, Farwell prioritized avoiding the obvious criminal conduct to ensure he could still have sex with Birchmore.[8]

---

[5] There are other text communications between the two regarding Farwell taking Birchmore's virginity, including but not limited to on March 19, 2019; March 24, 2019; June 5. 2019

[6] There are multiple other conversations referencing sexual contact that occurred before the April 2013 loss of Birchmore's virginity to Farwell, including on January 3, 2020; April 5, 2020; and March 23, 2020.

[7] Farwell's work records will corroborate that he was being paid by the Town of Stoughton to work as a police officer during these meetings.

[8] Other examples of the two discussing Farwell being on duty during encounters occur on April 10, 2020, January 29, 2020.

The government will also introduce evidence of Farwell's practice of ordering Birchmore to delete text messages in which the two discuss his historical criminal conduct. For example, in other text messages on March 19, 2019, after reminiscing about Farwell taking Birchmore's virginity, Farwell tells Birchmore to "clear out these texts."[9] These texts are examples of Farwell's efforts to contain the information about his criminal conduct.

The government will introduce evidence establishing that as of January 20, 2021, Farwell was no longer confident that Birchmore would refrain from disclosing the information about the criminal conduct in which he engaged while serving as a police officer. At trial, the government will introduce testimony from Birchmore's friend who called the Stoughton Police Department, Farwell's law enforcement employer, and disclosed, among other things, that Birchmore was engaged in a sexual relationship with Farwell. The Stoughton Police employee who took this call will testify that he disclosed the call to Farwell who responded angrily, ordering the employee to never tell anyone. The government will then introduce Farwell's irate texts to Birchmore in which he demands to know what else he has to worry about.

The government will then introduce testimony and evidence that proves that the January 20 call was a turning point and Farwell's conduct that followed it was driven by a desire to protect himself from the information Birchmore possessed. To do that, Farwell concocted a plan to eliminate Birchmore. Evidence of Farwell's plan will include, among other things, evidence that Farwell obtained a key to Birchmore's apartment, showed up at her apartment on short notice on

---

[9] Additionally, on March 24, 2019, after asking Birchmore whether or not she would have let him "fuck" her the day he first "fingered" her, Farwell tells her to "clear that part out baby." Similarly, on June 5, 2019, after discussing meeting her for the first time and wanting to have sex with her as soon as they met, Farwell instructs Birchmore to "clear all this out and Facebook."

February 1 while wearing items to disguise his appearance, and subsequently lied to State Police investigators about the length and nature of his relationship with Birchmore.

### Conclusion

Defendant Matthew Farwell killed Sandra Birchmore to prevent her from disclosing information about his crimes. A grand jury has returned a Superseding Indictment charging him with that crime. And, as set forth herein, there is ample evidence that Farwell wrongfully caused Birchmore's death to eliminate her as a potential witness. Accordingly, the government respectfully requests that the Court rule *in limine* that Birchmore's out-of-court statements are governed by the hearsay exception under Rule 804(b)(6) and may be admitted subject to a finding that the government has satisfied its preponderance of the evidence burden at trial.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:    /s/ Brian A. Fogerty
BRIAN A. FOGERTY
ELIZABETH C. RILEY
TOREY B. CUMMINGS
Assistant United States Attorneys

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

/s/ Brian A. Fogerty
BRIAN A. FOGERTY
Assistant United States Attorney

Date: August 3, 2026

25