UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MATTHEW FARWELL<br><br>Defendant | CRIMINAL No. 24-10259-DJC |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE ARGUMENT OR TESTIMONY DRAWING IMPROPER CONCLUSIONS FROM COMPLEX DNA MIXTURE EVIDENCE**

The United States of America, by Leah B. Foley, United States Attorney, and Brian A. Fogerty, Elizabeth C. Riley, and Torey B. Cummings, Assistant U.S. Attorneys for the District of Massachusetts, opposes the defendant's motion to preclude the government from accurately presenting to the jury the state of the evidence in this case. The defendant argues that the government should be limited to presenting the DNA evidence consistent with the way his retained expert characterizes it. Because the trial court's role as gatekeeper is not intended to serve as a replacement for the adversarial system, the government must be able to present the evidence and argue its significance to the jury. Here, the government has a good faith basis to believe that DNA evidence will include the defendant as a contributor to DNA mixtures on various pieces of evidence, including the portion of the ligature from which Birchmore was hung. Farwell's DNA is included on these items with strong statistical significance. The government to introduce that evidence and draw the jury's attention to it during argument.

## BACKGROUND

Criminalist Testing

On May 1, 2026, the government provided notice that it would call Stephanie Waite, Forensic Scientist IV at the Massachusetts State Crime Laboratory ("MSPCL"), to testify about her testing of various items for the presence of biological fluids. Waite will testify that, on or about March 5, 2021, the MSPCL received items from investigators at the Massachusetts State Police, including: a sexual assault evidence collection kit collected from the body of Birchmore on February 26, 2021; the underwear that Birchmore was found wearing on February 4, 2021; and the ligature from which she was found hanging on February 4, 2021. Waite will testify that sperm cells were detected on two distinct portions of Birchmore's underwear and were submitted to the DNA section of the crime laboratory. Waite may testify about how long sperm cells can survive within the body and how long they can persist on an item of clothing. She will not opine about when or how they arrived in either location on Birchmore's underwear specifically.

The government will present evidence that the defendant visited Birchmore at her Canton apartment multiple times in the month before she died, including on January 29, 2021, after which Birchmore discussed having anal sex with the defendant in the future given that she was on pelvic rest due to her pregnancy.

DNA Evidence

Elizabeth Duval, Forensic Scientist III at the MSPCL, will testify about the difference between a single source DNA profile and a mixture DNA profile. A single source profile is from one person. A mixture profile contains DNA from more than one person. She will also testify about the difference between STR and Y-STR testing, how each is conducted, and what conclusions can be drawn from each type of test. She will testify that STR testing, without

question, can identify an individual DNA profile. When a large amount of female DNA is present on an item compared to the amount of male DNA, Y-STR testing can be conducted to target the male DNA. With Y-STR testing, the results negate the female DNA so the resulting profile will only identify and apply to the male DNA in the sample. While Y-STR testing can help by eliminating female DNA and allowing a focus on the male DNA—and it can at times identify additional male profiles—results of Y-STR testing can be less statistically significant. Unlike STR testing, which identifies a profile unique to each individual, even fraternal twins, all males from the same patrilineal line will have the same Y-STR DNA.

Duval will testify about her work on this case. She will testify that stain J2 collected from the interior back crotch of Birchmore's underwear was tested for DNA. Duval will explain that a differential extraction was performed on stain J2 to attempt to create the sperm and non-sperm fractions. STR testing was performed on the non-sperm fraction of the sample and the DNA profile was interpreted as a mixture of two contributors, including male DNA, with Sandra Birchmore being assumed as one of the contributors. [1] The DNA profile from this item is at least 220 quintillion times more likely to have originated from Sandra Birchmore and Matthew Farwell than to have originated from Sandra Birchmore and an unknown, unrelated individual.

