UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MATTHEW FARWELL<br><br>Defendant | CRIMINAL No. 24-10259-DJC |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S RULE 702 MOTION *IN LIMINE* TO EXCLUDE THE EXPERT TESTIMONY OF DR. MICHAEL M. BADEN, M.D.**

The United States of America, by Leah B. Foley, United States Attorney, and Brian A. Fogerty, Elizabeth C. Riley, and Torey B. Cummings, Assistant U.S. Attorneys for the District of Massachusetts, opposes defendant Matthew Farwell's motion *in limine* to exclude the expert testimony of Dr. Michael M. Baden, M.D. ECF No. 181. Farwell moves to exclude Dr. Baden's testimony under Fed. R. Evid. 702, arguing (1) his methodology and its application in this case are unreliable because, according to Farwell, medical literature indicates that certain injuries Sandra Birchmore suffered could also be consistent with death by suicide; (2) Dr. Baden did not review particular pieces of evidence; and (3) Dr. Baden's assessment regarding the significance of Birchmore's hair being tangled in the ligature and his conclusion that because Birchmore did not die by suicide, the scene was staged, are both the product of "analytical gaps." Farwell's arguments are without merit.

## Introduction

As a threshold matter, the government has noticed two expert witnesses to testify regarding Birchmore's injuries and the cause and manner of her death: Dr. William Smock, M.D., and Dr. Baden. Dr. Smock is an emergency medicine physician with nearly 40 years of experience

regarding the examination and investigation of injuries in living and deceased patients. Particularly relevant to this case, Dr. Smock is a leading authority on asphyxia-related deaths, including manual and ligature strangulation. Dr. Baden is a forensic pathologist who has served as, among other things, the Chief Medical Examiner for New York City and the Director of the New York State Police's Medicolegal Investigations Unit. If both witnesses were called to testify at trial, they would cover much of the same ground, with Dr. Smock diving deeper into more topics that are especially relevant in this case. Therefore, to avoid presenting cumulative evidence, the government does not intend to call both experts. Instead, the current plan is to introduce Dr. Smock's testimony, reserving Dr. Baden for a rebuttal case, if necessary.

On the substance of Dr. Baden's opinion, Farwell purports to challenge Dr. Baden's methodology and his application of that methodology in this case. However, the gist of Farwell's argument for excluding Dr. Baden's testimony is that Farwell has cherry-picked aspects of medical literature that purport to suggest that the injuries Dr. Baden notes could also be consistent with the conclusion that Birchmore died by suicide. Farwell takes Dr. Baden's observations in isolation, cites portions of medical literature that he claims suggest the injuries could be consistent with suicide, and concludes that Dr. Baden's reasoning is flawed. Farwell's argument is unavailing for several reasons. It fails to account for the fact that Dr. Baden's opinion does not rest on isolated observations. *See Milward v. Acuity Spec. Prods. Group*, 639 F.3d 11, 23 (1st Cir. 2011) (holding the district court erred in reasoning that because no one piece of evidence in isolation support the proffered conclusion, a conclusion based on the totality of the evidence was unreliable) (citing *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 789 (7th Cir. 2000) (holding that an expert's reliance on individual pieces of evidence, insufficient in themselves to prove a point, "did not render his opinion speculative")). Nor do the sources Farwell cites exclude the possibility that the

observed injuries are the result of a homicide. And, as the First Circuit has held, these sorts of challenges to the underpinnings of Dr. Baden's opinion are quintessential cross-examination, not a basis to prevent the jury from hearing the testimony.

Farwell also alleges that Dr. Baden's opinion is based on erroneous and insufficient facts. ECF No. 181 at 13–16. Not so. Dr. Baden has undertaken an analysis of the observed physical and medical injuries that Birchmore suffered. From those observations and related evidence, he has opined, as a forensic pathologist would, about the cause and manner of death. In 2024, he took into account the possibility that Birchmore died by suicide—indeed, that is what the Office of the Chief Medical Examiner (OCME) had written in the autopsy report and the Massachusetts State Police had publicly concluded at the time. Moreover, Farwell fails to explain why the absence of DNA results undermines Dr. Baden's conclusion based on the evidence he reviewed.

