**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | Docket No. 1:24-cr-10259-DJC |
| v. | ) | |
| | ) | |
| | ) | |
| MATTHEW FARWELL | ) | |

**DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTION IN LIMINE TO ADMIT DECEDENT'S STATEMENTS PURSUANT TO FRE 804(b)(6)**

Now comes the defendant Matthew Farwell and hereby OPPOSES the Government's Motion in Limine to Admit Decedent's Statements Pursuant to the Federal Rules of Evidence (FRE) 804(B)(6). (D.E. 190).

The government, in its motion, argues that decedent Sandra Birchmore's out of court hearsay declarations ought to be admitted as evidence against the defendant at trial pursuant to the principle of forfeiture by wrongdoing. *United States v. Houlihan*, 92 F.3d 1271, 1280 (1st Cir. 1996).

First and foremost, the government must establish that Ms. Birchmore qualifies as a witness or potential witness under this doctrine. *Giles v. California*, 554 U.S. 353 (2008). The government next must prove that Mr. Farwell engaged in: (1) wrongful conduct, (2) intended to cause the witness's unavailability, and (3) actually caused the witness's unavailability. FRE 804(b)(6).

The government's motion fails to meet this burden.

**The Indictment**

Mr. Farwell is charged in count one of the above-numbered superseding indictment (D.E. 63) with Killing a Witness in violation of 18 USC §1512 (a)(1)(C):

(a)(1) Whoever kills or attempts to kill another person, with intent to—

(C) prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

The government declined to charge Mr. Farwell pursuant to 18 USC §1512 (a)(1)(A):[1]

(a)(1) Whoever kills or attempts to kill another person, with intent to—

(A) prevent the attendance or testimony of any person in an official proceeding;

**Witness/Potential Witness**

Having failed to charge Mr. Farwell with killing Ms. Birchmore with intent to prevent her attendance or testimony in an official proceeding, the government now avers in its motion that it "will prove by at least a preponderance of evidence at trial—that (a) Farwell caused Birchmore's unavailability (b) by a wrongful act (c) undertaken with the intention of preventing Birchmore from testifying at a future trial."

The government alleges that Matthew Farwell and Sandra Birchmore engaged in a years-long intimate relationship that began a month before her sixteenth birthday and ended with her death at age twenty-three. Mr. Farwell was married for the majority of that time. He and his wife were expecting their third child at the time of Ms. Birchmore's passing. Ms. Birchmore herself was pregnant with another married man's child at the time of her death; she told Mr. Farwell that he was the father. Mr. Farwell was a police officer for the town of Stoughton, and the government alleges that he and Ms. Birchmore, at times, carried on this illicit affair while he was on duty.

[1] Alternatively, the defense can only surmise that the government presented the charge pursuant to paragraph (C)and the Grand Jury returned a No True Bill.

To the extent that these acts qualify as criminal conduct: statutory rape, wage theft, civil rights violation under color of law, the government has identified Sandra Birchmore as both a victim and a witness.

The government now alleges in its motion in limine that Ms. Birchmore was a witness or potential witness as defined by FRE 804(b)(6) and *United States v. Houlihan*, 92 F.3d 1271, 1280 (1st Cir. 1996).

In support of its request the government proffers that Ms. Birchmore threatened to reveal the extramarital affair between herself and Mr. Farwell and her pregnancy to Mr. Farwell's wife; that she disclosed details of her affair with the defendant to certain friends and family; and that she made inquiries about obtaining a civil court order of child support. The government offers no evidence that Ms. Birchmore ever evinced any intent to testify against the defendant in any potential criminal proceeding. In fact, the government offers no evidence that Ms. Birchmore ever demonstrated any intent to report the defendant for criminal conduct to any law enforcement agency.

On the contrary, the government omits from its motion evidence that Ms. Birchmore affirmatively declared to a prosecution witness that she would NOT make any such report. The individual who was later determined to be the father of Birchmore's fetus told the FBI that Birchmore told him that she began a sexual relationship with Farwell, a married police officer, when she was fifteen years old. This individual tried to convince her to report this and looked up the statute of limitations for her. Birchmore replied that she would NOT report it; she was concerned about "having to put her sex life on trial".

