**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Docket No. 1:24-cr-10259-DJC |
| v. | ) | |
| | ) | |
| MATTHEW FARWELL | ) | |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S MOTION *IN LIMINE* TO LIMIT THE TESTIMONY OF DEFENSE EXPERT WITNESS DR. THOMAS ANDREW**

The accused, Matthew Farwell, respectfully replies to the government's motion *in limine* to limit the testimony of defense expert Dr. Thomas Andrew, an experienced and highly respected board-certified forensic pathologist. Mr. Farwell relies in part on Dr. Andrew's expert report and Curriculum Vitae, *see* D.E. 187-1, as well as the defense's expert disclosure,[1] and seeks here to respond to the specific assertions made by the government.

## INTRODUCTION

Was Ms. Birchmore's death accidental, a result of suicide, or a killing? Whether a killing occurred is *the central issue* in this case, even as the government has requested that this Court determine this central question of fact before a jury has heard a single shred of evidence. *See* D.E. 190, at 20-22. And despite the government's efforts to distract from this question by turning the trial into a referendum on Mr. Farwell's morality, *see*, *e.g.*, Government's Motion *in Limine* to Admit Evidence Pursuant to Rule 404(b) (filed under seal), the question of whether a killing occurred remains the crux of this case.

[1] If the Court would find it helpful for counsel to file the actual Rule 16 expert disclosure provided to the government on June 8, 2026, the undersigned will gladly do so, but the general nature of the disclosure is set forth in and this reply.

When holding this question – whether a killing occurred – at the center, it will be critical that the jury hear from qualified experts who have examined the full context and the plethora of facts that surround Ms. Birchmore's death to assist the jury in making its determination as to the legal cause and manner of death, decisions over which it has *sole* province as the fact finder. *See, e.g., United States v. Booker*, 543 U.S. 220, 230, 125 S. Ct. 738, 747 (2005); *Sparf v. United States*, 156 U.S. 51, 15 S. Ct. 273 (1895). Dr. Andrew is such an expert.

**ARGUMENT**

**A. Dr. Andrew's Qualifications**

The government stated that Dr. Andrew essentially "disclose[d] his or her mastery of a broad umbrella of topics without demonstrating a focused expertise in the particular subject of his or her proposed testimony." D.E. 187, at 11, *citing Tetiokhine*, 725 F.3d at 17. But in so stating, the government makes clear it does not understand what a board-certified forensic pathologist is, what a medical examiner does, the qualifications they are required to have, and the research and investigative processes they undertake daily to make determinations of cause and manner of death, a job that is as diverse as the deceased persons who pass through their doors.

In short, Dr. Andrew is a fully trained and board-certified *physician*, who has additional education and certifications in anatomic and forensic pathology. He offers his expert opinions in this case based on a 44-year career as a board-certified physician, a 34-year career as a board-certified forensic pathologist and medical examiner, and a 20-year career as the Chief Medical Examiner for the State of New Hampshire. *See*, Andrew C.V., at 1. Dr. Andrew holds certifications in pediatrics, anatomic pathology, and forensic pathology. *Id.*

As a medical examiner, Dr. Andrew has personally *conducted* nearly 6,000 autopsies and has *personally* signed the same number of death certificates as the forensic pathologist who

determined cause and manner of death.[2] Additionally, Dr. Andrew will testify that of those nearly 6,000 autopsies he has *personally* conducted, approximately 10-15% of the cases were determined to be suicide, and 2-5% of the cases were undetermined as to cause and manner of death, excluding incidents of infant sudden death.[3] Moreover, Dr. Andrew has also reviewed thousands more autopsy reports written by the medical examiners in his office, regularly participated in rounds, where medical examiners on staff discuss challenging, curious, or confusing cases. *See* Def. Discl., at 1-2. As a medical examiner and a Chief Medical Examiner, Dr. Andrew will testify that for the entirety of his 34-year career as a medical examiner, he was part of teams where rigorous research and peer review, as well as collaborative problem solving, are the norm. Adding to his wealth of experience, Dr. Andrew worked on both state and national boards and councils addressing myriad issues at the intersection of medicine, forensic pathology and public health. *See* Andrew C.V., at 2.

Moreover, as evidenced in Dr. Andrew's CV, he has served on the New Hampshire Suicide Prevention Council, the New Hampshire Youth Suicide Prevention Advisory Assembly, and the New Hampshire Injury Prevention Advisory Council – all of which grapple with the many factors that cause suicidality and the unpredictability of suicide, which makes it so hard to prevent. *See* Andrew C.V., at 2.

