UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

MATTHEW FARWELL

Defendant

CRIMINAL No. 24-CR-10259-DJC

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF DR. WILLIAM SMOCK, M.D.**

INTRODUCTION……………………………………………………………………………...4
BACKGROUND…………………………………………………………….………………6
I. Dr. Smock's Background…………………………………….……………..……6
A. Educational History……………………………………….………………6
B. Professional History……………………………………….……………...6
C. Forensic Medicine Training and Experience……………………………..7
II. Smock's Proposed Testimony……………………………………………….....10
LEGAL STANDARD…………………...……………………………………………….14
I. Rule 702 and Daubert……………...…………………………………………14
A. The Expert's Scientific, Technical, or Other Specialized Knowledge………..…15
B. The Court Should Admit Testimony That Is Based on Sufficient Facts or Data Which Is The Product of Reliable Principles and Methods…..…………....16
C. Expert Testimony is Subject to Rule 403's Balancing Test……………………..18
D. Evidentiary Hearing Is Not Required……………………………..………..18
ARGUMENT……………………………………………………………………………19
I. The Court Should Deny Farwell's Motion to Exclude Dr. Smock's Expert Testimony...19
A. Dr. Smock is qualified to offer an expert opinion regarding Birchmore's injuries and the cause and manner of death…………………………………….……19
i. Dr. Smock has the required training and experience..……………………19
ii. Courts have admitted Dr. Smock's expert testimony…………………..….19
iii. Dr. Smock need not be a forensic pathologist to opine in this case………22
B. Dr. Smock's opinions are sufficiently reliable……………………………………23
i. Dr. Smock's opinions are supported by reliable methodology…………...23
C. Farwell's specific objections are without merit and can be addressed cross-examination…………………………………………………………..….26
i. Birchmore was not suicidal on February 1, 2021, or in the preceding months. …………………………………………………….…..27
ii. There is a hemorrhage at the site of the hyoid fracture…………………...29
iii. Farwell misrepresents Dr. Smock's conclusions about incomplete hangings…………………………………………………..……….30

iv. Dr. Smock will not testify that Birchmore's hyoid bone fracture could only have been caused by squeezing pressure of manual or ligature strangulation to the exclusion of any other mechanism…………………..32

v. Farwell can cross-examine Dr. Smock on whether there are any alternate theories about the cause of the hyoid fracture……………………….……33

vi. Dr. Smock is not required to adopt Farwell's version of events or his characterization of the literature……………………………….….……….33

vii. Dr. Smock is not required to take the first responders' observations at face value……………………….………………………………...………34

viii. If Birchmore was murdered, her body must have been moved and the scene staged……………………….………………………………...……...35

ix. The abrasion on Birchmore's chest is a pattern imprint……..……...........36

x. Dr. Smock will discuss his consideration of the DNA…...……..................37

xi. Dr. Smock's opinion as to the injuries to Ms. Birchmore's nose are based on his 40+ years of experience………………………...……................38

xii. Dr. Smock's reference to the history of choking will be limited to how that impacted his evaluation of the lack of defensive wounds on Birchmore's body……………………………….…………………...……...................38

xiii. Dr. Smock will opine that Birchmore's manner of death was homicide, but he will not use the term "homicidal death" elsewhere in his testimony…………………………………………………………………….39

D. Rule 403 balancing test weighs heavily in favor of admitting Dr. Smock's expert testimony. ……………………………………………………………...40

II. The Court Should Deny Farwell's Motion to Exclude Dr. Smock's Expert Testimony Without Conducting an Evidentiary Hearing……………………………….............41

CONCLUSION……...……………………...............................................................................42

**Introduction**

The United States of America opposes defendant Matthew Farwell's motion *in limine* to exclude the expert testimony of Dr. William Smock, M.D., a physician with more than forty years' experience in the forensic evaluation of injuries and the analysis of injury causation and reconstruction. (filed under seal). Distilled to its core, Farwell's 70-page *Daubert* motion consists of three basic arguments: (1) the Court should exclude Dr. Smock's testimony in its entirety, because he is not a forensic pathologist and thus unqualified to render any opinion regarding the cause of death or Birchmore's injuries; (2) in the alternative, Dr. Smock's opinions lack sufficiently reliable bases because Farwell disagrees with the underlying facts and/or interpretation of the medical literature; and (3) admitting Dr. Smock's expert testimony would confuse the jury and cause unfair prejudice so it should be excluded under Rule 403. The Court should reject these arguments because Dr. Smock is, as other courts have held, eminently qualified to testify regarding the injuries Sandra Birchmore sustained and the cause of her death, his opinions are well supported by medical literature and his decades of experience in this field, and cross-examination is Farwell's remedy for any of his quibbles with the underlying facts or interpretation of the medical literature.

First, Farwell's challenge to Dr. Smock's qualifications is without merit. Dr. Smock is an emergency medicine doctor, having completed residency and forensic fellowship training. He has more than 36 years of experience as a physician conducting forensic evaluation of injuries and more than forty years in the analysis of injury causation, injury mechanisms, and injury reconstruction. Importantly, Dr. Smock's experience includes the evaluation of asphyxia-related deaths and the examination of crime scenes. Dr. Smock has also treated and evaluated thousands of patients—including those with fatal and non-fatal injuries—who have experienced the physiological consequences of asphyxia, overdose, penetrating and blunt force trauma, and

gunshot wounds. Over the last 10 years, Dr. Smock has been qualified to testify as an expert in approximately 85 criminal trials in courts throughout the country, including federal courts in the District of Wyoming, Northern District of Oklahoma, District of Idaho, and the District of Columbia. Dr. Smock has also testified as an expert in various state courts, including a 2023 trial in the Commonwealth of Massachusetts, for which the defendant called him to testify. Dr. Smock has been accepted in both federal and state courts as an expert in forensic medicine, emergency medicine, torture, injury interpretation, injury reconstruction, asphyxia-related injuries and deaths, and staged and altered crime scenes. Dr. Smock's training and experience makes him uniquely qualified to provide expert testimony regarding the injuries that caused Birchmore's death.

Second, Farwell's claims about the insufficient bases for Dr. Smock's opinions are nothing more than cross-examination topics dressed up as legal arguments. For nearly 40 pages, Farwell lists facts or conclusions that he disputes. However, none of those disputed issues reveal a legally deficient foundation for Dr. Smock's opinions. If anything, they highlight the parties' divergent views of the medical and forensic evidence—precisely what cross-examination and the jury trial is designed to resolve.

Third, the Court has sufficient information from the government's expert notice and the parties' filings to conclude that Dr. Smock is qualified to testify on the topics identified in the expert notice. In fact, a similar *Daubert* motion was filed and denied less than 3 months ago in a criminal case adjudicated in D.C. Superior Court. Given that the issues raised by Farwell's motion have been decided repeatedly and recently, the Court should deny Farwell's motion without a hearing. *See United States v. Crater,* 93 F.4th 581, 590 (1st Cir. 2024) ("[T]here is no particular procedure that the trial court is required to follow in executing [its] gatekeeping function, and we have specifically rejected the argument that a district court must necessarily hold an evidentiary

hearing.") (quoting *Smith v. Dorchester Real Estate, Inc.*, 732 F.3d 51, 64 (1st Cir. 2013) and *Phillipos*, 849 F.3d at 471).

## Background

### I. Dr. Smock's Background

#### A. Educational History

Dr. Smock is a former attending physician at a Level 1 trauma center emergency department and a leading expert in the field of forensic medicine with specialized knowledge in the field of asphyxia and asphyxia-related deaths. Dr. Smock has been a physician for over 36 years. He is a licensed physician in Kentucky and Indiana. He received a Master of Science from the University of Louisville School of Medicine, Department of Anatomy, in 1987 and a Doctor of Medicine degree from the same institution in 1990.

#### B. Professional History

Dr. Smock worked as both a resident and later an attending physician and professor in the Emergency Department at the University of Louisville Trauma Center, a Level 1 trauma center. There, he treated hundreds of patients who suffered from asphyxia-related injuries resulting from suicide attempts, manual strangulation, ligature strangulation, positional asphyxia, and choking. Dr. Smock has routinely observed and treated injuries of the throat and neck as well as pattern imprints caused by blunt force trauma like the ones at present in this case. He has also treated hundreds of surviving victims of asphyxia and noted the physical symptoms that accompany it. Dr. Smock's Master's Thesis, performed while he was in an investigator for the Jefferson County Coroner's Office, specifically included the use of pattern injuries and pattern imprints in the reconstruction and analysis of injuries in fatal motor vehicle collisions.

