THE CLERK: All rise.

(The Court entered the courtroom.)

THE CLERK: Court is in session. Please be seated.

(Jurors escorted into the courtroom at 10:31 a.m.)

10:31 THE COURT: Everyone can be seated.

Jurors, as I said before we took our recess, we will now have opening statements. Because the government has the burden of proof, they get to go first. Counsel?

MS. CUMMINGS: Thank you, Your Honor. Could you 10:31 please ask the jurors to take out their screens?

THE COURT: Sure.

So for the jurors in the back, you'll see these cases between every other seat. Just open up the top and there's a screen in there and pull those out, please.

10:32 Everybody set? All right. Thank you.

Ms. Cummings?

MS. CUMMINGS: Thank you, Your Honor.

I'm just waiting for the screen.

THE COURT: Sure.

10:32 MS. CUMMINGS: This is Sandra Birchmore.

On February 1st, 2021, Sandra was excited about her future. She was 23 years old, dreaming of a career in nursing and of becoming a mother.

And on February 1st, 2021, Sandra was on her way to 10:33 accomplishing her goals. The evidence will show that on that

day, she was in her first adult apartment on her own, chatting with her friends, surfing the Internet and working on completing her nursing school application requirements. And she was absolutely thrilled to be about ten weeks pregnant.

10:33 The evidence will show that Sandra had no idea that the defendant, Mathew Farwell, decided she would die that night.

You will hear that as the snowfall began to fall that evening and the defendant knew he had to be at the hospital the 10:33 next morning with his wife who was scheduled to give birth to their third child via C-section, the defendant knew he had a real problem. The defendant's problem was that he had committed multiple crimes and he was worried the authorities might find out.

10:34 The evidence will show that when the defendant was a 27-year-old Stoughton, Massachusetts police officer, he had sex with Sandra when she was 15 years old. He was supposed to be mentoring her in an after-school program run by the police department, but, instead, he was having sex with her when she 10:34 was underage. That's a crime.

But he didn't stop there. The defendant continued to meet Sandra for sex over the next eight years, often when he was on the clock and supposed to be working as a police officer, lying to the Town of Stoughton by saying you're 10:34 working when instead you're off having sex. It's a crime.

10:35 10:35 10:35 10:36 10:36

You will learn that during those eight years, the defendant was committing crimes involving Sandra. The defendant worked hard to keep Sandra quiet, to make sure nobody would know about his crimes. But as Sandra got older and started to understand that the defendant had victimized her, the evidence will show that she started to tell people about it. And when the defendant found out that was happening, he knew he had a problem. The defendant had to solve this problem. He had to get rid of it.

The evidence will show that on February 1st, 2021, the defendant strangled Sandra to death. She was pregnant with a baby boy who also did not survive.

After the murder, the evidence will show that the defendant staged Sandra's body to make it look like she had died by suicide. He placed her body in a seated position on the floor next to a closet door. He tied a duffle bag strap to the door handle of the closet with the other end tightly around her neck in an attempt to make it look like she had hung herself.

The evidence in this case will not only show you that the defendant murdered Sandra, the evidence will show why he murdered her. He killed her so that she couldn't talk about what he had done to her or with her. The defendant is charged in Count One with killing Sandra, who was a victim of and a witness to his crimes, in order to prevent those crimes from

being reported.

The evidence will show that the defendant's conduct while Sandra was alive involved coercing and enticing her into sexual activity when she was a child, using his position of authority as a police officer to deprive Sandra of her right to be free from sexual contact with an adult when she was a child and defrauding of Town of Stoughton by claiming to be working as a police officer when, instead, he was having sex with Sandra.

In Count Two, the defendant is charged under a law involving the protection of unborn children. He is charged with causing the death of Sandra's unborn baby boy, a baby she very much wanted and a baby the defendant believes was his child and a physical manifestation of his crimes.

You will learn that the defendant first met Sandra after she enrolled in the Stoughton Police Explorer's program in 2010. He was a police officer and her instructor in that after-school program. Here's a photo of some of the kids in the police Explorer's program. Sandra is the littlest one on the very end. She was 12 when she started the program. The Stoughton police Explorer's program aimed to instill structure and discipline and provide role models to kids who needed it most, and Sandra was one of those kids.

Sandra struggled in school. She was diagnosed with ADHD and received special education services. She was a little

different from the other kids, and she had trouble making friends. Sandra was raised by her mother Denise in Stoughton. Sandra had no siblings, she never knew her father, and she and her mother had very limited means. Her mother had serious chronic illnesses. At times, her mother was on an oxygen tank. Sometimes she was completely immobile.

Sandra's mother enrolled her in the police Explorer program with the hope Sandra would find structure and positive role models.

10:39 And you will hear that Sandra loved the police Explorer program. She continued in that program through high school. She spent hours at the Stoughton police station. She was enamored with police officers. She met some more positive role models for her. She also met the defendant.

10:39 You will hear that in October 2012, the defendant sent Sandra a friend request on Facebook inviting her to connect with him outside of the police Explorer program. She was 15. He was a police officer and her instructor in that program.

In 2013, when Sandra was still 15 years old, you'll hear that the defendant began to tutor her at a local library. And during those tutoring sessions, the defendant began to normalize sexual contact with her. He started by touching her, then putting his fingers inside of her body. And then, on April 10th, 2013, he put his penis inside of her body.

