**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Docket No. 1:24-cr-10259-DJC |
| v. | ) | Leave to File Excess Pages |
| | ) | ***Granted 11/06/2026*** |
| MATTHEW FARWELL | ) | |
| | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR JUDGMENT OF ACQUITTAL**

The defendant, Matthew Farwell, submits this memorandum in support of his renewed motion pursuant to Fed. R. Crim. P. 29, requesting that the Court enter a judgment of acquittal on Counts 1 and 2.[1] At trial, the government failed to prove beyond a reasonable doubt every element of the charged offenses: killing a witness/victim, in violation of 18 U.S.C. § 1512(a)(1)(C) (Count One); causing the death of a child in utero, in violation of 18 U.S.C. § 1841 (Count Two). The evidence, even when taken in the light most favorable to the government, is insufficient to sustain a conviction on either charges.

Mr. Farwell argues, as examples of the insufficiency of the evidence, that: the government failed to prove beyond a reasonable doubt that a killing occurred; assuming arguendo, the government proved a killing did occur, it failed to prove beyond a reasonable doubt that Mr. Farwell had the "intent to prevent the communication to a law enforcement officer . . . of the United States"; and, failed to prove there was a reasonable likelihood that, had Ms. Birchmore not died, she would have made at least one communication to a federal law enforcement officer. Therefore, the evidence, taken in the light most favorable to the

[1] Mr. Farwell previously filed a motion for judgment of acquittal under Rule 29 on October 28, 2026 (D.E. 380) and a renewed motion for judgment of acquittal under Rule 29 on November 5, 2026 (D.E. 395). He now submits this memorandum in support of the renewed motion.

government, was insufficient to prove beyond a reasonable doubt *all* of the elements of 18 U.S.C. § 1512(a)(1)(C), and a judgment of acquittal is required.

## LEGAL STANDARD

### I. Federal Rules of Criminal Procedure 29

To evaluate a Rule 29 motion, courts "consider whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt." *United States v. Abercrombie*, 162 F.4th 47, 51 (1st Cir. 2025), *cert. denied,* 146 S. Ct. 2555 (2026) (quoting *United States v. Ridolfi*, 768 F.3d 57, 61 (1st Cir. 2014)).

Although a district court must look at the evidence in the light most favorable to the government, the Rule 29 standard is not a "free pass" for the prosecution. *United States v. Martin*, 228 F.3d 1, 10 (1st Cir. 2000). The Court must apply "some degree of intellectual rigor" and reject "evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." *United States v. Pothier*, 919 F.3d 143, 146 (1st Cir. 2019) (quoting *United States v. Spinney*, 65 F.3d 231, 234 (1st Cir. 1995)); *United States v. Ofray-Campos*, 534 F.3d 1, 31-32 (1st Cir. 2008). "[I]f the evidence, when viewed in the light most favorable to the government, *gives equal or nearly equal circumstantial support to theories of guilt and innocence*," acquittal is required. *Martin*, 228 F.3d at 10 (emphasis added). "This is so because . . . where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence . . . , 'a reasonable jury *must necessarily entertain* a reasonable doubt.'" *United States v. Andujar*, 49 F.3d 16, 20 (1st Cir. 1995); *accord United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) ("[A]t the end of the day, if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable

jury must necessarily entertain a reasonable doubt.”).

## II. Offense Elements

Title 18 U.S.C. § 1512 criminalizes a range of activities constituting witness tampering. Section 1512(a)(1)(C) makes it a crime to “kill[] or attempt[] to kill another person, with intent to . . . prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense[.]” *Id.*

Under § 1512(a)(1)(C), the government must prove (1) a killing or attempted killing, (2) committed with a particular intent; namely, an intent (a) to “prevent” a “communication” (b) concerning “the commission or possible commission of a federal offense” (c) addressed to a “law enforcement officer or judge of the United States[,]” as defined by 18 U.S.C. § 1515(a)(4). *See Fowler v. United States,* 563 U.S. 668, 672 (2011).

### A. A Killing Under § 1512(a)(1)(C)

To convict under § 1512(a)(1)(C), and as averred in the Superseding Indictment, *see* D.E. 63, at ¶ 11, the government must prove that a killing occurred, as defined in 18 U.S.C. § 1111: that the defendant (1) unlawfully killed another, (2) with malice aforethought, and (3) with premeditation.

### B. The “Intent to Prevent”

Though § 1512(g)(2) states that “no state of mind need be proved with respect to the circumstance . . . that the law enforcement officer is an officer or employee of the Federal [g]overnment or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant[,]” *id.*, the defendant must intend to, at the least, prevent a communication to law enforcement, *see Fowler*, 563 U.S. at 674.

The government still "must show more than the broad indefinite intent . . . to prevent communications to law enforcement officers in general." *Fowler v. United States,* 563 U.S. 668, 674 (2011). As the *Fowler* Court cautioned:

> to allow the Government to show no more than the broad indefinite intent we have described (the intent to prevent communications to law enforcement officers in general) would bring within the scope of this statute many instances of witness tampering in purely state investigations and proceedings, thus extending the scope of this federal statute well beyond the primarily federal area that Congress had in mind.

*Fowler*, 563 U.S. at 675.

As delineated below, though the *Fowler* Court recognized that the witness tampering statute does apply "where the defendant [allegedly] killed the victim before the victim had decided to communicate to law enforcement officers," *id.*, at 676, and where the identities of the intended law enforcement officers are not clear, *id.*, it also determined that the government is not "excuse[d] from proving *something* about the hypothetical communication with federal officers." *Id.*, at 675.

**C. Proving the Federal Nexus Requirement Under *Fowler***

If a defendant is alleged to "kill[] a person with an intent to prevent communication with *law enforcement officers generally*," *Fowler,* 563 U.S. at 677-78 (emphasis added), which the government must prove beyond a reasonable doubt, *then* "that intent includes an intent to prevent communications with *federal* law enforcement officers <u>*only if*</u> it is <u>*reasonably likely*</u> under the circumstances that (<u>*in the absence of the killing*</u>) <u>*at least one*</u> of the relevant communications would have been made to a <u>*federal*</u> officer[,]"*id* (emphasis added). *See also*, *United States v. Tyler*, 732 F.3d at 252 (emphasis in original) (quoting *United States v. Lopez*, 372 F.3d 86, 92 (2d Cir. 2004), *vacated on other grounds by* 544 U.S. 902 (2005)) (holding that for a charge under § 1512(a)(1)(C), the government "must establish a *reasonable likelihood* that the person

whom defendant believes may communicate with law enforcement *would* in fact make a relevant communication with a federal law enforcement officer" and that to "establish this reasonable likelihood, 'there must be evidence – not merely argument' [. . .] of the witness's cooperation with law enforcement").

## ARGUMENT

### I. THE GOVERNMENT FAILED TO ESTABLISH ALL OF THE ELEMENTS OF THE 1512(A)(1)C) OFFENSE CHARGED; A JUDGMENT OF ACQUITTAL IS REQUIRED UNDER FEDERAL RULES OF CRIMINAL PROCEDURE 29

The government has failed to prove beyond a reasonable doubt that Mr. Farwell committed the crime as charged. Mr. Farwell renews his motion for a judgment of acquittal.

For the reasons that follow, though it is not an exhaustive accounting, no rational jury could unanimously find based on the evidence presented at trial, viewed in the light most favorable to the government, that Mr. Farwell killed Ms. Birchmore; or, that if, assuming solely arguendo he did so, he killed Ms. Birchmore with the intent to prevent the communication to federal law enforcement.