Duval will explain that Y-STR testing was also performed on the non-sperm fraction of stain J2 based on the ratio of female to male DNA and the number potential male contributors from

[1] Duval will testify about what it means to assume someone is a contributor, under what circumstances this is appropriate, and what follow up steps are conducted after an assumption. Typically, if a sample is taken from an item that one would expect a person's DNA to be on, such as an intimate sample or their undergarment, there is a reasonable scientific expectation that their DNA will be present on it and they will be assumed as a contributor. Once assumed, the forensic scientist will still manually look at the assumed profile to ensure that there is sufficient information for him or her to be assumed. If the data does not support inclusion, then the person will not be assumed.

the STR profile. She will opine that the profile was consistent with two male contributors, with one major contributor and one minor contributor. Duval will explain the concept of a major contributor, contrasting it with a minor contributor. The major DNA profile is at least 1,246 times more likely to have originated from Matthew Farwell (or a patrilineal relative) than from a randomly selected person.

Duval will explain that the sperm fraction of stain J2 underwent STR testing. STR testing of this item generated a DNA profile that is a mixture of four contributors, including male DNA, and that Birchmore was assumed to be a contributor. She will explain how female DNA can be present in a sperm sample.[2] She will explain that a comparison was made and statistics were generated in which likelihood ratios were determined. The DNA profile from this item is at least 16 quadrillion times more likely if it originated from Sandra Birchmore, Matthew Farwell, and two unknown persons than if it originated from Sandra Birchmore and three unknown, unrelated persons.

Duval will testify regarding the testing of the sample of stain E on the exterior back right side of Birchmore's underpants. Because sperm cells were detected, this sample went through differential extraction and the lab attempted to create a sperm fraction and non-sperm fraction. STR testing on the sperm fraction generated a profile interpreted as a mixture of three individuals, including male DNA. The DNA profile from this item is at least 5.5 quintillion times more likely to have originated from Matthew Farwell and two unknown individuals than from three unknown, unrelated individuals.

---

[2] Differential extraction is not always a clean separation and there can be carry-over cells from one fraction to the next.

Duval will describe the testing of the sample of the portion of the ligature found tied around Birchmore's neck. She will explain that STR testing was performed and discuss how it was performed. STR testing of this item generated a DNA profile that is a mixture of 4 contributors, including male DNA, and Birchmore was assumed as a contributor. The DNA profile from this item is at least 6.2 trillion times more likely to have originated from Sandra Birchmore, Matthew Farwell, and two unknown individuals than from Sandra Birchmore and three unknown, unrelated individuals.

Duval will explain how and why Y-STR testing was performed on the portion of the ligature. Y-STR testing generated a profile that is a mixture of at least four male contributors. A major contributor was observed. The minor profile is not suitable for comparison due to the quality of the profile. The major DNA profile is at least 158 times more likely if the profile originated from Matthew Farwell (or a patrilineal relative) than if it originated from a randomly selected individual.

## **ARGUMENT**

The Court should not preclude the government from presenting DNA evidence to the jury simply because it is inconvenient for defendant's theory of the case. Indeed, if the defendant believed that the opinions of the government's DNA experts as noticed were not the product of reliable principles or methods, his remedy was to file a motion under *Daubert v. Merrell Dow Pharms., Inc.* seeking to limit or exclude their testimony. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 596 (1993). But instead, the defendant has moved *in limine* asserting that this expert testimony was "improper" under Rules 401 and 403. Defendant did not file a *Daubert* motion related to the government's DNA experts because he had no basis to do so, as these experts' opinions are the product of reliable principles and methods. *See* Fed. R. Evid. 702.

The government intends to prove beyond a reasonable doubt, that the defendant murdered Birchmore between 9:14 and 9:43 p.m. on February 1, 2021, and that he used the ligature to stage her death as a suicide. The DNA results are important (and well supported) forensic evidence that will be introduced by an undisputedly qualified witnesses. The defense argument that the DNA results should be interpreted and presented to an expert as his expert sees fit is unpersuasive. Vigorous cross-examination and presentation of contrary evidence, rather than precluding a party from presenting its evidence is the traditional and appropriate means of attacking disparate views. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 596 (1993). In fact, the trial courts should not "determine which of several competing scientific theories has the best provenance.'" *See Milward v. Acuity Spec. Prods. Group*, 639 F.3d 11,15 (1st Cir. 2011) (*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

Here, the defendant's theory of the DNA evidence is not just competing, it is, at least as represented in prior hearings, flawed. In a previous hearing in this case, defense counsel misstated the DNA findings to Magistrate Judge Kelley. Defense counsel stated:

> What the government knows because, obviously, this was provided to the defense in discovery is that there is a probability that Mr. Farwell or someone in his paternal line was a contributor. And as the government well knows, Mr. Farwell and his twin brother were frequent visitors to Ms. Birchmore's home.