Dr. Baden's opinions do not suffer from analytical gaps. Farwell contends that Dr. Baden has no basis to testify regarding the significance of the fact that Birchmore's hair was entangled with the ligature or the conclusion that Birchmore's body was staged. However, Farwell fails to account for the fact that Dr. Baden's opinions rest on more than 50 years of experience as a forensic pathologist, including his experience examining women who have died by suicidal hanging. Farwell also fails to acknowledge that as a matter of logic, Dr. Baden can infer that the scene that purports to show Birchmore in suicidal hanging position was staged, because the evidence strongly supports the conclusion that Birchmore died in a different way: by homicidal asphyxia and strangulation. *See, e.g.*, *United States v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002) (holding that an expert may testify regarding inferences from the evidence) (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

## Background[1]

### I. Dr. Baden's Professional Experience.

Dr. Baden is a board-certified forensic pathologist. He worked as a medical examiner in the Officer of the Chief Medical Examiner for New York City from 1961 to 1985 and served as the Chief Medical Examiner from 1978 to 1979. From 1985 to 2011, Dr. Baden served as the Director of the New York State Police's Medicolegal Investigation Unit, which is a specialized unit that provides consultant services in death investigations.

Dr. Baden worked as a medical examiner for 50 years and performed more than 20,000 autopsies. In addition to this extensive practical experience, he has held professorial teaching appointments at Albert Einstein Medical School, Albany Medical College, New York University School of Medicine, New York Law School and John Jay College of Criminal Justice. He has consulted for the FBI, Department of Veterans Affairs, ATF, DEA, and U.S. Department of Justice. Dr. Baden has also testified as an expert in federal and state court and authored numerous publications in the field. *See* Curriculum Vitae of Dr. Michael M. Baden, M.D., attached as Exhibit A.

### II. Dr. Baden's Role In The Investigation.

In 2024, attorneys representing Birchmore's next-of-kin engaged Dr. Baden to evaluate the evidence regarding Birchmore's death. As part of that evaluation, Dr. Baden reviewed the autopsy and toxicology reports, crime scene and autopsy photos, autopsy x-rays, and the Stoughton Police report of the internal affairs investigation conducted following Birchmore's death. That autopsy report indicated that Birchmore died by suicide.

[1] The facts of the case have been briefed extensively and a full description of the crimes and investigation are included in the government's trial brief. ECF No. 179.

## III. <u>Dr. Baden's Expert Testimony</u>.

At trial, the government could call Dr. Baden to testify regarding the following topics:

### A. The Autopsy Process.

Dr. Baden can testify about the process of conducting an autopsy. He can explain the steps taken in cases of suspected asphyxia deaths and the factors to consider in determining the cause and manner of death.

### B. Birchmore's Injuries and Other Evidence.

Dr. Baden can testify regarding the injuries that Birchmore sustained. Specifically, Dr. Baden can testify that, based on injuries he has observed in the materials, Birchmore would have lost consciousness in less than 10 seconds and died within a few minutes.

Dr. Baden can testify that Birchmore presented at autopsy with petechial hemorrhages in her eyes as well as a hemorrhage of the left sternothyroid muscle and a fracture of her right hyoid bone. Dr. Baden's opinion is that all of the pathologic findings are commonly found in homicidal strangulation, both manual and with use of a ligature.

Furthermore, Dr. Baden can testify that based on his 50 years of experience and according to his review of the medical literature, the foregoing injuries are not commonly present in suicidal hanging deaths. He will explain that in his experience and through his research, fracture of the hyoid bone is very uncommon in suicidal hangings, especially in partially suspended hangings such as the position in which Birchmore's body was found.

Dr. Baden will cite the fact that Birchmore's hair was tangled in the ligature as inconsistent with his experience with suicidal hangings. He will also explain that the ligature tightly applied and crossing Birchmore's mid-neck horizontally would have compressed the carotid arteries

bilaterally. The appearance and location of the ligature was also, in Dr. Baden's opinion, consistent with homicidal strangulation rather than suicidal hanging.

**C. Cause and Manner of Birchmore's Death.**

Dr. Baden can testify that his opinion is that Birchmore's cause of death was asphyxia and strangulation and that her manner of dead was homicide.