The government ignores and omits this powerful proof because it does not support their narrative. This is a recurrent theme in their case. Instead, in its motion, the prosecution points the

Court to a telephone call made by a third party to the Stoughton Police Department two weeks prior to Ms. Birchmore's death.

"On January 20, 2021, Birchmore's friend calls the Stoughton Police Department and tells a Stoughton Police employee that her friend, Sandra Birchmore, has been having sex with Officer Matthew Farwell." (D.E. 190, ¶ v., pg. 14)

The recording of this call was subsequently destroyed by law enforcement; the defense has never heard it.[2] However, this so-called "friend" and another individual[3] made and recorded a 3-way call to Ms. Birchmore the same day, January 20, 2021, the report described in the government's motion was made to the Stoughton Police Department (SPD).

*Excerpt of recorded call: 3:35 – 4:00*

MS. _____________: ….I've been good to you, nothing but good to you.

MS. BIRCHMORE: Really, so you called --

MS. _____________: (Inaudible)

MS. BIRCHMORE: Hold on a second. So you say calling the baby's father's work is being good?

MS. _____________: I called the baby's father's work because you didn't pay me to make a police report. Yes.

MS. BIRCHMORE: Okay. And you know what that did for you? Nothing.

MS. _____________: Nothing, great, but now I can take you to court and you know what, I'm not even going to take you to court because I'm not Sandra Birchmore who takes everyone to court. I'm just, you know what, Sandra, I don't care.

*Later in the call: 13:50 – 16:00*

MS. BIRCHMORE: -- Ok put it this way, even if I fix things with you like at this point?

---

[2] Law enforcement witnesses report that the recording of the call was not preserved and automatically deleted after 12 months.

[3] This individual, a mutual acquaintance of the two women, is identified in the transcript; she laughs but does not speak during the call.

MS. ______________: I don't want to fix things, Sandra. That's the thing. I don't want to fix things.

MS. BIRCHMORE: Like you, no, but like even in future we decided to like I wouldn't.

MS. ______________: Well, I don't ever want to fix things. I don't want to be friends with you, Sandra. I don't want to be your friend. Like I don't need someone that treats me the way you did in my life.

MS. BIRCHMORE: And I don't need somebody in your life because, in my life because you could have just fucked the whole, the child over completely so.

MS. ______________: That's great. You shouldn't have been having sex with a married man in the first place.

MS. BIRCHMORE: But it's still none of your business.

MS. ______________: That's great. I called to make my police report. That's why –

MS. BIRCHMORE: But you also said other things that was none of your business. Did you or did you not.

MS. ______________: I said I would like to talk to the detective that is having sex with her. I didn't --.

MS. BIRCHMORE: Yeah, I guess you didn't answer the phone.

MS. ______________: That's good. I don't really care. She doesn't have to answer the phone. I got my point across. It's fine, Sandra, when you stop being a pathological liar, that's when things will look up for you.

MS. BIRCHMORE: They're looking up just fine for me.

MS. ______________: Things are looking fine for you? That's not --

MS. BIRCHMORE: The problem is for you.

MS. ______________: There's no problem for me. I'm happy as a clam. I just need to get paid and I'm good.

MS. BIRCHMORE: Yeah, but see --

MS. ______________: I'm happy as a clam, Sandra.

MS. BIRCHMORE: Yeah, not for long because I will be calling Color Street[4] again.

MS. _____________: Okay, that's good. That's a threat so.

MS. BIRCHMORE: Not really. I called them once. That's not even a threat.

- Recording of call to be filed under seal as Exhibit A.

This excerpt contradicts the government's characterization of the caller as Ms. Birchmore's "friend". It also makes clear that her objective, in reaching out to the SPD, was to collect money owed to her by Ms. Birchmore. Furthermore, this transcript shows that the only transgression reported in the call to SPD was a consensual adult extramarital affair between the defendant and Ms. Birchmore, not a crime. Finally, Ms. Birchmore's own words in this recorded dialogue make clear that her only desire was to seek revenge against the caller, her so-called "friend".