Finally, as relevant to this case, Dr. Andrew has also published extensively in reputable discipline-specific journals on drug-related deaths, including developing best practices for examining a body and the toxicology reports to determine cause and manner of death. *See*

[2] In contrast, Dr. Smock, the government's proffered expert, has *not personally conducted a single autopsy*, nor is there a *single* certificate of death issued following an autopsy that bears his signature.

[3] Dr. Andrew would testify that whenever it was possible to do so, by following the science and the evidence, he would make determinations as to cause and manner of death, but he would not force a determination if the science and evidence did not yield a clear result, leading to a determination of "undetermined."

Andrew C.V., at 4-6.

### B. Dr. Andrew is Qualified to Testify as to How Ms. Birchmore's Medications and Mental Health History Factor in to a Medical Examiner's Determination as to Cause and Manner of Death

In its motion *in limine*, the government suggested that Dr. Andrew is not qualified to opine on certain factual matters that are related to Ms. Birchmore's cause and manner of death because he has not treated living patients in 35 years. First, this again demonstrates the government's failure to understand the qualifications of a forensic pathologist. Dr. Andrew *is a board-certified physician* and was trained as a medical doctor, thus he has the training and experience to opine on these matters.

Second, while it should be an unnecessary thing to belabor, Ms. Birchmore is deceased. She was deceased and undergoing the process of decomposition for roughly two days when found on February 4, 2021, and when her body was transported to the Massachusetts Office of the Medical Examiner. Indeed, the medical examiner was assigned to conduct an autopsy on her body because she was deceased. As outlined extensively in the defense's motion to preclude Dr. Smock's testimony, the fact that Ms. Birchmore is deceased means understanding and making determination as to Ms. Birchmore's cause and manner of death falls squarely into the expertise and province of board-certified forensic pathologists, as Dr. Andrew is.

Notably, and highly relevant to the central question in this case, suicide is the second leading cause of death in individuals between the ages of 15 and 24 in the United States,[4] thus medical examiners like Dr. Andrew examine, review, and discuss suicide and its many facets and factors as a part of their daily work. Dr. Andrew can testify to his 34 years of experience

---

[4] "WISQARS Leading Causes of Death Visualization Tool" (2023), U.S. Centers for Disease Control and Prevention, available at https://wisqars.cdc.gov/lcd/?o=LCD&y1=2023&y2=2023&ct=11&cc=ALL&g=00&s=0&r=0&ry=3&e=0&ar=lcd1age&at=groups&ag=lcd1age&a1=0&a2=199.

handling suicide and undetermined cases, the investigations that are undertaken, the records and documents reviewed, and all of the related facts gathered to make an assessment as to cause and manner of death.[5] Indeed, the entire field has expended great effort to educate themselves and become experts in assessing suicide deaths carefully and accurately.[6]

1. Dr. Andrew is Qualified to Render an Opinion about How the Black Box Label on Sertraline Impacts a Medical Examiner's Review of a Case

To understand how and why a person has died, medical examiners, who are both board-certified physicians *and* board-certified forensic pathologists – use medical and mental-health related histories, including any medications that were taken by the deceased, to ascertain how and if that medical history and those drugs and/or prescribed medications played a role in the person's death.[7] *See also* Gov't MiL, at 25, 31. This is precisely what both the medical

[5] Dr. Andrew would testify as to the significant research and documentation as to the routine uses of these data by forensic pathologists in assessing possible suicides. *See*, *e.g.*, Alexandra Paredes Rivera et al., *Forensic Investigation of Apparent Suicidal Deaths: A 3-Year Retrospective Review of Complex Suicides with a Review of the Literature*, 45 AM. J. FORENSIC MED. AND PATHOLOGY 208 (2024) (noting that the medical examiners, in 725 suicide cases, reviewed "autopsy, toxicology, and scene investigation reports," as well as "gender, age, marital status, military service, sexual orientation, religion, race, occupation, incident location, suicide note, suicidal ideation history, past suicide attempt, psychiatric disorders, and motive for suicide."); Ian H. Steele, *Understanding Suicide Across the Lifespan: A United States Perspective of Suicide Risk Factors, Assessment & Management*, 63 J. FORENSIC SCI. 162 (2017) ("Results indicated predictors of suicide in juveniles were insomnia, burdensomeness, and recent conflicts with family or a romantic partner."); Angélique Franchi et al, *Forensic Autopsy of People Having Committed Suicide in 2002 and in 2012: Comparison of Epidemiological and Sociological Data*, 61 J. FORENSIC SCI. 109 (2015); Lisa B.E. Shields et al., *Adolescent and Young Adult Suicide: A 10-Year Retrospective Review of Kentucky Medical Examiner Cases*, 51 J. FORENSIC SCI. 874 (2006) (noting that "[a] variety of biopsychosocial factors may contribute to adolescent [15-24 year old] suicidal behavior, including psychiatric disorders, risk-taking behaviors, and lack of a cohesive family unit.").