Emergency medicine necessarily involves the treatment of living patients, treatment and attempted resuscitation of patients in the perimortem period, and observations of those who ultimately succumb to their injuries. As an emergency medicine physician, Dr. Smock has signed hundreds of death certificates that indicate cause and manner of death.

In addition to having treated thousands of patients as a resident, physician, and attending physician in the Emergency Department of the University of Louisville Trauma Center during his 21 years at that hospital, Dr. Smock also has extensive experience in the evaluation of injuries postmortem. Dr. Smock started gaining experience in this field in 1984, when he began working as an investigator for the Jefferson County Coroner's Office and Kentucky Medical Examiner's Office. Over the next 13 years, Dr. Smock continued to work at the Kentucky Medical Examiner's Office, an office that conducted approximately 1,000 autopsies per year. Dr. Smock worked as a diener during medical school, where he handled all parts of the autopsy process, including making incisions, removing organs, and evaluating physical evidence on the body. After medical school, he served as an Assistant Medical Examiner from 1991 to 1997.[1] During that time, he participated in thousands of autopsies, went to death scenes, reconstructed injuries, and evaluated physical evidence on the body.

Since 1993, Dr. Smock has served as a Police Surgeon and Medical Advisor for various law enforcement agencies, including: the Louisville Metro Police Department (Louisville, Kentucky), the Floyd County Sheriff's Department (Indiana), Jeffersontown Police Department (Jeffersontown, Kentucky), the St. Matthews Police Department (St. Matthews, Kentucky), the

[1] A diener is an autopsy technician who handles, moves, and cleans bodies, and assists pathologist during postmortem examinations.

United States Marshals Service (Western District of Kentucky), and the Federal Bureau of Investigation (Kentucky Division).

### C. Forensic Medicine Training and Experience

Additionally, Dr. Smock is a leading expert in the field of forensic medicine, a branch of medicine that deals with the intersection of medicine and the law. In fact, after completing his 3-year residency in emergency medicine at the University of Louisville School of Medicine, he was the first physician in the United States to complete a fellowship in Clinical Forensic Medicine. He did so at the Kentucky Medical Examiner's Office after being specially trained in forensic pathology in Edinburgh, Scotland by the esteemed forensic pathologist and police surgeon Dr. Anthony Busuttil.

Dr. Smock has written or edited multiple textbooks on clinical forensic medicine, including one on clinical forensic pathology including:

- *Manual Nonfatal Strangulation Assessment for Health Care Providers and First Responders*, 2d Ed., Forensic Learning Series, STM Learning (2020).
- *Forensic Emergency Medicine,* 1st Edition, Olshaker, Jackson, and Smock, Lippincott, Williams & Wilkins, 2000
- *Forensic Emergency Medicine,* 2nd Edition, Olshaker, Jackson, and Smock, Lippincott, Williams & Wilkins (2006)
- *Forensic Medicine: Clinical and Pathological Aspects. Eds.* Payne-James, Busuttil and Smock, Greenwich Medical Media, Ltd. London, 2003

Additionally. Dr. Smock has authored more than forty peer-reviewed articles and chapters on forensic and emergency medicine, including the recognition of pattern imprints in various textbooks:

- *Injury Patterns and Evidence Preservation* W.S. Smock. Assessment of Wounds and Injuries, A Practical Guide to Forensic Nursing; Angela Amar & L. Kathleen Sekula (2016)
- *Physics Restraints and Fractures; Forensic Medicine and Patterns of Injury*
- *Pattern Injuries of Domestic Violence, Assault, and Abuse* (WS Smock & Lawrence Stack) The Atlas of Emergency Medicine, Knoop, Stack, Storrow, Thurman, 5th Ed., (2021)

Furthermore, Dr. Smock has published multiple peer review articles including: "Why Didn't Someone Tell Me? Health Consequences of Strangulation Assaults for Survivors, *Domestic Violence Report*, Vol 19, No. 6, pp. 87-90, August/September 2014.

Dr. Smock is also a leading national trainer in the fields of hidden homicides and staged crime scenes, as well as suffocation and asphyxia-related deaths. He has presented at the FBI's National Homicide Conference, the Illinois Coroner's Conference, the Crimes Against Women Conference in Dallas, Texas, as regularly at the Department of Justice's National Advocacy Center. There, and elsewhere, he teaches an annual national course on "Hidden Homicides."

Dr. Smock has travelled the country to train federal agents, state and local police officers, nurses, prosecutors, defense attorneys, and judges regarding the investigation and analysis of fatal and near fatal strangulation cases and the investigation of staged and altered crime scenes. Dr. Smock is also the Medical Director of the San Diego-based Training Institute for Strangulation Prevention and has written and lectured extensively on the medical risks and consequences of strangulation, suffocation, positional asphyxia, blunt force trauma, traumatic deaths, crime scene evaluation, hidden homicides, staged and altered crime scenes, and the recognition and interpretation of pattern injuries. In June 2026, Dr. Smock provided judicial training for the Queensland magistrates in Brisbane, Australia on strangulation.

Dr. Smock engages in continuing education related to strangulation, having most recently done so in June of 2026. In December of 2020, Dr. Smock presented at the continuing

education course entitled, "The Forensic and Medical Evaluation of the Fatal and Non-Fatal Strangulation Patient," which was hosted by the Louisiana State University School of Medicine. Dr. Smock also speaks at training programs and symposia and has presented on "The Forensic and Medical Evaluation of the Fatal and Near-Fatal Strangulation Patient" numerous times, including 19 separate occasions in 2025 and 9 separate occasions in 2026. In sum, Dr. Smock's CV demonstrates that he is exceptionally qualified to testify as an expert in asphyxiation, strangulation, and forensic and emergency medicine.

In the last 40 years, Dr. Smock has visited and investigated over 1,000 crime scenes. He has continued to both give and receive specialized training in the recognition and evaluation of staged or altered crime scenes. Dr. Smock has received training in advanced automobile accident reconstruction, shooting reconstruction, bloodstain pattern analysis, trace evidence collection, forensic photography, and perhaps most notably, a course on strangulation prevention and intervention at the Canberra Hospital in Australia.

## II. <u>Smock's Proposed Testimony</u>

*The Pathophysiology of Asphyxia*

At trial, Dr. Smock will describe the pathophysiology of fatal asphyxia, including strangulation and suffocation. He will explain the various types of asphyxia, including manual strangulation, ligature strangulation, suffocation, and positional asphyxia, each of which deprives the human brain of oxygen, potentially causing death. He will testify about the difference between hypoxia and anoxia, and how long it would take someone to lose consciousness in either scenario.

Dr. Smock will also testify regarding the difference between a complete hanging, in which a person's entire body weight is suspended, and an incomplete or partial hanging, in which only part of the body weight is applied to the neck ligature. He will describe the various subsets of

partial hangings: standing, kneeling, seated, and reclined hangings. He will describe how each scenario involves a different amount of body weight suspended and different amount of corresponding pressure applied through the ligature.

*Birchmore suffered from a fractured hyoid bone*

Dr. Smock will testify regarding the physical injuries with which Birchmore presented, all of which are injuries that he has personally observed in living and deceased patients hundreds of times. He will testify about his observation of Birchmore's fractured hyoid bone, and how this is more consistent, in his 40 years of experience, with fatal or non-fatal strangulations rather than completed or attempted suicide. He will also testify that he has never seen a fractured hyoid bone resulting from a suicide or suicide attempt in which a person under 30 years old was seated or reclined—a position where nearly all the person's weight is supported by the ground. Dr. Smock will explain a point on which all experts in this case agree: hyoid bones are not fully fused in people under 30 years old; Birchmore's hyoid bone was not fully fused; and an unfused hyoid bone requires significantly more pressure to fracture than a fused hyoid bone found in older adults.

*Birchmore's hyoid bone fracture was perimortem and acute*

Dr. Smock will testify that Birchmore's hyoid bone fracture was perimortem and acute, which are other facts that are not truly in dispute here according to the expert notices. This means that Birchmore's hyoid bone was fractured at or near her time of death rather than in the months or weeks or days leading up to it. To further support the fact that Birchmore's hyoid bone was not fractured at some date prior to her death, Dr. Smock will describe his treatment, in his 21 years as an emergency medicine physician, of patients who have survived hyoid bone fractures and the pain and symptoms with which they presented and how, by all accounts, Ms. Birchmore displayed none of these symptoms.

*Birchmore's hyoid bone had a hemorrhage associated with it*

Dr. Smock will also testify that there was hemorrhage associated with the hyoid fracture, suggesting that Birchmore was alive at the time the bone was broken. While such a hemorrhage is not noted in the autopsy report, it is visible in the photographs that Dr. Smock commissioned before forming his opinion. Dr. Smock will also testify as to the medical examiner's observations of a hemorrhage of the left sternothyroid muscle, suggesting that pressure was exerted bilaterally on Birchmore's neck.