10:40 She was a 15-year-old child. That is statutory rape

and that is a crime.

In this trial, you will see many text messages recovered from Sandra's phone and her laptop. There are over 40,000 messages on those devices between the defendant and Sandra.

10:40

In one of those messages, the defendant tells Sandra that the day he took her virginity when she was 15 was the best day of his life. And he told her that, "All I wanted was to fuck you, baby." She acknowledged, "And you got that." His response was, "I know, but I wanted it so much sooner."

10:41

The defendant then told Sandra, "I absolutely would have fucked you in '12," in 2012 when she was 14, turning 15.

You will hear that the defendant continued to have sex with this vulnerable teenager throughout her high school years and beyond. He made her feel special, gave her the attention that she craved. And, as a result, Sandra developed a strong attachment to the defendant. She would often tell him that he was her best friend.

10:41

And throughout all those years, you will learn that the defendant didn't tell other people about his sexual activities with Sandra, not his coworkers, not his twin brother, not his close friends. The evidence will show that the defendant deleted all his text messages with Sandra from his phone and instructed her repeatedly to make sure she deleted their communications from her phone to eliminate

10:41

10:42

evidence of his crimes. You will also hear in this trial about the nature of the defendant's sexual activities with Sandra. They involved domination, him dominating her. They involved causing pain, him causing her pain. They involved rape fantasies, him raping her.

10:42

For example, the defendant texted her, "You know my favorite is R word." And then he made clear that the "R" word is rape. "I love it when you try to say no and I pin you down."

10:43 Their sexual activities also involved strangulation, him strangling her. You will learn that the defendant discussed strangling, choking, or grabbing Sandra's throat in at least 20 communications.

Here are just a few examples that you will see during trial. He texted her, "Grab you by the throat and rip your pants off. And I'll grab your throat and say you won't say a word to anyone or you will be sorry. I'll grab your throat and say trust me, I'll do whatever I want."

10:43

The evidence will show that because the defendant had a history of repeatedly grabbing and squeezing Sandra's neck and throat on the night of the murder, he knew Sandra would allow him to put his hands or strap around her neck and she wouldn't suspect that he was going to kill her.

10:44

You will hear that like many victims of child sexual abuse, Sandra had struggles in her teenage and early adult

10:44

years. Her mother and grandmother both died in 2016 when Sandra was 19 years old, and Sandra grieved them deeply.

Sandra was diagnosed with depression and anxiety. When her grief was really bad in 2017 when she was 20 years old, she wrote a journal entry expressing dark, serious suicidal thoughts. That was almost four years before her death.

You'll also probably see that she sent some text messages to friends, including the defendant, expressing feelings of sadness and hopelessness. Sandra's first sexual experience involved a crime. You'll learn that the rest of her life was impacted by the defendant's abuse.

When she got older, Sandra had sexual relationships with other people, including the defendant's twin brother. You'll see text messages showing that the defendant and Sandra broke up on several occasions, but they always communicated afterward and would resume their sexual relationship.

You will also hear that when the defendant was grooming and continuing to have sex with Sandra for years, he also got married, had a family of his own. He married in May 2013, just a month after taking Sandra's virginity. And by 2019, he and his wife had two children.

You will hear from multiple witnesses that Sandra had talked for years about wanting to have children, to be a mom. And in 2019, when Sandra was 22 years old, she told the

defendant multiple times she wanted him to father her child because he was her first sexual partner and her best friend.

In 2020, when Sandra was 23, she wanted a baby more than ever. And as Sandra got older and became more independent, the evidence will show she started to understand what the defendant had done to her. She started to tell people in bits and pieces her history with the defendant, that he had sex with her when she was underage and he was her police officer instructor and that he was continuing to have sex with her when he was on the clock and supposed to be working.

You will hear that one of the people Sandra told was a man named Josh Heal. And on October 5th, 2020, when Sandra was 23 years old, Josh Heal told her that the defendant was going to be a father again, just not with her. The defendant's wife was pregnant with a third child due in February 2021.

You will see that after hearing this news from Josh Heal, Sandra immediately texted the defendant about his wife 's pregnancy. "You have baby number 3 on the way and don't lie about it. And if the answer is yes, I'm telling her what you've been doing. I don't care or you can give me a baby, not my choice, because I know for a fact she is and she's due in February."

Sandra told the defendant she was going to expose what he had been doing unless he agreed to give her a baby, too.

Over the next several hours, Sandra, who was 23 years

old at this point, made clear to her friend Josh Heal that if the defendant would not give her a child, she would disclose what the defendant had been doing the last almost ten years.

She was going to expose his crimes. When Josh Heal asked Sandra, what do you think he will do, Sandra said, not my problem. He took my virginity before I was 16.

Evidence will show that Sandra gave the defendant an ultimatum. He had to give her a baby or she would tell people what he had been doing for the last almost ten years and that he took her virginity before she was 16 when he was her police officer instructor. Sandra knew that was a crime.

The evidence will show that on that same night, October 5th, 2020, around 7 p.m., when the defendant was on the clock supposed to be working, he met Sandra in person and told her he would agree to her ultimatum. The defendant agreed to impregnate Sandra in order to silence her, to prevent her from disclosing his crimes.

You will see text messages from October 2020 between the defendant and Sandra confirming he had unprotected vaginal intercourse with her on days she was most likely to conceive a baby to keep her quiet, but she didn't get pregnant in October.