Upon review of other § 1512(a)(1)(C) cases, key themes become readily apparent. First, in all cases reviewed, with one unique exception,[2] the *fact* that a killing had occurred was not a contested issue because the manner of death was clear. *See*, *e.g.*, *Fowler*, 563 U.S. at 670 (witnesses saw Fowler "sh[oo]t and kill" the victim); *United States v. Weadick*, 15 F.4th 1 (1st Cir. 2021) (witnesses confessed that they had been present when the victim was killed); *United States v. Tyler*, 956 F.3d 116 (3d Cir. 2020) (victim has been "beaten, shot in the chest, and then

---

[2] *See United States v. Kilmartin*, 944 F.3d 315 (1st Cir. 2019) (interrogating whether the defendant's "conduct actually or proximately caused [the witness-victim's] death" when the defendant intentionally sent cyanide to someone who "was just adamant that he wanted to commit suicide[,]" after the man had complained about defendant to the FBI).

shot in the head" in front of witnesses); *Stuckey v. United States*, 603 Fed.App'x 461, 461 (7th Cir. 2015) (the victim was shot eleven times).

Second, in most cases, the defendant or defendant's associates were *already* being investigated or prosecuted for criminal conduct at the time the killing occurred, or a preceding criminal act was clearly identified. *See*, *e.g.*, *Fowler*, 563 U.S. at 670 (describing that the victim "came upon" a group of people "prepar[ing] to rob a Florida bank" when he was killed); *Weadick*, 15 F.4th at 7 (the victim had been federally indicted); *United States v. Snyder*, 865 F.3d 490 (7th Cir. 2017) (the convenience store robbery witnessed by the victim was investigated and prosecuted); *Stuckey*, 603 Fed.App'x at 461 ("the federal investigation into Stuckey's drug organization led to [the victim's] federal indictment").

Third, in most cases, the witness/decedent either was *already* in communication with law enforcement as a witness, cooperator, or informant, had been previously in communication with law enforcement, or had been approached by law enforcement. *See*, *e.g., Fowler*, 563 U.S. at 670 (identifying the victim as a "local police officer"); *Weadick*, 15 F.4th at 13 (1st Cir. 2021) (noting that the defendant "expressed concern after a federal agent sought cooperation from" the decedent, "and his death occurred the day after he reported a second contact from a federal agent."); *United States v. Mendez*, 182 F.4th 728 (8th Cir. 2026) (noting in a § 1512(a)(2)(C) case that the assaulted witness had previously spoken with federal law enforcement and "was reasonably likely to speak with federal law enforcement again"); *Tyler*, 956 F.3d at 124-25 (noting that the decedent had been cooperating with law enforcement and was set to testify against defendant's brother in state court the following day); *Stuckey*, 603 Fed. App'x at 461 (stating that the victim's indictment by the FBI caused them to search for him and seek his cooperation). This case sits apart from these exemplar cases.

### A. The Government Failed to Prove that Mr. Farwell Killed Ms. Birchmore and Judgment of Acquittal is Required Under Rule 29

Here, the government had to prove beyond a reasonable doubt that Mr. Farwell killed Ms. Birchmore. The government did not prove beyond a reasonable doubt that Dr. Capó-Martinez's and the defense experts' interpretations of the evidence were unreasonable. Given the ambiguity of the physical findings, the DNA, and the digital data, *at least* "an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence," *Andujar*, 49 F.3d at 20, and thus acquittal is required.

#### i. Examples of physical evidence that create reasonable doubt.

For example, Dr. Capó-Martinez, the board-certified forensic pathologist who was the medical examiner assigned to conduct Ms. Birchmore's autopsy, determined that the cause of Ms. Birchmore's death was asphyxia and the manner was undetermined. Testimony of Dr. Maria del mar Capó-Martinez on 10/26/26. On February 5, 2021, Dr. Capó-Martinez conducted an autopsy on Ms. Birchmore, and to date, she is the *only* witness that did a physical examination of Ms. Birchmore's body. *Id.* In her autopsy, she identified injuries such as petechiae, a hemorrhage to the left sternothyroid, and a broken hyoid bone – all of which are overlapping injuries found in both homicide and suicide, including partial hangings. *Id.* Notably, Dr. Capó-Martinez did *not* identify a hemorrhage at the site of the hyoid fracture at the time of autopsy. *Id.*

On May 6, 2021, following a full autopsy and communication with the Massachusetts State Police, Dr. Capó-Martinez issued a death certificate stating that the cause of Ms. Birchmore's death was asphyxia by hanging and the manner of death was suicide. *See id.* Between 2024 and her 2026 change to the cause and manner of death on the death certificate, Dr. Capó-Martinez reviewed significant amounts of evidence provided to her by the government, conferred with her colleagues at the OCME, and subsequently changed the death certificate to

"undetermined" in 2026. *Id.* She testified that undetermined is used in cases where there may be multiple manners of death being considered and cannot be excluded from one another. *Id*.

Dr. Mindy Hull, the Chief Medical Examiner for the Commonwealth of Massachusetts, testified that undetermined is the classification that is used when the other manners of death are not appropriate. *See* Testimony of Dr. Mindy Hull on 10/29/26. Dr. Andrew, a board-certified forensic pathologist for nearly thirty years, also testified that when there is insufficient information to support one and a little information to support another or maybe even equally weighted information [regarding manner of death], it is not good practice to just take a guess. Testimony of Dr. Thomas Andrew on 11/4/26.

Dr. Andrew testified that he concurred with the findings of Dr. Capó-Martinez, and specifically, that all of the physical findings scientifically support a finding of undetermined. *Id.* Additionally, Dr. Andrew testified that he considered Ms. Birchmore's mental health history, *along with* Ms. Birchmore and Mr. Farwell's alleged history of consensual choking, the videos of Mr. Farwell entering and leaving the elevator in Ms. Birchmore's apartment building, the DNA evidence, and the digital evidence, when making the determination that the cause of death was hanging and the manner was undetermined. *Id.* Dr. Andrew testified that, in his opinion, the autopsy findings favor suicide. *Id.*

Another example: though Dr. Smock's testified that he saw a hemorrhage at the fracture site of the hyoid bone (*see* Testimony of Dr. William Smock on 10/27/26), neither Dr. Capó-Martinez, who viewed the hyoid and surrounding tissue *at the time of autopsy* (*see* Testimony of Dr. Maria del mar Capó-Martinez on 10/26/26), nor defense expert Dr. Thomas Andrew saw hemorrhage at the fracture site (*see* Testimony of Dr. Thomas Andrew on 11/4/26). Dr. Andrew explained that when there is no hemorrhage at the hyoid fracture site, it means that either the

person's blood pressure is so low that they could not develop enough pressure to bleed at the fracture site or they were deceased at the time of fracture. *See* Testimony of Dr. Thomas Andrew on 11/4/26.

Dr. Smock viewed the hyoid bone three-and-a-half years after Ms. Birchmore died (*see* Testimony of Dr. William Smock on 10/27/26), and after the hyoid bone had been stored in formalin, blood, and water with other organ samples for that period of time. *See* Testimonies of Dr. Capó-Martinez on 10/26/26, Dr. Mindy Hull on 10/29/26, and Dr. Thomas Andrew on 11/4/26. *See also*, Exhibit 716. When asked by the government about a similar photograph of the hyoid bone taken 3 ½ years later, Dr. Capó-Martinez noted that the government and Dr. Smock had "mentioned" a darker color around the fracture area, but she could not be sure "just based on the photograph." Testimony of Dr. Capó-Martinez on 10/26/26. Throughout her testimony, Dr. Capó-Martinez stated that she relies on the notes she took at the time of autopsy because she is trained to take accurate notes about her findings. *Id*.