Transcript of April 28, 2026 Detention Hearing at 6: 14-19.

The defendant's argument may have been accurate if only Y-STR testing had been performed on the item. However, at the time of that hearing, Farwell had results of the STR testing which revealed that the defendant—and not anyone in his patrilineal line—was found to be included in the mixture on the ligature from which Birchmore hung. In fact, the defendant's unique

profile[3] was included in the mixture on the ligature to a degree of strong statistical significance. While the government was able to correct this assertion at the detention hearing and ensure that the magistrate judge had the full state of the evidence, it bears highlighting that it was the defendant, and not the government, that failed to use appropriate scientific language in a prior hearing and, ultimately, mischaracterized the DNA evidence.

Farwell may argue that he failed to notify the magistrate judge of significantly inculpatory evidence because he plans to have a defense expert attempt to rebut it. In fact, the defendant noticed an expert who intends to attempt to confuse or distract the jury with the concept of adventitious inclusion of DNA, a concept that is not a possibility in the present case. Adventitious inclusion can cause a non-contributing person's DNA profile to statistically appear in a complex mixture because a person with whom they share alleles—like a close relative—is included in the mixture and pulls them in. Specifically, the defendant's expert report notes, generally, that "adventitious inclusion of relatives in a DNA mixture is not new" and that "relatives of a true contributor can be adventitiously included in the same DNA mixture even though they are true non-contributors." However, this could not have happened in this case.

There is extraordinarily strong statistical support for the fact that the defendant is included in the DNA mixture on the ligature and on Birchmore's underwear. The articles cited by the defendant's expert stand for the proposition that, because there is such strong support for the defendant being included, *his* patrilineal relatives may be adventitiously included when *they* are true non-contributors. The defendant's presence in the DNA samples found on these items are nowhere near the low numbers that one may see if someone's sample were included adventitiously.

---

[3] The defendant highlights that he is a twin but declines to mention that he is a fraternal twin and, thus, has a unique DNA profile.

In other words, playing out Farwell's adventitious inclusion hypothetical, based on the observed strong support for inclusion of Matthew Farwell's unique DNA profile, adventitious inclusion could work to draw-in Billy Farwell; it would not explain why Farwell was included, in such a significant quantity and to such strong statistical significance, in the first instance. This adventitious inclusion argument, while creative given the facts of this case, is not supported by the evidence or the science and the government should not be required to limit its presentation of the evidence to conform with what will be a thoroughly debunked defense theory at trial.

While the defense theory regarding the STR results is unpersuasive and arguably misleading, the government is not moving to preclude the defendant from making such an argument. That is because longstanding precedent holds that courts should have an expectation that the parties will present expert witnesses espousing different views and, in turn, their testimony will be tested by the adversarial process and evaluated by the jury. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 595 (1993) (holding that the respondent was "overly pessimistic about the capabilities of the jury and of the adversary system generally"). Similarly, it has been held that "vigorous cross-examination, presentation of contrary evidence… are the traditional and appropriate means of attacking such shaky but admissible evidence." *See Daubert* at 596.

In addition to being unpersuasive and misleading, the defense theory regarding the state of the DNA evidence is also not binding on the government. The government is not required to perpetuate the misstatements made to the Court during a detention hearing simply because a defense expert has a different opinion. STR testing, which reveals unique DNA profiles, was performed on the portion of the ligature that was used to hang Birchmore. That testing revealed strong statistical support for the defendant's inclusion as a contributor to that mixture. The government is permitted to say so.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: /s/ Elizabeth C. Riley
TOREY B. CUMMINGS
BRIAN A. FOGERTY
ELIZABETH C. RILEY
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

_/s/ Elizabeth C. Riley________
ELIZABETH C. RILEY
Assistant United States Attorney

Date: August 17, 2026