## **Legal Standard**

### **I. Rule 702 Authorizes Admission of Expert Testimony.**

Under Rule 702, expert testimony is admissible if the proponent shows by a preponderance of the evidence that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"*Daubert* establishes that before admitting expert testimony, the trial court must fulfill its 'gatekeeping role' by making an independent determination that the expert's proffered . . . knowledge is both reliable and relevant." *United States v. Crater*, 93 F.4th 581, 590 (1st Cir. 2024) (quoting *United States v. Phillipos*, 849 F.3d 464, 470 (1st Cir. 2017) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993))).

### **II. The Court Should Admit Testimony That Is Based on Sufficient Facts or Data Which Is The Product of Reliable Principles and Methods.**

Courts may exclude expert opinions that are "connected to existing data only by the *ipse dixit* of the expert," or opinions arising from "too great an analytical gap between the data and the opinion proffered." *See Milward*, 639 F.3d at 15 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). However, "[t]his does not mean that trial courts are empowered 'to determine which

of several competing scientific theories has the best provenance.'" *See Milward*, 639 F.3d at 15 (quoting *Ruiz-Troche*, 161 F.3d at 81). "*Daubert* does not require that the party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct . . . It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *Mooney*, 315 F.3d at 63 (quoting *Ruiz-Troche*, 161 F.3d at 85).[2] "The object of *Daubert* is 'to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *See Milward*, 639 F.3d at 15 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). And, ultimately, "the fact that another explanation might be right is not a sufficient basis for excluding [the expert testimony]. 'Lack of certainty is not, for a qualified expert, the same thing as guesswork.'" *Id.* at 22 (quoting *Primiano v. Cook*, No. 06-15563, 2010 U.S. App. LEXIS 8859 (9th Cir. Apr. 27, 2010)). Any alleged flaws "go to the weight of [the expert's opinion], not its admissibility. There is an important difference between what is unreliable support and what a trier of fact may conclude is insufficient support for an expert's conclusion." *Milward*, 639 F.3d at 22.

"[O]nce a trial judge determines the reliability of the proffered expert's methodology and the validity of his reasoning, the expert should be permitted to testify as to the inferences and conclusions he draws from it, and any flaws in his opinion may be exposed through cross-examination or competing expert testimony." *Mooney*, 315 F.3d at 63 (citing *Ruize-Troche*, 161

[2] "When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis . . . on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Advisory Cmt. Note to Fed. R. Evid. 702.

F.3d at 85); *see also United States v. Jackson*, 58 F.4th 541, 552 (1st Cir. 2023) (stating that even "where 'the factual underpinning of an expert's opinion is weak' but the methods are otherwise found to be reliable, such an issue is 'a matter affecting the weight and credibility of the [expert's] testimony'—that is, 'a question to be resolved by the jury.'") (quoting *Martinez v. United States*, 33 F.4th 20, 24 (1st Cir. 2022)); *see also Milward*, 639 F.3d at 15 ("So long as an expert's scientific testimony rests upon ''good grounds,' based on what is known,' it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities.") (quoting *Daubert*, 509 U.S. at 590, 596).

**III. Expert Testimony is Subject To Rule 403's Balancing Test.**

Like all evidence, expert testimony is subject to Rule 403's balancing test to determine if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, wasting time, or needlessly presenting cumulative evidence." *See United States v. Montas*, 41 F.3d 775, 783 (1st Cir. 1994); Fed. R. Evid. 403. "[T]he standard for exclusion under Rule 403 is a high one." *United States v. Pires*, 138 F.4th 649, 670 (1st Cir. 2025) (quoting *United States v. Soler-Montalvo*, 44 F.4th 1, 16 (1st Cir. 2022)). However, given the potential power and complexities inherent in expert testimony, courts "exercise[] more control over experts than over lay witnesses." *See Daubert*, 509 U.S. at 595.

**IV. Evidentiary Hearing Is Not Required.**

It is well settled that the Court is not required to conduct an evidentiary hearing to determine the admissibility of expert testimony under Rule 702. *See Crater,* 93 F.4th at 590 ("[T]here is no particular procedure that the trial court is required to follow in executing [its] gatekeeping function, and we have specifically rejected the argument that a district court must necessarily hold an evidentiary hearing.") (quoting *Smith v. Dorchester Real Estate, Inc.*, 732 F.3d 51, 64 (1st Cir. 2013) and *Phillipos*, 849 F.3d at 471).