The government, in its motion, refers to a text message where Sandra Birchmore told Matthew Farwell that something he did during an encounter made her fear him. She also texts three friends about this alleged frightening encounter with Farwell, describing concerns for her own safety and the safety of the baby. She tells at least one friend that Farwell grabbed her phone out of her hand, removed her computer from her hand, and shoved her.

Assuming arguendo this account constitutes a single episode of earlier abuse, the prosecution offers no evidence it was intended to dissuade Birchmore from testifying against the defendant in some future theoretical criminal proceeding. The government doesn't even attempt to make that claim in their motion.

**Wrongful Conduct/Causation/Manner of Death**

---

[4] Color Street is a direct sales nail polish applique company: https://support.colorstreet.com/hc/en-us/articles/360056548514-How-do-I-become-a-Stylist. The caller, Ms. ____ worked for this company as an independent seller/stylist. Ms. Birchmore's "threat" to contact her employer as retaliation for the call to the Stoughton Police Department is expressed here.

The government alleges that Matthew Farwell murdered Sandra Birchmore, and by this wrongful conduct caused her to be unavailable as a witness at trial. Sandra Birchmore's manner of death is the paramount factual issue in this case. The government states, in its motion in limine that two independent experts have reviewed the evidence and determined that Birchmore's death was a homicide.

The prosecution, however, omitted from its brief that they have conferred with at least four other experts, two board certified forensic pathologists, a forensic anthropologist, and a radiologist. Each of these four experts have communicated findings to the government that contradict certain material opinions and/or observations of the aforementioned "independent experts". In keeping with their theme, the prosecution will not call as witnesses half of these dissenting experts at this trial.

The government also failed to inform the Court in its pleading that the defense has served expert notice of its intent to call a board-certified forensic pathologist, a psychiatrist, a pattern impression expert, and two forensic anthropologists whose expert opinions will refute the testimony of their two "independent experts"[5]. Indeed, one of the forensic anthropologists on the defense witness list is the FBI forensic anthropologist consulted by and subsequently cast-off by the government.

Finally, the board-certified pathologist who personally performed the autopsy on Sandra Birchmore now opines, having sat through repeated meetings with the prosecution as will be discussed below, that the manner of death is "medically undetermined," not homicide. This contradicts the prosecution's two privately retained doctors.

---

[5] The defense has also filed FRE 702/Daubert challenges regarding the two.

Sandra Birchmore's body was discovered in a seated hanging position in her apartment in Canton, by first responders on February 4, 2021. Her death was ruled a suicide by asphyxia by board certified forensic pathologist, Dr. Maria Del Mar Capo-Martinez, of the Office of the Chief Medical Examiner (OCME).

On December 29, 2022, Darlene Smith, as the personal representative of the estate of Sandra Birchmore, filed a civil wrongful death claim in the Norfolk County Superior Court against Matthew Farwell, William Farwell, William Devine, the Stoughton Police Department, and the Town of Stoughton. The civil complaint alleges that the defendants "through their inappropriate and undue influence, ultimately led her [Birchmore] to allegedly take her own life". (Complaint attached as Exhibit B). This complaint has never been amended to withdraw suicide as Sandra Birchmore's manner of death. (Docket sheet attached as Exhibit C).

On January 3, 2024, Ms. Smith's attorney Steven J. Marullo wrote to the OCME requesting information as to the "fracture of the hyoid bone[,]" found during the autopsy of Ms. Birchmore. Specifically, Mr. Marullo's office asked: "Is [a broken hyoid bone] consistent with cases of asphyxia where a person is simply leaning into a ligature as opposed to a violent drop or strangulation." The OCME replied approximately two weeks later, explaining: "You questioned whether this [hyoid] fracture is consistent with cases of asphyxia where a person is simply leaning into the ligature as opposed to a violent drop or strangulation. After consulting with the medical examiner, she indicated that a hyoid bone can be fractured without strangulation or a violent drop." At some point, either before or after this email, Attorney Marullo retained board certified forensic pathologist, Dr. Michael Baden. Dr. Baden, in a letter to the law firm dated June 18, 2024, opined that Ms. Birchmore's manner of death was homicide.