[6] *See*, *e.g.* **ante**, at n.5. *See also* Lorenzo Gitto, *Social Media and Medicolegal Death Investigation: Logged in…To the Morgue*, 61 J. FORENSIC SCI. 1556 (2019) ("The purpose of this study is to provide information about the usefulness of [social media] in forensic practice."); Antonios Paraschakis et al., *Psychiatric Medication Intake in Suicide Victims: Gender Disparities and Implications for Suicide Prevention*, 61 J. FORENSIC SCI. 1556 (2016) (reviewing toxicological data from suicide cases); Ryan Hookano, *Applications of Social Network Media in Medicolegal Death Investigation*, 58 J. FORENSIC SCI. 1628 (2013) ("With the increased popularity of online social networking services (SNS) such as Facebook, LinkedIn, Twitter, and Google+, we propose that a wealth of new resources is available for medicolegal death investigation."); Lisa B.E. Shields et al., *Schizophrenia and Suicide: A 10-Year Review of Kentucky Medical Examiner Cases*, 52 J. FORENSIC SCI. 930 (2007) ("A comprehensive investigation of the biopsychosocial factors is warranted in cases of schizophrenics who commit suicide.").

[7] *See, e.g.*, Sara J. Schreiber and Brian L. Peterson, *Using Forensic Toxicology to Enhance Medicolegal Death Investigations*, 44 AM. J. FORENSIC MED. AND PATHOLOGY 173 (2023); Rooholah Valipour et al., *Pattern of Suicide Methods and Postmortem Toxicological Findings in Suicide-Related Deaths: A Retrospective 7-Year Forensic-Based*

examiner assigned to this case and Dr. Andrew did when reviewing the cause of death of Ms. Birchmore.

Medical examiners stay abreast of the research coming out of the medical and toxicology fields, as well as discussions within forensic pathology as to drugs and medications impact on the body.[8] As Dr. Andrew can attest, this work also involves paying attention to black box warnings and other information related to commonly prescribed medications, because those warnings inform forensic pathologists of the constellation of factors that may impact, influence, and/or cause a person's death.

Such is the case with sertraline, a very commonly prescribed antidepressant. Medical examiners, including Dr. Andrew, followed the multi-disciplinary developments in research that ultimately led to the black box warning applied by the Federal Drug Administration in 2006 – a warning that is still in place to this day.[9] The literature that promoted the black box warning for

---

*Study in Iran*, 42 AM. J. FORENSIC MED. AND PATHOLOGY 227 (2021) ("All suicide fatal cases were investigated to define the cause and manner of death. Toxicological analyses were performed using thin-layer chromatography, high-performance liquid chromatography, gas chromatography/mass spectrometry, headspace gas chromatography, and gas chromatography equipped with nitrogen phosphorus detector."); Breanna Cuchara and Francisco J. Diaz, *An 8-Year Retrospective Study on Suicides in Washington, DC*, 41 AM. J. FORENSIC MED. AND PATHOLOGY 18 (2020) (noting increase in suicide over last 10 years, and "data showed that ethanol (26.4%), antidepressants (20.1%), opioids (14.9%), and benzodiazepines (12.9%) were the drugs most frequently involved, although the finding of no drugs was most common (33.7%)."); D. Kimberley Molina and Veronica M. Hargrove, *Can Intoxication Status Be Used as a Prediction Tool for Manner of Death? A Comparison of the Intoxication Status in Violent Suicides and Homicides*, 38 AM. J. FORENSIC MED. AND PATHOLOGY 69 (2017) (noting the import of toxicology studies, where "antidepressants or antipsychotics, benzodiazepines, and zolpidem were more common in suicides."); Lisa B.E. Shields et al. *Toxicologic Findings in Suicide: A 10-Year Retrospective Review of Kentucky Medical Examiner Cases*, 27 AM. J. FORENSIC MED. AND PATHOLOGY 106 (2006); Stephen J. Cina et al., *Toxicology: What is Routine for Medicolegal Death Investigation Purposes?*, 1 ACAD. FORENSIC PATHOLOGY 28 (2011); Michael M. Heninger, *Commonly Encountered Prescription Medications in Medical-Legal Death Investigation: A Guide for Death Investigators and Medical Examiners*, 21 AM. J. FORENSIC MED. AND PATHOLOGY. 287 (2000); Simon P. Avis, *An Unusual Suicide: The Importance of the Scene Investigation*, 14 AM. J. FORENSIC MED. AND PATHOLOGY 148 (June 1993) ("Toxicologic analysis is an integral component in the investigation of suicide and requires correlation with a detailed scene inspection, with an extensive exploration into the decedent's medical and social background to uncover suicidal ideation or intent and a postmortem examination of the body.").