*Birchmore's hyoid bone was fractured medially*

Dr. Smock will also testify that Birchmore's hyoid was fractured medially, which means the break was inward. This is consistent with the findings of forensic anthropologist Dr. Angi M. Christensen. Dr. Smock will testify that, in his 40 years as a physician, including 21 years as an emergency medicine physician and his work as an assistant medical examiner, an inward fracture occurs significantly more frequently in strangulations than in hangings, especially incomplete, seated hangings. In suicidal hangings, especially more passive types like position in which Birchmore's body was found, it is more common for the hyoid bone to be fractured laterally (outwardly).

*Birchmore presented at autopsy with a perimortem patterned imprint caused by blunt force trauma*

Dr. Smock will further testify about the injuries to Birchmore's body. Specifically, Dr. Smock will identify a perimortem patterned abrasion caused by blunt force trauma. Unlike Farwell's proffered expert, Dr. Thomas, Dr. Smock will opine that this is a pattern imprint caused by a specific buckle (also known as a "lobster claw clasp") located on one end of the ligature from which Birchmore was hung. Dr. Smock will describe how he reviewed the medical examiner's measurements of this abrasion as well as the multiple photographs that she took of the injury and

the process of measuring the injury during autopsy. Dr. Smock will then testify that he personally inspected the ligature and measured the lobster claw clasp. The measurements of the clasp match exactly the measurements of Birchmore's injury. Dr. Smock will also describe and demonstrate for the jury how he used a replica ligature and placed its lobster claw clasp in clay, creating the same imprint that appeared on Birchmore's upper clavicle. For background, Dr. Smock referenced his years of treating living patients and participating in the autopsies of deceased patients and identifying pattern imprints formed during blunt force trauma. Dr. Smock will testify regarding the force necessary to cause this injury, especially through clothing, and opine that the location and nature of the imprint is not consistent with an incomplete hanging, and certainly not with the position in which Birchmore was found. Furthermore, the location and nature of the imprint is inconsistent with the position in which the ligature was found. Accordingly, her body must have been moved and, necessarily, staged.

*Birchmore presented, at autopsy, with abrasions to her nose and mouth*

Dr. Smock will also testify regarding the images of Birchmore's nose and mouth that were taken at autopsy. He will testify that, based on his 40 years as a physician, including 21 years as an emergency room physician, and his experience as an assistant medical examiner and police surgeon, the abrasions to Birchmore's nose appear consistent with Birchmore having moved her nose and face against a surface, consistent with an attempt to breathe. Dr. Smock has evaluated multiple strangulation survivors with similar or identical injuries who describe being smothered by something applied to their faces.

Dr. Smock will testify about his review of crime scene photos in which he observed a duffle bag next to Birchmore's bed, and Birchmore reclined under a doorknob with a duffle bag strap tied tightly around her neck and affixed to the doorknob. He will also testify regarding his

observations in the crime scene and autopsy photos of Birchmore. This will include observing Birchmore's hair tangled in the ligature, and how that is inconsistent with his experience treating survivors of suicidal handing attempts and patients who died by suicide. He will also testify regarding his observations of crime scene photos depicting a necklace broken and laying on Birchmore's shirt. Dr. Smock will testify how both of these are signs of a struggle. He will testify that a lack of defensive wounds on Birchmore could have been because of their history of consensual, sexual choking. He will opine that she could not have suffered the injuries to her neck and chest in the position in which she was found and, thus, conclude that her body had been moved.

Dr. Smock will not testify about other areas that added context to his reports, including the content of any discussions with Birchmore's mental health providers about her lack of suicidality, or anything regarding an incident of domestic violence between Farwell and Birchmore in early January 2021 or how that correlates, statistically, with subsequent homicides.

## Legal Standard

### I. Rule 702 and *Daubert*.

Rule 702 authorizes the Court to admit testimony by a:

> witness who is qualified as an expert by knowledge, skill, experience, training, or education . . . if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"*Daubert* establishes that before admitting expert testimony, the trial court must fulfill its 'gatekeeping role' by making an independent determination that the expert's proffered . . . knowledge is both reliable and relevant." *United States v. Crater*, 93 F.4th 581, 591 (1st Cir. 2024) (quoting *United States v. Phillipos*, 849 F.3d 464, 470 (1st Cir. 2017) (quoting *Daubert*, 509 U.S. at 597)).

**A. The Expert's Scientific, Technical, or Other Specialized Knowledge.**

"As an initial matter, the Court must determine whether the proffered expert witness is 'qualified as an expert by knowledge, skill, experience, training, or education' before permitting the testimony to be presented to the jury." *Camacho v. United States*, No. 19-2091(JAG), 2022 U.S. Dist. LEXIS 254766, at *4 (D.P.R. Sept. 12, 2022).

In the context of medical expert testimony, it is well settled that "[t]he fact that the physician is not a specialist in the field in which he is giving his opinion affects not the admissibility of his opinion but the weight the jury may place on it." *Mitchell v. United States*, 141 F.3d 8, 15 (1st Cir. 1998) (quoting *Payton v. Abbott Labs*, 780 F.2d 147, 155 (1st Cir. 1985)); *see also Gaydar v. Sociedad Instituto Geneco-Quirurgico y Planificacion Familiar*, 345 F.3d 15, 24 (1st Cir. 2003) (ruling that a district court may not exclude expert witness testimony as unqualified "on the sole basis that his medical specialty was something other than" the specialty of the defendant doctor); *see also Holbrook v. Lykes Bros. S.S. Corp.*, 80 F.3d 777, 782 (3d Cir. 1996) (holding the "district court erred by finding that [the proffered expert] was not qualified to render a diagnosis or to discuss the pathology report because he was not a pathologist, oncologist or expert in 'definitive cancer diagnosis'").

In fact, federal courts regularly admit expert testimony regarding a decedent's cause of death when it is offered by non-forensic-pathologist witnesses. *See, e.g., Ely v. Cnty. of Santa Barbara*, CV 20-6549-DMG (SKx), 2022 U.S. Dist. LEXIS 236211, at *28 (C.D. Cal. July 25, 2022) (admitting expert testimony by emergency room physician regarding cause of death); *Montgomery v. Bobst Mex SA*, No. 24-367, 2026 U.S. Dist. LEXIS 95989, at * (E.D. Pa. May 1, 2026) (denying *Daubert* motion to exclude general medicine physician from testifying about the decedent cause of death: fatal mechanical asphyxia); *Atencio v. Arpaio*, CV-12-02376-PHX-PGR, 2015 U.S. Dist. LEXIS 179741, at *50–51 (D. Ariz. Jan. 15, 2015) (admitting expert testimony by non-forensic-pathologist medical doctor regarding cause of death); *Alves v. Riverside County*, 2021 U.S. Dist. LEXIS 169354, at *18 (C.D. Cal. Aug. 5, 2021) (same); *Gillis v. Cmty. Prods., LLC*, 5:22-cv-00080-DAE, 2024 U.S. Dist. LEXIS 134184, at *17–30 (W.D. Tex. July 9, 2024 (denying *Daubert* motion to exclude cause of death testimony by non-forensic-pathologists, holding "[a] medical doctor who has the necessary 'knowledge, skill, experience, training, or education' is qualified to opine on factual medical matters, including cause and manner of death").[2]

Moreover, "[i]t is not required that experts be blue-ribbon practitioners with optional certifications." *See United States v. Mahone*, 453 F.3d 68, 71 (1st Cir. 2006) (citing *United States v. Rose*, 731 F.2d 1337, 1346 (8th Cir. 1984) (holding, pre-*Daubert*, that "[a]n expert witness need not be an outstanding practitioner in the field nor have certificates of training in the particular subject")).

[2] *Cf. Lind v. United States*, No. 1:20-cv-00574 (AMN/DJS), 2024 U.S. Dist. LEXIS 57261, at *14–18 (N.D.N.Y Mar. 29, 2024) (applying New York law, rejecting argument cardiologist was not qualified to testify regarding cause of death).

### B. The Court Should Admit Testimony That Is Based on Sufficient Facts or Data Which Is The Product of Reliable Principles and Methods.