The defendant thought he was off the hook, but you will see that Sandra told him that they had to try again in November. And when Sandra didn't get pregnant in November of 2020, she told the defendant they had to try again in December.

You'll see text messages showing that she kept changing the terms of the deal. She kept asking for more. The evidence will show that the defendant was not happy about it, but he was trying to appease her in order to keep her quiet.

10:50 In December 2020, the defendant again had unprotected vaginal sex with Sandra on days she was likely to conceive in order to try to get her pregnant.

And on December 28th, 2020, Sandra got some of the best news of her life. She found out she was pregnant.

10:51 Sandra tried to get in touch with the defendant all day to share her exciting news. When he didn't answer, she sent him a text message of a photo of a sign she had made, "Congrats, we are going to be parents."

The evidence will show that Sandra and the defendant 10:51 both believed he was the father of her baby, particularly because they had purposefully had unprotected sex on -- on a day in December that she had likely conceived.

But after Sandra's death, it was determined that the defendant was not the father of her baby. You will hear that 10:51 at no point in the hundreds of communications the defendant had with Sandra about her pregnancy did he ever deny or doubt paternity of that baby.

He did, however, make it clear that he was not happy about her pregnancy. After she sent him the congrats sign, he 10:52 texted her, quote, You are truly the worst person on the face

of the earth.

Sandra got the pregnancy she had long wanted, but the evidence will show the defendant did not want that baby. He reacted with violence.

10:52 The defendant went to visit Sandra on December 29th, the day after she told him they were pregnant. He was on the clock and supposed to be working when he went to see her.

And after he left, Sandra texted him, telling him he had scared her. She told other people who will testify in this 10:52 trial that the defendant put his hands on her, that he grabbed her phone out of her hand, took her laptop from her and shoved her. Sandra was about five feet tall at that. The defendant is six-foot-four.

For a few weeks after that, you will see evidence that 10:53 the defendant became cold towards Sandra. At times, he was trying to distance himself from her. But at no point did he deny he was the father of her baby. And the evidence will show that he was continuing to meet Sandra for sex during those weeks. She continued to make demands of him. She wanted him 10:53 to be there for her and for their baby, to sign the birth certificate, to buy clothes for the baby and to agree to spend parts of the holidays with their baby.

For eight years, the defendant believed he had maintained Sandra's silence. But then, on January 20th, 2021, 10:54 about three weeks after Sandra found out she was pregnant,

something happened that made the defendant understand he had not maintained her silence.

On that day, January 20th, a friend of Sandra's made a call to the Stoughton Police Department where the defendant worked. You will learn that in that call the friend said that Matthew Farwell was having sex with Sandra Birchmore.

When the dispatcher who answered the phone told the defendant about this call, the defendant was enraged. He told the dispatcher not to tell anyone about the call and to never mention it to him again.

The defendant knew Sandra was a victim of and a witness to his crimes. He had sex with her when she was a child. He was still meeting her for sex when he was supposed to be working and now someone was reporting that sexual activity to his employer, the Stoughton Police.

You will see evidence that the defendant texted Sandra after that January 20th call. "Dude, your fucking friend called my job, Sandra. What the fuck? You also told me that no one knew about us, yet she claimed we are fucking. Like, you have no idea how bad what she did is. But how does she know anything about me? I literally can't believe this is even real life. Like, what else do I have to worry about now? Which other friend will do something tomorrow?"

Twelve days after the defendant sent those messages, Sandra was dead. The evidence will show after that

January 20th call, the defendant realized all of his efforts to keep Sandra quiet hadn't worked. It was no longer a matter of whether his crimes would be exposed; it was a matter of when. He had lost control of Sandra. He had a real problem. He needed a way to silence her permanently. So he started to plan her murder.

10:56

After that call, you will learn that the defendant changed his tune. He started to be kind to Sandra. He lulled her into feeling safe so that he could kill her. He made her feel optimistic about their future together so that she would not expect it when he strangled her to death.

10:56

You will see text messages that Sandra sent to friends after January 20th telling them the defendant had done a complete 180. He stopped arguing with her. He brought her ginger ale for her morning sickness.

10:57

Less than a week before her death, Sandra noticed the defendant inspecting her closets and her bathroom and she found that weird enough that she texted multiple friends about it on January 24th, 2021.

10:57

She texted one friend, "But, like, last night, he opened my closet door for something and then he went in my bathroom, looking at my bathroom. And then I have a dolly in my living room and he asked why I had it. It was just really odd. He started, like, looking around. I don't know."

10:57

When her friend commented that was weird, Sandra said,

"Yeah. It was really weird."

The same day she told a different friend, "He asked me if I'd give him a key and said if I keep it a secret, he'll be around and see them and all that. So it's somewhere. Then he looked in my closet and then the bathroom, but I don't know why. Haven't figured that out." Eight days later, her dead body would be hung from that closet doorknob.

In this trial, you will learn from many people who knew Sandra well that in January 2021, she was absolutely ecstatic about her pregnancy. She told over 85 people that she was pregnant. She showed her ultrasound photo to many of them.

In the month before her death, you will hear that Sandra booked a maternity photo shoot, made plans for her gender reveal, researched baby names, reached out to baby shower venues and asked photographers about prices for newborn photo shoots. She obtained baby items like onesies, a car seat, a stroller.

She focused on her health, taking prenatal vitamins, making prenatal appointments, actively corresponding with her OB/GYN, drinking lots of water, monitoring her exercise.