Dr. Andrew explained that the fluid in the stock jar containing the hyoid bone is formalin, water, and blood that oxidizes and turns brown over time. *See* Testimony of Dr. Thomas Andrew on 11/4/26. When viewing Exhibit 321, Dr. Andrew noted that the tissue still adhered to the hyoid bone had brown discoloration because the blood had been oxidized by the formalin. *Id.* He did *not* observe hemorrhage present in the photograph of the hyoid bone. *Id.*

Drs. Heather Garvin and Angi Christensen, both board-certified forensic anthropologists, testified about their examination of Ms. Birchmore's hyoid bone, each having identified a single fracture to the right greater horn. Testimony of Dr. Heather Garvin on 11/2/26; Testimony of Dr. Angi Christensen on 11/3/26. Both forensic anthropologists noted there is not a specific amount of force required to fracture a hyoid bone, even when unfused. *Id.* Additionally, both testified

that hyoid fractures can be found in seated hangings and, though less common, can occur in individuals under the age of 30. *Id.* Dr. Garvin testified that Ms. Birchmore's hyoid bone fracture is nonspecific, and that there are too many factors to predict if and how a hyoid would fracture. Testimony of Dr. Heather Garvin on 11/2/26. As to the scientific literature, Dr. Garvin noted that no study put together the specific combination of variables present in Ms. Birchmore's case, but the research does show that fractures do occur in unfused hyoid bones *and* seated hangings. *Id.* Critically, Dr. Garvin testified that modern scientific articles about the hyoid bone caution against making determinations as to manner of death based solely on a hyoid fracture. *Id.*

Another example of physical factors creating reasonable doubt as to whether a killing occurred arises from the testimony about DNA found on the strap found around Ms. Birchmore's neck. On October 22, Elizabeth Duval, from the Massachusetts State Police Laboratory, testified that DNA major contributors are those who give more DNA in a mixture than others. *See* Testimony of Elizabeth Duvall on 10/22/26. She then testified that Mr. Farwell was a major contributor on that strap. *Id*. Ms. Duval's testimony revealed that she was not informed that Mr. Farwell had a fraternal twin, and was never provided with a DNA sample from Billy Farwell. *Id.*

Defense DNA expert, Dr. Maher Noureddine, added critical context to Ms. Duval's testimony – that Ms. Birchmore's skin-cell DNA made up *ninety*-percent of that found on the strap. Testimony of Dr. Maher Noureddine on 11/3/26. The remaining ten-percent of the DNA found on the strap belonged to a mixture of four contributors – Matthew Farwell *and* three unknown, unrelated individuals. *Id.* There is no information as to who those other contributors are, and there is no way to know if there could be a missing male from that mixture, including Billy Farwell. *Id.*

The breakdown for the male DNA mixture on the ligature makes up five-percent, three-

percent, and two-percent of the total DNA found. *Id.* Mr. Farwell's DNA profile is attributable to the five-percent, but as Dr. Noureddine testified, the genotypes consistent with Mr. Farwell were not always the highest weighted, his combination of alleles makes up the highest probability of that five-percent, but not all of them. *Id*.

Dr. Noureddine also testified about transfer DNA and the ways in which it can happen before evidence collection begins. *Id.* At the scene, Ms. Birchmore was removed from the door by OCME technicians who may have touched other parts of Ms. Birchmore or the carpet prior to touching the ligature to remove her from the door. *See*, *e.g.*, Testimony of Caitlin Bulger on 10/29/26; Testimony Dr. Maher Noureddine on 11/3/26. Once Ms. Birchmore was removed from the door, while photographs were taken, the ligature was lying on the carpet. *See*, *e.g.*, Exhibits 37, 550. At the medical examiner's office, the ligature was kept on Ms. Birchmore's body and the t-shirt she was wearing was pulled up and over her head and the ligature, not cut off her body. Testimony of Caitlin Bulger on 10/29/26. When bagged to be sent to the crime lab for DNA testing, the ligature was crumbled into a big ball in a bag of plastic against best practices as to how biological evidence should be packaged. *See*, *e.g.*, Testimony Dr. Maher Noureddine on 11/3/26 (illustrative aid). Each of these events could have caused material containing DNA to transfer on to the ligature from other surfaces, such as gloves, clothing, and carpeting.

**ii. Examples of digital forensic and video evidence that create reasonable doubt.**

The government's digital forensics experts, Christopher Beckstrom and Jessice Hyde, testified that Ms. Birchmore's phone locked at 9:13:37 p.m. on February 1, 2021, and was never again unlocked. *See*, *e.g.*, Testimony of Christopher Beckstrom on 10/16/26; Testimony of Jessica Hyde on 10/28/26. They further testified that Ms. Birchmore's phone registered six steps at 9:10:40 p.m. and eight steps at 9:40:19 p.m. that night. *See*, *e.g.*, Testimony of Christopher

Beckstrom on 10/16/26; Testimony of Jessica Hyde on 10/28/26. After those 9:40:19 p.m. steps, the phone did not register movement again until law enforcement recovered the phone on February 4, 2021. Ms. Hyde testified that there was a very low error rate in Apple's health data. *See*, *e.g.*, Testimony of Jessica Hyde on 10/28. Additionally, both Ms. Hyde and defense digital forensics expert, Daniel Loper, testified that in order for Apple devices to register steps, a person must be carrying or wearing a device, and that device must be powered on. *See*, *e.g.*, Testimony of Jessica Hyde on 10/28; Testimony of Daniel Loper on 11/4/26. Finally, Ms. Hyde testified that if a phone is, for example, sitting on a desk, there would be no health data recorded, but it does not mean that the person who owns the phone or device is not moving. Testimony of Jessica Hyde on 10/28.

Defense expert Daniel Loper identified that at 5:02 p.m., when Ms. Birchmore was last seen on the apartment foyer's camera, she walked from the front door of the apartment building to the elevator, and then presumably walked from the elevator into her apartment, yet no steps were registered in the Apple health data. *See*, *e.g.*, Testimony of Daniel Loper on 11/4/26; Exhibit 43. From this, it can be inferred that Ms. Birchmore's iPhone did not record *every* step she took.

During its direct examination of Billy Farwell, the government introduced a string of text messages between the witness and Matthew Farwell that occurred on February 1, 2021. *See* Testimony of Billy Farwell on 10/27/26; Exhibit 428. The government noted that Mr. Farwell responded to Billy Farwell's text at 9:22 p.m., while he was allegedly inside Ms. Birchmore's apartment. *Id*.

As to video evidence, the government, for example, repeatedly asked witnesses about Ms. Birchmore's hair in a 5:33 p.m. video (Exhibit 45) to show that her hair was in a messy bun on

top her head. Testimony of Trooper Dunne on 10/14/26; Testimony of SA Heidi Kelsch on 10/19/26. With some witnesses, the government juxtaposed this video with photos of a deceased Ms. Birchmore when she was discovered by law enforcement on February to show that her hair was down. All the video indicates is that Ms. Birchmore had her hair up more than *three hours* before any proximate time of death.