## Argument

### I. The Court Should Deny the Motion to Exclude Dr. Baden's Expert Testimony.

The Court should deny Farwell's motion to exclude Dr. Baden's testimony because his opinions regarding Birchmore's injuries and the cause and manner of her death are well supported by his extensive professional experience as a forensic pathologist and medical examiner as well as the medical literature.

#### A. Dr. Baden's opinions are the product of reliable principles and methods applied to the facts of this case.

Farwell argues that the Court must exclude Dr. Baden's testimony because Farwell offers a different interpretation of the medical literature's assessment of the prevalence of petechial hemorrhages, facial abrasions, and hyoid fractures in suicidal hangings versus homicidal strangulations. ECF No. 181 at 8–13. Farwell is wrong for three reasons.

First, the Court should reject this challenge because Farwell invites the Court to do what the First Circuit has said it should not, which is to exclude testimony that is based on the confluence of multiple factors simply because the individual factors considered in isolation are subject to alternative explanations. *See Milward*, 639 F.3d at 23 (holding the district court erred in reasoning that because no one piece of evidence in isolation supports the proffered conclusion, a conclusion based on the totality of the evidence was unreliable).

Moreover, in service of this flawed argument, Farwell misquotes Dr. Baden's report. In an effort to challenge Dr. Baden's reliance on the existence of petechial hemorrhages as a piece of evidence of suicidal asphyxia, Farwell misquotes Dr. Baden's report to suggests that Dr. Baden opined that petechial hemorrhages alone "are commonly found in homicidal strangulation—manual and ligature—but not in suicidal hanging." ECF No. 181 at 8. Then, Farwell goes on to quote a passage from Spitz and Fisher's *Medicolegal Investigation*, which states "[o]ver 50 percent

of suicidal hangings show petechial hemorrhages." *See* Spitz and Fisher, *Medicolegal Investigation of Death*, 5th Ed. (2020), at 409. Farwell presents this as an example of Dr. Baden offering an opinion that is at odds with the literature he cites. The problem is Farwell uses incomplete excerpts of Dr. Baden's report, omitting the preceding sentences that reveal that it is the combination of several "pathologic findings that are commonly found in strangulation . . . not in suicidal hangings." *See* Baden Report at 2, attached as Exhibit B. What Farwell does not put before the Court is the full passage from Dr. Baden, which is not inconsistent with the literature:

> The photographs show a very tightly applied ligature crossing the mid-neck horizontally that would have compressed the carotid arteries bilaterally and would have caused a loss of consciousness in less than ten seconds, and death within a few minutes. *There were prominent petechial hemorrhages in the eyes and skin above the ligature, an abrasion on the chin, hemorrhages in neck muscle and a fracture of the hyoid bone.* All of these pathologic findings are commonly found in homicidal strangulation—manual and ligature—but not in suicidal hangings.

*See* Baden Report (Ex. B) at 2 (emphasis added). And Farwell does the same thing—mistakenly attributing a conclusion about a confluence of evidence to its constituent parts—in his attack on Dr. Baden's reference to the fractured hyoid bone. ECF No. 181 at 10. The bottom line is Dr. Baden's testimony does not rise or fall with any one of the facts identified in his disclosure. Therefore, Farwell's attack on the individual parts is unavailing.

Second, Farwell attacks various components of Dr. Baden's opinions by citing literature that he claims suggests the injuries in isolation could also be consistent with suicide. Even putting aside that he misquotes Dr. Baden's report, he still overstates the degree to which the literature supports his argument. The literature he cites does not say that Dr. Baden's opinions about the cause and manner of death must be wrong. Rather, the literature, at best for Farwell, says the isolated injuries could also be consistent with suicide. For example, the literature indicates that petechial hemorrhages alone occur in more than 50 percent of suicidal hangings. *See* Spitz and

Fisher, *Medicolegal Investigation of Death*, at 409. Importantly, that does not rule out their existence in homicidal strangulations. At trial, inherently, some matters that are the proper subject of expert testimony will be in dispute. Therefore, not surprisingly, it is well settled that alternative theories and interpretations of the evidence do not require excluding expert opinion testimony. *See, e.g., Mooney*, 315 F.3d at 63 (holding that any flaws in expert testimony are exposed through cross-examination or competing experts). It merely underscores the need for a jury to resolve the dispute after considering cross-examination and any additional expert testimony on the subject.