In April of 2024, the government brought Dr. Capo-Martinez's report, autopsy photos, and photos of the death scene to Dr. Zoe Sundell, forensic pathologist and the Director of the Armed Forces Medical Examiner System (AFMES). Law enforcement notes from this meeting reveal that Dr. Sundell told the government that broken hyoids happen in hangings, nothing at the time of her review looked like a manual strangulation, and nothing at the time of her review contradicted the OCME's finding that the manner of death was suicide.

After these two board-certified forensic pathologists declined to rule Ms. Birchmore's death a homicide, the United States Attorney's Office privately retained non-board-certified doctor of emergency medicine and self-proclaimed "staged suicide" expert, Dr. William Smock.

The initial indictment charging Killing of a Witness or Victim, USC 1512 §(a)(1)(C), was returned on August 27, 2024; the superseding indictment adding the charge of Protection of Unborn Children, USC 1841§(a)(1); (a)(2)(A); (a)(2) (C), was returned on October 28, 2025.

The government declined to call both Dr. Capo-Martinez and Dr. Sundell as Grand Jury witnesses in this case.

The prosecutors met with Dr. Capo Martinez again in July 2026. Dr. Capo-Martinez then sought out additional information from the prosecution and consulted with her colleagues at the OCME. Dr. Capo-Martinez subsequently amended the death certificate in this case to "medically undetermined".

The government enlisted the expert opinion of an FBI Forensic Anthropologist after their initial meeting with Dr. Capo-Martinez. She conducted a visual and radiological examination of Sandra Birchmore's hyoid bone at the FBI Laboratory in Quantico, Virginia.

Several of the FBI's Forensic Anthropologist's findings contradicted those of Dr. Smock – for example, she saw one fracture (not two) of the hyoid bone, she opined that fractures of the

hyoid bone can occur in hangings, and the type of blunt trauma to this hyoid bone is undetermined and may have occurred substantially after the death event. The government has declined to call her as witness at trial. The defense will call her instead.

The government has served expert notice of its intent to call Dr. Baden. He is presumably the second independent expert who will opine that Sandra Birchmore's manner of death was homicide. The government notes in its expert disclosure that "Dr. Baden has not reviewed any additional materials since he authored his June 18, 2024, report." Absent from discovery is any evidence that the government has directly consulted Dr. Baden regarding the instant case. It bears noting, too, that the government's disclosure differs from the 2024 report as it changes Dr. Baden's cause of death determination from "strangulation," to "asphyxia/strangulation" without explanation for the change.

The government, in filing this motion, has asked this Court to declare, based upon a preponderance of the evidence standard, that Matthew Farwell murdered Sandra Birchmore. They have asked the Court to make this conclusion prior to trial based upon the following points:

- Matthew Farwell was the last person to see Sandra Birchmore on the presumptive date of her death, February 1, 2021.
- Birchmore was a prolific cell phone user. Her cell phone never moved after Farwell arrived at her apartment and was found days later next to her body.
- Farwell's DNA is on the ligature that was found around Birchmore's neck.
- Two independent experts have opined that, among other things, Birchmore's fractured hyoid bone, other hemorrhaging in the neck area, and the existence of perimortem abrasions on her nose are evidence that further supports the conclusion that she was murdered and did not take her own life and that of her unborn child.

Matthew Farwell voluntarily met with law enforcement after Ms. Birchmore's body was discovered. He admitted that on the evening of February 1, 2021, he went to her apartment; he

asked her if he could come by and she said no problem. That night, he broke up with Birchmore and told her that she was crazy, and it was not his child. Farwell told Massachusetts State Police (MDP) said Birchmore told him that he was a "dick". He told her that it was all over and he was blocking her from all forms of communication. He said that it was a pretty nasty argument, but they weren't too loud. He kept telling her that there was no way that he was the father based on her timeline. He said that Birchmore was upset but she did not make any suicidal statements at all. Farwell told investigators that he had been trying to distance himself from Birchmore and that she was having sex with other people during their entire time together. He did not know that she was telling other people that he was the father of her unborn child. He said that he has been to her Canton apartment 5-6 times and he helped her move in. Farwell also told MSP that Ms. Birchmore had been "sectioned" by the police department when her aunt sold her grandmother's house where Ms. Birchmore was living in at the time.