[8] The Court can review Dr. Andrew's C.V., at 2-4, to see a selection of these very types of articles written by Dr. Andrew.

[9] Zoloft, "Important Safety Information" (last accessed July 29, 2026), available at https://www.zoloft.com/ ("ZOLOFT and other antidepressant medicines may increase suicidal thoughts or actions in some people 24 years of

sertraline was conclusive that there is an increased risk of suicidality in people under the age of 24 when taking sertraline.[10] Indeed, a simple internet search demonstrates the intense discussions that were being had within public health, mental health, *and* forensic pathology in the early 2000s as the research that precipitated the subsequent black box warning was unfolding. And those discussions continue twenty years later.[11]

When medical examiners like Dr. Capó-Martinez and Dr. Andrew receive a potential suicide case, it is best practice to conduct toxicologic testing to ascertain what, if any, substances were in a person's system at the time of death, and how, if at all, those substances may have influenced, impacted, or caused the death. As Dr. Andrew can testify, separating out the impact of sertraline from other factors that impact the cause of death is hard, but it is a necessary factor that a forensic pathologist must consider. This is part and parcel of the day-to-day work of a forensic pathologist.

The government suggests that because Dr. Andrew has not treated living patients in many years, he is not qualified to opine as to the black box warning of sertraline, or its potential effect on Ms. Birchmore. It bears noting again that Ms. Birchmore is the *decedent* in this case. And, as

---

age and younger, especially within the first few months of treatment or when the dose is changed."); Federal Drug Administration, "Zoloft" (last accessed July 29, 2026), available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/019839s74s86s87_20990s35s44s45lbl.pdf (noting that "[a]ntidepressants increased the risk of suicidal thoughts and behaviors in pediatric and young adult patients).

[10] *See*, *e.g.*, "The Revised Warning for Antidepressants and Suicidality: Unveiling the Black Box of Statistical Analyses," 164 AM. J. PSYCHIATRY 12 (Dec. 2007) (describing the timeline for the black box warning on antidepressants due to risk of suicidality among adults").

[11] *See*, *e.g.*, Wayne K. Goodman and Eric A. Storch, *Commentary*: *Duty to Warn: Antidepressant Black Box Suicidality Warning is Empirically Justified*, FRONTIERS IN PSYCH. (Apr. 2020); Michele Fornaro, *The FDA "Black Box" Warning on Antidepressant Suicide Risk in Young Adults: More Harm Than Benefits?*, 10 FRONTIERS IN PSYCH. (May 2019); Juan Carlos Martínez-Aguayo et al., *Ten years after the FDA black box warning for antidepressant drugs: a critical narrative review*, 43 ARCH CLIN PSYCHIATRY 60 (2016) ("The United States Food and Drug Administration (FDA) has warned about the increased suicidality risk associated with the use of selective serotonin reuptake inhibitors (SSRI) and venlafaxine in children and adolescents.").

explained herein, it is precisely the role of the medical examiner to figure out how and why Ms. Birchmore died, which necessarily involves a review of the events, substances, and related facts that precipitated her death.

Indeed, the government notes that Dr. Capó-Martinez reviewed and considered significant discovery in her determination. *See* Gov't MiL, at 5 ("Dr. Capó Martinez requested to review voluminous discovery that had not been generated or made available to her prior to her May 2021 ruling."). Presumably, the materials provided to Dr. Capó-Martinez included the very same types of discovery provided to Dr. Andrew for the very same reason – to ensure the medical examiner has all relevant information to ascertain cause and manner of death, including what medications Ms. Birchmore was taking at the time of her death. Upon receiving such information, Dr. Andrew would testify the medical examiner then looks for any relevant warnings, concerns, or research related to that medication.