Courts may exclude expert opinions that are "connected to existing data only by the *ipse dixit* of the expert," or opinions arising from "too great an analytical gap between the data and the opinion proffered." *See Milward v. Acuity Spec. Prods. Group*, 639 F.3d 11, 15 (1st Cir. 2011) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). However, "[t]his does not mean that trial courts are empowered 'to determine which of several competing scientific theories has the best provenance.'" *See Milward*, 639 F.3d at 15 (*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)). "*Daubert* does not require that the party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct . . . It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *United States v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002) (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).[3] "The object of *Daubert* is 'to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *See Milward*, 639 F.3d at 15 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). And, ultimately, "the fact that another explanation might be right is not a sufficient basis for excluding [the expert testimony]. 'Lack of certainty is not, for a qualified expert, the same thing as guesswork.'" *Id.* at 22 (quoting *Primiano v. Cook*, No. 06-15563, 2010 U.S. App. LEXIS 8859 (9th Cir. Apr. 27, 2010)). Any alleged flaws "go to the weight of [the

---

[3] "When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis . . . on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Advisory Cmt. Note to Fed. R. Evid. 702.

expert's opinion], not its admissibility. There is an important difference between what is unreliable support and what a trier of fact may conclude is insufficient support for an expert's conclusion." *Milward*, 639 F.3d at 22.

"[O]nce a trial judge determines the reliability of the proffered expert's methodology and the validity of his reasoning, the expert should be permitted to testify as to the inferences and conclusions he draws from it, and any flaws in his opinion may be exposed through cross-examination or competing expert testimony." *Mooney*, 315 F.3d at 63 (citing *Ruize-Troche*, 161 F.3d at 85); *see also United States v. Jackson*, 58 F.4th 541, 552 (1st Cir. 2023) (stating that even "where 'the factual underpinning of an expert's opinion is weak' but the methods are otherwise found to be reliable, such an issue is 'a matter affecting the weight and credibility of the [expert's] testimony'—that is, 'a question to be resolved by the jury.'") (quoting *Martinez v. United States*, 33 F.4th 20, 27 (1st Cir. 2022)); *see also Milward*, 639 F.3d at 15 ("So long as an expert's scientific testimony rests upon ''good grounds,' based on what is known,' it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities.") (quoting *Daubert*, 509 U.S. at 590, 596).

### C. Expert Testimony is Subject to Rule 403's Balancing Test.

Like all evidence, expert testimony is subject to Rule 403's balancing test to determine if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, wasting time, or needlessly presenting cumulative evidence." *See United States v. Montas*, 41 F.3d 775, 783 (1st Cir. 1994); Fed. R. Evid. 403. "[T]he standard for exclusion under Rule 403 is a high one." *United States v. Pires*, 138 F.4th 649, 670 (1st Cir. 2025) (quoting *United States v. Soler-Montalvo*, 44 F.4th 1, 16 (1st Cir. 2022)). However, given the potential power and complexities inherent in expert testimony, courts "exercise[] more control over experts than over lay witnesses." *See Daubert*, 509 U.S. at 595.

### D. Evidentiary Hearing Is Not Required.

It is well settled that the Court is not required to conduct an evidentiary hearing to determine the admissibility of expert testimony under Rule 702. *See United States v. Crater,* 93 F.4th 581, 590 (1st Cir. 2024) ("[T]here is no particular procedure that the trial court is required to follow in executing [its] gatekeeping function, and we have specifically rejected the argument that a district court must necessarily hold an evidentiary hearing.") (quoting *Smith v. Dorchester Real Estate, Inc.*, 732 F.3d 51, 64 (1st Cir. 2013) and *Phillipos*, 849 F.3d at 471).

## Argument

### I. The Court Should Deny Farwell's Motion to Exclude Dr. Smock's Expert Testimony.

### A. Dr. Smock is qualified to offer an expert opinion regarding Birchmore's injuries and the cause and manner of death.

i. Dr. Smock has the required training and experience.

Dr. Smock is a nationally recognized emergency medicine physician who has decades of experience in determining cause and manner of death and observing and treating strangulation-related injuries. He gained this specific expertise in the topics of asphyxia and strangulation by interviewing patients about what happened to their bodies while they were strangled, reviewing medical records of living and dead patients, visiting crime scenes or reviewing crime scene evidence, and participating in autopsies. He has assisted in thousands of autopsies and published a number of articles on the effects of strangulation and strangulation-related deaths. Notably, since 1991, he has signed hundreds of death certificates, a process that includes making a determination of the cause and manner of death.

ii. Courts have admitted Dr. Smock's expert testimony.

Dr. Smock has testified in more than 85 criminal trials in the last ten years. Not once has a court precluded him from testifying regarding his opinion about the cause and manner of death.[4] In a recent case pending in the Superior Court for the District of Columbia, a similar *Daubert* motion was filed to preclude Dr. Smock from opining regarding an asphyxia-related death. After two days of testimony, the court made the following findings:

> So in considering the admissibility of the testimony of Dr. Smock, the Court has reviewed the pleadings of the parties and exhibits, the curriculum vitae of Dr. Smock, the expert disclosures and reports, autopsy findings and photographs, the extensive testimony of Dr. Smock, and the arguments of counsel. Having considered the evidence and applicable law, the Court finds as follows: Regarding qualifications, **the Court finds that Dr. Smock is qualified by knowledge, skill, experience, training, and education to offer expert testimony regarding asphyxia, strangulation, injuries, blunt force trauma, neck anatomy, mechanisms of injury, and interpretations of medical findings associated with alleged strangulation.** The Court further finds that the witness's extensive experience reviewing and evaluating strangulation-related injuries; together with review of autopsy materials, medical records, photographs, investigative materials, and relevant literature, provides a sufficient foundation for the opinions proffered in this case.
>
> **With regard to the reliability of methodology, the Court finds that the opinions offered are grounded and reliable principles and methods within the field of forensic medicine and forensic pathology and are sufficiently reliable to satisfy Rule 702**. I would note that Dr. Smock specifically relied upon autopsy findings, internal neck anatomy findings, hemorrhage of the neck musculature, hemorrhage surrounding the thyroid cartilage, fracture of the superior horn and the thyroid cartilage, petechial hemorrhages, external injury patterns, photographs, investigative materials, and the witness's training and experience in the evaluation of asphyxia and strangulation injuries. I would find also that the methodology employed involves recognized comparative medical analysis of injury patterns, anatomical findings, and physiological mechanisms commonly utilized in forensic death investigations. With regard to facts and data, the Court finds that the expert relied on sufficient facts and data reasonably relied upon by experts in the field, including the

[4] Throughout his 40-year career, Dr. Smock has been qualified as an expert in the field of asphyxia over one hundred times and has never had his testimony limited in this area.

autopsy reports, postmortem photographs, investigative information, medical records of GW Hospital, body-worn cameras taken at the time of the EMT response, the report of anthropology consultation of Dr. Jennifer Love, and other items that were identified during the hearing and in Dr. Smock's report. **The Court further finds that disputes regarding the completeness of the underlying data or the interpretation of particular findings go to the weight of the testimony rather than its admissibility**.

The Application of Methodology to the Facts. The Court finds that the expert reliably applied the foregoing principles and methods to the facts in this case. The Court recognizes that the certain individual findings discussed by the expert, including petechial hemorrhage in the left eye and external trauma, may not be independently diagnostic of strangulation; however, the Court finds that the expert's opinions are based upon totality of the anatomical and physiological findings rather than any single isolated observation. **The Court further finds that the existence of potential alternative explanation for some of the injuries, including blunt force trauma, does not render the methodology unreliable where the expert has considered the overall injury pattern and offered opinions within the scope of medical probability and his professional judgment.** With regard to assistance to the trier of fact, the Court finds that the proposed testimony will assist the jury in understanding neck anatomy, the mechanisms of asphyxia and strangulation, including the timing of each, the internal versus external injury patterns, petechial hemorrhages, thyroid cartilage injury, and the interpretation of medical findings outside the common knowledge of lay jurors, and, in fact, some doctors. The Court notes that the challenges concerning the degree of certainty expressed, the significance of alternative mechanisms of injury, the interpretation of specific findings, and the weight to be given to the opinions are proper subjects for vigorous cross examination and the presentation of contrary expert testimony.

So consistent with the principles of Daubert and Motorola, the Court further notes that the admission of the testimony does not constitute a finding that the expert's conclusions are correct, only that the testimony satisfies the threshold requirements of 702. So as a result -- and I don't believe that Dr. Smock's testimony would be confusing in any way to the jury. In fact, you know, I thought it was very educating. So I'm going to -- the motion to exclude Dr. Smock's testimony is denied, and Dr. Smock will be permitted to the testify in the areas identified.

*See United States v. Guerra*, No. 2023-CF1-9004, (D.C. Super. Ct. May 29, 2026), Tr. at p, 31-36 (emphasis added), attached as Exhibit A.

iii. Dr. Smock need not be a forensic pathologist to opine in this case.