She also took care of her mental health, going back on an antidepressant medication that she was prescribed in the past to help her anxiety and depression. She made sure this is a medication that was safe for pregnancy. She actively monitored side effects, talked to her OB/GYN about them.

And you will hear all the steps Sandra was taking to ensure a healthy pregnancy to protect her unborn child.

There was one thing, one person, she could not protect her unborn son from, the defendant.

10:59 Sandra was a victim of and a witness to his crimes. She had used that to get him to impregnate her. And even after he gave her what she wanted, a pregnancy, she was starting to tell people. And what friend was he going to have to worry about next?

11:00 She could end his life with the information she had, so he was going to end hers first. The evidence will show that on February 1st, 2021, the defendant was out of time. His wife was scheduled to give birth the next morning via C-section. And because it was COVID, he wouldn't be able to leave the hospital for several days. 11:00 He could not control Sandra or her response when she learned about that baby's birth. You'll also hear that a Nor'easter blizzard was predicted for February 1st and 2nd that year, closing schools, offering the potential that it might be a few days before a body was found.

11:00 So Matthew Farwell made sure that Monday, February 1st, you will hear, would be Sandra's last day alive.

Due to the forecasted storm, the school where Sandra worked as a teacher's aide closed early. She went home to her apartment around 12:30 p.m. that day. She took a picture of 11:01 where she parked, sent it to her friend that she had asked to

shovel her out to ensure she could go back to school the following Thursday when it was scheduled to be back and it would reopen, a day she was planning to be alive.

Sandra had arranged for things -- help with things, 11:01 like shoveling or cleaning out her cat litter to ensure she could stay healthy for the baby she was carrying, a baby she had all intentions of delivering.

When she got to her apartment, Sandra searched online for an EMT course. She uploaded a form to Massasoit Community 11:01 College admissions and paid $106 to take an entrance exam for their nursing program that was scheduled for the following Saturday, a day she believed she would get to experience.

That afternoon, Sandra also texted and FaceTimed multiple friends. At 4:43 p.m., she ordered food and went 11:02 downstairs to the lobby of her apartment to pick it up just after 5 p.m.

This is a screenshot from a surveillance video of Sandra's apartment building that you will see during the trial. You will learn that the time stamp on the video was about 11:02 13 minutes ahead of the actual time. Sandra was wearing blue leggings, an orange zip sweatshirt and black socks. She would die in those clothes later that night.

Then, just after 5:30 p.m., because it had started to snow, Sandra went outside to dust snow off her car. Here are a 11:02 couple of screenshots of her coming back inside. Notice here

that Sandra's hair is on top of her head in a bun. After that, Sandra would never leave her apartment again. About four hours later, she would be dead.

That evening, she continued to communicate with multiple friends, ultimately sending or receiving almost 600 text messages that day. You'll learn that was pretty typical for Sandra. Multiple witnesses will say that she was always on her phone, texting everybody about every detail of her life.

And during this time, this day on February 1st, she was also texting with the defendant. She told him about an early baby shower present she got in the mail that she was really excited about. She asked him at 7:46 that evening if when they found out if they were having a boy or a girl if he would buy an outfit for the baby to wear home from the hospital.

Less than two hours later she would be dead.

Between 8 and 9 p.m. in her final hour, Sandra searched for baby shower venues. She searched for children's furniture and bookshelves. She had a 25-minute call with her best friend who will tell you she sounded normal.

And at 9:07 p.m., the defendant texted Sandra. He asked her, "Are you still up?" After she said, "Yeah," he asked, "Okay to come by for a second?" She said, "Yeah. You can come say hi. You okay?" Then she told him, "Door's open when you get here."

That was the last text message Sandra would ever send. The last messages she sent anyone ever were messages welcoming the defendant into her apartment, telling him the door was open for him.

11:04 Three minutes later, at 9:13 p.m., Sandra's phone locked. She would never unlock it again. The evidence will show that at about 9:14 p.m., the defendant entered Sandra's building.

Again, the timestamp on the video is about 13 minutes 11:05 ahead. You will hear from multiple witnesses that the defendant was actively opposed to wearing a mask during COVID, even when it was required. And here he is coming in from outside with nobody else around with a mask on and his hood up.

About 29 minutes later, the defendant left Sandra's 11:05 building, again, with his hood up and his mask on, even though nobody else was around.

The evidence will show that in those approximately 29 minutes that he was inside, the defendant murdered Sandra by strangling her. He put a duffle bag strap tightly around her 11:06 neck. He killed her by putting pressure on her neck and blocking her ability to breathe. That's called asphyxia.

And then, the evidence will show that in an attempt to cover up what he had done, he moved her lifeless body and left it on the floor seated underneath a closet door handle. He 11:06 tied one end of the strap around the door handle, leaving the

other end wound tightly around her neck. The evidence will show that the defendant was counting on the fact that the vulnerability Sandra had that made it possible for him to groom and rape and abuse her were the same vulnerabilities that made it possible for him to murder her and stage it as a suicide.

11:06

People would see a vulnerable girl tied to a door handle and assume suicide. Maybe they wouldn't even bother to investigate her death as a homicide, and you will hear he was right.

11:07

Three days later, when Sandra did not report back to work after school reopened, law enforcement found Sandra's dead body. You will learn that they found her body in a seated position reclined back tied to that closet door handle with her hair chaotically tangled in the strap that was around her neck.