The video of Mr. Farwell entering the foyer of Ms. Birchmore's apartment building at approximately 9:14 p.m. on February 1, 2021 (*see* Exhibit 46), and his departure from the elevator and building at 9:43 p.m. (*see* Exhibit 47), were shown repeatedly throughout the trial. Much testimony was elicited about how unusual it was for Mr. Farwell to wear a mask. *See*, *e.g.*, Testimony of Heather Cheever on 10/13/263; Testimony of Sandra Barrett on 10/21/26; Testimony of Daniel Barber on 10/21/26; Testimony of Robert Kuhn on 10/15/26; Testimony of Brian Holmes on 10/15/26. The government asked witnesses whether Mr. Farwell wore "disguises" when he met up with them. Testimony of Sheana Isabel on 10/22/26; Testimony of Samantha McCue on 10/22/26; Testimony of Sarah Sproul on 10/22/26. Yet *every single law enforcement officer* that the government called to testify in this case stated that they immediately recognized Mr. Farwell, not just because of his size and gait, but because he was wearing the same hoodie and boots that he always wore to work. *See* Testimony of Trooper Dunne on 10/14/26; Testimony of Donna McNamara on 10/15/26.

Mr. Farwell may have sought to minimize *facial* recognition from Canton residents who knew his wife because she grew up in that community. He may have passed residents who would see him walking into the apartment of a woman with whom he was having an extramarital affair. Indeed, Mr. Farwell told Troopers Dunne and Fanning of the Massachusetts State Police that he was, in fact, at Ms. Birchmore's apartment on February 1st, and offered the approximate time he

was there. *See* Testimony of Matthew Dunne on 10/14/26.

The video and related testimony also showed that Mr. Farwell entered and left the building with heavy-soled wet boots (the video shows him wiping his shoes on the mat before the elevator door), boots that would undoubtedly leave footprints, tread marks, or salty puddles in or around Ms. Birchmore's apartment. No boot prints or salt marks were found by Trooper Dunne. *See* Testimony of Matthew Dunne on 10/13/26. Additionally, the video and testimony showed that Mr. Farwell wore no gloves (Exhibits 46 and 47), and that he often walked around with his hands in his pockets. *See*, *e.g.*, Testimony of Sandra Barrett on 10/21/26.

**iii. Examples demonstrating there were no signs of a struggle.**

On February 4, 2021, when Trooper Dunne entered Ms. Birchmore's apartment, *before* he was ever aware that Mr. Farwell had been in Ms. Birchmore's apartment on the night she likely died, he noted no signs of struggle – no drag marks, no footprints, items on shelving in the bedroom were left upright. *See*, *e.g.*, Testimony of Trooper Dunne on 10/14/26. He testified that he saw nothing that indicated foul play. *See*, *e.g.*, Testimony of Trooper Dunne on 10/14/26.

As another example, Dr. Smock testified that hair caught under the ligature is "one of the things that a forensic investigator should look at if they've been trained on the – the difference between what we see of hair in suicides versus the hair we see in homicides . . . That's the difference that a forensic pathologist with appropriate training and experience would know that the hair under, through, around a ligature is a red flag." Testimony of Dr. William Smock on 10/27/26. However, Dr. Smock could not point to a single study providing valid support for this assertion. The one study he stated supported this proposition relied on the Baden Letter written about Ms. Birchmore, and an article about a single case where there was a documented homicide. Yet, experienced death investigator Trooper Dunne, and experienced medical examiners Drs.

Capó-Martinez and Andrew assigned no particular significance to this issue. *See*, *e.g.*, Testimony of Trooper Dunne on 10/14/26; Testimony of Dr Capó-Martinez on 10/26/26; Testimony of Dr. Andrew on 11/4/26.

As a final example, Dr. Smock testified that a necklace was ripped from Ms. Birchmore's neck. Testimony of Dr. Smock on 10/27/26. The evidence showed that Ms. Birchmore's necklace was broken, as the chain and pendant were still visible on her body. *See* Testimony of Matthew Dunne on 10/13/26; Testimony of Dr. William Smock; Testimony of Dr. Thomas Andrew. Upon close review of the x-rays of Ms. Birchmore's head and neck before autopsy, Drs. Garvin and Andrew testified that there appeared to be a metallic object underneath the ligature, and that object traveled with Ms. Birchmore from her apartment to the medical examiner's office. *See*, *e.g.*, Testimony of Heather Garvin on 11/2/26; Testimony of Dr. Andrew on 11/4/26. Therefore, the necklace was not ripped from Ms. Birchmore's body as Dr. Smock claimed. Testimony of Dr. Smock on 10/27/26. It broke and remained under the ligature.

**iv. Examples of evidence that Ms. Birchmore had a significant mental health history and history of at least one suicide attempt.**

Dr. Smock testified that Ms. Birchmore died by homicide. Testimony of Dr. Smock on 10/27/26. His testimony did not demonstrate serious consideration of the alternative: that Ms. Birchmore may have committed suicide. He made one brief call to Ms. Alkhalil regarding Ms. Birchmore's therapy session on January 31, 2021, where she told him that Ms. Birchmore did not express suicidal ideation. *Id.* That was the end of his inquiry. *Id.* He did not call Dr. Venkataraman, who prescribed Ms. Birchmore sertraline, "[b]ecause that was not part of what I felt was critical in this case. *Id.* He did not review any of Ms. Birchmore's mental health or medical history. *Id.* Dr. Smock testified that "[i]f it's something that happened years ago, no, ma'am. What's important is what was she experiencing in the most recent past. Not what

happened years ago, but what happened in the recent past." *Id.*

Defense expert, Dr. Melissa Piasecki, a board-certified forensic psychiatrist, reviewed a broad range of Ms. Birchmore's medical and mental health records and many other materials. Testimony of Dr. Melissa Piasecki on 10/30/26. Dr. Piasecki gave extensive testimony about Ms. Birchmore's risk factors for suicide, identifying the following examples of "co-occurring problems" present in Ms. Birchmore's life at the time of her death:

> the depression and the history of suicide attempts included problems with anxiety, such as a diagnosis of generalized anxiety disorder and recurrent panic attacks. She also had co-occurring problems in her social world. She had co-occurring problems with relationships, finances, social support. She had co-occurring problems with problems with impulsivity and a diagnosis of ADHD. She had co-occurring problems with loss and grief. Those are some of the co-occurring problems present for her at that time. And then she also had some facts or some adversities that were risk factors that could change over time, but at the time of her death were very serious. Those problems were depression, social isolation, the effects of pregnancy on worsening depression, the potential effects of an SSRI antidepressant sort of activating suicide thoughts and behavior, all kind of laid on top of her persistence or enduring personality problems of impulsivity, sensitivity to abandonment.[3]

Throughout her testimony, Dr. Piasecki emphasized that it is the *aggregate* of risk factors that are concerning when evaluating for a potential suicide. *Id.*

The government asked a number of witnesses whether Ms. Birchmore left a suicide note. *See*, *e.g.*, Testimony of Matthew Dunne on 10/14/26; Testimony of Dr. Maria del mar Capó-Martinez on 10/26/26; Testimony of Heidi Kelsch on 10/1926. Dr. Piasecki testified that only about 20% of those who commit suicide leave a suicide note. Testimony of Dr. Melissa Piasecki on 10/30/26. Additionally, Dr. Piasecki testified to Ms. Birchmore's documented impulsivity and history of ADHD. *Id.* She noted that Ms. Alkhalil declined to recommend Ms. Birchmore for a

---

[3] Counsel respects that the court reporters have asked that the rough transcripts not be cited directly. Because Dr. Piasecki's testimony was particularly technical, counsel pulled this specific part of the testimony from the October 30, 2026, rough transcript to ensure it was as accurate.

license to carry a firearm due to her impulsivity and engagement in risk-taking behaviors. *Id.* Edge play in which Ms. Birchmore engaged was identified by Dr. Piasecki as additional evidence of risk-taking behaviors. *Id.*

Dr. Piasecki testified that suicide is a significant cause of death during pregnancy, and that pregnancy can elevate the risks of homicide, though, based on the data, less so for white women. *Id.* Mental health concerns are the number on cause of death in pregnant women. *Id.* This can be true even when a pregnant person is expression happiness and joy about their pregnancy. *See id.* This testimony aligned with that of Dr. Venkataraman, who prescribed Ms. Birchmore medication for her depression and anxiety. *See* Testimony of Dr. Priyanka Venkataraman on 10/20/26. Dr. Venkataraman testified that the American College of Obstetrics and Gynecology has guidelines about screening for mental health concerns because when they are left untreated, they affect the mother *and* the baby's health. *Id*.