Third, Farwell criticizes Dr. Baden for not explaining the absence of other evidence that Birchmore died by asphyxia and strangulation. ECF No. 181 at 11–12. Farwell cites the purported absence of defensive wounds and his claim that there is no hemorrhage at the site of the hyoid fracture. On the absence of defensive wounds, Dr. Baden does indeed cite evidence of resistance: Birchmore's hair entangled with the ligature. *See* Baden Report (Ex. B) at 3. Dr. Baden provides the further explanation that the injury Birchmore "sustained would have caused a loss of consciousness in less than ten seconds." *See* Baden Disclosure at 2, attached as Exhibit C.

And Farwell's reference to the absence of a hemorrhage at the site of the hyoid fracture is a red herring. ECF No. 181 at 10. The medical examiner identified an acute, perimortem fracture of Birchmore's hyoid bone at autopsy. By all accounts, this injury occurred at or around the time of Birchmore's death. Dr. Smock personally inspected the hyoid bone and requested that high-resolution photographs and CT scans be taken of the hyoid bone. Dr. Smock noted that there was a hemorrhage associated with the fracture.[3] He also requested that a forensic anthropologist examine the scans of the hyoid bone. That forensic anthropologist confirmed that Birchmore's

[3] While the medical examiner did not dissect the hyoid bone to determine whether it was at the fracture site, there is clear discoloration suggesting hemorrhage at the right greater horn of the hyoid bone.

hyoid bone had been unfused and that it had suffered a perimortem, inward/medial fracture at the right greater horn. Farwell suggests that because Dr. Christensen, a forensic anthropologist, did not note a hemorrhage at the hyoid bone, one must not exist. This is flawed. First, Dr. Christensen is a forensic anthropologist who critically evaluated the scans, but not the high-resolution photographs of the hyoid bone that Dr. Smock commissioned.[4] Dr. Christensen performed a radiological review of the hyoid bone from her lab in Quantico after it had been shipped to her laboratory in Huntsville for imaging. Dr. Christensen did not review the twenty-two photographs of the hyoid bone before it was sent for imaging. A hemorrhage at the fracture site would not appear on the scans that Dr. Christensen critically evaluated so an absence of her noting such a fracture is not surprising.

The defense expert, Dr. Andrew, makes only a passing reference to the existence or lack of hemorrhage associated with the fracture, stating that Dr. Smock's "finding of hemorrhage associated with the hyoid bone fracture" was an "interpretive overreach" unsupported by the "post fixation photographic images of the hyoid bone." Dr. Andrew is notably silent on the medical examiner's observation of the hemorrhage of the left sternothyroid muscle, suggesting bilateral pressure on the neck. The presence of the acute hemorrhage of the left sternothyroid muscle, as noted by the medical examiner, is evidence that Birchmore was alive when she suffered this injury.

**B. Dr. Baden's opinions are based in fact.**

Farwell argues that Dr. Baden's opinions are based on erroneous or insufficient facts because Dr. Baden did not review Birchmore's mental health records or the subsequently completed DNA test results. However, these items do not undermine Dr. Baden's opinions.

[4] Farwell incorrectly states that Dr. Capo Martinez, rather than Dr. Smock took these photographs.

The context of Dr. Baden's review reveals why Birchmore's mental health records do not affect the soundness of his opinions. When Dr. Baden was engaged by Birchmore's next-of-kin to evaluate the circumstances of her death, it was against the backdrop of the OCME's ruling and State Police conclusion that Birchmore died by suicide. Those were the facts as presented to Dr. Baden. No historical references to suicidal ideations in the medical records could have provided a stronger bias in favor of a suicide finding. Nevertheless, Dr. Baden, based on his evaluation of the physical and medical evidence, came to the opposite conclusion.