The government alleges that, during the course of their relationship, the defendant directed Birchmore to delete their text exchanges as well, but she did not do so.

Sandra Birchmore's cell phone and laptop were recovered from her apartment after her death. There is no evidence that Mr. Farwell took them from the scene or attempted to tamper with them in any way; the government makes no such claim.

The prosecution states in its motion that Matthew Farwell has been identified as a major contributor of the DNA mixture found on the duffel bag strap wrapped around Ms. Birchmore's neck and affixed to the closet door handle. In that same motion, the government alleges that he opened that same closet door, presumably with his bare hand, only a week prior. It is also important to note that the DNA evidence from the duffel bag strap yielded a complex mixture of multiple male contributors.

The government fails to include in its recitation that Matthew Farwell was excluded as a contributor of the male DNA found under Ms. Birchmore's fingernails.

The government's "two independent experts," Smock and Baden, in reaching their respective conclusions that Ms. Birchmore was strangled to death, place considerable weight on the fact that her hyoid bone was fractured. The government specifically notes this detail as well. Indeed, the defense expects that the frequency of such a finding in suicide by hanging may turn out to be a dominant issue for the jurors' deliberation in this case.

On this subject in particular, Dr. Baden and the Department of Justice (DOJ) have found major disagreement in another high-profile case.

Dr. Baden has made public statements, some quite recently, questioning and criticizing the DOJ's handling and determination of the manner of death of criminal defendant, Jeffrey Epstein. Mr. Epstein died in federal custody while awaiting trial on charges of sex trafficking of minors. Despite the three neck fractures present in Epstein's case, the DOJ and the FBI ruled Epstein's death a suicide.

> After a thorough investigation, FBI investigators concluded that Jeffrey Epstein committed suicide in his cell at the Metropolitan Correctional Center in New York City on August 10, 2019. This conclusion is consistent with previous findings, including the August 19, 2019 autopsy findings of the New York City Office of the Chief Medical Examiner, the November 2019 position of the U.S. Attorney's Office for the Southern District of New York in connection with the investigation of federal correctional officers responsible for guarding Epstein, and the June 2023 conclusions of DOJ's Office of the Inspector General. - FBI Memo, July 2025 - United States Department of Justice[6]

Dr. Baden personally observed Epstein's 2019 autopsy and has repeatedly asserted his expert opinion as to his manner of death and the sufficiency of the DOJ's investigation. In February of this year, Dr. Baden was interviewed by the major British newspaper, The Telegraph.

> Dr Baden claimed that he had never seen a hanging by suicide with three neck fractures throughout the 50 years he was employed to review post mortem reports for inmate

[6] Available at https://www.justice.gov/opa/media/1407001/dl

> deaths in all New York state and local jails. "Even one fracture, we have to investigate the possibility of a homicide. Two definitely warrant a full investigation," he said. "Findings in textbooks never see those fractures, and neither have I."
>
> [then Chief Medical Examiner] Dr Sampson disagreed with this, saying that fractures of the hyoid bone and the cartilage were seen in both suicides and homicides.[7]

Like all criminal defendants, Mr. Farwell bears no burden of proof at trial nor in this motion. However, at trial the defense intends to elicit expert testimony from four additional witnesses in the fields of forensic pathology, forensic anthropology, pattern impression evidence, and psychiatry respectively to further refute the government's theory of homicide in this case.

Again, the defendant is under no onus to prove that Sandra Birchmore committed suicide, but her mental health history is replete with suicide attempts and threats, as well as acts of self-harm, and suicidal ideation and rumination. Further, the evidence suggests that Ms. Birchmore engaged in auto-erotic asphyxia on her own accord with other male partners.