As Dr. Andrew would testify, he, Dr. Capó-Martinez, and any other competent medical examiner would review the entire universe of facts that surrounded Ms. Birchmore's death, which, for the reasons discussed **ante**, must include a toxicological review. Therefore, Dr. Andrew, as a board-certified physician and forensic pathologist, is not only qualified to discuss the black box warning regarding the use of sertraline for young adults under 25, but he is also qualified to discuss the ways in which that substance may or may not have impacted a decedent's, *and* this decedent's, cause of death.

2. <u>Dr. Andrew Is Qualified to Opine as to the Contextual Clues and Facts of Ms. Birchmore's Mental Health History as They Relate to a Medical Examiner's Determination of Cause and Manner of Death</u>

Just as a decedent's medical and medication history is a relevant avenue of inquiry for medical examiners, so too is the person's history of suicidal ideation, suicide attempts, or any

related materials that are part of that medical history, particularly when a decedent's body is found in a position that suggests a suicide occurred. In the case of Ms. Birchmore, this history is documented in the decedent's own hand in the form of journal entries, as well as prior medical and mental health records, including records Ms. Birchmore's, emergency mental health civil commitment, (known in Massachusetts as "sectioning") in 2020.[12]

Dr. Andrew's opinion as to how these records factor into an analysis as to cause and manner of death is precisely in the realm of expertise of medical examiners. He would testify that medical examiners consider a broad range of nonmedical factors when investigating possible suicides, a task that is sadly part of their day-to-day given the high rate of suicide in this country.[13] Dr. Andrew is simply naming the myriad medical *and* nonmedical factors that indicate suicide, as would and should be considered by a medical examiner.

Additionally, Dr. Andrew will testify that forensic pathologists are scientists *and* physicians – not technicians. Consequently, they use a similar model in problem solving as their medical colleagues. When presented with chief complaint – here, death – a relevant medical and mental health history, a physical exam, lab studies, and relevant nonmedical materials are all part of the differential diagnosis process, whittling down to a single unifying diagnosis. Therefore, insisting as the government does, that a forensic pathologist limit his or her opinions only to what autopsy shows, would be the equivalent of limiting an emergency medicine physician to only testify as to lab results. It is simply not the standard in forensic pathology. It is not the standard in medicine. And it should not be the standard the government imposes here, without

---

[12] Notably, the government claims, without providing evidence or explanation, that the May 2020 incident where Ms. Birchmore's aunt called the police because she was worried Ms. Birchmore was going to self-harm "was disproven." *See* Gov't MiL, at 2.

[13] *See* **ante** at n.5 & 6.

justification or explanation.

The government's supposition that Dr. Andrew is not qualified to opine on Ms. Birchmore's "victimology," an as yet undefined term used by the government, despite being a physician and forensic pathologist who literally determines cause and manner of death on a daily basis, is nonsensical.[14] Moreover, Dr. Andrew would testify that consideration of the mental health and related nonmedical data to inform a determination as to whether a suicide occurred is best practice in the field of forensic pathology.

3. Dr. Andrew's Extensive Experience Provides a Bases to Observe How Treatment Providers Have Responded to a Client's Purported Suicide

Regarding Dr. Andrew's observations that Ms. Alkhalil's "shock" at Ms. Birchmore's possible suicide is not out of the ordinary, the government alleges that Dr. Andrew is not qualified to opine or observe such a phenomena. However, this again misunderstands what medical examiners and their investigators do every day, particularly as suicides are significantly more common than homicides.[15]

Dr. Andrew will testify that in his 35-year career as a forensic pathologist and medical examiner, he and his colleagues frequently spoke with family members and treating providers to get medical records and other personal information about the deceased. In the hundreds of conversations had with those treatment providers, it was more common than not that the provider

[14] Merriam-Webster defines "Victimology" as, "the scientific study of crime victims including the study of the relationship between victim and offender and of the consequences and effects of being victimized. Also**:** characteristics of a particular criminal's victim or victims." Available at: https://www.merriam-webster.com/dictionary/victimology. The term does not appear in Black's Law Dictionary (12th ed. 2024).