Farwell moves to exclude Dr. Smock's testimony, arguing that Dr. Smock is not qualified to testify regarding the cause of death because he is not a forensic pathologist. The Court should reject this argument because it is inconsistent with First Circuit precedent and the spirit and intent of Rule 702. Indeed, the First Circuit has held "[t]he fact that the physician is not a specialist in the field in which he is giving his opinion affects not the admissibility of his opinion but the weight the jury may place on it." *See Mitchell*, 141 F.3d at 15; *see also Gaydar*, 345 F.3d at 24 (ruling that a district court may not exclude expert witness testimony as unqualified "on the sole basis that his medical specialty was something other than" the specialty of the defendant doctor). Moreover, federal courts routinely admit non-forensic-pathologists' expert testimony regarding the cause and manner of death. *See supra* at 13–14 (listing cases).

The Court must take a holistic approach to the gatekeeping function in determining whether specialized opinion testimony is admissible. Here, where Dr. Smock has such broad medical and forensic experience, in addition to deep experience in the areas of asphyxia and strangulation, he has even more experience than a typical forensic pathologist would have in addressing the topics at issue in this case.

Not only has Dr. Smock never been precluded from testifying regarding the topics at issue here, but multiple courts have affirmed in cases where his testimony was admitted. *See People v. Feldman,* 563 P. 3d 1215 (Colo. App. 2024) (affirming trial court's admission of Dr. Smock testimony regarding cause and manner of death in staged homicide by strangulation); *see also People v. King*, 2025 IL App (2d) 230086-U, 2025 WL 262774, *appeal denied*, 260 N.E.3d 74 (Ill. 2025) (not reported) (admitted as expert in forensic and emergency medicine as it related to

asphyxia causes of death, testified decedent's cause of death was assault, strangulation, and suffocation); *see also State v. Derek Chauvin,* 27-CR-20-12646, 2021 WL 2621001 (Minn. Dist. Ct. June 25, 2021) (sentencing order and memorandum opinion) (admitted as expert in asphyxia, forensic medicine, and cause and manner of death).

The Colorado Appellate Court said it most plainly:

> [The defendant] asserts that Dr. Smock was not qualified to testify about the cause and manner of the victim's death because he is not a forensic pathologist and that his testimony was therefore unreliable. Whether Dr. Smock is a forensic pathologist is not dispositive of this issue, however. As discussed above, a district court's reliability determination is based on the totality of the circumstances and considers the witness's subject matter expertise . . . Dr. Smock's seventy-one-page curriculum vitae indicated that his experience includes treating or consulting with thousands of strangulation and suffocation patients, assisting in thousands of autopsies, publishing extensively in the fields of emergency and forensic medicine, and working as a police surgeon and a medical director for the Institute on Strangulation Prevention. Based on his experience, we conclude that the trial court did not abuse its discretion by admitting Dr. Smock as an expert in clinical forensic medicine and strangulation to opine that the victim's bruises were consistent with strangulation and suffocation."

*See People v. Feldman*, 563 P.3d 1215, 1222 (Colo. App. 2024).

Dr. Smock's training, professional experience, and knowledge far exceed what is required to serve as an expert witness on the topics at issue. The government respectfully requests that this Court join the others in concluding Dr. Smock may testify as an expert in asphyxiation and strangulation, among other things, as outlined in his report, and opine regarding Birchmore's injuries, cause and manner of death.

**B. Dr. Smock's opinions are sufficiently reliable.**

i. Dr. Smock's opinions are supported by reliable methodology

Under Rule 702, the Court's inquiry is "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that

reasoning or methodology properly can be applied to the facts in issue.'" *See Daubert*, 509 U.S. at 592–93. The inquiry is "a flexible one" and courts should eschew "a definitive checklist or test." *Id.* Thus, the *Daubert* factors can be useful to consider but are not definitive of the Court's inquiry.

In this case, Dr. Smock's proffered opinions are supported by reliable methodology. Dr. Smock reviewed crime scene photos taken by first responders as well as the reports they generated from their response. He also reviewed Birchmore's autopsy report, autopsy photos, and autopsy x-rays. Dr. Smock reviewed police reports, electronic evidence recovered from the scene, and a relevant surveillance video. While he formed his opinion before the additional information that Farwell's DNA was on the murder weapon (i.e., the ligature), he considered that as well when that information became available[5].

Dr. Smock's methodology would have been sufficient if he merely relied on the investigative file as described above. In fact, Dr. Smock has testified in several other proceedings that required him to make conclusions based on reviewing a person's medical records. *See, e.g., United States v. Goodman*, 827 Fed. Appx 826 (10th Cir. 2020) (Dr. Smock determining location of decedent in fatal truck accident by reviewing crime scene evidence, police reports, and medical records of truck's occupants). However, here, Dr. Smock also physically inspected the items the original investigators had preserved. He personally inspected Birchmore's preserved hyoid bone as well as the ligature from which she hung. He had the hyoid bone photographed, visibly showing hemorrhage associated with the fracture[6]. Dr. Smock did this rather than relying

---

[5] He also considered other DNA results in which Farwell was included as the source of sperm on Birchmore's underwear and excluded as the source of DNA under her fingernails.

[6] The hyoid bone was not dissected by the medical examiner so the most that can be said is that hemorrhage was associated with the fracture, but not conclusively at the fracture site.

on written notes taken during autopsy. He also requested additional imaging, including microscopic CTs, of the hyoid bone and requested consultations with doctors in with other expertise. Specifically, despite Dr. Smock's extensive experience in emergency medicine and forensic medicine, he asked the government to consult with a forensic anthropologist, who confirmed his opinion that regarding the existence of a medial fracture, and a radiologist who was able to explain what Dr. Smock had believed to be a second fracture on the left side of Birchmore's hyoid bone. [7]

While Dr. Smock did not inspect Birchmore's body himself, he consulted with the medical examiner who conducted the autopsy, Dr. Capo Martinez, to ensure that he knew what she was and was not aware of when she initially ruled Birchmore's death a suicide.[8]

Notably, Dr. Smock's methodology was similar to that employed by Dr. Andrew, Farwell's proffered expert. While Dr. Andrew's review of the evidence was less comprehensive and more cherry-picked, the categories of evidence (e.g., autopsy reports and photos, crime scene photos, police reports, text messages/journals) are the same as those Dr. Smock reviewed. Simply because

---

[7] Dr. Angi M. Christensen, M.D., confirmed that Birchmore's hyoid bone was fractured at the greater right horn inward, which is also called a medial fracture. She opined that this type of fracture in the hyoid bone is more common in older people whose hyoid bones are fully fused and that Birchmore's was not fully fused. Dr. Christensen opined that it is possible for a hyoid bone fracture to occur in younger people. However, she did not opine about the amount of pressure required to fracture a hyoid bone in younger people and has not indicated whether it is common or even possible in younger people who are in reclined or seated incomplete suicides.

Dr. Sassoon, a radiologist, confirmed a fracture on the right greater horn of Birchmore's hyoid bone and explained what Dr. Smock was observing that made it appear as if she could have had a slight fracture on the left side. Sassoon explained that he too, observed a defect, but that it was not sufficient to conclusively call it a fracture.

[8] Dr. Smock also consulted with Birchmore's therapist. While it was certainly appropriate and thorough for Dr. Smock to do so, the government does not intend to elicit any testimony regarding his conversation with Dr. Alkhalil. For the reasons stated in our motion to limit the testimony of proffered defense expert Dr. Andrew, we will not ask Dr. Smock to opine about Birchmore's suicidality or lack thereof.

Dr. Smock, aided by his specialized knowledge and experience in this field, reached a different conclusion than Dr. Andrew, who considered much of the same materials, does not render the methodology flawed. "*Daubert* does not require that the party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct . . . It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *See Mooney*, 315 F.3d at 63 (quoting *Ruiz-Troche*, 161 F.3d at 85).[9] "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

One of the *Daubert* considerations is whether the reasoning or methodology has been subjected to peer review and publication, although this is not a requirement for admission. *Daubert,* 509 U.S. at 593. Another strangulation expert could easily review the same materials as Dr. Smock and be able to come to their own reasoned opinions regarding Birchmore's cause and manner of death. In fact, the defendant's own expert has reviewed a subset of the same evidence and come to a slightly different conclusion: the possibility that Birchmore committed suicide cannot be excluded based on the medical evidence. Strangulation injuries are well-documented in medicine and Dr. Smock's career has provided him with expertise related to such injuries. As a result, Dr. Smock's testimony is based on reliable principles and methods.