11:07

A necklace was broken down the front of her chest. There was scratches on her nose and her chin consistent with her face struggling against a surface. There was no suicide note. The girl who told everyone everything about her life left no note.

Sandra's cell phone, which had stopped moving when the

11:07

defendant was still in the building, was facedown on the floor just out of her reach.

Her glasses were in the middle of her unmade bed. There were bobby pins spread across the floor, and her flip-flops were oddly upside down near her body.

11:08

State Police officers working in the Norfolk County

District Attorney's Office, in a unit that was called Norfolk CPAC, Crime Prevention and Control, were in charge of investigating Sandra's death because Sandra died in Norfolk County.

11:08 Despite all of the evidence that Sandra did not take her own life, you will hear that Norfolk CPAC did very little to actually investigate Sandra's death.

The evidence will show that not only did they not investigate, they very quickly told others, including the 11:08 medical examiner, that this was definitively a suicide and there was no foul play. They told the medical examiner, no need to treat this death as suspicious.

MS. STEVENS: Objection.

THE COURT: Overruled.

11:09 MS. CUMMINGS: About -- after about a half an hour of this opening statement, you now know more about Sandra Birchmore's life and her relationship with the defendant than the medical examiner knew when she made her initial ruling about how Sandra died.

11:09 The medical examiner will tell you that when she made her initial ruling, she did not know that at the time of Sandra's death the defendant believed she was pregnant with his child, that days before her death the defendant found out she was starting to tell people about their relationship, their 11:09 relationship that involved him committing multiple crimes for

years.

The medical examiner did not know that the defendant had routinely strangled Sandra in the past, and the medical examiner did not know that the defendant was in Sandra's apartment when her phone stopped all activity.

11:09

Based on the information she had in 2021, the medical examiner ruled Sandra's death to be a suicide.

After Sandra died, a flood of her friends and colleagues reached out to Norfolk CPAC and told officers that Sandra Birchmore was not suicidal, she was very happy about being pregnant, and she had been dating a married Stoughton police detective named Mathew Farwell who was not happy about the pregnancy.

11:10

Armed with the information about Sandra's lack of suicidality and the defendant's clear motive and opportunity to murder her, you will learn that Norfolk CPAC investigators decided to conduct a hastily arranged, unrecorded interview of the defendant in a local school parking lot. They didn't ask for his phone or his DNA. They didn't inspect him for any injuries.

11:10
11:10

And you will hear that, over the course of that interview, the defendant told investigators multiple lies, lies that were provable as false to anyone who had an interest in fact-checking. The Norfolk CPAC investigators did not.

11:11

The defendant -- you will hear that the defendant then

held onto his phone for three days. You will hear that after that, he allowed Norfolk CPAC to search it only for messages between himself and Sandra, but there were no messages between himself and Sandra left on his phone. The defendant had made sure those were deleted before he handed it over.

11:11 You will hear that one of the only other people who Norfolk CPAC proactively called in the days following Sandra Birchmore's death was the defendant's twin brother, Billy Farwell.

11:11 Billy's experiences with Norfolk CPAC will provide you with insight into how they conducted their interviews. You will hear that this interview was also in a parking lot.

Investigators told Billy that Sandra's death was a suicide, that nothing was criminal, that they weren't 11:12 investigating and that they needed an investigation like they, quote, needed a fucking bullet in the head.

And the evidence will show that Norfolk CPAC investigators made good on their word to Billy Farwell. They were not going to investigate. No one would be in any trouble. 11:12 They closed their investigation without getting a single search warrant, without attending Sandra's autopsy.

You will hear in the years that followed Sandra's death, after another law enforcement agency, the FBI, gave her death more than a cursory glance, the medical examiner changed 11:12 her opinion. The medical examiner was no longer certain that

the information she had been given in 2021 was complete or valid. And you will hear that today Sandra's death certificate no longer says a suicide. The medical examiner changed her ruling to undetermined. Evidence in this trial will enable you to make a determination about the way Sandra died. And the evidence will show it was a homicide, a premeditated homicide.

In this trial, you will hear from Dr. William Smock. He has treated thousands of live patients and been involved in the autopsies of thousands of decedents. He travels the globe training law enforcement and others on asphyxia-related deaths and staged suicide scenes. And he will talk to you about certain aspects of Sandra's death that show it was a homicide, not a suicide.

In addition to Sandra's hair being tangled in the strap, the abrasions on her nose and her chin, Dr. Smock will tell you about a U-shaped bone in her neck that was broken, and you will learn it takes a lot of force to break that bone. It's incredibly hard for someone to break that U-shaped bone in the neck from a seated reclined position. There's just not enough force. And in people under 40 years old, like Sandra, this U-shaped bone is still flexible and even more difficult to break.

Dr. Smock will tell you he has never in his 40 years' experience seen someone as young as Sandra fracture their U-shaped bone from a seated position. Dr. Smock will tell you

it's far more common to see that U-shaped bone broken in homicidal strangulations when another person is pressing inward on the victim's neck.

You will hear both Dr. Smock and the medical examiner talk about an injury to Sandra's right upper chest. They both determined this was an injury that Sandra got at or near the time of her death.

Here's a photo of the duffle back bag strap that was around Sandra's neck. It had a lobster claw-shaped clasp. And Dr. Smock will tell you the injury on Sandra's chest was an imprint of one of those lobster clasps being forcefully pressed into her chest. You will also hear --

THE COURT: Counsel, two minutes. Two minutes.