Dr. Piasecki also testified that it was significant in her forensic review of Ms. Birchmore's mental health that Ms. Alkhalil had tried to refer Ms. Birchmore to intensive outpatient therapy, which, to Dr. Piasecki indicated that Ms. Birchmore was presenting to Ms. Alkhalil with clinical instability and Ms. Alkhalil was seeking to reduce Ms. Birchmore's risk of hospitalization. Testimony of Dr. Melissa Piasecki on 10/30/26. *See also* Testimony of Diala Alkhalil on 10/26/26 (testifying that on and around June 23, 2020, Ms. Alkhalil recommended that Ms. Birchmore enter an Intensive Outpatient Program). As noted above, Dr. Venkataraman also recommended that Ms. Birchmore seek psychiatric care. *See* Testimony of Dr. Priyanka Venkataraman on 10/20/26.

As a final example of Dr. Piasecki's testimony, she noted that pregnancy appeared to have increased Ms. Birchmore's grief for the loss of her mother and grandmother. Testimony of Dr.

Melissa Piasecki on 10/30/26. This was also supported by Ms. Alkhalil's testimony regarding the vision Ms. Birchmore had of her mother a short time before she died. *See* Testimony of Diala Alkhalil on 10/26/26.

When viewing the aggregate of these myriad risk factors, including the rekindled grief for her mother and grandmother, Dr. Piasecki opined that if Mr. Farwell had broken up with Ms. Birchmore, denied paternity, and otherwise indicated he would no longer be a part of her life on the night of February 1, 2021, it would have been a "catastrophic loss" for Ms. Birchmore. *See* Testimony of Dr. Melissa Piasecki on 10/30/26. She explained: "She was -- at this point, she had lost her other major supports, and so this would have been the final relationship that she was losing. So this would have been in the category of catastrophic loss." *Id.*

Considering the totality of the evidence, the Court should issue a judgment of acquittal on Counts One and Two for insufficient evidence that Mr. Farwell killed Ms. Birchmore. No further analysis is required.

### B. The Government Failed to Prove Beyond A Reasonable Doubt That Mr. Farwell Killed Ms. Birchmore With the Intent To Prevent Communications To Federal Law Enforcement And Judgment Of Acquittal Is Required Under Rule 29

Assuming, solely for purposes of argument, that the government proved a killing occurred, and construing the evidence in favor of the government, a rational jury could not find that the government proved beyond a reasonable doubt that Mr. Farwell killed Ms. Birchmore with the intent to prevent a communication to law enforcement, and more specifically, to federal law enforcement, as is required under § 1512(a)(1)(C). The evidence failed to show beyond a reasonable doubt that Mr. Farwell formed the intent to prevent Ms. Birchmore from

communicating to law enforcement, let alone federal law enforcement. Examples of the government's failure to meet its burden are outlined herein.

The charging of Mr. Farwell under § 1512(a)(1)(C) is highly unusual because, prior to Ms. Birchmore's death, there was no indication whatsoever that Mr. Farwell was being or would be investigated by any law enforcement entity or prosecuted federally. As an example, in *United States v. Santonastaso*, a § 1512(b)(3) case, the First Circuit held that the government proved the "specific intent element of witness tampering" because the defendant, who had been previously investigated by the Federal Aviation Administration, and was convicted in Massachusetts state court for stealing a helicopter, was again under investigation by state and federal authorities, and had himself been introduced to the federal agent who also spoke with the witness. 100 F.4th 62, 66-68 (1st Cir. 2024). When addressing Mr. Santonastaso's claim that he did not know the agent the witness spoke to was a federal agent, the First Circuit found that because an investigation was under way, "there [was] no meaningful distinction between intent related to the federal status of the investigating agents and the federal nature of the crime *being investigated*." *Id.*, at 73. *See also* **ante** (collecting cases).

Here, there *was no investigation* into Mr. Farwell before or at the time of Ms. Birchmore's death. For example, *none* of the local, state, or federal officers who testified at trial indicated that *any* investigation into Mr. Farwell was contemplated, let alone imminent before Ms. Birchmore's death. *See*, *e.g.*, Testimony of Sandra Barrett on 10/21/26; Testimony of Robert Kuhn on 10/29-30/26; Testimony of Brian Holmes on 10/15-16/26; Testimony of McNamara on 10/15/26; Testimony of Matthew Dunne on 10/13/26; Testimony of Heidi Kelsch on 10/16/26 and 10/19/26.

No evidence introduced at trial suggested that Ms. Birchmore had been in communication

with law enforcement with the intent to report *any* crimes allegedly committed by Mr. Farwell, or as an informant regarding any kind of ongoing investigation into Mr. Farwell. The only communications Ms. Birchmore had with law enforcement were in social and/or sexual contexts. *See*, *e.g.*, Testimony of Heather Cheever on 10/13/26, Testimony of Sandra Barrett on 10/21/26, Testimony of former-Deputy Chief Donna McNamara on 10/15/26, Testimony of Billy Farwell on 10/26/26 and 10/27/26.

Not a single witness testified that Ms. Birchmore ever intended to speak to law enforcement about allegations of an underage sexual relationship with Mr. Farwell. Though witnesses testified that Ms. Birchmore had disclosed that Mr. Farwell had allegedly taken her virginity when she was one month shy of her sixteenth birthday, those disclosures did not include any indication that Ms. Birchmore intended to *report* Mr. Farwell for criminal conduct or wanted those to whom she disclosed to report on her behalf. *See*, *e.g.*, Testimony of Lindsey Crean on 10/28/26, Testimony of Shauna McGrath on 10/21/26; Testimony of Rebecca Chandler on 10/21/2026. For example, Mr. Pickard testified that Ms. Birchmore would not report that Mr. Farwell allegedly took her virginity when she was one month shy of her sixteenth birthday because she did not want to put her sex life on trial. Testimony of Jason Pickard on 10/22/26.

Similarly, Diala Alkhalil, Ms. Birchmore's long-time therapist, testified that Ms. Birchmore disclosed she had lost her virginity when she was sixteen, but did so with a "smirk." *See* Testimony of Diala Alkhalil on 10/23/26 and 10/26/26. Ms. Alkhalil claimed: "I knew there was more to the story." *Id*. Ms. Alkhalil noted that Ms. Birchmore did not share everything with her. *Id.*

Though, as this Court noted in its Fed. R. Evid. 804(b)(6) decision on October 28th, there were indicators in the government's case-in-chief that the relationship between Mr. Farwell and

Ms. Birchmore was changing, no witness testified that Ms. Birchmore *ever* indicated that she intended to report to law enforcement any alleged criminal conduct by Mr. Farwell. Rather, witness after witness stated that Ms. Birchmore threatened to tell Mr. Farwell's wife about their affair. *See*, *e.g.*, Exhibits 182, 185, 220, 222, 239, 348 (Josh Heal texts, admitted through Beckstrom 10/16/26); Testimony of Rebecca Chandler on 10/21/26, Exhibit 390 (Chandler texts, admitted through Beckstrom 10/16/26); Testimony of Sarah Odams on 10/22/26. Another example came in through Agent Kelsch's testimony, when she read into the record text exchanges between Ms. Birchmore and her friend, Gianna Papadapoulous. Testimony of Heidi Kelsch on 10/19/26. On October 6, 2020, Ms. Birchmore texted Ms. Papadapoulous: "So I gave him an ultimatum and I'm getting my baby because he knocked her up again and I found out and said, either I go to your wife or you keep your word and give me a baby and he was not at all happy about it." *Id. See also*, Exhibit 186.