Neither do the DNA test results undermine Dr. Baden's opinions. Dr. Baden's role was to examine evidence regarding the injuries to Birchmore and opine about their significance and the cause and manner of her death. The DNA evidence that Farwell cites does not change that fundamental analysis and conclusion. The absence of Farwell's DNA under Birchmore's fingernails does not make it less likely that she suffered the injuries Dr. Baden observed. Similarly, Farwell does not explain precisely how Dr. Baden's failure to discuss the existence of a mixture of likely Farwell DNA in Birchmore's underwear and the exclusion of Farwell as the biological father undermines Dr. Baden's opinions. Merely stating that Dr. Baden did not consider it does not demonstrate why he should have done so.

### C. Dr. Baden's opinions contain no "analytical gaps."

Farwell identifies two aspects of Dr. Baden's testimony that he claims are unsupported and arise from analytical gaps: Dr. Baden's observations that Birchmore's hair was entangled with the ligature, which is consistent with resistance during homicidal strangulation, and that the ligature was tied to a doorknob to give the appearance of a suicidal hanging. ECF No. 181 at 16–17. These observations and conclusions are well supported.

To begin, Dr. Baden has participated in roughly 20,000 autopsies over 50 years. His extensive experience observing and examining persons who have died by suicidal hanging

provides a sufficient and unique basis from which to opine about the very specific fact regarding Birchmore's hair placement. Here, Farwell, too, cites no medical literature on the subject. And other than concluding that Dr. Baden cannot rely on his experience alone, he fails to explain why such robust professional experience is insufficient.

The Court should also reject Farwell's attempt to exclude Dr. Baden's opinion that the ligature was tied around the doorknob to give the scene the appearance of a suicidal hanging because that conclusion is a reasonable inference from his well-supported opinion that Birchmore died by homicidal strangulation. ECF No. 181 at 17. If Birchmore was killed by strangulation either manually or with a ligature, the ligature would not have been in the position depicted in the scene photos that Dr. Baden reviewed. Accordingly, Dr. Baden can testify that the ligature was moved to the doorknob, giving the scene the appearance of a suicidal hanging. *See Mooney*, 315 F.3d at 63 (holding that an expert may testify regarding inferences from the evidence).

### D. The probative value of Dr. Baden's opinions far outweighs any risk of undue prejudice.

Applying Rule 403's balancing test, the Court should decline to exclude Dr. Baden's expert testimony. The cause and manner of Birchmore's death are critically important disputed facts in this case. Dr. Baden's testimony is based on half a century of relevant professional experience and a review of physical and medical evidence in this case. Notwithstanding Farwell's attempt to pick apart the bases for Dr. Baden's opinion, Dr. Baden's summary report and the government's disclosure demonstrate that he applied the requisite level of intellectual rigor in forming his opinions. Accordingly, his opinion reflects a reliable methodology applied to the facts, not merely a "patina" of science, and the Court should hold that the probative value is not substantially outweighed by danger of unfair prejudice or confusion. Fed. R. Evid. 403.

**II. The Court Should Deny the Motion to Exclude Dr. Baden's Expert Testimony without Conducting an Evidentiary Hearing.**

The Court should deny Farwell's motion without conducting an evidentiary hearing. The First Circuit has repeatedly held that a trial court need not conduct an evidentiary hearing in order to fulfill its gatekeeping function. *See Crater*, 93 F.4th at 591; *see also Phillipos*, 849 F.3d at 470–71. Here, Dr. Baden's report, the government's disclosure, and the parties' briefing provide a sufficient record from which the Court can apply *Daubert* and rule that Dr. Baden's expert testimony is admissible.

## Conclusion

For the foregoing reasons, the government respectfully requests that the Court deny defendant Matthew Farwell's motion to exclude the expert testimony of Dr. Michael M. Baden, M.D., and rule that his testimony is admissible without conducting an evidentiary hearing.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: /s/ Brian A. Fogerty
BRIAN A. FOGERTY
ELIZABETH C. RILEY
TOREY B. CUMMINGS
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

/s Brian A. Fogerty
BRIAN A. FOGERTY
Assistant United States Attorney

Date: August 17, 2026