The government's highlighted detail, that Matthew Farwell was the last person to see Sandra Birchmore alive and that her cell phone stopped moving that night, coupled with his report to law enforcement that he broke off their affair, is equally consistent with suicide as her manner of death.

In summary, Sandra Birchmore's manner of death has been and will be disputed forcefully at trial; it is the paramount factual issue in this case.

## <u>LEGAL AUTHORITY</u>

### <u>United States v. Houlihan</u>

"When a person who eventually emerges as a defendant (1) causes a potential witness's unavailability (2) by a wrongful act (3) undertaken with the intention of preventing the potential

[7] Available at https://www.telegraph.co.uk/gift/a80bf70c38fb620d

witness from testifying at a future trial, then the defendant waives his right to object on confrontation grounds to the admission of the unavailable declarant's out-of-court statements at trial." *United States v. Houlihan*, 92 F.3d 1271, 1280 (1st Cir. 1996). ("We think that the government need only prove such predicate facts by a preponderance of the evidence.")

The Court in *Houlihan*, a case of first impression in this Circuit, laid out the facts as follows:

> For nearly four years Michael Fitzgerald and John Houlihan ran a ruthlessly efficient drug ring from an unlikely command post: Kerrigan's Flower Shop, Charlestown, Massachusetts. The organization commanded the allegiance of numerous distributors, stationary and mobile, including Jennierose Lynch, William "Bud" Sweeney, George Sargent, and Alan Skinner. These minions, and others like them, helped the organization supply cocaine to hordes of buyers through an elaborate street-level distribution network that arranged most of its sales with the aid of electronic pagers, assigned customer codes, and preset rendezvous points.
>
> Fitzgerald and Houlihan imposed a strict code of silence on all who came into contact with them, including their own troops. They dealt severely with persons who seemed inclined to talk too freely. Joseph Nardone, a professional assassin who bragged that he was the "headache man"—when the organization's chieftains had a headache, Nardone got rid of it—acted as the principal enforcer. Over time, the gang's targets included Sargent, Sweeney (who survived multiple attempts on his life, but was left paralyzed from the chest down), a rival drug dealer, James Boyden III, and the latter's son and helpmeet, James Boyden IV.

*Id* at 1277.

> Sargent served as a distributor for the Fitzgerald–Houlihan organization. The police arrested him twice during 1992 on drug-trafficking charges. Both times, Sargent made voluntary statements that inculpated Fitzgerald and Houlihan in a sprawling drug conspiracy and tended to link them with several murders. The statements also furnished evidence probative of the elements of the offenses with which Nardone had been charged, but Sargent did not mention him by name. On June 28, 1992—within a month after he gave the second statement—Sargent was ambushed outside his dwelling and was shot several times. He died as a result.

*Id* at 1278.

The victim's manner of death, homicide, was not in dispute at Houlihan's trial. The issue of first impression was Sargent's status as witness versus potential witness:

> First, the district court supportably found that they believed Sargent was cooperating with the police and could harm them and the organization by talking. *See Houlihan,* 887 F.Supp. at 363–64. Second, Sargent was in fact cooperating with law enforcement officials at the time and made two voluntary statements in which he provided detailed accounts of the organization's modus operandi, descriptions of the principals' roles in various murders, and a frank admission of his own involvement in the conspiracy. While the defendants' perception of likely cooperation may well be enough to meet this prong of the test, the fact of Sargent's cooperation reinforces the inference that the killers believed Sargent was spilling the beans and murdered him on that account. Last but not least, the conspirators knew to a certainty that Sargent had keen insight into their felonious activities both from his own work in the distribution network and from sundry conversations in which they spoke openly to him—in retrospect, too openly—of their participation in serious crimes.

*Id* at 1280-81.