[15] In the Commonwealth of Massachusetts, the ratio of occurrence between homicidal strangulation and suicidal hanging between 2016 and 2022 was 21:2 (467/22). This data was coalesced from two Commonwealth of Massachusetts state sites: (1) "Statewide homicide data," Injury Surveillance Program, Department of Health, available at https://www.mass.gov/info-details/statewide-homicide-data; and, (2) "Suicide data & reports," Division of Violence and Injury Prevention, Department of Health, available at https://www.mass.gov/info-details/suicide-data-reports.

expressed shock and surprise, and/or that they did not see the suicide coming. This was a common factual experience for Dr. Andrew, and it has also been an experience commonly reported to Dr. Andrew over the course of his career. Additionally, Dr. Andrew can testify about the numerous articles and studies that corroborate his qualitative experiences.[16]

Likewise, Dr. Andrew's qualitative experience in speaking with family members and treatment providers of those who died by suicide and hearing them say they did not see the suicide coming is supported by the literature how unpredictable suicide is.[17]

Given Dr. Andrew's extensive professional experience, which finds great support in the research on the topic, he is clearly qualified to testify as to that experience and the ways in which Ms. Alkhalil's expressions of shock and statements of Ms. Birchmore's friends and family stating she was planning for the future are similar to Dr. Andrew's many experiences.

4. <u>As a Chief Medical Examiner, Dr. Andrew Has the Requisite Experience to Opine on the Impact A Meeting with the FBI, USAO, and Prosecution's Expert May Have on a Medical Examiner</u>

[16] *See*, *e.g.*, Aliza Spruch-Feiner et al., *Effects of Patient Suicide on Professional Practice Among Mental Health Providers*, 28 J. PSYCHIATR. PRACT. 184 (May 2023) ("The mourning process faced by any suicide survivor may include feelings of shock, trauma, guilt, overwhelming grief, and complex emotions.5 For clinicians, this process may be no less emotionally difficult and may also be further compounded by adverse professional consequences."); David M. Sandford et al., *The impact on mental health practitioners of the death of a patient by suicide: A systematic review*, 28 CLIN PSYCHOL PSYCHOTHER. 261 (2021) ("Most common personal reactions in qualitative studies included guilt, shock, sadness, anger, and blame."); Patrik Rytterström et al., *Impact of suicide on health professionals in psychiatric care mental healthcare professionals' perceptions of suicide during ongoing psychiatric care and its impacts on their continued care work*, 29 INT'L. J. MENTAL HEALTH NURSING 92 (2020); Michael J. Gitlin, *A Psychiatrist's Reaction to A Patient's Suicide*, 156 Am. J. Psych. 1630 (Oct. 1999) ("The small literature addressing therapists' reactions to patients' suicide describes several typical reactions. Among the first are disbelief/denial followed by depersonalization, shame, guilt, and the finding of omens.").

[17] *See*, *e.g.*, Tobais Tesimann, *Suicide risk assessment: clinical implications of the unpredictability of suicidal behavior*, Frontiers in Psychiatry (2026), available at https://www.frontiersin.org/journals/psychiatry/articles/10.3389/fpsyt.2026.1844322/full; Hilary Coon, et al., *Genetic Liabilities to Neuropsychiatric Conditions in Suicide Deaths With No Prior Suicidality*, JAMA Network (2025), available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2840358; Robert I. Simon, "Suicide Risk: Assessing the Unpredictable," *Psychiatric Times* (2003), available at https://www.psychiatrictimes.com/view/suicide-risk-assessing-unpredictable

To be clear, Dr. Andrew nor defense counsel intend Dr. Andrew's observation to question Dr. Capó-Martinez's professionalism or qualifications. Instead, Dr. Andrew made this observation based on his own personal experiences as the Chief Medical Examiner in New Hampshire interacting with prosecutors who have pressured him to change his determinations as to cause and manner of death to suit their theory of the case. Further, the pressure was demonstrated and is a logical deduction from the unusual nature and timing of the meetings where FBI Agents, prosecutors and Dr. Smock all converged on the Office of the Chief Medical Examiner to meet with Dr. Capo Martinez, professing to take no notes, in Dr. Andrew's experience as a Medical Examiner.

**C. Dr. Andrew's Opinions as to the Physical Findings at Autopsy**

Unquestionably, and unquestioned by the government, Dr. Andrew's qualifications as an accomplished and experienced board-certified forensic pathologist make him eminently qualified to opine on the physical findings at autopsy in this case.

Additionally, Dr. Andrew would testify that forensic pathologists have for many years researched and written about homicides staged to appear as suicides.[18] As a result, board-certified forensic pathologists who serve as medical examiners are aware of this phenomenon, and have received training to guard against making an erroneous determination as to manner of death – including mistaking a suicide for homicide.