### C. Farwell's specific objections are without merit and can be addressed cross-examination

[9] "When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis . . . on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Advisory Cmt. Note to Fed. R. Evid. 702.

Farwell spends more than 40 pages arguing, in large part, that the Court must find Dr. Smock's opinions unreliable because Dr. Smock does not base his opinion on Farwell's version of the facts—a version that teeters between misleading and patently false. None of Farwell's arguments call into question Dr. Smock's reliability and all are more appropriate topics for cross-examination

i. Birchmore was not suicidal on February 1, 2021, or in the preceding months.

Farwell argues that Dr. Smock ignored Birchmore's history of suicidality and suicide attempts. Def. Mot. at 29. However, Birchmore was not suicidal on February 1, 2021, and there is no evidence to support Farwell's claim. FBI agents interviewed every person with whom Birchmore interacted on February 1. Every single one of them said she was the happiest she had ever been. She was actively planning for the future. And they each confirmed that she showed no signs of suicidality. Furthermore, there is not a single internet search in which Birchmore researches hanging or how to commit suicide, or any written communication or journal entry that suggests that Birchmore was suicidal at or near the time of her death.

On the other hand, there were multiple text messages in the days preceding Birchmore's death, in which Birchmore described Farwell becoming uncharacteristically violent, asking for the code and a key to her apartment, and snooping around her bathroom and closet, the area from which she was ultimately hung.

While Birchmore did write a journal entry suggesting suicidal ideations in June 2017—almost 4 years before her death—she left no such note on February 1, 2021. Birchmore, a woman who witnesses describe as constantly on her cell phone, texted no one about having suicidal ideations, left no digital suicide note, and did not text anyone about any suicidal intentions. In

fact, the last time Birchmore accessed her phone in anyway was seconds before Farwell entered her apartment at 9:14 p.m. on February 1.

Farwell's references to a May 2020 incident are misleading. The discovery in this case, including interview reports from all 3 Stoughton police officers who responded to Birchmore's home that day, as well as Birchmore's aunt statements, do not support Farwell's characterizations. All four—3 of whom were trained to recognize the signs of suicidality—deny that Birchmore was suicidal or showed any signs of suicidality. The officers transported Birchmore to a hospital because they were required because of what her aunt initially reported. Once Birchmore arrived at the hospital, she was evaluated, quickly determined not to be suicidal, and released. The government long ago produced Birchmore's medical records reflecting those facts.

Moreover, Farwell has stated, in his own words, that he knows that Birchmore was not suicidal on May 14, 2020. Throughout her brief visit to the hospital, Farwell and Birchmore were communicating via text message. During that conversation, Farwell told Birchmore that he was not worried, that he knew she was fine, and that he intended to "pound" her and "grab [her] throat" later. Farwell's reference to this incident in support of an argument that Birchmore was suicidal eight months before her death is unavailing.

Similarly, Birchmore's Google search on the morning of February 1, 2021 was not a suicidal outcry. The digital forensic evidence is not hard to understand. Birchmore saw an image of a ribbon, googled what the purple ribbon meant, and *only then* searched "what color is the suicide ribbon." Then, she proceeded to browse the internet for children's bookshelves, order baby clothes, commission homemade onesies, and communicate with a friend to ensure someone would be able to shovel out her car so she could get to work three days later when school was supposed to reopen.

ii. <u>There is a hemorrhage at the site of the hyoid fracture</u>.

The defendant argues that Dr. Smock's assertion that there was a hemorrhage at the site of the hyoid bone fracture was erroneous. Def. Mot. at 34. Birchmore did have a hemorrhage at associated with the fracture of hyoid bone. No images were taken of Birchmore's hyoid bone at autopsy. However, the medical examiner had preserved the bone. Dr. Smock both personally inspected the hyoid bone as well as commissioned high-resolution photographs of and high-resolution micro CT scans of the hyoid bone that he reviewed before rendering his opinion. The photographs show a hemorrhage associated with the fracture.[10]

Farwell points out that the forensic anthropologist did not observe the hemorrhage. Def. Mot. at 34. That is not surprising. Such a hemorrhage would not appear on the scans (not photos) that the anthropologist reviewed in this case.

Farwell's proffered expert, Dr. Andrew, is the only expert who has reviewed the images of the hyoid and opined that no such hemorrhage exists. However, his findings on this topic are vague, at best, with his report merely stating that a hemorrhage at the fracture site is an "interpretive overreach." In addition to being vague about his opinion on a hemorrhage at associated with the fracture, Andrew is also notably silent about the hemorrhage of the left sternothyroid muscle noted by Dr. Capo-Martinez, which demonstrates bilateral pressure on the neck.

Farwell is free to cross-examine Dr. Smock or Dr. Capo Martinez, the only people who inspected Birchmore's hyoid bone, to challenge any observations they made with respect to a

[10] Of course, this hemorrhage would not be visible on the CT scans, which only depict bones.

hemorrhage. However, the Court should not exclude Dr. Smock because others who have not inspected the same evidence have reached a different (albeit vague) conclusion.

iii. Farwell misrepresents Dr. Smock's conclusions about incomplete hangings.

The defendant argues that Dr. Smock concluded that incomplete hangings can never cause hyoid bone fractures. Def. Mot. at 36. Farwell misrepresents Dr. Smock's opinions. Dr. Smock does not opine that incomplete hangings cannot cause hyoid bone fractures. He opines that the purported incomplete hanging in this case—i.e., the position in which Birchmore was found, plus consideration of Birchmore's age and gender—would not have resulted in a hyoid bone fracture.

Birchmore was not fully suspended, not standing into a ligature, not kneeling under a ligature, but seated and almost reclined under the ligature. Very little of her body weight was applied to that ligature.

Additionally, Dr. Smock considered Birchmore's age in reaching his conclusion. The medical literature consistently emphasizes that, in younger people whose hyoid bones are not fully fused, more pressure is required to fracture the hyoid bone. Here, no assumption about the formation of Birchmore's hyoid bone because she was significantly younger than the average age of fusing needs to be made because subsequent examination confirmed that her hyoid bone was not fully fused. Dr. Smock and Dr. Christensen, the forensic anthropologist, both conclude that Birchmore's hyoid bone, at the time of her death, had not fully fused. Therefore, it would require significantly more pressure to break.

Dr. Smock will testify that the amount of pressure necessary to fracture an unfused hyoid bone of a young female would not be produced by the passive form of hanging in this case.

Dr. Smock will testify that, in his 40 years of experience, treating the living and examining the dead, he has never seen a fractured hyoid bone from a partial hanging in a woman under 30

years old. Similarly, Dr. Capo Martinez will indicate that she does not recall seeing a fractured hyoid bone from a partial hanging in a person as young as Birchmore. The study that Farwell cites extensively also points out that age has a predictive power in determining whether a hyoid bone fracture will result from a hanging death. Rachel Wilson et. al., *A Metanalytical review of the frequency and patterning of laryngohyoid and cervical fractures in cases of suicide by hanging*, 68 J. OF FORENSIC SCIENCES 731, 739 (2023). It indicates that people 40 year old and over are 2.3 times more likely to suffer from a neck fracture than people, like Birchmore, who are under the age of 40. Younger people whose hyoid bones have not ossified are less susceptible to structural failure and fracturing when subjected to loads on the neck. In none of Farwell's studies of pooled data is there an attempt to break out various, distinct types of incomplete hangings *as well as* age to determine likelihood of neck fracture. Birchmore's death was unique: she was quite young and had almost no body weight on the ligature. These are both factors that need to be considered together in determining how likely, if at all possible, it would be fracture her hyoid bone in the manner in which her body was found. Nowhere in the studies cited is there identified a hyoid bone fracture for anyone under 152 centimeters or under the age of 26 resulting from a seated, incomplete hanging.

Farwell also attacks various components of Dr. Smock's opinions by citing literature that he claims suggests the injuries in isolation could also be consistent with suicide. Even putting aside that he misquotes Dr. Smock's report, he still overstates the degree to which the literature supports his argument. The literature he cites does not say that Dr. Smock's opinions about the cause and manner of death must be wrong. Rather, the literature, at best for Farwell, says the isolated injuries could also be consistent with suicide.