MS. CUMMINGS: Thank you, Your Honor.

You will also learn that the FBI got a search warrant for the defendant's DNA and a lab compared his unique DNA profile to the DNA from the portion of the strap that was used to hang her.

A forensic scientist will come and tell you about the DNA results and how the results are explained in terms of the statistical likelihood of two hypotheses: Number one, that Matthew Farwell is included as a contributor on the strap; number two, Mathew Farwell is not included as a contributor.

The forensic scientists will tell you it was 6.2 trillion -- with a "T" -- trillion times more likely that

Mathew Farwell is included as a contributor on that strap that was around Sandra's neck.

All of this scientific evidence will corroborate what you will hear from the many witnesses who will testify at this trial about their personal experiences with Sandra. These are the people who knew Sandra best. And they will tell you, even in times she was very sad, she did not kill herself and on February 1st, 2021, she was happy and excited for her future. They will tell you she never would have harmed her unborn child.

And while you'll hear about the hundreds of searches on Sandra's phone and computer for baby items in the days and weeks before her death, you'll also hear there was zero searches on her devices for ways to commit suicide or for how someone might kill themselves by hanging from a doorknob while seated on the floor.

On the day she died, the evidence will show that Sandra spent almost her entire day planning for her future, a future the defendant would not let her have.

When the defendant killed Sandra, he also killed her unborn son, a son that she had prayed for, nurtured, and protected.

Over the course of this trial, you will see how the defendant counted on the fact that people would write Sandra's death off as a suicide. You won't be able to. The evidence

will compel you to convict. At the end of this trial, we will ask you to return the only verdicts consistent with the evidence, guilty on both charges. Thank you.

THE COURT: Thank you, counsel.

11:17 Counsel?

MS. STEVENS: May it please the Court?

THE COURT: Yes.

MS. STEVENS: Matthew Farwell is a man who had an affair. He's made regrettable mistakes. He's human.
11:18 Matthew Farwell did not kill Sandra Birchmore. He did not.

This is going to be a difficult journey that we all take together. It's hard to hear evidence of mental health struggles and challenges and sadness and obsession, despondency and suicide.

11:18 The government portrayed Sandra Birchmore just now as happy and excited. She's a 23 years old young woman.

On January 31st, 2021, we have a window into her mind. And the evidence will show she texted Matthew Farwell. "I'm sorry. I'm needy today. And I don't feel good."

11:19 5:25 p.m., "It's okay. I'm hoping I feel better after dinner. I just need to eat."

6:41, she texted Matthew Farwell. "Can we talk tonight for a little bit before I go to sleep? Can I text you tomorrow before the snow comes," the Nor'easter the government
11:19 mentioned, like the one we had last weekend, this time with

snow.

7:53 p.m., "I took my medicine just to let you know, so I may be asleep by the time you reply to me. I ate and feel better, though."

11:20 9:02 p.m., I wish you were here with me tonight," sad face.

1:28 a.m., "I keep waking up."

7:18 a.m., "I couldn't sleep last night. I kept waking up."

11:20 7:50 a.m., Sandra Birchmore searches on Safari, "What color is the suicide ribbon?" This is February 1, the day we're talking about. "What color is the suicide ribbon?"

8:18, "Can we talk this morning?"

10:41, "I'm kind of stressed out and freaking out."

11:20 11:23 a.m., "Can you visit me tomorrow before work tonight?"

11:32, nine minutes later, "I'm feeling better."

11:32:56, "And I just am today. It's a struggle. I wish you were with me. Can you visit me when I get out 11:21 briefly? Can we please talk later tonight when it switches over if I'm awake and not tomorrow? I'm super stressed out today."

5:52 -- we saw the snow in the excerpts from the lobby.

11:21 5:52, "Please be careful. I fell tonight." Sandra

Birchmore says, "I fell tonight." There will be evidence of that.

7:36 p.m., "I'm sorry."

7:47 p.m., she calls up images from the Internet of a young man being grabbed by other people on a bridge, and it says "People holding tightly to a man trying to commit suicide."

7:55 p.m., she pulls up an image, looks at it, "Can I die just for a day? I just want to see who will cry when I'm gone."

And then the text exchange -- 8:19. Excuse me. 9:07 p.m. Matthew Farwell responds to this volley of texts that you just heard me read. "Are you still up?" "Yeah." "Okay to come by for a second? "Wish you can come over and say hi. You okay?" "You asked if I could come over?" Sandra Birchmore smily face. "Door's open when you get here."

Okay. That's a window into her mental state as this is all happening. Sandra Birchmore had spent Thanksgiving alone, Christmas alone. No family. She's pregnant.

Mid-January, you will see the texts where she is looking up "I'm spotting during pregnancy. I'm spotting at six weeks."

There's an emergency room -- a hospital visit, and she tells the friend, "I was gushing blood."

And on this day, in the series of texts I was reading

you, she's looking up "cramping at nine weeks." She's worried. She's stressed out. She's freaking out. She's pulling up imagery of suicide.

What we say is in no way, in no way, meant to harm the 11:24 memory of Ms. Birchmore or her memory to her family, but these are facts that you will hear that she was alone at the holidays.

Sandra Birchmore began taking psychiatric medicine at the age of six and continued on and off throughout her life. 11:24 At the age of six.