Ms. Birchmore also made these threats directly to Mr. Farwell. *See*, *e.g.*, Exhibits 183, 211. *See also* Exhibit 200 ("This is your last and final offer...If not it will be tomorrow."); Exhibit 237 ("I'm giving you till the 31st to figure it out").

The evidence provided only one other example of a threat made by Ms. Birchmore regarding Mr. Farwell, and that was to take Mr. Farwell to family court and force him to pay child support. *See*, *e.g.*, Testimony of Jessica Katz on 10/20/26; Testimony of Sarah Odams on 10/22/26; Testimony of Lindsey Crean on 10/23/26; Exhibits 220, 222, 239, 353 (Heal texts, admitted through Beckstrom 10/16/26); Exhibit 334 (Crean texts, admitted through Beckstrom 10/16/26); Exhibit 383 (Pickard texts, admitted through Beckstrom 10/16/26).

Ms. Birchmore threatened to take Mr. Farwell to family court despite her knowledge that Mr. Farwell was not the fetus's father, *see*, *e.g.*, Testimony of Heidi Kelsch on 10/19/26

("recall[ing] that Ms. Birchmore told at least two people that Mr. Farwell was not the father), and despite Mr. Farwell's *contemporaneous* denial of paternity to Ms. Birchmore, *see*, *e.g.*, Testimony of Matthew Dunne on 10/14/26 (noting that when Trooper Dunne interviewed Jordan Igoe after Ms. Birchmore's death, Ms. Birchmore had told Ms. Igoe that Mr. Farwell denied being the father of the baby); Testimony of Diala Alkhalil on 10/23/26 and 10/26/26 (recalling Ms. Birchmore saying Mr. Farwell was denying paternity, would not sign the birth certificate, and would not be involved in the baby's life); Testimony of Lesley Davis on 10/15/26 (testifying that Ms. Birchmore told Ms. Davis that Mr. Farwell told Ms. Birchmore "that's not my baby").

The final example put forward by the government was a phone call placed by Julia Perlin to the Stoughton Police Department business line on January 20, 2021, about a money dispute between her and Ms. Birchmore (hereinafter "the Perlin call"). S.A. Kelsh testified that she inferred the Perlin call caused Mr. Farwell to form this intent to prevent Ms. Birchmore's communication with law enforcement. But the testimony the government elicited simply does not bear this out.

James Fitton testified that the Perlin call was made on the business line of the SPD. Testimony of James Fitton on 10/20/26. Mr. Fitton testified that the caller asked to speak with Detective Matthew Farwell and alluded to a relationship between Mr. Farwell and her friend. *Id.* Mr. Fitton testified that he classified the call as personal, wrote the caller's name and number down and went to find Mr. Farwell. *Id.* Mr. Farwell reacted angrily to the message Mr. Fitton relayed and told Mr. Fitton never to speak about it again. *Id.* Mr. Fitton testified that no crime had been reported. *Id.* A text message from Mr. Farwell to Mr. Fitton was introduced where Mr. Farwell said "let's never discuss it again. That girl is fucking insane. Well, both of them are." *See* Exhibit 423. No further action was taken by Mr. Fitton or SPD.

*After* the death of Ms. Birchmore, then-Deputy Chief Holmes accessed and listened to the Perlin call. He, too, determined that no criminal conduct had been reported and did not take further action regarding the call. *See*, *e.g.*, Testimony of Brian Holmes on 10/15/26 – 10/16/26**.** Chief McNamara did not hear about the call at all until Spring of 2024. *See*, *e.g.*, Testimony of Donna McNamara on 10/15/26.

The Perlin call reported no crime committed by Mr. Farwell and was not intended to do so. The texts introduced to the jury between Mr. Farwell and Ms. Birchmore, when taken in context, demonstrate that Mr. Farwell understood this, too. *See*, *e.g.*, Exhibits 246 and 247. Within the texts between Ms. Birchmore and Mr. Farwell, Mr. Farwell asked if Ms. Birchmore owed Ms. Perlin money and asked about why Ms. Perlin made the call. *See* Exhibit 246. Ms. Birchmore denied telling Ms. Perlin about her affair with Mr. Farwell and stated that she did not support Ms. Perlin's actions. *Id*. Ms. Birchmore also noted that Ms. Perlin had called other people's workplaces to embarrass them or make demands, making Mr. Farwell's workplace almost a tangential issue. *Id.* Indeed, Ms. Birchmore said: "It's literally nothing." *Id.* Mr. Farwell said: "It's not nothing she called my job that's insane. . .  like what do I have to do with you not giving her something." *Id.* When Mr. Farwell said, "Like you have no idea how bad what she did is," Ms. Birchmore replied with emojis and "Makes me more mad like this has been done to other people too." *Id.* Mr. Farwell responds, "I just don't understand why she even knows my name and why I got involved in something that has nothing to do with me. / I have no idea who this person even is." *Id.* The two continued to text between 8:55:08pm when Exhibit 246 ends and 10:45pm when Exhibit 247 begins, and those texts also provide context that further demonstrate that Mr. Farwell was concerned about the call in relation to his job and his marriage, not about any actual, potential, or even hypothetical allegations of criminal conduct.

Witnesses testified and marriage and birth certificates showed that Mr. Farwell was married with two children and another on the way in January and February 2021. *See*, *e.g.*, Exhibit 160 (marriage certificate). Witnesses testified that many SPD employees grew up in Stoughton and had deep connections to that community. *See*, *e.g.*, Testimony of Robert Kuhn on 10/14/26; Testimony of Billy Farwell on 10/27/26. They also testified that Brockton, Canton, and Stoughton are all close in proximity, where people know and recognize each other, and know each other's families. *See*, *e.g.*, Testimony of Sheanna Isabel's on 10/22/26; Testimony of Billy Farwell on 10/27/26; Testimony of Matthew Dunne on 10/14/26; Testimony of Robert Kuhn on 10/14/26. Witnesses testified that SPD was a rumor mill. *See*, *e.g.*, Testimony of Heather Cheever on 10/13/26, Testimony of Sandra Barrett on 10/21/26, Testimony of Daniel Barber on 10/21/26. Ms. Perlin's call announced Mr. Farwell's extramarital affair with Ms. Birchmore to a work colleague, at a workplace where he was respected, where people know his wife, and where there was an active rumor mill. His subsequent anger, then, is a natural reaction to that information being shared with his workplace.

Notwithstanding the Perlin call, in the twelve days between the call and Ms. Birchmore's death, there was no investigation into Mr. Farwell's relationship with Ms. Birchmore.

If anything, the evidence showed that Mr. Farwell feared Ms. Birchmore's disclosure about their affair to his wife and/or her initiation of a lawsuit against him in family court, which would inevitably become known to his wife. While Ms. Birchmore capitalized on the Perlin call to further pressure Mr. Farwell into claiming paternity, she did not use it to threaten any kind of criminal reporting to law enforcement. *See*, *e.g.* Exhibit 247.