**People v. Giles**

In *People v. Giles*, the Supreme Court of California, citing *Houlihan* in part, held that the defendant forfeited his right to confront his ex-girlfriend about a prior incident of domestic violence by killing her and thus making it impossible for her to be at the murder trial under the doctrine of forfeiture by wrongdoing. 40 Cal. 4th 833, 152 P.3d 433 (2007), vacated *sub nom*. *Giles v. California*, 554 U.S. 353 (2008) (Defendant admitted that he killed his ex-girlfriend, but claimed that the killing was committed in self-defense. Over defendant's objection, the trial court admitted the victim's prior statements to a police officer who had been investigating a report of domestic violence involving defendant and the victim. The prior incident had occurred a few weeks before the killing. The victim related that, during that incident, defendant had held a knife to her and threatened to kill her.)

**Giles v. California**

The Supreme Court of the United States held that the California Supreme Court's theory of "forfeiture by wrongdoing" was not an exception to Sixth Amendment's confrontation requirement because it was not established at the time of the founding of the Bill of Rights or in American jurisprudence since that time. The judgment of the California Supreme Court was vacated, and the case remanded to the trial court for further proceedings not inconsistent with the Court's opinion. *Giles v. California*, 554 U.S. 353 (2008).

"In cases where the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person from testifying—as in the typical murder case involving accusatorial statements by the victim—the testimony was excluded unless it was confronted or fell within the dying-declarations exception. Prosecutors do not appear to have even *argued* that the judge could admit the unconfronted statements because the defendant committed the murder for which he was on trial." *Id* at 361-362.

"The notion that judges may strip the defendant of a right that the Constitution deems essential to a fair trial, on the basis of a prior *judicial* assessment that the defendant is guilty as charged, does not sit well with the right to trial by jury." *Id* at 365.

"Domestic violence is an intolerable offense that legislatures may choose to combat through many means—from increasing criminal penalties to adding resources for investigation and prosecution to funding awareness and prevention campaigns. But for that serious crime, as for others, abridging the constitutional rights of criminal defendants is not in the State's arsenal." *Id* at 376.

> The domestic-violence context is, however, relevant for a separate reason. Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal

> prosecution—rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify. This is not, as the dissent charges, *post,* at 2708, nothing more than "knowledge-based intent."

*Id* at 377.

"The state courts in this case did not consider the intent of the defendant because they found that irrelevant to application of the forfeiture doctrine. This view of the law was error, but the court is free to consider evidence of the defendant's intent on remand." *Id*.

**ARGUMENT**

The government in its motion to admit Sandra Birchmore's statements under the theory of forfeiture by wrongdoing pursuant to FRE 804(B)(6) fails to meet its burden at every turn.

Sandra Birchmore was not a witness or a potential witness at the time of her death. There were no ongoing criminal proceedings at which she would have been expected to testify. *Id*. There is no evidence that Matthew Farwell abused or threatened to abuse her with the intent to dissuade her from making a report to law enforcement. *Id*. She was not cooperating with law enforcement against the defendant in any context and, in fact, rejected that proposition outright when suggested by another paramour. *Contrast Houlihan,* 887 F.Supp. at 363–64.

The government's insinuation that the phone call made by Ms. Birchmore's "friend" to the Stoughton police fills some evidentiary gap in their argument is not supported by any case law.

Sandra Birchmore was not murdered and the government, in its pleadings, has not proven otherwise, not even by a preponderance of the evidence. They fail to point to a single homicide prosecution where the decedent's manner of death was in dispute at trial, and the Court admitted hearsay statements under the doctrine of forfeiture by wrongdoing.

## CONCLUSION

The prosecution asks this Court to take the holding in *Houlihan*, itself a case of first impression, and to extend it broadly to fit their narrative in this case. In doing so, the prosecution overlooks the dictates of the Sixth Amendment's Confrontation Clause, and ignores their burden of proof on the charges in the indictment. Mr. Farwell respectfully asks the Court to DENY their request.

Respectfully submitted,

MATTHEW FARWELL,
By his attorneys,

*/s/ Joanne M. Daley*

Joanne M. Daley, BBO # 653375
Kimberly C. Stevens, NC State Bar # 20156
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061
joanne_daley@fd.org

CERTIFICATE OF SERVICE

I, Joanne M. Daley, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on August 17, 2026.

*/s/ Joanne M. Daley*

Joanne M. Daley