1. <u>Dr. Andrew's Opinion as to the Hyoid Bone</u>

As the government notes, and as the research detailed extensively in the *Smock 702*

---

[18] Scotia P. Mullin, *Differentiating homicidal, suicidal, and autoerotic neck compression deaths*, 70 J. FORENSIC SCI. 2360 (2025); Samuel P. Prahlow et al, *Homicides Disguised as Staged Suicides*, 10 ACAD. FORENSIC PATHOLOGY 104 (2020); Agnieskzka Rogalska et al, *The Perfect Murder: How a Suicide Became a Homicide,* 5 ACAD. FORENSIC PATHOLOGY 481 (2015).

*Motion*, at 36-48, shows, "Dr. Andrew Thomas [sic.] concludes that the 'final resting place could exert an inward directed force sufficient to produce the fracture observed at autopsy.'" D.E. 187, at 6. The government then critiques Dr. Andrew for not including in his report any research or case studies as the bases for this conclusion, though, as evidenced by myriad other experts in this case, it is a commonly accepted fact in the fields of forensic pathology and forensic anthropology.

Moreover, Dr. Andrew would testify that he and many forensic pathologists do neck dissections and examine hyoid bones as a daily practice – it is, in his words, "the bread and butter" of forensic pathology. As a result, he is an expert in neck dissections and hyoid bones, and based on his experience, studies, and awareness of the research in his field, he is more than qualified to opine as to whether the position in which Ms. Birchmore was found could "exert an inward directed force sufficient to produce the fracture observed at autopsy," D.E. 187-1, at 6, without reciting the literature he reviewed to arrive at that opinion.

Notwithstanding, on July 10, 2026, defense counsel provided the government with the specific subset academic articles on which Dr. Andrew relied to form his opinion in this case. It bears noting that forensic pathologists and anthropologists have written extensively on the topic of hyoid bone fractures, as outlined in the *Smock 702 Motion*, at 36-48. Dr. Andrew is well versed in this research and can and will testify as to its relevance in this case if needed.

2. <u>Dr. Andrew's Opinion that There is **No** Hemorrhage at the Hyoid Fracture Site</u>

Curiously, the government recites:

> Dr. Andrew states "of particular note is the absence of any description of hemorrhage associated with the fracture at autopsy." While he is correct that the hemorrhage is not noted in the autopsy report, *he ignores photographs of the hyoid bone itself, taken by the FBI at the request of the government's expert, which clearly depict a hemorrhage at the fracture site*.

D.E. 187, at 6.

Not so, Dr. Andrew reviewed *all* of the photographs and imaging provided of the hyoid bone *in addition* to Dr. Capó-Martinez's bench notes and autopsy report, *see* D.E. 187-1, at 1, and concluded that there was no hemorrhage at the fracture site, *see id.*, at 3. He also reviewed Dr. Christensen's report and bench notes, along with the photographic evidence. It is not that Dr. Andrew failed to review any material, or that he is missing something. Instead, it is simply that there is, in fact, no hemorrhage at the fracture site. An opinion that is shared by Dr. Capó-Martinez, board-certified forensic pathologist *who examined the strap muscles and hyoid herself*, *USAO_007729*) (hereinafter "*Autopsy Report*").[19] Further, Dr. Andrew would testify that it is an accepted fact in the field of forensic pathology that the best time to see a fresh hemorrhage is when conducting the autopsy and perform the detailed dissection of the neck block.

It bears noting that the FBI photographs of the hyoid to which the government refers were taken after the hyoid bone had been in formaldehyde for a period of years, affecting the quality and nature of the tissue surrounding the bone, which is where hemorrhage would be indicated. As described extensively in the *Smock 702 Motion*, at 25-26, 34-35, Dr. Smock is the *only* person who found a hemorrhage at the fracture site.

3. Dr. Andrew's Findings as to the Abrasion on Ms. Birchmore's Chest

The government states that Dr. Andrew opined that the abrasion on Ms. Birchmore's chest "*may* represent abrasions caused by terminal hypoxic seizure activity against the closet door[,]" D.E. 187, at 6 (emphasis added), and that "[h]e, again, provides no support for the basis of this conclusion[,]" *id.*

---

[19] Notably, neither Dr. Sundell, a board-certified forensic pathologist consulted by the government, nor Dr. Christensen, a board-certified forensic anthropologist consulted by the government, noted a hemorrhage at the fracture site.