For example, the literature indicates that, when not separating out the various subsets of partial hangings, 22% of individuals under the age of 40 suffered a hyoid bone fracture from a suicidal hanging. *See* Wilson et. al. Importantly, that does not rule out their existence in homicidal strangulations. In fact, that study concludes that even when not controlling for age, homicide by ligature strangulation saw hyoid bone fractures of up to 64%. At trial, inherently, some matters that are the proper subject of expert testimony will be in dispute. Therefore, not surprisingly, it is well settled that alternative theories and interpretations of the evidence do not require excluding expert opinion testimony. *See, e.g., Mooney*, 315 F.3d at 63 (holding that the proponent of expert testimony does not have to negate competing theories for testimony to be admissible). It merely underscores the need for a jury to resolve the dispute after considering cross-examination and any additional expert testimony on the subject.

iv. Dr. Smock will not testify that Birchmore's hyoid bone fracture could only have been caused by squeezing pressure of manual or ligature strangulation to the exclusion of any other mechanism.

He also argues that Smock opines that a fractured hyoid bone can only be caused by the squeezing pressure of manual or ligature strangulation. Def. Mot. at 42. The defendant misrepresents this opinion as well. Dr. Smock will testify, consistent with his report, that he holds a reasonable degree of medical certainty that Birchmore's hyoid bone fracture was not the result of a seated, incomplete hanging. He will testify that manual or ligature strangulation would exert sufficient force to fracture her hyoid bone, even given that it was not fully ossified and thus harder to fracture. He will testify that Birchmore's hyoid bone fracture occurred at or near her time of death and that, combined with the other physical evidence, his opinion is that Birchmore was strangled, resulting in the fracture to her hypoid bone and abrasion on her clavicle, and that her body was moved to make it appear as if she had committed suicide.

v. Farwell can cross-examine Dr. Smock on whether there are any alternate theories about the cause of the hyoid fracture.

Farwell presumes that Dr. Smock did not consider Farwell's theories implausible theories that hypoxic terminal convulsing during asphyxia or metal buckles could have fractured Birchmore's hyoid bone during a suicidal hanging. Def. Mot. at 46. While Farwell is free to cross-examine Dr. Smock on whether he considered either of these scenarios and, if he chooses, whether either scenario is plausible, the existence of an articulable alternative theory does not make Dr. Smock's testimony inadmissible. And Dr. Smock does address, and reject, Farwell's theory that Birchmore's hyoid bone could have been fractured during the two (almost three) days she was left seated with the ligature around her neck before police found her. Dr. Smock opines that the presence of hemorrhages, at the left sternothyroid muscle as reported during autopsy and associated with the hyoid fracture of the right superior horn of the hyoid bone, as evidenced in photographs, confirms that Birchmore was alive when she suffered these injuries.

vi. Dr. Smock is not required to adopt Farwell's version of events or his characterization of the literature.

The defendant states that, according to the literature, the frequency of hyoid fractures varies considerably, from 0% to 100% inv various studies. Lenka Zatopkova et al., *Laryngohyoid fractures in suicidal hanging: A prospective autopsy study with an updated review and critical appraisal,* 290 FORESNIC SCIENCE INTERNATIONAL U70, 73 (2018). They site a meta-analytic review of over 8,000 hanging suicides, which indicates that approximately 1/3 of individuals who died by suicidal hanging suffered from a hyoid bone fracture, and, so, hyoid bone fractures are not unique to homicides. That study found that age was a predictive factor in determining whether a person would suffer a hyoid bone fracture from a suicidal hanging, as individuals under 40 were 2.3 times less likely to suffer a hyoid bone fracture from a hanging. Def. Mot. at 38. The defendant is critical of the fact that Smock is not persuaded by this meta-analysis.

Def. Mot. at 37. The fact that Farwell cites meta-analysis *is* relevant. Neither the doctor, nor the government, as Farwell alleges, misunderstands the purpose and values of such studies. Dr. Smock merely opines that meta-analysis is not helpful here because the studies discuss correlations and averages, and none identify a single case of a person Birchmore's age suffering from a fractured hyoid bone from a seated or reclined hanging. While it is fair to suggest that it is not impossible for a 23-year-old to suffer a fractured hyoid bone from a suicidal hanging, and also not impossible for a person to suffer a fractured hyoid bone from a seated hanging, there is no examples in the literature of a 23 or similarly youthful person suffering from a broken hyoid bone in a seated or reclined position. Smock's 40 year career (and Capo-Martinez's ten-year career), similarly, like the meta-analysis, are void of observations of a person as young as Birchmore suffering from a hyoid bone fracture when found in a passive form of suicidal hanging.

vii. <u>Dr. Smock is not required to take the first responders' observations at face value</u>

Here, Farwell argues that Smock's opinion is unreliable because he fails to adopt the conclusion of the first responders that Ms. Birchmore's apartment showed "no signs of a struggle." Def. Mot. at 51. The lack of marks on Birchmore's throat to suggest she struggled are as irrelevant now as when initial investigators noted them in February 2021. Farwell routinely choked Birchmore during sex. After their penultimate meeting, the two discussed engaging in a sex act at their future visit. Birchmore would have no way of knowing that, in the seconds it took her to lose consciousness, that she should struggle because Farwell was about to murder her, rather than just choke her as a means to increase his sexual arousal, as he routinely did.

Further, there were numerous signs of struggle that the first responders missed or did not appreciate the importance of. Dr. Smock considered Birchmore's hair being tightly tangled in

multiple locations on the ligature. He also considered the necklace broken down the front of Birchmore's shirt that was obvious in the crime scene photos but not noted or collected by investigators. Finally, he noted abrasions to Birchmore's nose that appeared unprobed by investigators. Dr. Smock was not required to consider an opinion that has been categorically disproved: that there was no sign of struggle in Birchmore's apartment on February 4, 2021. The fact that he did not rely on their representations but, rather, inspected the photos and reports himself, makes his opinion more, not less, reliable.

viii. <u>If Birchmore was murdered, her body must have been moved and the scene staged</u>.

The defendant argues that Dr. Smock provides no grounds for his conclusion that Ms. Birchmore's body was moved and staged to appear as if she had committed suicide. Def. Mot. at 50. Dr. Smock will opine that Birchmore did not die in the position in which she was found. The lobster claw clasp on the ligature that caused the acute, perimortem, blunt force trauma to Birchmore's clavicle was found more than a foot from the injury site, tied tightly behind the doorknob. Because Birchmore did not die in the position in which she was found, of course, it follows that her body was moved and it was moved by the last person to see her alive. As a matter of logic, Dr. Smock can infer that the scene that purports to show Birchmore in suicidal hanging position was staged, because the evidence strongly supports the conclusion that Birchmore died in a different way: by homicidal asphyxia and strangulation. *See, e.g.*, *Mooney*, 315 F.3d at 63 (holding that an expert may testify regarding inferences from the evidence).

Here, the ligature around Birchmore's neck was moved so that the clasp that caused her injury ended up behind her head. The ligature was tied tightly around a doorknob handle. Birchmore's cell phone was not opened after the defendant entered her apartment, and yet travelled

8 steps and was placed face down next to Birchmore's right hand at 9:40 p.m., 3 minutes before the Farwell left her apartment. Dr. Smock has inspected thousands of crimes scenes as a member of law enforcement and a forensic investigator. He developed and teaches a course on the recognition of staged crime scenes specifically for members of law enforcement charged with investigating these crimes. He will opine that she did not die in the position in which she was found and, thus, her body was moved.

Farwell is free to cross-examine government witnesses or call their own witnesses to describe their observations from the crime scene. Farwell, in his fillings, lauds the investigative steps taken by the Canton and State Police investigators, highlighting that they observed no signs of a struggle or drag marks. They criticize Dr. Smock for not considering, or disagreeing with, the first responders' analysis. Dr. Smock does not have to accept the initial investigators' conclusions. The trial process is how this dispute will be resolved.

ix. The abrasion on Birchmore's chest is a pattern imprint.

The defendant argues that Dr. Smock concluded, without explanation, that the injury to Ms. Birchmore's chest was a pattern imprint. Def. Mot. at 52. Dr. Smock will testify about pattern imprints and describe his years of identifying pattern imprints on both living and deceased patients. He will show the jury side-by-side images that he commissioned of the lobster claw clasp on the ligature from which Birchmore hung and the injury on her chest that was measured by the medical examiner during autopsy. There will be no doubt that that clasp caused that injury on Birchmore's chest. They are a perfect match in height, width and shape. Dr. Smock will also show the jury the imprint that that clasp made when placed in clay, and he will show that image side-by-side with the injury on Birchmore's chest.