She had physical and mental health issues, social and emotional issues through school. Her counselor that you will hear from said her first suicide attempt was in her early teenage years.

11:25 You'll hear from experts who describe risk factors for suicide. Risk factors. And she will tell you that none of us, none of us who fear our loved ones might commit suicide can pick the day or time or it wouldn't matter. It is a shock and a sadness.

11:25 And there are risk factors. And what we have learned in preparing this case is one of those, too, is pregnancy. The biggest one is prior suicide attempts, and she had one in her early teenage years.

And then, in 2016, she lost her mom. She lost her 11:26 grandmother. And she was dating a young man named

William Kilroy in 2016. And she has texts with him that says you have stopped me from killing myself. But ultimately, they broke up. And after they broke up, William Kilroy will tell you that he swore in an affidavit that she threatened suicide --

MS. CUMMINGS: Objection.

THE COURT: Overruled. But, counsel, Ms. Stevens, you understand the nature of the objection?

MS. STEVENS: Yes, Your Honor.

She threatened suicide and to blame me, Mr. Kilroy.

After the death of her mother, Ms. Birchmore lived with her mother's twin sister and her son Jerry. And things were rocky in that relationship. And there were times that Sandra reported that her aunt told her to kill herself and you should be buried in a dump.

Ms. Birchmore fantasized in the 40,000 text messages that you've seen a hand-selected excerpt from in the opening statements in the government's presentation about having a relationship that would produce a child to create the home that she never had. There is evidence in her journals and her texts of her hopes and desires of how she wanted to be wanted, to matter. She had numerous partners, which you will hear about.

She had visits to the medical -- to hospitals, to emergency rooms and about her unquenchable desire to have a baby.

11:28 11:28 11:29 11:29 11:29

And you heard from the government that in the first few weeks of learning she was pregnant, she'd already told 84 people. She's booking a photo shoot for a baby while she's spotting during pregnancy.

And while this is happening, walls are closing in. She's having financial struggles. She's borrowing money from friends, friends who are beginning to call and say I need you to pay me back.

And you will see that on January 20th, her bank account balance was $2.90 and the rent was due February 1st. The stresses that are swirling around her are mounting.

And this trial will take you through a journey of science because, make no mistake, the burden of proof rests right here at this table throughout. The government bears the highest burden known under the law, because the charges are that serious. They must prove to each and every one of you beyond a reasonable doubt that the charges that they levied against Matt in this case, that they've proven them.

And the first part is whether he killed her -- and he did not -- and we're going to talk about science in a moment from that scene.

But the second part of that, if he did so -- and he didn't -- that it would have been done to prevent a communication of a federal crime to a federal law enforcement officer. And you will hear none.

In fact, Ms. Cummings pointed to you the one thing they could point to you in the opening, that she might tell his wife. Make no mistake. His wife is not a federal law enforcement officer.

11:30 More importantly, Matt Farwell did not kill Sandra Birchmore. And when we look at the science, let's look at what happened. The medical examiner from the Office of the Chief Medical Examiner here in Boston, they are solely charged with declaring cause and manner of death. Cause and manner of death. 11:30 That is their statutory obligation. And Dr. Maria Capo-Martinez declared her death to be a suicide, not that day of the autopsy, not the week of the autopsy, not the month of the autopsy, but after she reviewed the evidence and after she reviewed the body of Sandra Birchmore to determine what 11:31 happened and to fulfill her statutory obligation to the citizens of Massachusetts. And she declared cause and manner of death to be a hanging and suicide.

Three and a half years later, the federal government begins to look at the case. Three and a half years later. 11:31 They consulted -- and you will hear this -- a lieutenant colonel from the Armed Forces Medical Examiner's group, Lieutenant Colonel Zoe Sundell. She looked at the file of the medical examiner. And that was passed to her by the government. They gave her the information they wanted, and the 11:31 notes of the FBI from that meeting reflect that she said, I

have no evidence to contradict the medical examiner's conclusion of suicide.

But they didn't stop. They went on and hired who you heard about, Dr. Smock. He's not a medical examiner. He's not a pathologist. He's not trained or board certified in -- pathologist. And what's the difference? You will hear the pathologist in this case testify that they are trained and qualified to determine cause and manner of death, if it can be done.

And they understand what happens after a body is killed to that body. And I don't want to get graphic in the opening statement. But she had been there for four days, and early decompositional changes were noted that affect the way the body looks or looks in a photograph. They are the experts qualified to determine cause and manner of death.

And what the medical examiner found was a single ligature mark with the furrows matching the position in which she was found, not two strap marks, not one across this way or changed as they contend the body was moved, one that lines up with the position on the doorknob. And that tremendous pounds of force that they talked about, we will call an expert who will tell you, Dr. Garvin, 7 pounds of force. 7 pounds of force can break that little U-shaped bone. And when someone commits suicide with a strap around their neck, they shake as they die. They will tell you they convulse as they die.

And you will see X-rays that Dr. Capo-Martinez had done that showed the buckles of that very strap positioned here right against the area where the break in the hyoid bone occurred.

11:34 There's another thing. The notes of Dr. Capo-Martinez trained to conduct forensics evaluations, gone to medical school, knew to note this, did not note a hemorrhage at the site of the break in the hyoid bone.

Why is that important? She will tell you, the experts 11:34 will tell you, if a hemorrhage isn't documented around the break, it happened after death.