Based on the evidence presented at trial, the death of Ms. Birchmore was the *only* reason that *local and state* law enforcement began investigating Mr. Farwell. For example, the evidence

showed that local and state law enforcement did *not* seek to refer Mr. Farwell's case to the FBI or any federal law enforcement agency. Deputy Chief Holmes testified that he did *not* refer Matthew Farwell's conduct, as described in the internal affairs report, to federal law enforcement. Testimony of Brian Holmes on 10/16/26. Instead, Deputy Chief Holmes referred the findings of *Billy* Farwell's internal affairs report due to concerns that he may have committed crimes in other states. *Id.* Trooper Dunne indicated that he, Trooper Fanning, and the Norfolk District Attorney's office investigated Mr. Farwell for at least two years after the death of Ms. Birchmore – again, triggered only by her death – with no indication that they intended to make a federal referral or wanted federal involvement. Testimony of Matthew Dunne on 10/14/26.

For the non-exhaustive reasons outlined above, no rational trier of fact could find beyond a reasonable doubt that Mr. Farwell intended to prevent Ms. Birchmore from communicating to law enforcement. Thus, this Court should issue a judgment of acquittal.

### C. The Government Did Not Prove That, Had Ms. Birchmore Not Died There Was A Reasonable Likelihood That At Least One Communication Would Go to A Federal Law Enforcement Officer

As outlined above, the government has failed to prove beyond a reasonable doubt that Mr. Farwell killed Ms. Birchmore at all, let alone with the "intent to prevent" Ms. Birchmore from communicating with law enforcement. The government additionally failed to meet the federal nexus required to sustain a § 1512(a)(1)(C) conviction. When inquiring as to whether the government has met its burden, "the Supreme Court instructed courts to consider the counterfactual world in which the victim is not murdered and to ask with whom she would have communicated." *United States v. Snyder*, 865 F.3d 490, 493 (7th Cir. 2017). Where, as here, the defendant is alleged to have committed a killing "with an intent to prevent communication with law enforcement officers generally," *Fowler*, 563 U.S. at 677, the government must, and, here,

failed to show that it was "*reasonably likely* under the circumstances that (*in the absence of the killing*) *at least one* of [Ms. Birchmore's] relevant communications would have been made to a *federal* officer[,]" *id.*, 563 U.S. at 678 (emphasis added). Instead, the evidence showed only that the likelihood of Ms. Birchmore's communication with federal law enforcement was "remote, outlandish, [and] simply hypothetical." *Fowler*, 563 U.S. at 678. This showing fails to pass *Fowler* muster.

When viewing the evidence through the *Fowler*-required "counterfactual world," to ask, if Ms. Birchmore was alive, "with whom she would have communicated[,]" *Snyder*, 865 F.3d at 493, the evidence has shown that it was *not* reasonably likely that Ms. Birchmore would have communicated with law enforcement about the conduct in which the government alleges Mr. Farwell engaged, but instead that she would have communicated with Mr. Farwell's wife. In Ms. Birchmore's own words, as presented through the testimony of Mr. Pickard, that possibility of communication with law enforcement was not just remote, but highly unlikely. *See Fowler*, 563 U.S. at 678. Furthermore, as outlined above, the evidence shows that local and state law enforcement *only* became involved *because* of Ms. Birchmore's death, and even then, the evidence shows that *only* local and state law enforcement was involved in any subsequent investigation.

*United States v. Snyder*, a § 1512(a)(1)(C) case, is instructive. 865 F.3d 490 (7th Cir. 2017). In *Snyder*, a witness to a Circle K gas station robbery was killed.[4] *Id.*, at 493. There, as here, "only state and local officials investigated" both the underlying crime *and* the subsequent murder. *Snyder*, 865 F.3d at 497. The *Snyder* Court noted that there were "two separate paths the government can take to show the required federal nexus under § 1512: one path if the *underlying*

[4] In *Snyder* the underlying predicate crime was not an open question but had *in fact* occurred and was already being investigated when the murder occurred.

crime would have been prosecuted in federal court, and a second if it would have been prosecuted in state court." *Snyder*, 865 F.3d at 497. Those proposed paths are applied to the facts in this case.

**i. The first path presented by *Snyder.***

As to the first path – "the government can still satisfy § 1512 by showing a reasonable likelihood that the victim would have *communicated with a federal officer who was assisting the state prosecution of the underlying crime*." *Snyder*, 865 F.3d at 497. However, the court cautioned that "Section 1512 is not satisfied simply because [the defendant]'s underlying crimes amounted to federal offenses" because "*Fowler* expressly rejected that argument, which would have reached too far." *Snyder*, 865 F.3d 497-98. Because "there is extensive overlap between state and federal crimes, the fact that the [alleged criminal conduct] *could be prosecuted* under [a federal statute], without more, does not satisfy § 1512." *Snyder*, 865 F.3d 498.

Here, there has been no evidence put forward that Ms. Birchmore intended or planned to communicate with *any* law enforcement regarding any of the conduct alleged by the government. The single instance of communication the government can point to – the Perlin call – was not made by Ms. Birchmore, was disavowed by Ms. Birchmore, and went to the SPD's business line as a personal call with no investigation ensuing in the subsequent twelve days. Only in the aftermath of Ms. Birchmore's death did local and state officials investigate any possible criminal conduct on the part of Mr. Farwell. For nearly *two years*, there was no indication that the government-alleged predicates would *ever* be prosecuted in federal court, nor were the alleged predicates charged here. Thus, the evidence fails to establish that Mr. Farwell would have contemplated a reasonable likelihood that at least one of Ms. Birchmore's communications regarding his alleged criminal conduct would have been to a federal law enforcement officer.

### ii. The second path presented by *Snyder.*

As to the second path – the government in *Snyder* argued that even if the robbery at issue were to be prosecuted in state court, "it is reasonably likely that [the victim] would have communicated with one of the federal officers assisting the [local] police." *Snyder*, 865 F.3d 498. The court then set out a fact-specific analysis as to how federal law enforcement would have engaged in the investigation, such as assisting with the cell phone extraction of the murder victim and identifying the defendant's tattoo. *See, Snyder*, 865 F.3d 498. Following its review, the court noted that the government did not meet the requirements for a conviction under § 1512, and collected cases demonstrating much "stronger showings of federal nexus." *Snyder*, 865 F.3d 499. Ultimately, the *Snyder* Court found that "[t]aken together, the evidence does not support a reasonable likelihood that [the victim] would have communicated with a federal officer if she had not been murdered. Without the murder, it is unlikely that the Circle K robbery would have been prosecuted in federal court[,]" nor did it support "a reasonable likelihood that any federal officer would have assisted in a capacity where he would have communicated with eyewitnesses." *Snyder*, 865 F.3d 499.

As outlined above, the evidence presented at trial is not sufficient to show that *if*, absent Ms. Birchmore's death, the underlying crimes were investigated and ultimately prosecuted, federal officers would have been involved in any way.

While *Fowler* does indicate that § 1512(a)(1)(C) reaches cases where a person was killed before s/he/they could communicate with law enforcement, *Fowler* and related cases do not suggest that the statute applies when (1) it is unclear whether criminal conduct even occurred, (2) it is unclear whether *any* investigation into the alleged criminal conduct was imminent, or even likely, (3) even if an investigation occurred, it would involve any entity other than local or state

law enforcement, and (4) even if the alleged criminal conduct were prosecuted, absent the killing (or even after a killing occurred), it would have been filed in state court. All four factors are at issue here. Even if there was underlying criminal conduct, absent Ms. Birchmore's death, there is no indication that any investigation or prosecution would occur at all, and if it did, that it would involve federal law enforcement. Therefore, the evidence presented at trial fails to establish the communication required by § 1512(a)(1)(C).