As outlined **ante**, and detailed in his C.V., Dr. Andrew has 35 years of experience as a forensic pathologist who has personally conducted nearly 6,000 autopsies and is well versed in the scientific literature in his discipline. He will testify that scientific research has documented when people hang themselves and experience the process of asphyxiation, they have involuntary muscular activity and hypoxic seizures for *minutes* after they lose consciousness.[20] This can involve large and small muscular movements for a sustained period of time. *Id.* Additionally, these processes can go on for a longer period of time for those who engage the method of incomplete hanging,[21] as Ms. Birchmore did, due to the nature of the compression on the neck.[22] These seizures may cause further injury, such as abrasion, bruising, and/or fracture. *See Smock 702 Motion*, at 47-48.

Moreover, Dr. Andrew will testify, based on his experience, research, and familiarity with the scientific literature in his field, that people often experience injury *in the act of hanging*, such as abrasions and bruises. This has also been documented in the famous textbooks written by both DiMaio and Spitz and Fisher.[23]

4. Dr. Andrew's Findings as to the Drying Artifact Found on Ms. Birchmore's Nose

The government erroneously asserts: "Dr. Andrew also suggests that the post-mortem drying artifact of the nose has been over-interpreted as smothering. He neither confirms nor

[20] Anny Sauvageau et al., Agonal Sequences in 14 Filmed Hangings with Comments on the Role of the Type of Suspension, Ischemic Habituation, and Ethanol Intoxication on the Timing of Agonal Responses, Am. J. Forensic Med. Pathology (2010); Anny Sauvageau et al., *Agonal sequences in eight filmed hangings: analysis of respiratory and movement responses to asphyxia by hanging*, 55 J. Forensic Sci. 1278 (2010).

[21] Incomplete hangings mean that some part of the person's body is touching the ground – feet, seat, or lying down.

[22] *See DiMaio*, at 253; Spitz and Fisher, at 406, 409.

[23] Vincent DiMaio and Dominick DiMaio, *Forensic Pathology*, at 248 (Vernon J. Geberth, ed., 2nd Ed. 2006) (hereinafter "*DiMaio*"). *See also Spitz and Fisher's Medicolegal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation* 431 (Werner U. Spitz and Francisco J. Diaz, eds., 5th Ed. 2020) (hereinafter "*Spitz & Fisher*").

denies that there are visible abrasions on her nose and has *noticed no opinion of the source of the marks* on Birchmore's nose." D.E. 187, at 6 (emphasis added). In fact, Dr. Andrew clearly stated the source of the marks on Ms. Birchmore's nose – they are *a "post-mortem drying artifact*." It is just that the government and its emergency medicine expert do not understand what a drying artifact is.

Dr. Andrew, a board-certified physician and forensic pathologist, will explain that when a body begins the decomposition process, as had that of Ms. Birchmore, skin changes in texture and moisture. As the body's fluids drain to the lowest point of the body, the skin in the upper regions dry. When the skin desiccates, it changes in color and character. It has been documented that these types of postmortem changes can be mistaken as traumatic injury, particularly by those who do not know what they are looking for, when they are, in fact, only part of the natural decomposition process.[24]

## CONCLUSION

For all the reasons above, Dr. Andrew is highly qualified to opine on each of the findings he outlines in his expert report. Moreover, Dr. Andrew's extensive experience and wide knowledge of medicine, forensic pathology, and the role of the medical examiner make him a competent and capable expert to aid the jury in its factfinding role, particularly to understand the myriad and complicated issues around Ms. Birchmore's death.

---

[24] Anny Sauvageau and Stéphanie Racette, "Postmortem changes mistaken for traumatic lesions: a highly prevalent reason for coroner's autopsy request," 29 AM. J. FORENSIC MED. PATHOLOGY 145 (2008), available at https://pubmed.ncbi.nlm.nih.gov/18520482/ (noting that postmortem artifacts were mistaken for traumatic injuries); U Hammer, A Büttner, "Distinction between forensic evidence and post-mortem changes of the skin," 8 FORENSIC SCI. MED. PATHOLOGY. 330 (2012), available at https://pubmed.ncbi.nlm.nih.gov/21994042/.

Dated: August 17, 2026

Respectfully submitted,

MATTHEW FARWELL,
By his attorneys,

*/s/ Kimberly C. Stevens*
Kimberly C. Stevens, NC State Bar # 20156
Joanne M. Daley, BBO # 653375
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061
Kim_Stevens@fd.org
Joanne_daley@fd.org

**CERTIFICATE OF SERVICE**

I, Kimberly C. Stevens, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on August 17, 2026.

*/s/ Kimberly C. Stevens*
Kimberly C. Stevens