The fact that the defendant has these images, measurements, and report and still suggests that there is no basis to suggest that the injury to her clavicle was caused by the lobster claw clap is troubling. Despite that, he still argues that Dr. Smock's opinion is unreliable because the medical examiner only noted the injury and photographed it but did not appreciate its significance. Def. Mot. at 53. However, Dr. Smock is not limited to medical examiner's observations and conclusions. He is free to rely on images and notes taken by the medical examiner to reach his own conclusions, especially in light of his specialized knowledge in asphyxia-related deaths. The medical examiner, in this case, was never asked to probe the death as if it could be a suicide and, so, she never considered objects from the scene or on Birchmore's body that could have caused such a clear imprint.

x. Dr. Smock will discuss his consideration of the DNA.

The defendant argues that the conclusions reached by the Massachusetts State Police Crime Laboratory are invalid and because Dr. Smock reviewed them, his opinion is infected. Def .Mot. at 59. First, as referenced in a separate motion, the conclusions reached by the Massachusetts Crime Laboratory were valid, supported, and conclusive. A criminal defendant does not get to misrepresent the state of forensic evidence simply because it is inconvenient for him. Nor does continuing to misrepresent the state of the evidence over and over again in various motions in limine make it any more true. Dr. Smock made no erroneous assumptions about the DNA evidence. He accurately interpreted the DNA reports, directly as they reported from the forensic scientists. Of note, Dr. Smock reached his conclusion that Ms. Birchmore's death was the result of a homicide before he knew that the defendant's unique DNA profile was included, unquestionably, in the mixture on the ligature from which Ms. Birchmore was hung, so his review of any DNA reports could not have "infected" his opinion.

That being said, Dr. Smock will not offer any opinion regarding the DNA evidence. He may opine that the DNA results further confirmed his opinion, but he will not be asked to explain or describe the DNA results in this case.

xi. Dr. Smock's opinion as to the injuries to Ms. Birchmore's nose are based on his 40+ years of experience

The defendant argues that Dr. Smock has provided no rationale for his opinion that the abrasions on Ms. Birchmore's nose are consistent with injuries seen in instances of suffocation. Once again, it is apparent that the defendant intends to ask the jury to ignore what they can see with their own eyes. Ms. Birchmore, at autopsy, presents with abrasions to her nose. While the medical examiner did not note these, she photographed them in detail. Smock, through his significant experience as an emergency room physician and assistant medical examiner has seen hundreds of cases of attempted and completed suffocation. He will testify that the injuries to Birchmore's are consistent with injuries that he has seen on other patients who have reported being smothered or suffering from suffocation attempts and having something, like a pillow, pushed into their face[11].

xii. Dr. Smock's reference to the history of choking will be limited to how that impacted his evaluation of the lack of defensive wounds on Birchmore's body.

The defendant argues that Smock should not be permitted to give an opinion about Farwell's history of choking Birchmore. Def. Mot. at 59. Farwell's history of choking Birchmore during consensual sexual intercourse will be proven through the introduction of text messages between Farwell and Birchmore. Dr. Smock will only comment on Farwell and

[11] The first responders did not collect Birchmore's linens or inspect her bed for evidence of a struggle.

Birchmore's history of choking to explain why there may be an absence of defensive wounds on Birchmore's neck. Farwell has argued in multiple filings that the absence of fingerprints or scratches on Birchmore's neck proves she died by suicide. Farwell has also focused on the lack of DNA under Birchmore's fingernails, claiming that Birchmore did not struggle so she could not have been murdered.

Dr. Smock will agree that there are no defensive wounds on Birchmore's neck, but he will opine that he would not necessarily expect such injuries given how quickly Birchmore would have lost consciousness when strangled. He will further opine that the lack of defensive wounds is even less persuasive given that it is undisputed that Farwell routinely "rolled" Birchmore to have anal sex with her and engaged in choking activity to increase his sexual arousal. Dr. Smock will not comment on the alleged incident of physical violence between Farwell and Birchmore that occurred after Birchmore told him she was pregnant or argue that, because Farwell choked Birchmore in the past, he was more likely to have murdered her. Their history of choking will only be referred to in the context of explaining why Ms. Birchmore did not struggle when placed in a vulnerable position with the defendant.

xiii. <u>Dr. Smock will opine that Birchmore's manner of death was homicide, but he will not use the term "homicidal death" elsewhere in his testimony</u>.

The defendant argues that Smock should not be permitted to use the term "homicidal death." Def. Mot. at 67. Dr. Smock will certainly engage with and rebut Farwell's argument that there were no signs of a struggle. He will testify regarding two obvious signs of resistance depicted in the crime scene photos: (1) Birchmore's hair entangled in the ligature and (2) a necklace broken on the front of Birchmore's shirt. He will also opine that Birchmore died by means of homicidal strangulation and not, as the defense would argue, a suicidal hanging.

However, he will not use the term "homicidal death" elsewhere in his testimony when referring to Birchmore's death except when providing his official opinion on her manner of death.

### D. Rule 403 balancing test weighs heavily in favor of admitting Dr. Smock's expert testimony.

Here, the standard is whether the probative value of Dr. Smock's testimony is "substantially" outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. Dr. Smock's testimony is prejudicial to Farwell in the sense that all inculpatory evidence is prejudicial to a defendant. However, Dr. Smock's testimony will help establish that Birchmore died by homicide and clearly refute any claims that Birchmore died by a partial, incomplete hanging or that she died in the position in which she was found.

Dr. Smock's testimony is quite probative. It will assist the jury in understanding the evidence and determining a fact at issue in the case. Here, the government is required to prove beyond a reasonable doubt that the defendant killed Birchmore with malice aforethought, willfully, deliberately, maliciously, and with premeditation. While there is overwhelming evidence learned during its investigation of Birchmore's death that the government will present to prove its case, Dr. Smock will help the jury understand the medical evidence that supports this conclusion.

The only two people present at the time of the murder were the defendant and Birchmore. Dr. Smock's testimony, supported by his extensive experience and ongoing training and presentations in the field of asphyxia-related deaths makes him uniquely qualified to review the materials in this case and offer his opinion as to the cause and manner of Birchmore's death.

Dr. Smock is also a national leader in identifying and treating asphyxia related injuries – exactly the type of injuries that Birchmore suffered from here. It is important to have someone with that specialized focus supplement the observations of the medical examiner, who, through no

fault of her own, has not evaluated many asphyxia-related homicides.[12] While it is also important for forensic pathologists to have medical knowledge about a wide array of causes of death, it is equally important for a jury to hear from someone who specializes in and educates others on asphyxia-related deaths.

Dr. Smock will also discuss his experience investigating deaths where the victim was strangled or suffocated to death and the body was then positioned as a victim of suicide. Such testimony is not unduly prejudicial. The charge is that that the defendant murdered Birchmore. The jury will infer, of course, that if the defendant murdered Birchmore, he also *must* have moved her body given that she was found reclined under a doorknob with a ligature around her neck. Farwell credits the initial investigators assessment that there were no signs of a struggle. The government must be permitted to call an expert, who has responded to and investigated thousands of crimes scenes, to describe the items of significance for the crime scene and to explain to the jury positions in which Birchmore could have died and why she could not have possibly died in the position in which she was found.

**II. <u>The Court Should Deny Farwell's Motion to Exclude Dr. Smock's Expert Testimony Without Conducting an Evidentiary Hearing</u>.**

It is well settled in this circuit that Rule 702 does not require that the Court conduct an evidentiary hearing. *See Crater,* 93 F.4th 581, 590 (1st Cir. 2024) ("[T]here is no particular procedure that the trial court is required to follow in executing [its] gatekeeping function, and we have specifically rejected the argument that a district court must necessarily hold an evidentiary hearing.") (quoting *Smith v. Dorchester Real Estate, Inc.*, 732 F.3d 51, 64 (1st Cir. 2013) and *Phillipos*, 849 F.3d at 471).

[12] Dr. Capo Martinez, in her expert disclosures, indicates that she has had no asphyxia-related homicides in the last four years. In her entire career, she has seen four, but all had injuries at other locations and were not isolated asphyxia cases like the present case.

The Court should deny the defendant's motion to preclude Dr. Smock's testimony concerning cause and manner of death, asphyxiation strangulation and the staged crime scene without conducting an evidentiary hearing. The Court has abundant information about the nature and scope of Dr. Smock's qualifications and proffered opinions. Other courts have without exception admitted his expert testimony on these subjects. An evidentiary hearing would reveal nothing that has not already been addressed.

## Conclusion

For the foregoing reasons, the government respectfully requests that the Court deny defendant Matthew Farwell's motion to exclude the expert testimony of Dr. William Smock, M.D.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: /s/ Elizabeth C. Riley
ELIZABETH C. RILEY
BRIAN A. FOGERTY
TOREY B. CUMMINGS
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

_/s/ Elizabeth C. Riley___________
ELIZABETH C. RILEY
Assistant United States Attorney

Date: August 17, 2026