The first officers on scene noted that she was seated, that the clothing that you saw her wearing, that's what she was wearing. Those tight leggings were on and pulled all the way 11:34 up. She had the sweatshirt on. She had a shirt on. They said there were no drag marks in the carpet. The apartment was generally in messy condition. They documented cat hair undisturbed at the scene. There was no evidence of a struggle. There was no evidence that the body had been dragged. Her 11:35 pants are all the way up, that if she had been dragged, pulled those leggings down.

Those people first on scene, trained officers, will come and tell you -- Trooper Dunne will tell you that he saw the body, he saw the scene, and he made no notation of a 11:35 struggle of any kind. And furthermore, that, tragically, as a

law enforcement officer, he has seen suicides. He has seen seated suicides. They call them partially suspended.

Science. Ms. Abby, may you pull up the DNA?

The forensics, the forensics that were done in this case -- many of us like to watch Forensics Files, other shows about forensics and think we know. Trust me. You're going to learn a lot in this case from experts. Okay. And we encourage you, base your judgment only on the evidence you receive in the courtroom from the witness stand.

But forensics, what they examined was DNA. And they checked. They took swabs. They took samples from under Ms. Birchmore's fingernails. They checked two different spots or places in her underpants that she was wearing at the time of death, and they checked the ligature.

And one thing you will learn from the DNA experts, when I touch this, chances are I just left DNA. And if I shook your hand, we would exchange DNA. And if I, say, go like this, it could transfer to here. That's called transference of DNA.

Another thing, so if -- the next slide, please, Abby.

Matthew Farwell was totally excluded from the material under both of Ms. Birchmore's hands. There were no -- they're too tiny to see. There were no cells. There was no evidence of his DNA from either of her hands. And recall Zoe Sundell. You would scratch. You would claw. You would try to get that ligature off.

The next slide, please.

The left hand, a single source. And that is the kind of DNA that can declare a match. It's called single source. It becomes much more complicated with a mixture. We'll talk about that in a moment. But the single source on the left hand, Sandra Birchmore only. So her own genetic material was found under her left hand fingernails.

Under the right hand, a mixture of two contributors, and Matt was excluded. The DNA scientists will testify that Matt's DNA was not under her right hand but two people's were.

And the next slide.

This is a little harder for me to see. We're getting into the complicated part. In the underwear -- and experts will tell you what all these terms mean. Don't worry. STR testing and Y-STR testing.

But here's what to take from this. The interior sample of the underwear showed a mixture of four contributors, including male DNA. The non-sperm fraction of the STR testing -- again, that will all be explained in this trial -- a mixture of two contributors, including male DNA. And Y-STR testing, a mixture consistent with two male contributors.

The next slide, please.

The underwear exterior sample, STR testing of the sperm fraction of the material left on the exterior of the underwear, a mixture of three contributors, including male DNA.

Three. Four in the other.

The strap around her neck, the ligature, a mixture of four different contributors on it, including male DNA, and the Y-STR testing mixture of at least four different male contributors.

I'm going to show you this for a brief time -- go ahead, Abby -- and ask you then to take it down and I'll return to that point.

Mixture evidence, you heard some odds that were calculated at the end of a process, and it's a comparison of two hypothetical -- two hypotheses and then what number comes out of a computer. And an expert will describe to you in this trial, if we took four cans of Campbell's soup, four different cans, and we put the letters G, T, A and C, the wondrous part of human DNA is that we were all composed of those four simple buildings blocks, the letters G, T, A and C.

We pour that into a single pot from the four cans. And then there's a mixture. And for somebody to come and pull out this G and say that one belongs to Matt and that T and say that belongs to the second person and that A belongs to this fourth person and try to reconstruct whether it actually belongs to a single contributor cannot be done. Mixture evidence is never evidence that a single person was, in fact, included in a mixture. Okay. That's a principle to watch for in this trial as you hear about the DNA.

The last photo that I showed you, Ms. Birchmore was wearing an Apple Watch on her wrist at the time of her death. Apple Watches contain health data and heart rate data. And so surely the government looked into that Apple Watch before they indicted Matt for crimes this serious. Do you know when they looked at the Apple Watch? This Monday. This Monday.

Matt Farwell met voluntarily with law enforcement. And he told them, "I went there to break up with her. I told her that's not my baby." The timeline doesn't work up -- work out. "It's not my baby." And Sandra Birchmore herself texted friends, "Matt is denying paternity." She knew.

He went over there and he said "that's not my baby" and he left and he blocked her from his phone. And when he met with the investigators, he gave them consent to search his phone for evidence related to the death/suicide of Sandra Birchmore. Gave it to them.

When you saw the pictures of Matt Farwell that the government just showed you, did you notice his hands were bare? He's clearly on a camera, a lobby camera. There's snow on his hood and he's wearing a mask, which is what people having an affair might do. He is a trained detective with the Stoughton Police Department.

His hands were bare. And as he was leaving, when you saw, his bare hands are in his pocket leaving the building back out into the snow.

At the scene were her phone, was her laptop. Matt Farwell broke up with Sandra Birchmore and said, "It's not my baby." And in an impulsive act of despair, she took her own life.

11:44 At the close of the evidence, we are confident that you will find -- and if any one of you finds that the government has not met their burden of proof beyond a reasonable doubt, that you must acquit Matt Farwell. And we are confident that you will return a verdict of not guilty.

11:45 THE COURT: Thank you, counsel.