Moreover, Special Agent Kelsch's October 28th testimony that she always interviews eyewitnesses and victims is irrelevant without evidence that the criminal conduct alleged in this case, even if true and proven, would have *ever* reached S.A. Kelsch or federal law enforcement. This is particularly so when following the *Fowler* Court's "counterfactual world." *Snyder*, 865 F.3d at 496. When viewing the entirety of the evidence presented, it does *not* suggest, let alone show a reasonable likelihood that Ms. Birchmore would have communicated with S.A. Kelsch, federal law enforcement, *or* local law enforcement for the purposes of reporting or informing on any alleged criminal misconduct by Mr. Farwell. Thus, the government has not met the "reasonable likelihood" threshold required under § 1512(a)(1)(C) and *Fowler*. Judgement of acquittal is therefore required.

**D. The Government Has Failed To Show The Commission Or Possible Commission Of The Federal Offenses Alleged In The Superseding Indictment**

**i. Deprivation of Rights Under Color of Law.**

To show Mr. Farwell violated 18 U.S.C. § 242, the government must prove that he (1) acted under color of law; (2) to deprive Sandra Birchmore of a constitutional right . . . secured by the Fourteenth Amendment to be free from sexual contact while under the age of 16 years old, and (3) that the defendant acted willfully.

At trial, the government produced a series of text messages between Mr. Farwell and a

then-20- or 21-year-old Ms. Birchmore from 2019 and 2020 engaging in sexual texting that discussed and engaged in sexual banter scenarios where the Mr. Farwell describes allegedly or fantastically digitally penetrating Ms. Birchmore and taking her virginity, an event Ms. Birchmore claimed occurred on April 10, 2013, when she was one month shy of her sixteenth birthday. *See*, *e.g.*, Exhibit 146, 432. The government also elicited testimony that Ms. Birchmore reported to others that Mr. Farwell took her virginity. Notwithstanding, there is no extant contemporaneous evidence as to when and if these *sexual* encounters in fact occurred.

The government also introduced evidence that in 2013 Ms. Birchmore's mother reported that a police officer tutored Ms. Birchmore in the public library. *See*, Exhibit 148. And on May 30, 2013, Ms. Birchmore discussed irregular menses and birth control pills with a new doctor. *See*, Exhibit 149.

Assuming arguendo that Mr. Farwell engaged in the conduct described above, there is insufficient evidence from 2013 to show that he did so "'in the course of performing an actual or apparent duty of his office.'" *Pike v. Budd*, 133 F.4th 74, 83 (1st Cir. 2025) (quoting *Martinez v. Colon*, 54 F.3d 980, 986 (1st Cir. 1995)). Though "'acting under color of law' includes 'acting under pretense of law' for purposes of a state action analysis, there can be no pretense if the challenged conduct is not related in some meaningful way either to the officer's governmental status or to the performance of his duties." *Colon*, 54 F.3d at 987. Here, the government did not present evidence that Mr. Farwell's alleged conduct was related in a meaningful way to his official status or duties.

**ii. Coercion and Enticement**

To show that Mr. Farwell violated 18 U.S.C. § 2422(b), the government must prove that he (1) knowingly persuaded, induced, enticed, or coerced a victim to engage in sexual activity,

(2) he did so by using a facility or means of interstate or foreign commerce, (3) the victim at the time was under the age of 16 years old, and (4) the sexual activity was a criminal offense.

The evidence presented in the previous section is also relevant here. Additionally, the government introduced Exhibit 115 to show that Mr. Farwell made a Facebook Friend request to Ms. Birchmore on October 28, 2012. *See* Exhibit 115. The defense then presented Exhibit 749, showing Mr. Farwell, on December 27, 2012, removed Ms. Birchmore as a Facebook Friend. When Ms. Birchmore made a Friend request on April 29, 2015, that request was rejected. *See* Exhibit 380. There were no similar records introduced into evidence that come from the 2013 time period.

A Facebook Friend request without more does not establish coercion or enticement under § 2422(b). The texts in 2019 and 2020, when Ms. Birchmore was a consenting adult, without more, fail to show any sexual activity that was a criminal offense.

**iii. Wire Fraud.**

To show Mr. Farwell violated 18 U.S.C. § 1343, the government must prove that (1) there was a scheme to defraud, by means of false or fraudulent pretenses, representations, or promises in order to obtain money or property, (2) the scheme to defraud involved the misrepresentation or concealment of a material fact or matter, or the scheme to obtain money or property by means of false or fraudulent pretenses involved a false statement, assertion, half-truth, or knowing concealment concerning a material fact or matter, (3) that the defendant knowingly and willfully participated in this scheme with the intent to defraud, and (4) that for the purpose of executing the scheme or in furtherance of the scheme, the defendant caused an interstate or foreign wire communication to be used, or it was reasonably foreseeable that for the purpose of executing the scheme or in furtherance of the scheme, an interstate or foreign wire communication with be

used.

The government has failed to show that Mr. Farwell engaged in conduct that constitutes wire fraud, as would be required to obtain a conviction under § 1512. There was no evidence introduced at trial that Mr. Farwell acted with the specific intent to defraud the Stoughton Police Department or the Town of Stoughton, or with the purpose to deceive the Stoughton Police Department or the Town of Stoughton. There was no evidence of a policy that Mr. Farwell violated, or a policy that prohibited particular conduct during break periods. There was no evidence that Mr. Farwell violated the one requirement, testified to by Deputy Chief Holmes and Chief McNamara, that when an SPD employee takes a break, s/he remains accessible by phone and immediately respond when called in. There was no evidence showing that Mr. Farwell failed to perform his duties or failed to respond when called by the SPD. There was no evidence showing that Mr. Farwell worked fewer than the required 40 hours a week, such that he was obtaining payment for work he did not do. Therefore, the government did not show that Mr. Farwell engaged in criminal conduct in connection with his time and attendance at SPD.

## II. A JUDGMENT OF ACQUITTAL AS TO COUNT TWO IS REQUIRED UNDER FEDERAL RULES OF CRIMINAL PROCEDURE 29

Because Count Two is inextricably tied to a violation of a predicate offense – in this case, Count One charging a violation of 18 U.S.C. § 1512 – this Court's review of the sufficiency of the evidence rises and falls on Count One. Therefore, the government's failure to prove Count One beyond a reasonable doubt necessitates a judgment of acquittal on Count Two. *See* 18 U.S.C. § 1841(a)(1) and (b)(1). Judgement of acquittal is required.

## CONCLUSION

As the examples above demonstrate, the evidence presented to the jury did not prove beyond a reasonable doubt that Mr. Farwell killed Ms. Birchmore and did not prove the federal nexus required for a conviction under 18 U.S.C. § 1512(a)(1)(C). This Court should find him acquitted of both Counts One and Two of the Superseding Indictment.

Dated: November 6, 2026

Respectfully submitted,

MATTHEW FARWELL,
By his attorneys,

*/s/ Joanne M. Daley*
Joanne M. Daley, BBO # 653375
Kimberly C. Stevens, NC State Bar # 20156
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061
Joanne_daley@fd.org

## CERTIFICATE OF SERVICE

I, Joanne M. Daley, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on November 6, 2026.

*/s/ Joanne M. Daley*
Joanne M. Daley